Nick J. Brustin, NY Bar No. 2844405
  Email: nick@nsbcivilrights.com
Anna Benvenutti Hoffmann, NY Bar No. 4412011
  Email: anna@nsbcivilrights.com
Danielle Hamilton, NY Bar No. 5352653
  Email: danielle@nsbcivilrights.com
NEUFELD, SCHECK AND BRUSTIN, LLP
99 Hudson Street, 8th Floor
New York, NY 10013
Telephone: (212) 965-9081
Facsimile: (212) 965-9084

Kate Chatfield, State Bar No. 245403
  Email: chatfield@legalprivilege.ch
Alex Reisman, State Bar No. 45813
LAW OFFICE OF CHATFIELD AND REISMAN
32 Boardman Place
San Francisco, CA 94103
Telephone: (415) 255-9076
Facsimile: (415) 520-5876

Attorneys for Plaintiff
JAMAL RASHID TRULOVE

1
2
3

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION

| | |
|---|---|
| 4 JAMAL RASHID TRULOVE, | Case No. |
| 5      Plaintiff, | |
| 6         vs. | **COMPLAINT** |
| 7 THE CITY AND COUNTY OF SAN | **AND** |
| 8 FRANCISCO, ETC., MAUREEN D'AMICO, | **DEMAND FOR JURY TRIAL** |
| 9 MICHAEL JOHNSON, ROBERT MCMILLAN, | |
| 10 MICHAEL ANDROVICH, FRANCIS HAGEN, | |
| 11 CARLA LEE, KEVIN NOBLE, SHAWN | |
| 12 PHILLIPS, ANTHONY RAVANO, JAMES | |
| 13 TRAIL, JAMES AHERNE, ROBERT | |
| 14 DANIELE, JENNIFER JACKSON, DANIEL | |
| 15 SILVER, DONNA MEIXNER, JOHN F. | |
| 16 MURPHY, MICHAEL STASKO, and | |
| 17 STEPHEN TITTEL, and JOHN DOE | |
| 18 OFFICERS 1-10, in their individual | |
| 19 capacities, | |
| 20      Defendants | |

21

22      Plaintiff JAMAL RASHID TRULOVE, by and through his attorneys, the law firms of

23 Neufeld, Scheck & Brustin, LLP, and the Law Office of Chatfield and Reisman, hereby alleges

24 as follows:

25
26
27
28

COMPLAINT, Case No.                                                                Page 2

**INTRODUCTION**

1. Plaintiff Jamal Rashid Trulove was sentenced to 50 years to life in prison and spent over six years imprisoned for a crime that he did not commit—the July 2007 murder of Seu Kuka.

2. Mr. Trulove's wrongful conviction was the result of serious misconduct by the San Francisco Police Department (SFPD) officers investigating the Kuka shooting. SFPD Defendants manipulated an eyewitness, Priscilla Lualemaga, into misidentifying Mr. Trulove as the shooter.  Defendants then hid the blatantly improper means they had used to obtain the misidentification, which was only uncovered through a remarkable coincidence after Mr. Trulove's wrongful conviction.

3. No physical or forensic evidence ever inculpated Mr. Trulove. Because Mr. Trulove always said—truthfully—that he was innocent, no statements implicated him, either. The sole evidence incriminating him was the misidentification unlawfully procured by the SFPD Defendants.

4. Even before Defendants' most blatant misconduct was revealed, it was clear Ms. Lualemaga was, at best, a questionable witness.  Although Ms. Lualemaga testified at the time of trial that she was certain in her identification of Mr. Trulove, she had initially failed to identify him, and had been paid over $60,000 in living expenses in exchange for her testimony. What the jury that convicted Mr. Trulove did not know, however—because Defendants hid it—was that Defendants had directly suggested to Ms. Lualemaga that she should identify Mr. Trulove.

5. Mr. Trulove's conviction was reversed on direct appeal by the California Court of Appeals. After retrial, Mr. Trulove was acquitted in March, 2015. He had by then spent over six years incarcerated for a crime he did not commit.

6. At the time of his wrongful arrest, Mr. Trulove was a young father. He was also an aspiring actor and hip hop performer who had recently appeared on the national

television program I Love New York 2. As a result of his wrongful conviction and six years of wrongful imprisonment, he was torn away from his family and his budding acting and musical career.

### JURISDICTION

7. This Court has federal question jurisdiction, pursuant to 28 U.S.C. § 1331, over the claims arising out of violations of the United States Constitution.

8. Jurisdiction is conferred by 28 U.S.C. § 1343, which provides for original jurisdiction of this Court in suits authorized under 42 U.S.C. § 1983 to redress the deprivation (under color of state law, statute, ordinance, regulation, custom, or usage) of any right, privilege, or immunity secured by the Constitution of the United States or by any act of Congress providing for equal rights of citizens of all persons within the jurisdiction of the United States.

9. This Court has supplemental jurisdiction over Plaintiff's pendent state law claims pursuant to 28 U.S.C. § 1367 (a).

### VENUE

10. Pursuant to 28 U.S.C. § 1391(b), venue is proper in the Northern District of California, the judicial district in which the claims arose and in which the Defendants conducted business.

### PARTIES

11. Plaintiff JAMAL RASHID TRULOVE is, and at all times relevant herein was, an individual residing in the State of California.

12. Defendant CITY AND COUNTY OF SAN FRANCISCO is, and at all times relevant herein was, a public entity existing in the state of California. At all times relevant to this action, the San Francisco Police Department is and was a part of the City and County of San Francisco.

COMPLAINT, Case No.                                                                 Page 4

13. Upon information and belief, Defendant Inspector Maureen D'Amico is a resident of the State of California and of this judicial district. At all relevant times herein, D'Amico was a duly appointed and acting supervisor in the SFPD acting under color of law and in her individual capacity within the scope of employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City and County of San Francisco and the State of California.

14. Upon information and belief, Defendant Inspector Michael Johnson is a resident of the State of California and of this judicial district. At all relevant times herein, Johnson was a duly appointed and acting supervisor in the SFPD acting under color of law and in his individual capacity within the scope of employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City and County of San Francisco and the State of California.

15. Upon information and belief, Defendant Inspector Robert McMillan is a resident of the State of California and of this judicial district. At all relevant times herein, McMillan was a SFPD Officer acting under color of law and in his individual capacity within the scope of employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City and County of San Francisco and the State of California.

16. Upon information and belief, Defendant Officer Michael Androvich is a resident of the State of California and of this judicial district. At all relevant times herein, Androvich was a SFPD Officer acting under color of law and in his individual capacity within the scope of employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City and County of San Francisco and the State of California.

17. Upon information and belief, Defendant Officer Francis J. Hagen is a resident of the State of California and of this judicial district. At all relevant times herein, Hagen was a SFPD Officer acting under color of law and in his individual capacity within

the scope of employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City and County of San Francisco and the State of California.

18. Upon information and belief, Defendant Officer Carla Lee is a resident of the State of California and of this judicial district. At all relevant times herein, Lee was a SFPD Officer acting under color of law and in her individual capacity within the scope of employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City and County of San Francisco and the State of California.

19. Upon information and belief, Defendant Officer Kevin Noble is a resident of the State of California and of this judicial district. At all relevant times herein, Noble was a SFPD Officer acting under color of law and in his individual capacity within the scope of employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City and County of San Francisco and the State of California.

20. Upon information and belief, Defendant Officer Shawn Phillips is a resident of the State of California and of this judicial district. At all relevant times herein, Philips was a SFPD Officer acting under color of law and in his individual capacity within the scope of employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City and County of San Francisco and the State of California.

21. Upon information and belief, Defendant Officer Anthony Ravano is a resident of the State of California and of this judicial district. At all relevant times herein, Ravano was a SFPD Officer acting under color of law and in his individual capacity within the scope of employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City and County of San Francisco and the State of California.

22. Upon information and belief, Defendant Officer James Trail is a resident of the State of California and of this judicial district. At all relevant times herein, Trail was a SFPD Officer acting under color of law and in his individual capacity within the scope of employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City and County of San Francisco and the State of California.

23. Upon information and belief, Defendant Sergeant James Aherne is a resident of the State of California and of this judicial district. At all relevant times herein, Aherne was a SFPD Officer acting under color of law and in his individual capacity within the scope of employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City and County of San Francisco and the State of California.

24. Upon information and belief, Defendant Sergeant Robert G. Daniele is a resident of the State of California and of this judicial district. At all relevant times herein, Daniele was a SFPD Sergeant acting under color of law and in his individual capacity within the scope of employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City and County of San Francisco and the State of California.

25. Upon information and belief, Defendant Sergeant Jennifer Jackson is a resident of the State of California and of this judicial district. At all relevant times herein, Jackson was a SFPD Sergeant acting under color of law and in her individual capacity within the scope of employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City and County of San Francisco and the State of California.

26. Upon information and belief, Defendant Officer Daniel Silver is a resident of the State of California and of this judicial district. At all relevant times herein, Silver was a SFPD Officer acting under color of law and in his individual capacity within

the scope of employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City and County of San Francisco and the State of California.

27. Upon information and belief, Defendant Lieutenant Donna J. Meixner was at all times relevant to this Complaint a duly appointed and acting supervisor in the SFPD, acting under color of law and in her individual capacity within the scope of employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City and County of San Francisco and the State of California.

28. Upon information and belief, Defendant Lieutenant John F. Murphy was at all times relevant to this Complaint a duly appointed and acting supervisor in the SFPD, acting under color of law and in his individual capacity within the scope of employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City and County of San Francisco and the State of California.

29. Upon information and belief, Defendant Lieutenant Michael Stasko was at all times relevant to this Complaint a duly appointed and acting supervisor in the SFPD, acting under color of law and in his individual capacity within the scope of employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City and County of San Francisco and the State of California.

30. Upon information and belief, Defendant Captain Stephen M. Tittel was at all times relevant to this Complaint a duly appointed and acting supervisor in the SFPD, acting under color of law and in his individual capacity within the scope of employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City and County of San Francisco and the State of California.

31. Defendant Officer John Doe #1, whose actual name Plaintiff has been unable to ascertain notwithstanding reasonable efforts to do so, but who is sued herein by the fictitious designation "John Doe #1" is an white, male officer between 30 and 45 years old who was working at Ingleside Station on July 23-24, 2007 and

participated in the misconduct described herein.  John Doe #1 was at all times relevant to this Complaint a SFPD officer acting under color of law and in his individual capacity within the scope of employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City and County of San Francisco and the State of California. He is sued in his individual capacity.

32. Defendant John Does 2–10, whose actual names Plaintiff has been unable to ascertain notwithstanding reasonable efforts to do so, but who are sued herein by the fictitious designations "John Doe", represent those officers, detectives, supervisors, and/or other agents and employees of the SFPD, acting under color of law and in their individual capacities within the scope of employment or agency pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City and County of San Francisco and the State of California, who participated in the misconduct described herein.  They are sued in their individual capacities.

## **FACTUAL ALLEGATIONS**

Seu Kuka's Homicide

33. Shortly before 11:00 p.m. on July 23, 2007, 28-year-old Seu Kuka was fatally shot on a sidewalk in front of 140 Blythedale Avenue, in the Sunnydale Housing Projects in San Francisco, California.

34. Plaintiff Jamal Trulove is innocent of this crime—he had nothing to do with the murder of his friend, Seu Kuka.

Priscilla Lualemaga at Ingleside Station, July 23-24, 2007

35. Although there were as many as 25 people on the street at the time of the shooting, most fled at the time of the gunshots. However, Priscilla Lualemaga, who was standing in a second floor window at 140 Blythedale, uphill and to the west of

where Mr. Kuka was shot, came out from her apartment and told officers at the scene, including Officer Carla Lee, that she saw the shooting.

36. Immediately after the murder, Ms. Lualemaga was brought to the Ingleside Police Station and waited in a room. She was told by Officer Lee to examine a bulletin board with 34 photographs on it, which she did.

37. Ms. Lualemaga was looking at the bulletin board for over two hours while waiting to be interviewed by Inspectors Michael Johnson and Maureen D'Amico. Inspectors Johnson and D'Amico were the lead investigators of the Seu Kuka homicide. Pursuant to SFPD policies, practices and customs, Johnson and D'Amico directed all aspects of the investigation or were informed of the results.

38. The bulletin board at Ingleside Police Station had mug shots of Jamal Trulove, his younger brother, Joshua Bradley, and another brother, David Trulove. Mr. Trulove and his brothers were African-American young men who were raised in the Sunnydale Housing Projects.  By virtue of this fact, according to the SFPD, they were therefore suspected of being gang members. A "gang validation file" was started on Mr. Trulove when he was 12 years old.  In this first entry, Mr. Trulove was detained along with his younger brothers, then 7 and 8 years old, after these boys were in an argument on a basketball court. SFPD Officer Daniel Silver wrote that because Mr. Trulove was with his younger brothers and his friends, this met the San Francisco Police Department's "criteria" for gang membership as Mr. Trulove was "associating with future gang members."

39. The mugs hot of Jamal Trulove on the bulletin board at Ingleside Police Station was taken when he was arrested for his sole criminal conviction, a 2003 arrest for a violation of California Penal Code § 496, subd. (a), receipt of stolen property. Though Mr. Trulove successfully completed the sentence of probation he received for this offense, Mr. Trulove's photograph nevertheless remained on the Ingleside Police Station bulletin board in July 2007.

40. Joshua Bradley's photograph on the Ingleside Police Station bulletin board was below the photograph of Mr. Trulove. Mr. Bradley had non-violent, juvenile matters, the last of which was a juvenile probation violation in March of 2005. Regardless, his photograph remained on the Ingleside Police Station bulletin board in July 2007.

41. David Trulove's photograph on the Ingleside Police Station bulletin board was to the left of the photograph of Jamal Trulove. David Trulove had an adult conviction in 2000 of theft and a 2001 burglary conviction.  Six years after this second conviction, and despite the fact that he was not on probation and had not committed any subsequent offense, his picture remained on the Ingleside Police Station bulletin board in July 2007.

42. During the two hours that Ms. Lualemaga examined the bulletin board in the room at Ingleside Police Station, she reported to police that she recognized several men whose photographs were on the bulletin board. She later testified that she knew David Trulove "from a long time ago."

43. However, she never recognized, nor identified, Jamal Trulove at any time during these two hours as someone who was involved in any way in Seu Kuka's homicide.

44. At approximately 1:00am that night (the early morning hours of July 24, 2007), Inspectors Johnson and D'Amico came to meet with Ms. Lualemaga. Ms. Lualemaga was taken to an upstairs room in the station and interviewed by Inspectors Johnson and D'Amico.

45. A portion of the interview was tape recorded. Upon information and belief, Inspectors Johnson and D'Amico did not tape record their entire interview with Ms. Lualemaga.

46. During the recorded portion of the interview, Ms. Lualemaga alternatively told Inspectors Johnson and D'Amico that she had been staying at her grandmother's apartment for one week and that she had been living there for one year.

COMPLAINT, Case No.                                                      Page 11

47. Ms. Lualemaga then reported what she had seen, and was not able to see, from her second story window at 140 Blythedale Avenue. She reported that when she heard yelling, she looked out of her bedroom window.  She saw Seu Kuka chasing a young African-American male downhill, from west to east. While chasing this man downhill, Mr. Kuka "smashed" into another African-American man who was in Mr. Kuka's way.  Because Mr. Kuka hit him so hard, the second man fell to the ground hard.  Mr. Kuka continued running downhill, chasing the first man.

48. Ms. Lualemaga stated that the man who had been knocked down was "wearing a black hooded sweater."  Ms. Lualemaga reported that this second man got up, chased after Mr. Kuka, and shot Mr. Kuka at close range.

49. Ms. Lualemaga stated that this man was standing directly behind, to the west of, and uphill from Mr. Kuka.

50. Ms. Lualemaga later testified that she never actually saw a gun in this second man's hands.

51. Ms. Lualemaga then stated that a photograph of the man that Mr. Kuka was chasing—not the shooter—was on the bulletin board that she viewed. She also wrote this in a statement that night.

52. Ms. Lualemaga then stated that she did not know the man who Mr. Kuka was chasing.  She told officers, "I don't know him at all.  I don't even know his name."

53. However, she said that she had read his name on the photograph. This person was Joshua Bradley, whose photograph was immediately below Jamal Trulove's on the bulletin board.

54. As to the shooter, Ms. Lualemaga stated to Inspectors Johnson and D'Amico that she "didn't really get a good look at the shooter" as the fight and shooting happened "so fast."

55. In response to a direct question from Inspector D'Amico: "Do these guys have any distinguishing, like a tattoo on their face[1] that you can see or a piercing, or anything that would make them distinctive to us?" Ms. Lualemaga answered, "I can't really tell.  I can't remember."

56. Inspector D'Amico then asked Ms. Lualemaga, "If, if we were able to identify the shooter and put his picture in a line-up for you do you think you'd be able to pick him out?"  Ms. Lualemaga responded, "I think so."

57. Inspector Johnson next told Ms. Lualemaga that they could arrange to move her out of the neighborhood if she were a witness.

58. After the interview, Ms. Lualemaga then returned with Inspectors D'Amico and Johnson to the bulletin board and pointed out Joshua Bradley's photograph, directly below Jamal Trulove's photograph.

59. At this time, Ms. Lualemaga never identified Mr. Trulove's picture as that of someone involved in Mr. Kuka's shooting, as someone who was present that night, nor indicated in any way that she recognized him as associated with Joshua Bradley.

Officer Lee and John Doe #1 directly suggest that Ms. Lualemaga identify Jamal Trulove as the shooter, but are initially unsuccessful

60. Upon information and belief, there were numerous conversations between Ms. Lualemaga and officers at Ingleside Station on July 23-24, 2007 which were never documented or recorded.

61. One conversation happened to be witnessed by a 17-year-old boy, Oliver Barcenas. This conversation, between Ms. Lualemaga, Officer Lee, and John Doe #1, was not

---

[1] Jamal Trulove has, and had in July 2007, a large tattoo on his neck that reads "Cheryl Trulove."

documented or memorialized by San Francisco police officers or, if it was, was concealed.

62. John Doe #1 was holding a clipboard and pointing to what seemed to be a photograph. As he pointed to the clipboard, this officer asked Ms. Lualemaga, "Are you sure it wasn't Jamal Trulove?"

63. Despite this direct pressure from Officer Lee and John Doe #1 to identify Jamal Trulove as the shooter, at that time Ms. Lualemaga responded "No, I don't know."

64. John Doe #1 was visibly frustrated by Ms. Lualemaga's refusal to identify Mr. Trulove at that time.

65. It would not be until three years later, after Jamal Trulove's conviction, that this conversation would be revealed.

66. Upon information and belief, SFPD officers, including Officers Lee and John Doe #1 and others, improperly suggested, pressured, and/or coerced Ms. Lualemaga to identify Mr. Trulove as the shooter. These conversations did not happen to be witnessed by neutral observers who would later have an opportunity to report it.

67. Upon information and belief, these conversations were made at the direction of Inspectors D'Amico and Johnson and/or they were made aware that conversations occurred.

68. Sometime in the early morning hours of July 24, 2007, Inspectors D'Amico and Johnson drove Ms. Lualemaga to her home.

Officers visit Priscilla Lualemaga's home on the evening of July 24, 2007

69. Inspector Johnson, Inspector McMillan, Officer Androvich, and Officer Trail went to Ms. Lualemaga's apartment building, 140 Blythedale Avenue, on July 24, 2007 at approximately 5:00 p.m. Upon information and belief, Inspector D'Amico knew or was made aware of this meeting.

70. Upon information and belief, the officers continued to exert direct pressure on Ms. Lualemaga to identify Mr. Trulove as the shooter at this meeting.

71. Any conversation had with Ms. Lualemaga was not disclosed.

The Computer Generated Line-Ups Created by Inspectors on July 25, 2007

72. On July 25, 2007, Inspectors D'Amico and Johnson, using a computer database of mug shots, created four photographic line-ups.

73. Photographic lineups generally contain six photographs of individuals: one suspect and five fillers.

74. Officer Johnson testified in 2015 that officers would create line-ups by calling up the latest mugs hot of the suspect on a computer.  The officer would then enter in features of the suspect—skin tone, eye color, height—and the computer would bring up photographs of fillers, people with similar features. The officer would then review these suggested photographs and discard those photographs where a filler has a distinguishing feature on a face, such as a bandage or tattoo, or when the clothing between photographs is dissimilar.

75. Using this standard procedure, officers created four photographic line-ups of Jamal Trulove, David Trulove, Israel Benson, and Joshua Bradley.  According to Inspector Johnson, these names and names of other people had been provided to the homicide inspectors from Inspector Robert McMillan.

Inspectors D'Amico and Johnson hide exculpatory evidence and/or use improper identification procedures to obtain a misidentification of Mr. Trulove from Ms. Lualemaga

76. Within two hours of creating these line-ups, on July 25, 2007, Inspectors D'Amico and Johnson went to Ms. Lualemaga's work.  These officers had Ms. Lualemaga speak to them in their car after driving a few blocks away from her work with her.

COMPLAINT, Case No.                                                                                    Page 15

77. In their car, the inspectors showed Ms. Lualemaga a different photographic line-up than the ones they created—they showed her a line-up of six photographs of all suspects for the Seu Kuka homicide. One of the six photographs was of Jamal Trulove. This photograph was the <u>exact same photograph</u> that was on the bulletin board that she did not recognize nor identify the previous day.

78. The inspectors next audio recorded some portion of their conversation with Ms. Lualemaga. Upon information and belief, this conversation was not audio recorded in its entirety.

79. In the portion of the conversation that was recorded, Inspector D'Amico read the standard admonitions regarding line-ups.  One of these admonitions, and perhaps the most important one, tells the witness, "The person who you saw commit the crimes may or may not be in this group of photographs."

80. However, Ms. Lualemaga testified that before the inspectors met with Ms. Lualemaga on July 25, 2007, they informed her that they had identified someone as the shooter and would be showing her his photograph.

81.  This was in addition to what Inspector D'Amico had stated at Ingleside Station on July 24, 2007, "If, if we were able to identify the shooter and put his picture in a line-up for you do you think you'd be able to pick him out?"  These separate statements to Ms. Lualemaga rendered the most important admonition meaningless.

82. On July 25, 2007, Ms. Lualemaga did what San Francisco police officers had earlier asked her to do.  She picked out Jamal Trulove's photograph—the <u>same</u> photograph that she had been with for hours before on July 24, 2007 and had failed to recognize or identify in any way—and said of Jamal's photograph, "Um, he looks like the person that could have shot Seu" and "the shooter, I want to say it's him."

83. After this equivocal identification, Inspector D'Amico asked Ms. Lualemaga, "Did you see a photograph of Number 6 (Jamal) up on the board that you recognized?" Ms. Lualemaga replied, "No."

84. Upon information and belief, Inspectors D'Amico and Johnson were determined to get Ms. Lualemaga to identify Jamal Trulove. Either they showed Ms. Lualemaga the four photographic line-ups and, when Ms. Lualemaga failed to identify anyone in the line-ups as the individual who shot Seu Kuka, never disclosed the exculpatory results; or they deliberately chose not to use the four proper photographic line-ups, and instead showed Ms. Lualemaga an improper line-up of all suspects, including a photograph of Mr. Trulove that she had seen before.

85. Either way, there was no attempt on the part of law enforcement to abide by any proper identification procedures, such as double-blind line-ups in which the person administering the line-up does not know who the suspect is; line-ups that actually match the description of the person given by the witness; line-ups in which the suspects actually match one another; or a line-up in which there is one suspect and multiple fillers.

Officers search Mr. Trulove's home, and find nothing connecting him to the Seu Kuka homicide

86. Even with the officers' improper assistance, Ms. Lualemaga's identification of Mr. Trulove as the shooter was, at best, equivocal and uncorroborated. Given this unreliability, officers needed additional evidence to seek an arrest warrant.

87. In August of 2007, San Francisco police officers conducted a thorough search of Joshua Bradley and Jamal Trulove's home in Oakland.  They found nothing there— no gun, no ammunition, no gang indicia, no photographs of guns, and no contraband of any sort.  They found nothing connecting Mr. Trulove in any way to Seu Kuka's homicide.

88. With no evidence of any kind to corroborate Ms. Lualemaga's identification of Mr. Trulove as the shooter, officers did not seek an arrest warrant.

<u>With an unreliable identification and no evidence tying Mr. Trulove to the crime, officers directly suggest another misidentification of Mr. Trulove</u>

89. Nothing of note would happen in the case for approximately 10 months.

90. On June 18, 2008, at approximately 5:30 p.m., San Francisco Police Officers Aherne and Hagen and Inspector McMillan of Gang Task Force were in the Hunter's Point area of San Francisco and conducted a search of a car located near the center of narcotics trafficking. Latisha Meadows-Dickerson was in the passenger seat of the car.

91. Officers found cocaine and heroin in the car. Latisha Meadows-Dickerson stuffed a loaded 9mm semi-automatic firearm into her pants when police arrived.

92. The gun had been reported stolen out of Fairfield, CA.  Ms. Meadows-Dickerson had two prior serious felonies, or "strikes"—a prior adult robbery conviction and a juvenile robbery disposition.

93. Instead of charging Ms. Meadows-Dickerson with a crime, which would have been her third "strike," officers asked her if she had any information for them. Ms. Meadows-Dickerson told them that she had seen Seu Kuka's murder.  After speaking with officers, a portion of which was recorded, Ms. Meadows-Dickerson was driven home by officers, uncharged.

94. In addition to Ms. Meadows-Dickerson's obvious incentive to lie, her statement was incredible on its face. In her recorded statement with Inspectors Johnson and McMillan and Officer Hagen, Ms. Meadows-Dickerson says "Kamal" then "Jamal," shot and killed Mr. Kuka at around 5:00 or 6:00 p.m. one evening.  Mr. Kuka was actually shot at almost 11:00 pm on July 23, 2007.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

95. Ms. Meadows-Dickerson told officers that when Mr. Kuka was killed "it was still light outside." Inspector McMillan attempted to correct her, saying, "It was dark. Was it not? Was it dark?" Ms. Meadows-Dickerson then said that it was "twilight."

96. According to Ms. Meadows-Dickerson, Mr. Kuka and Jamal Trulove got in a fight in front of her building. This building was up the hill and across the street from 140 Blythedale. Ms. Meadows-Dickerson's unit was a substantial distance in from Blythedale Street.

97. Ms. Meadows-Dickerson said that Mr. Kuka, a man named Tuma Vaovasa, and Mr. Trulove then walked across Blythedale Avenue and Mr. Trulove then shot Mr. Kuka.

98. However, unknown to Ms. Meadows-Dickerson, Inspectors Johnson and D'Amico had spoken to Mr. Vaovasa months before, on September 5, 2007 at Ingleside Station. A recording of this conversation was never disclosed. In a brief note in the Chronological of Investigation, Mr. Vaovasa says he was coming out of a building across the street and up the block from where Mr. Kuka was killed. Mr. Vaovasa told officers that from where he was—where Ms. Meadows Dickerson claimed that she was also—he could not see the shooting. Mr. Vaovasa told officers that he was a friend of Mr. Kuka and wanted to assist the investigation.

99. Ms. Meadows Dickerson said that Mr. Kuka punched Jamal in the face and then Mr. Kuka, Jamal, and Mr. Vaovasa walked across the street. She stated that she heard one shot and she saw Mr. Kuka get shot in the back of the head by Jamal Trulove. Mr. Kuka was actually shot nine times.

100.     It was also impossible to see where Mr. Kuka was killed from where Ms. Meadows-Dickerson claimed she was. Any officer who had been to the scene or had spoken to Mr. Vamoose—including Inspectors Johnson and D'Amico—would have known that Ms. Meadows-Dickerson's account of viewing the homicide from that location was impossible.

101.    Upon information and belief, officers engaged in suggestion to encourage Ms. Meadows-Dickerson's identification of Mr. Trulove and attempted to alter her statement to better fit the known facts of the murder.

<u>Officers rely on Ms. Lualemaga and Ms. Meadows-Dickerson's obviously unreliable statements to get an arrest warrant.</u>

102.    Officers used Ms. Meadows-Dickerson's statements, as well as Ms. Lualemaga's statements, to finally apply for an arrest warrant for Jamal Trulove.

103.    Approximately six weeks after Ms. Meadows-Dickerson's statement was obtained, on August 28, 2008, an arrest warrant was issued for Jamal Trulove for Seu Kuka's murder, based on the identifications made by Ms. Meadows-Dickerson and Ms. Lualemaga.

104.    In the application for this arrest warrant, Inspector Johnson described portions of Ms. Lualemaga's statements to police officers and her identification of Mr. Trulove on July 25, 2007.

105.    Inspector Johnson described Priscilla Lualemaga identifying Joshua Bradley from the bulletin board that she had been asked to view for two hours and brought the inspectors to see his photograph.

106.    However, Inspector Johnson completely failed to mention that this bulletin board had a picture of Mr. Trulove on it, immediately above that of Mr. Bradley.

107.    Inspector Johnson failed to note that inspectors showed her the same photograph of Jamal Trulove on July 25, 2007—the same photograph that was on the bulletin board and that she had failed to identify, or indicated in any way she had recognized on July 24, 2007.

108.    Inspector Johnson failed to note that from where Ms. Meadows-Dickerson said she was, up the street, and halfway into a parking lot from Blythedale Avenue, it was impossible to see Seu Kuka's shooting.

COMPLAINT, Case No.                                                          Page 20

109. Inspector Johnson wrote that Ms. Meadows-Dickerson stated that the homicide happened at "night (she thought it was early evening.)"  Inspector Johnson did mention that the homicide occurred at 10:49 p.m., but failed to note that Ms. Meadows-Dickerson stated multiple times in her statement that it was still light out.

110. Inspector Johnson failed to write that Ms. Meadows-Dickerson's story about Tuma Vaovasa had been contradicted by Mr. Vaovasa himself, months earlier when he was interviewed by Inspectors Johnson and D'Amico.

111. Ms. Meadows-Dickerson was never called to testify by the prosecution, at Mr. Trulove's preliminary hearing, first trial, or re-trial.

Payments to Priscilla Lualemaga

112. Priscilla Lualemaga, on whose testimony the prosecution rested their entire case, was offered much by the state in exchange for her identification of Jamal Trulove.  This identification grew increasingly certain as she, and her family, received tens of thousands of dollars in benefits.

113. On July 23, 2007, it was unclear how long Ms. Lualemaga had been living in her grandmother's small, two- bedroom apartment with six other people:  her grandmother, her sister, her sister's boyfriend, her sister's two children, and Priscilla's then-boyfriend.

114. In the course of her recorded statement on July 24, 2007, Ms. Lualemaga gave various stories about how long she was there and the circumstances of her living arrangement.  She told inspectors that she had been there one week housesitting and also that she had been there one year.

115. Under oath, during Jamal Trulove's first trial she gave yet another version of her living situation: that she was just staying at her grandmother's during the work week so she did not have to commute from South San Francisco.  (South San

Francisco is approximately five miles from the Sunnydale Housing Projects, a ten-minute drive by car.)

116. At Mr. Trulove's second trial, in 2015, she testified that she was living at her grandmother's home.

117. What was clear was that Ms. Lualemaga was not on the Housing Authority lease and thus, could not legally reside there.  Ms. Lualemaga was effectively homeless.

118. What was also clear was that Ms. Lualemaga wanted to move from her present situation.  One of the first things she said to inspectors was that she and her boyfriend wanted to move out of the Sunnydale housing projects to the East Bay.

119. In her recorded conversation on July 24, 2007, Inspector Johnson informed Ms. Lualemaga that she could be moved if she were a witness.

120. Then, in May 2009, prior to her testimony at the preliminary hearing, she asked for, and began to receive, all living expenses paid for her and her family.

121. This assistance continued for almost two years, until April 30, 2011.

122. From June 1, 2009 until April 30, 2011, Ms. Lualemaga and her immediate family received $62,999.00 as payment for all living expenses.

123. Then, just prior to her testimony at Mr. Trulove's trial, Ms. Lualemaga also asked for benefits for her sister, a non-witness, and the prosecution paid almost $10,000 in living expenses for her sister.

124. At each stage of the proceedings, Ms. Lualemaga's statements and testimony became increasingly certain.

125. On July 24, 2007, Ms. Lualemaga told officers that the shooter was in a black hooded sweater and she did not get a good look at him because it happened "so fast."

126. On July 25, 2007—after an unrecorded phone call with officers, a conversation at her work, and possibly after a conversation the evening before at her grandmother's home—when presented with the same photograph of Jamal Trulove that she had not identified on July 23-24, 2007, Ms. Lualemaga stated that Jamal Trulove, "looked like the guy that could have shot Seu."

127. On May 19, 2009, after starting to receive benefits, at Jamal Trulove's preliminary hearing, Ms. Lualemaga positively identified Jamal Trulove as the shooter.

128. On May 19, 2009, at Jamal Trulove's preliminary hearing, Ms. Lualemaga identified Jamal Trulove as the man outside her window and said he shot Seu, but when asked twice, once by the prosecution and once by the defense, said she could not remember if the shooter's hood was up or down.

129. At the preliminary hearing, she testified that she could not remember whether she had seen Jamal Trulove earlier on July 23, 2007.

130. By January 2010, after she had been receiving benefits for six months and after her sister had also started to receive benefits, Ms. Lualemaga was "100% certain" that Trulove was the shooter. By this point, she had "remembered" that the shooter's hood was down. She also remembered that she had seen Jamal with Seu earlier in the day on July 23, 2007.

131. Officers explained every inconsistency in Priscilla Lualemaga's statements and testimony as having been caused by her fear. Ms. Lualemaga testified that she did not tell police that Jamal Trulove was the shooter because she was afraid of having to testify.

132. In fact, officers' explanation of fear was only to hide their misconduct—directly suggesting, coercing, and offering benefits to Ms. Lualemaga to obtain a false identification of Mr. Trulove.

Conviction and Sentence

133. On February 9, 2010, based on the identification by Ms. Lualemaga, and without knowledge of the direct suggestion used to procure it, Jamal Trulove was convicted of the first-degree murder of Seu Kuka; the use of a firearm enhancement was found true.

134. On October 15, 2010, at his sentencing, Jamal Trulove addressed Seu Kuka's family.

135. Mr. Trulove said, "I know y'alls whole family. I was raised with Seu. Seu was one of my best friends. I fought this case. I fought this case in a matter of innocence, because I know I didn't do it. . . everybody that was out there from – you know, Rosa, and all of them, they all know I didn't do it.. . .Because me, Seu not resting peacefully, if that's what you guys wanted, for him to rest peacefully, with somebody – with just anybody with a conviction, the wrong person was convicted. And, you know, I'm going to sleep with this on my heart all the time. I would not have took a year in this jail and admitted to something that I did not do. Period. I just want to say, I didn't do it. I didn't do it."

136. Judge Carol Yaggy sentenced Mr. Trulove, saying, "Mr. Trulove, your actions in this case were unspeakably vicious and brutal . . . By these callous acts, you have forfeited your right to live here in this community for many years."

Mr. Trulove learns of SFPD misconduct in his case from Oliver Barcenas

137. After Jamal Trulove was convicted in January 2010 and awaiting sentencing in San Francisco County Jail, he was placed in a 12-person cell. A young man named Oliver Barcenas was also housed in this cell.

138. Mr. Trulove and Mr. Barcenas are from different parts of the city, of different ethnicities, and had no connection prior to being housed together.

139. While in this cell together, Mr. Barcenas saw Jamal Trulove's large neck tattoo that reads "Cheryl Trulove."  Mr. Barcenas remembered the name "Trulove" as he had heard it years before, while he was sitting at Ingleside Station on the night of July 23-24, 2007.

140. On that night, July 23-24, 2007, Mr. Barcenas was brought to Ingleside Station and handcuffed to a bench in an open room.  While he was sitting there, he saw John Doe #1, a white, male officer dressed in plain-clothes, with a uniformed female officer with short hair, Officer Carla Lee.  With these two officers was a "Samoan lady or girl" who was heavy built, with her hair in a bun.

141. Mr. Barcenas recalled that he first heard the name "Trulove" from John Doe #1.

142.  Mr. Barcenas testified that John Doe #1 held a clipboard, and was pointing out something on the clipboard to the Samoan woman.  As he was pointing, the officer asked this woman, "Are you sure it wasn't Trulove?"

143. Mr. Barcenas testified that at the time he thought the first name was something like "Jeremiah or Jermaine." Mr. Barcenas definitely remembered the name "Trulove" as "the last name was distinctive.  I never heard a last name like that, Trulove."

144. Mr. Barcenas could not see what was on this clipboard that was being shown to this Samoan woman.  He recalled that she responded to this repeated suggestion that it was "Trulove" with, "No I don't know."

145. In response to this, John Doe #1 held his hand over his eyes and pulled his hand down his face.  Mr. Barcenas testified that John Doe #1 looked "frustrated" by the woman's response.

146. Mr. Barcenas was able to draw a diagram of the room at the Ingleside Police Station where this occurred.  He could hear this conversation because he was only 10-12 feet away from this unfolding scene.

147. Mr. Barcenas did not think about this conversation for three years until he saw Jamal Trulove and read the tattoo of his mother's name on his neck.

148. Police reports reveal that Mr. Barcenas was, in fact, arrested on Mission Street on July 23, 2007. Mr. Barcenas and his co-defendant were brought to Ingleside Station on the night of July 23 to 24th, 2007 and he was there at the same time as Ms. Lualemaga.

149. Police reports also revealed that Ms. Lualemaga was brought to Ingleside Station by Officer Lee.

Appeal and Reversal

150. Mr. Trulove's family, who always believed in his innocence, hired attorney Marc Zilversmit to represent Mr. Trulove on appeal.

151. In September 2013, the California Court of Appeal upheld Trulove's convictions, but reduced the murder conviction from first-degree to second-degree murder.

152. Mr. Zilversmit petitioned the court to rehear the case and the appellate court agreed. On January 6, 2014, the First District Court of Appeal filed its opinion reversing Jamal Trulove's conviction and sentence. The appellate court held that the prosecution had committed misconduct by arguing that Ms. Lualemaga had faced threats which caused her to fear for her life.

153. The appeals court, in a unanimous opinion written by Presiding Justice Anthony Kline, said the prosecution "did not present a scintilla of evidence" of any threats. "This yarn was made of whole cloth." The court held that the prosecution's argument was improper and likely prejudiced the jury.

154. The Attorney General petitioned the California Supreme Court for Review. On April 16, 2014, the Supreme Court declined review and on April 21, 2014, the remittitur issued. Mr. Trulove returned to San Francisco County Jail, awaiting his re-trial.

Re-Trial

155.    Mr. Trulove's re-trial began in January 2015.

156.    Ms. Lualemaga again testified and identified Trulove as the gunman who shot
Seu Kuka running downhill from east to west.

157.    Regarding her fear in testifying, on cross-examination, Ms. Lualemaga testified
that:  1) Jamal Trulove had never threatened her; 2) nobody associated with
Jamal Trulove had ever threatened her; and 3) nobody ever threatened her in
connection with being a witness in this case.  She testified that her fears were
based on other things she had seen on television, unrelated to this case.

Forensic evidence disproves the case against Mr. Trulove

158.    At Mr. Trulove's re-trial, a crime scene reconstruction and ballistics expert,
James Norris, and forensic pathologist, Dr. Judy Melinek, each testified that
based on their analysis of the casings and the bullet entry wounds and wound
trajectories, the only reasonable interpretation of the evidence was that Kuka
was shot from someone who was below him, running up the street—not down
the street as Ms. Lualemaga thought—and from west to east, not east to west.

159.    Mr. Norris, the former director of the San Francisco Crime Lab and an expert in
crime scene reconstruction, testified regarding the ejection patterns of firearms,
the pattern of the casings found at the scene, and the bullet trajectories through
the body of Mr. Kuka.  Mr. Norris testified that the pattern of the casings, found
in sandy soil, in a line leading up to the body of Mr. Kuka, along with the autopsy
findings, of the entrance and exit wounds of the bullets, revealed that the
shooter moved uphill toward Mr. Kuka in an east to west direction.

160.    If Ms. Lualemaga actually saw what she thought she saw, the casings would
have been together in a group, uphill from the body.  This group of casings

COMPLAINT, Case No.                                                    Page 27

either would have been on the sidewalk or on the street, depending on how the gun was held.

161.   Dr. Judy Melinek worked at the San Francisco Medical Examiner's office at the time of Mr. Kuka's homicide and was in the autopsy theater during the autopsy. At the time of Mr. Trulove's re-trial, Dr. Melinek was an Assistant Professor of Clinical Pathology at the University of San Francisco Medical Center and worked on a contract basis for the Alameda County Medical Examiner's Office.  Dr. Melinek also lectured nationally and internationally on anatomic and forensic pathology, training doctors and attorneys on neuropathology and wound interpretation.

162.   Dr. Melinek visited the scene of the homicide at night prior to testifying.  After reviewing all the forensic evidence, Dr. Melinek testified that the only reasonable interpretation of the evidence was that Seu Kuka was shot and killed by someone who was standing downhill at a distance from him.  Dr. Melinek testified that Priscilla Lualemaga's version of events—that the shooter was uphill from Seu Kuka and shot him from behind at close range—was contradicted by the physical evidence.

163.   Ms. Lualemaga was shown photographs taken from her window during daytime.  These photographs revealed that Ms. Lualemaga could not see far enough down the street to see where the shooter was.

164.   Dr. Kathy Pezdek, a professor and researcher since 1975 in the area of cognitive psychology, testified regarding human memory and perception.

165.   Dr. Pezdek opined that given the distance and lighting of the scene, the exposure time available to Ms. Lualemaga to perceive events, her position in a window with a limited view, her lack of focus on the person who got knocked down, and the distractions of the scene, Ms. Lualemaga had an inability to

COMPLAINT, Case No.                                                                                    Page 28

accurately perceive what actually happened—where the shots came from and who was the shooter.

166.   On March 11, 2015, Mr. Trulove was acquitted on all counts.

Mr. Trulove's wrongful imprisonment

167.   At the time of Mr. Trulove's arrest in October 27, 2008, he was living in Seaside, California with his two oldest sons, Milli and Jeremyah, and the boys' mother, Martha.  Milli was then 4 years old and Jeremyah was 18 months old.

168.   Jamal also had infant twins, a girl, Mo'neke, and a boy, Lamari'a.  The twins had just had their first birthday at the time of Mr. Trulove's arrest.

169.   Mr. Trulove was imprisoned in San Francisco County Jail until November 2010. Just before his 26th birthday, Mr. Trulove was sent to San Quentin State Prison (San Quentin).  His four children were then 7, 3, and 2 years old.

170.   Mr. Trulove was housed in the Reception Center at San Quentin for approximately four months.  Within a few days after he arrived at San Quentin, guards announced to Mr. Trulove that he was going to be housed with a notorious prisoner who had just left death row.  Guards taunted Mr. Trulove with this information.

171.   Mr. Trulove, new to prison, was not then, nor ever was, a member of a prison gang.  He was a "civilian."

172.   However, this man that Mr. Trulove was housed with was allegedly a leader in a black prison gang, known as "Kumi."

173.   Mr. Trulove, who had been in the cell first, had the bottom bunk.  This is the coveted bunk in a prison cell.  Mr. Trulove's new cellmate did not ask for the bottom bunk, nor did Mr. Trulove offer the bottom bunk to his new cellmate.

174. Members of Kumi viewed Mr. Trulove's not giving the bottom bunk to this man as a sign of extreme disrespect. While at San Quentin, a member of Kumi stabbed Mr. Trulove in the stomach for this sign of disrespect.

175. Mr. Trulove still bears the scar where the prison shank sliced open his abdomen.

176. While in San Quentin, Mr. Trulove's oldest son turned 8 years old and his second son had his third birthday. Mr. Trulove missed both of these birthdays.

177. On his first day in the yard at San Quentin, a man was stabbed repeatedly in front of him. This man was cut up so badly that Mr. Trulove did not know whether he survived. Mr. Trulove believed the perpetrators were members of the Aryan Brotherhood. He was traumatized by seeing a man killed or almost killed in front of him.

178. Because Mr. Trulove was sentenced to life, during his time in prison, he was always housed in a Level 4 maximum-security prison.

179. Mr. Trulove left San Quentin State Prison in or around April of 2011. He was moved to Calipatria State Prison, (Calipatria).

180. Calipatria is in far southern California. It takes over eight hours to drive from the San Francisco Bay Area to Calipatria.

181. Mr. Trulove was at Calipatria State Prison for approximately one year. During this time, Mr. Trulove's family was never able to visit him. He did not see his mother, father, girlfriend, friends, brothers, sister, nor any of his children.

182. Phone calls were extraordinarily difficult to get in Calipatria. Mr. Trulove rarely had the opportunity to speak with his family while he was there.

183. While Mr. Trulove was in Calipatria, he saw repeated stabbings on the yard. There were at least four riots by Latino prison gangs while Mr. Trulove was there. When there was a riot, Mr. Trulove, like all non-involved prisoners, would dive to the ground and attempt to crawl out of the way while guards shot

at prisoners.  In the midst of some of these riots, he along with other prisoners, were pepper-sprayed.

184.   Mr. Trulove's time at Calipatria State Prison was similar to being in an active war zone.

185.   While he was in Calipatria, his oldest son turned 9, and his twins turned 4 years old.  He missed both of these birthdays.

186.   Mr. Trulove requested a transfer as soon as he was able in order to be closer to his family.

187.   In or around April of 2012, Mr. Trulove was moved to Salinas Valley State Prison (Salinas Valley).  He was housed in C yard.  Mr. Trulove spent the remainder of his time in state prison in Salinas Valley.

188.   Salinas Valley was then regarded as one of the most violent prisons in California.  When Mr. Trulove arrived, C yard was in lockdown and it was in lockdown for almost one year after Mr. Trulove arrived.

189.   There were riots between black and Latino prison gangs and, although Mr. Trulove was a civilian, because he was African American he was also part of the lockdown.

190.   Lockdown meant that prisoners had to stay in their cell, approximately 6 feet by 9 feet, with their cellmate all day and night, every day and night.  The tiny cells had a bunk bed, shelves, and a toilet, so the walking area was the space between the bunk bed and the shelves.  This space was approximately two feet wide, just enough for one person to walk down the bed and back again.

191.   Prisoners were fed in their cells.  During lockdown, packages that could be sent from family members through designated vendors were not delivered.  Canteen was not available either.

192.   Prisoners were taken out to shower every two to three days, but sometimes it would be every four days.  In order to shower, prisoners would be handcuffed naked to the shower wall.

193.   Mr. Trulove had to take birdbath showers by using the toilet water to clean himself.  Toilet water would also be used to clean one's underwear and clothing. Because canteen was not available, soap and laundry detergent was extremely limited and sometimes unavailable.

194.   Mr. Trulove had to be in "high alert" the entire time he was in prison, but especially at Salinas Valley.  He would go to school, but there was little opportunity for learning.  Mr. Trulove would always try to stay alert for prison gossip so that if he heard there was trouble between rival gangs, he could stay in his cell and avoid the danger.

195.   While in Salinas Valley, Mr. Trulove's oldest son turned 9, then 10, then 11 years old. His second son turned 5, then 6, then 7 years old.  His twins turned 5, then 6 years old.  Mr. Trulove missed all of these birthdays.

196.   At the time Mr. Trulove was arrested, he was living with his two oldest sons and remained in close contact with his infant twins.  While in Seaside, he would walk his oldest son to school.

197.   While Mr. Trulove was incarcerated and could not help to support them financially, the mother of his two oldest children could no longer manage to maintain permanent housing in Monterey.  They moved to Sacramento, then out of state.  Mr. Trulove's oldest son attended no less than 6 elementary schools while Mr. Trulove was in prison.

198.   Mr. Trulove's two oldest sons eventually moved with their mother to Las Vegas, Nevada, where they remain now.

199.   Mr. Trulove was incarcerated when his oldest son was not yet five, his second son was 18 months, and his twins still infants.  Mr. Trulove was a stranger to his

1    children when he was released from custody.  His oldest son barely
2    remembered him and his younger children only knew him from rare prison
3    visits.

4  200.  Mr. Trulove bears the psychological scars of being in custody for over six years
5        and Mr. Trulove's children lost their father for six years.

6  201.  Mr. Trulove also bears the psychological scars of being tried twice for a crime
7        that he did not commit.

8

9                                  **DAMAGES**

10  202.  Defendants' actions deprived Jamal Rashid Trulove of his civil rights under the
11        First, Fourth, Fifth, and Fourteenth Amendments to the United States
12        Constitution, and the constitution and laws of the State of California.

13  203.  This action seeks damages for the period from October 27, 2008 through each
14        and every year to the present. Mr. Trulove's liberty was curtailed upon his
15        arrest on October 27, 2008.  He remained incarcerated until March 11, 2015.
16        The damages suffered by Mr. Trulove began in 2008 and continue to the
17        present.

18  204.  Defendants' unlawful, intentional, willful, deliberately indifferent, reckless,
19        and/or bad-faith acts and omissions caused Mr. Trulove to be falsely arrested,
20        tried, wrongfully convicted, and incarcerated for over six years for a crime he
21        did not commit.

22  205.  Defendants' unlawful, intentional, willful, deliberately indifferent, reckless,
23        and/or bad-faith acts and omissions caused Mr. Trulove the following injuries
24        and damages, which continue to date and will continue into the future: personal
25        injuries; pain and suffering; severe mental anguish; emotional distress; loss of
26        family relationships; severe psychological damage; damage to business and
27        property; legal expenses; loss of income; infliction of physical illness;

28

COMPLAINT, Case No.                                                    Page 33

inadequate medical care; humiliation, indignities and embarrassment; degradation; permanent loss of natural psychological development; and restrictions on all forms of personal freedom including but not limited to diet, sleep, personal contact, educational opportunity, vocational opportunity, athletic opportunity, personal fulfillment, sexual activity, family relations, reading, television, movies, travel, enjoyment, and expression, for which he is entitled monetary relief.

206. Mr. Trulove suffered a number of physical injuries while wrongfully incarcerated, including but not limited to being stabbed in the stomach by another inmate, and resulted in permanent scarring, and developing anxiety.

207. As a result of his wrongful incarceration, Mr. Trulove missed the opportunity to parent his four children.  As Mr. Trulove's children were all under the age of five when he was arrested, they barely remembered him when he was released from custody. Mr. Trulove was a stranger to his children and continues to struggle to develop a relationship with them as a result.

208. These injuries and damages to Mr. Trulove were foreseeable to Defendants at the time of their acts and omissions.

209. Pursuant to California Government Code § 825(a), Defendants are entitled to indemnification because their individual liability and acts of misconduct arose from acts and omissions within the course and scope of their employment with the City and County of San Francisco.

210. All of the acts and omissions committed by Defendants were done intentionally, unlawfully, maliciously, wantonly, recklessly, negligently and/or with bad faith, and said acts meet all of the standards for imposition of punitive damages.

## COUNT I

**42 U.S.C. § 1983 claim for deprivation of liberty without due process of law and violation of right to a fair trial, under the Fourteenth Amendment**

211. Plaintiff hereby incorporates each of the allegations of this Complaint as if fully set forth herein, and further alleges as follows:

212. Defendants fabricated false evidence of Mr. Trulove's guilt and suppressed exculpatory and material evidence of Mr. Trulove's innocence, thereby violating Mr. Trulove's right to a fair trial and causing him to be deprived of his liberty without due process of law.

213. Rather than conduct an adequate investigation, Defendants, individually and in concert, acted in a manner that shocks the conscience and followed through with the unlawful prosecution of Mr. Trulove, thereby depriving Mr. Trulove of his right not to be deprived of liberty without due process of law.

214. Defendants fabricated evidence prior to trial, including Priscilla Lualemaga's and Latisha Meadows-Dickerson's identifications, and they did so knowingly or in reckless disregard for the truth. Both identifications were used to prosecute Mr. Trulove. This evidence was actually false; Mr. Trulove did not kill Mr. Kuka. Ms. Lualemaga's statements were then used at trial and, as the only evidence linking Mr. Trulove to the crime, most likely would have created a different result at trial.

   a. Defendants, individually and in concert, deliberately misrepresented witness statements. In particular, Defendants misrepresented the strength and circumstances of Priscilla Lualemaga's identification of Mr. Trulove, and suppressed that Ms. Lualemaga had failed to identify Mr. Trulove on two prior occasions when shown his photo. Defendants also misrepresented the strength and circumstances of Latisha Meadows Dickerson's identification of Mr. Trulove, and suppressed that it was impossible for Ms. Meadows

Dickerson to have seen Mr. Kuka's shooting from where she said she was located and that she stated multiple times in her statement that the shooting happened while it was still light out.

b. Defendants, individually and in concert, used identification procedures that were so suggestive that they knew or should have known that those techniques would yield false information.  For example, Defendants pressured Ms. Lualemaga to identify Mr. Trulove. Defendants also pressured Mr. Meadows Dickerson to identify Mr. Trulove, and did so instead of arresting her for carrying a weapon, her third "strike."

215. In addition to fabricating evidence, Defendants, individually and in concert, in an effort to secure Mr. Trulove's conviction without regard to his actual innocence, suppressed material, exculpatory information from Mr. Trulove, Mr. Trulove's defense counsel, and the prosecution in violation of the Constitution and *Brady v. Maryland*.

a. Defendants, individually and in concert, failed to memorialize, intentionally suppressed, and/or recklessly failed to disclose Ms. Lualemaga's conversation with two SFPD officers at Ingleside Station on July 24, 2007 where she was directly pressured to identify Mr. Trulove by being asked by John Doe #1, "Are you sure it wasn't Jamal Trulove?"

b. Defendants, individually and in concert, failed to memorialize, intentionally suppressed, and/or recklessly failed to disclose Ms. Lualemaga's conversation with SFPD officers at her home on the evening of July 24, 2007.

c. Defendants, individually and in concert, failed to memorialize, intentionally suppressed, and/or recklessly failed to disclose Mr. Vaovasa's statement to police officers that contradicted Ms. Meadows-Dickerson's statements.

216. Evidence of Defendants' misconduct could have been used to undermine key evidence relied on by Defendants in this investigation. Had it been disclosed, it

could have been used at trial to impeach Defendants as well as the quality of the entire investigation.

217. Defendants' actions, individually and cumulatively, played a direct and decisive role in the jury's guilty verdict and were highly prejudicial to Mr. Trulove's defense. Had Defendants' misconduct been disclosed, the evidence would have tended to prove Mr. Trulove's innocence, cast doubt on the entire police investigation and prosecution, and most likely would have created a different result at trial.

218. The foregoing acts and omissions were deliberate, reckless, wanton, cruel, motivated by evil motive or intent, done in bad faith, and/or involved callous indifference to Mr. Trulove's federally protected rights. These acts were perpetrated while Defendants were acting in their capacities as employees or agents of the City and County of San Francisco and under color of state law.

219. As a direct and proximate result of Defendants' actions, Mr. Trulove was wrongly arrested, detained, charged with murder, prosecuted, convicted, sentenced to 50 years to life in prison, incarcerated for over six years and suffered the other grievous injuries and damages set forth above.

<u>**COUNT II**</u>

**42 U.S.C. § 1983 Claim for Malicious Prosecution and Violation of the Fourth and Fourteenth Amendments**

220. Plaintiff hereby incorporates each of the allegations of this Complaint as if fully set forth herein, and further alleges as follows:

221. The criminal proceedings initiated against Mr. Trulove in October of 2008 have been pursued to a legal termination favorable to Mr. Trulove. In particular, in January 6, 2014, the First District Court of Appeal filed its opinion reversing Jamal Trulove's conviction and sentence. The Attorney General petitioned the California Supreme Court for Review. On April 16, 2014, the

Supreme Court declined review and on April 21, 2014 the remittitur issued. On March 11, 2015, Mr. Trulove was acquitted on all counts.

222. The criminal proceedings initiated against Mr. Trulove in October of 2008 were brought without probable cause and without any reasonable belief in guilt.

223. The false and tainted witness identifications failed to provide probable cause to arrest Mr. Trulove. Defendants were aware of this fact but nonetheless caused the arrest of Mr. Trulove, and subsequently, Defendants intentionally continued the prosecution against Mr. Trulove on the basis of fabricated inculpatory evidence and suppressed material exculpatory evidence, thereby effecting a continuing seizure of Mr. Trulove in violation of his Fourth and Fourteenth Amendment rights.

224. The criminal proceedings against Mr. Trulove were initiated on the basis of Defendants intentional and knowingly false accusations, fabrication of evidence, suppression of exculpatory evidence, and other malicious conduct.

225. In falsely arresting Mr. Trulove despite the absence of probable cause to believe he had committed a crime, Defendants deprived Mr. Trulove of his liberty prior to the preliminary hearing, and in maliciously prosecuting him despite the absence of probable cause or existence of other evidence linking Mr. Trulove to the crime, Defendants caused Mr. Trulove to suffer the indignity of a public trial twice, the most severe continuing deprivation of liberty, 6 years of emotional distress while serving prison time for a crime he did not commit, and the other injuries and damages set forth above.

226. The criminal proceedings against Mr. Trulove were initiated with malice in that Defendants caused the charges against Mr. Trulove to be filed by knowingly providing the prosecution misinformation, concealing exculpatory evidence, and otherwise engaging in wrongful and bad faith conduct that was

actively instrumental in causing the initiation of the legal proceedings against Mr. Trulove.

227.  Defendants' wrongful prosecution of Mr. Trulove, which was initiated with malice and without probable cause, and was brought for the purpose of denying Mr. Trulove's constitutional rights, including his right to be free from unreasonable searches and seizures, and his right to not be deprived of liberty without due process of law.

228.  As a direct and proximate result of Defendants' actions, Mr. Trulove was wrongly prosecuted, detained, and incarcerated for over six years and suffered the other grievous injuries and damages set forth above.

## COUNT III

### 42 U.S.C. § 1983 Civil Rights Conspiracy Claim

229.  Plaintiff hereby incorporates each of the allegations of this Complaint as if fully set forth herein, and further alleges as follows:

230.  Defendants and others yet unknown agreed among themselves and others to act in concert to deprive Mr. Trulove of his clearly established constitutional rights as protected by the Fourth, Fifth, and Fourteenth Amendments, including his right not to be deprived of liberty without due process of law and be free from illegal seizure.

231.  As described in detail above, in furtherance of the conspiracy, Defendants engaged in and facilitated numerous overt acts in furtherance of the conspiracy, including but not limited to the following:

  a.  Acting in concert to suggest, coerce, and/or fabricate Ms. Lualemaga and Ms. Meadows Dickerson's identifications of Mr. Trulove;

b. Acting in concert to conceal that Ms. Lualemaga's identification had been tainted, and had been exchanged for the promise of payment of all of her and her family's living expenses. and

c. Acting in concert to fail to document Ms. Lualemaga's conversations with police on July 23-24, 2007 and July 24, 2007 where she was directly pressured into identifying Mr. Trulove.

232. As a direct and proximate result of Defendants' overt acts, Mr. Trulove was deprived of his constitutional rights; wrongly prosecuted, detained, and incarcerated for over six years; and subjected to other grievous injuries and damages as set forth above.

## COUNT IV

**42 U.S.C. § 1983 claim pursuant to *Tatum v. Moody* for Failure to Disclose Highly Significant Exculpatory Information Leading to Plaintiff's Continued Detention**

233. Plaintiff hereby incorporates each of the allegations of this Complaint as if fully set forth herein, and further allege as follows:

234. Pursuant to *Tatum v. Moody*, 768 F.3d 806 (9th Cir. 2014) *cert. denied,* 135 S. Ct. 2312, 191 L. Ed. 2d 978 (2015), Defendants failed to disclose exculpatory evidence to prosecutors leading to Mr. Trulove's lengthy detention, in violation of Mr. Trulove's right to due process.

235. As mentioned above, Defendants failed to disclose conversations with Ms. Lualemaga at Ingleside Station on July 23-24, 2007 and at Ms. Lualemaga's home on July 24, 2007 where, upon information and belief, officers directly pressured Ms. Lualemaga to identify Jamal Trulove as the shooter in the homicide of Seu Kuka.

236. Defendants knew the sole evidence used against Mr. Trulove was Ms. Lualemaga's identification of Mr. Trulove as the shooter. Had Defendants disclosed that their conversations with Ms. Lualemaga in which they

manipulated Ms. Lualemaga into misidentifying Mr. Trulove as the shooter, this evidence would have tended to prove Mr. Trulove's innocence, cast doubt on the entire police investigation and prosecution, and led to the end of Mr. Trulove's pre-trial detention.

237.  Defendants performed the above-described acts under color of state law, deliberately, intentionally, with malice or reckless disregard for the truth and Mr. Trulove's rights and with deliberate indifference to Mr. Trulove's clearly established constitutional rights.  No reasonable officer in 2007 would have believed this conduct was lawful.

238.  As a direct and proximate result of Defendants' conduct, Mr. Trulove was wrongly and maliciously prosecuted, denied bail and suffered a prolonged pre-trial detention during the more than 16 months that he was jailed, from October 27, 2008 until March 9, 2010 as well as the other grievous and continuing damages and injuries set forth above.

## COUNT V

### 42 U.S.C. § 1983 Supervisory Liability Claim

### Against Defendants Maureen D'Amico, Michael Johnson, Donna Meixner, John F. Murphy, Michael Stasko, Stephen Tittel, and John Does 2-10

239.  Plaintiff hereby incorporates each of the allegations of this Complaint as if fully set forth herein, and further allege as follows:

240.  Mr. Trulove's wrongful arrest, confinement, prosecution, trial, conviction, and incarceration was caused by the unconstitutional action and inaction of Maureen D'Amico, Michael Johnson, Donna Meixner, John F. Murphy, Michael Stasko, Stephen Tittel, and John Does 2-10, acting in their individual capacities and under color of law.

241. Upon information and belief, D'Amico, Johnson, Meixner, Murphy, Stasko, Tittel and John Does 2-10 directly participated in the misconduct that resulted in Mr. Trulove's wrongful conviction, including but not limited to coercing, fabricating, or suggesting false identifications and suppressing exculpatory evidence.

242. D'Amico, Johnson, Meixner, Murphy, Stasko, Tittel and John Does 2-10 knowingly refused to terminate the wrongful prosecution of Mr. Trulove, which, upon information and belief, they knew or should have known had been initiated based on the coerced, fabricated, or suggested identifications and in spite of suppressed exculpatory information. As a result D'Amico, Johnson, Meixner, Murphy, Stasko, and Tittel knew or reasonably should have known that Mr. Trulove's constitutional rights to be free from unreasonable seizure and not to be deprived of liberty without due process of law would be violated.

243. D'Amico, Johnson, Meixner, Murphy, Stasko, Tittel and John Does 2-10culpably failed to adequately train, supervise, an/or control their subordinates, who obtained coerced, fabricated, or suggested identifications, and suppressed exculpatory information.

244. D'Amico, Johnson, Meixner, Murphy, Stasko, Tittel and John Does 2-10 violated Mr. Trulove's constitutional rights by acquiescing in the deprivation of Mr. Trulove's constitutional rights by their subordinates, and by generally showing a reckless or callous indifference to Mr. Trulove's rights.

245. D'Amico, Johnson, Meixner, Murphy, Stasko, Tittel and John Does 2-10's failure to train, supervise, and/or control their subordinates, their indifference to the actions of their subordinates, and their indifference to Mr. Trulove's rights, encouraged and permitted their subordinates to fabricate evidence and to fail to document and to disclose exculpatory evidence.

246.  The actions and omissions of Defendants D'Amico, Johnson, Meixner, Murphy, Stasko, Tittel and John Does 2-10, in their individual capacities, caused Mr. Trulove to suffer the constitutional deprivations and grievous personal injuries and damages described above.

**<u>COUNT VI</u>**

**42 U.S.C. § 1983 *Monell* Claim Against the City and County of San Francisco, for**

**Failure to Train, Supervise, and/or Discipline in Constitutionally Adequate**

**Investigation Techniques, Identification Procedures, and/or *Brady* duties**

247.  Plaintiff hereby incorporates each of the allegations of this Complaint as if fully set forth herein, and further allege as follows:

248.  The City and County of San Francisco, by and through its policymakers, created and maintained a custom, policy and/or practice of failing to train, supervise, and/or discipline their employees and agents, including Defendants, regarding constitutionally adequate investigation techniques.

249.  The City and County of San Francisco, by and through its policymakers, created and maintained a custom, policy and/or practice of failing to train, supervise, and/or discipline their employees and agents, including Defendants, regarding constitutionally proper identification procedures and to ensure that unreliable, discredited, and improper identification techniques were not utilized.

250.  The City and County of San Francisco, by and through its policymakers, created and maintained a custom, policy and/or practice of failing to train, supervise, and/or discipline their employees and agents, including Defendants, regarding their obligations to document and disclose exculpatory evidence pursuant to their *Brady* obligations.

251.  The unconstitutional customs, policies, patterns, and practices of the City and County of San Francisco have caused numerous individuals to be wrongfully convicted.  In addition to Mr. Trulove, individuals wrongfully convicted include:

a.  <u>John Tennison and Antoine Goff, convicted 1990, exonerated 2003</u>: In 1989, Roderick Shannon was chased in his vehicle by a number of men, beaten, and

ultimately shot to death by one of these men. A witness contacted SFPD inspectors and identified Lovinsky Ricard as the shooter, and also indicated that neither of Tennison nor Goff had been present at the scene of the incident. Inspectors failed to disclose the identification of Ricard or exculpatory information regarding Tennison and Goff. Inspectors also encouraged witnesses to identify Tennison and Goff as being involved in the crime by promising them a reward of $2,500 from a Secret Witness Program. Tennison and Goff were ultimately convicted. A month following the conviction, while post-trial motions were still being heard by the trial court, other officers arrested Ricard on unrelated drug charges, and questioned him. Ricard confessed to the Shannon murder in a videotaped statement, which officers failed to disclose to the prosecutor or defense attorney. This confession was only inadvertently revealed during a new trial motion hearing. Thirteen years later, a federal court, on the basis of this information, granted the two men habeas relief and they were released.

b. Maurice Caldwell, convicted 1991, exonerated 2011: In 1990, Judy Acosta was shot to death in the Alemany public housing project in San Francisco. A woman named Mary Cobb said that she saw two men shoot at a car and she did not know the names of the gunmen and that neither of them lived in the area. SFPD officers brought Caldwell in handcuffs to the building where Cobb lived and allowed her to see him. Cobb also saw Caldwell on one other occasion with police. Soon after that, police said Cobb identified Caldwell as one of the gunmen. Cobb was also heralded as a hero for defying alleged gang threats against testifying and given a key to the city of San Francisco as well as a trip to Disney World. She was also relocated, given a new job and $1,000. Caldwell was convicted solely on the testimony of Cobb and sentenced to life in prison without parole. In 2010, San Francisco Superior Court Judge Charles Haines granted a

motion for new trial after lawyers from the Innocence Project presented evidence that it was physically impossible for Cobb to have seen anyone under the light pole from her apartment and a sworn affidavit from Marritte Funches admitting that he committed the crime and that Caldwell was not involved. The San Francisco District Attorney ultimately dismissed the case on March 28, 2011 and Caldwell was released.

c. <u>Caramond Conley, convicted 1994, exonerated 2011</u>: In 1989, Roshawn Johnson and Charles Hughes were killed in a drive-by-shooting that left 11 others injured. Conley was convicted and sentenced to serve two life-without-parole terms. SFPD investigators knew that the prosecution's star witness, Clifford Polk, lied on the stand about whether he was being paid, but they did nothing to intervene. The lead investigator in the case, Earl Sanders, started paying Polk, an unemployed transient with a history of drug dealing, three months before Conley's trial. The payments totaled thousands of dollars, and police also provided Polk with the use of a house. San Francisco Superior Court Judge Marla Miller ruled in December 2010 that Conley had been wrongly convicted. He was released a month later.

252.  These unconstitutional customs, policies, and practices of the City and County of San Francisco proximately and directly caused Mr. Trulove's physical and constitutional injuries, including his false arrest, illegal confinement, unfair trial, wrongful conviction, and other damages described above.

## COUNT VII

**Claim under California Civil Code § 52.1 Against**

**Defendants Maureen D'Amico, Michael Johnson, Carla Lee, and John Doe #1**

253.  Plaintiff hereby incorporates each of the allegations of this Complaint as if fully set forth herein, and further allege as follows:

254.  Defendants D'Amico, Johnson, Lee, and John Doe #1 interfered or attempted to interfere with Mr. Trulove's rights secured by the U.S. and California constitution and laws. These constitutional violations were accompanied by threats, intimidation, or coercion.

255.  For example, D'Amico, Johnson, Lee, and John Doe #1 used threats, intimidation, and/or coercion in an attempt to obtain Ms. Lualemaga's identification of Mr. Trulove.

256.  As a direct and proximate result of D'Amico, Johnson, Lee and John Doe #1's threats, intimidation, and/or coercion, Mr. Trulove was deprived of his constitutional rights; wrongly prosecuted, detained, and incarcerated for over six years; and subjected to other grievous injuries and damages as set forth above.

## COUNT VIII

### Claim under California State Law, Cal. Gov. Code § 815.2, for Respondeat Superior and Vicarious Liability against the City and County of San Francisco

257.  Plaintiff hereby incorporates each of the allegations of this Complaint as if fully set forth herein, and further allege as follows:

258.  Mr. Trulove suffered the aforementioned injuries as a proximate result of the misconduct of the individual Defendants.

259.  During all relevant times, Defendants were employees of the SFPD and the City and County of San Francisco.

260.  The acts and omissions of Defendants that proximately caused Mr. Trulove's injuries were within the scope of Defendants' employment with the SFPD and the City and County of San Francisco.

## JURY DEMAND

261.  Pursuant to the Seventh Amendment of the United States Constitution, Mr. Trulove requests a jury trial on all issues and claims set forth in this Complaint.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff Jamal Rashid Trulove respectfully requests:

a.      A trial by jury on each of the Plaintiff's claims;

b.      That the Court award compensatory damages to Plaintiff and against Officer Defendants, jointly and severally, in an amount to be determined at trial;

c.      That the Court award punitive damages to Plaintiff, and against Defendants, in an amount to be determined at trial, in order to deter such conduct by Officer Defendants in the future;

d.      For pre-judgment and post-judgment interest and recovery of costs, including reasonable attorneys' fees pursuant to 42 U.S.C. § 1988 for all 42 U.S.C. § 1983 claims; and

e.      For any and all other relief to which he may be entitled.

DATED: January 5, 2016

By:     /s/ Kate Chatfield


Nick J. Brustin,* NY Bar No. 2844405

Anna Benvenutti Hoffmann,* NY Bar No. 4412011

Danielle Hamilton,* NY Bar No. 5352653

NEUFELD, SCHECK AND BRUSTIN, LLP

*Awaiting Admission Pro Hac Vice


Kate Chatfield, State Bar No. 245403

Alex Reisman, State Bar No. 45813

LAW OFFICE OF CHATFIELD AND REISMAN


Attorneys for Plaintiff

JAMAL RASHID TRULOVE