Nick J. Brustin, NY Bar No. 2844405
  Email: nick@nsbcivilrights.com
Anna Benvenutti Hoffmann, NY Bar No. 4412011
  Email: anna@nsbcivilrights.com
Danielle Hamilton, NY Bar No. 5352653
  Email: danielle@nsbcivilrights.com
NEUFELD, SCHECK AND BRUSTIN, LLP
99 Hudson Street, 8th Floor
New York, NY 10013
Telephone: (212) 965-9081
Facsimile: (212) 965-9084

Kate Chatfield, State Bar No. 245403
  Email: chatfield@legalprivilege.ch
Alex Reisman, State Bar No. 45813
LAW OFFICE OF CHATFIELD AND REISMAN
32 Boardman Place
San Francisco, CA 94103
Telephone: (415) 255-9076
Facsimile: (415) 520-5876

Attorneys for Plaintiff
JAMAL RASHID TRULOVE

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA, OAKLAND DIVISION

| | |
|---|---|
| JAMAL RASHID TRULOVE, | Case No. 16-cv-00050-YGR |
| Plaintiff, | |
| vs. | |
| THE CITY AND COUNTY OF SAN | **PLAINTIFF'S RESPONSE IN** |
| FRANCISCO, ET AL, | **OPPOSITION TO DEFENDANTS'** |
| Defendants. | **MOTION TO DISMISS** |

# **Table of Contents**

INTRODUCTION ................................................................................................................... 1

STANDARD............................................................................................................................ 2

FACTS .................................................................................................................................... 2

**ARGUMENT .................................................................................................................... 10**

I.    The Court must ignore evidence outside the FAC. ......................................... 10

II.   Mr. Trulove sufficiently alleges Defendants Phillips, Silver, Knoble, McMillan, Androvich, Trail, and Hagan were integral participants in constitutional violations which caused his wrongful conviction. . ................................................................................... 12

III.   Plaintiff has well-pleaded fabrication, suppression, and malicious prosecution claims against Defendants Phillips, Silver, Knoble, McMillan, Androvich, Trail, and Hagan. .......... 15

    a.   Fabrication of evidence ................................................................................ 15

    b.   Suppression of evidence............................................................................... 17

    c.   Malicious prosecution .................................................................................. 19

IV.   Mr. Trulove's conspiracy claim is well-pleaded. .......................................... 20

V.   Mr. Trulove's supervisory liability claim against Defendants Johnson, D'Amico, Daniele and Slade is well–pleaded. ...................................................................................... 21

VI.   Defendants are not immune against Plaintiff's state law claims. ................... 23

VII.   Plaintiff's state law indemnification claim should not be dismissed. ............ 24

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## Table of Authorities

**Cases**

*Adams v. Kraft*, No. 10-CV-00602-LHK, 2011 WL 846065 (N.D. Cal. Mar. 8, 2011) .............. 12

*Allen v. Cty. of Lake*, No. 14-CV-03934-TEH, 2015 WL 434990 (N.D. Cal. Feb. 2, 2015) ....... 14

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ......................................................................... 2

*Auto Equity Sales, Inc. v. Superior Court*, 369 P.2d 937 (Cal. 1962) ........................................ 23

*Avalos v. Baca*, 596 F.3d 583 (9th Cir. 2010) ......................................................................... 20

*Awabdy v. City of Adelanto*, 368 F.3d 1062 (9th Cir. 2004) ......................................................... 19

*Bark v. Chacon*, No. 10-CV-01570-WYD-MJW, 2011 WL 1884691 (D. Colo. May 18, 2011)  14

*Beaman v. Freesmeyer*, 776 F.3d 500 (7th Cir. 2015) .................................................................... 21

*Boyd v. Benton County,* 374 F.3d 773 (9th Cir. 2004) ........................................................... 13, 14

*Bradford v. Scherschligt*, 803 F.3d 382 (9th Cir. 2015) ............................................................ 15

*Brady v. Maryland*, 373 U.S. 83 (1963) .......................................................................... 17

*Brown v. Arizona*, No. CV-09-2272-PHX-GMS, 2010 WL 396387 (D. Ariz. Jan. 28, 2010)..... 25

*Chuman v. Wright*, 76 F.3d 292 (9th Cir. 1996) .............................................................. 12, 14

*Cook v. Brewer*, 637 F.3d 1002 (9th Cir. 2011) ...................................................................... 2

*Costanich v. Dep't of Soc. & Health Servs.*, 627 F.3d 1101 (9th Cir. 2010) ............................... 15

*Cousins v. Lockyer*, 568 F.3d 1063 (9th Cir. 2009) .................................................................. 2

*Devereaux v. Abbey*, 263 F.3d 1070 (9th Cir. 2001) ............................................................ 15, 16

*Dinius v. Perdock*, No. C 10-3498 MEJ, 2012 WL 1925666 (N.D. Cal. May 24, 2012)............. 21

*Employers Ins. of Wausau v. California Water Serv. Co.*, No. C–06–03002 RMW, 2008 WL
    3916096 (N.D. Cal. Aug. 25, 2008)................................................................... 10, 11

*Galbraith v. Cty. of Santa Clara*, 307 F.3d 1119 (9th Cir. 2002)................................................. 19

*Garaux v. Pulley*, 739 F.2d 437 (9th Cir. 1984) ........................................................................ 12

*Gerritsen v. Warner Bros. Entm't Inc.*, 112 F. Supp. 3d 1011 (C.D. Cal. 2015) ........................ 12

*Godoy v. Cty. of Sonoma*, No. 15-CV-00883-WHO, 2016 WL 269867 (N.D. Cal. Jan. 22, 2016)
    ......................................................................................................................... 22

*Gressett v. Contra Costa Cty.*, No. C-12-3798 EMC, 2013 WL 2156278 (N.D. Cal. May 17, 2013) ........................................................................................................................... 21

*Hanania v. Loren-Maltese*, 56 F. Supp. 2d 1010 (N.D. Ill. 1999), aff'd, 212 F.3d 353 (7th Cir. 2000) ........................................................................................................................... 25

*Hansen v. Black*, 885 F.2d 642 (9th Cir. 1989) ............................................................... 22

*Harris v. Roderick,* 126 F.3d 1189 (9th Cir. 1997) ........................................................... 19

*Hayes v. Brown*, 399 F.3d 972 (9th Cir. 2005) ............................................................... 17

*Hotel Employees & Rest. Employees Local 2 v. Vista Inn Mgmt. Co.*, 393 F. Supp. 2d 972 (N.D. Cal. 2005) ........................................................................................................................... 12

*IFC Interconsult, AG v. Safeguard Int'l Partners, LLC.*, 438 F.3d 298 (3d Cir. 2006) ............... 25

*Isakhanova v. Muniz*, No. 15-CV-03759-TEH, 2016 WL 1640649 (N.D. Cal. Apr. 26, 2016)... 23

*Jones v. Williams*, 297 F.3d 930 (9th Cir. 2002) ............................................................... 13

*Lee v. City of Los Angeles*, 250 F.3d 668 (9th Cir. 2001) ........................................... 10, 11

*Luong v. City & Cnty. of San Francisco*, No. C 11-5661, 2012 WL 5519210 (N.D. Cal. Nov. 14, 2012) ........................................................................................................................... 24

*Mendocino Environmental Center v. Mendocino County*, 192 F.3d 1283 (9th Cir. 1999) .... 20, 21

*Moore v. City of Oakland*, No. 14-CV-05637-JSC, 2015 WL 831612 (N.D. Cal. Feb. 23, 2015) ........................................................................................................................... 19

*Myers v. City & Cnty. of San Francisco*, No. C 08-1163, 2012 WL 4111912 (N.D. Cal. Sept. 18, 2012) ........................................................................................................................... 24

*Robinson v. Sappington*, 351 F.3d 317 (7th Cir. 2003) ..................................................... 25

*Somers v. Apple, Inc.*, 729 F.3d 953 (9th Cir. 2013) ......................................................... 2

*Stapley v. Pestalozzi*, 733 F.3d 804 (9th Cir. 2013) .............................................. 2, 11, 16

*Starr v. Baca*, 652 F.3d 1202 (9th Cir. 2011) ......................................................... passim

*Sullivan v. County of Los Angeles*, 527 P.2d 865 (Cal. 1974) ........................................... 23

*Tatum v. Moody*, 768 F.3d 806 (9th Cir. 2014), *cert. denied*, 135 S. Ct. 2312 (2015) ............... 18

*Tennison v. City and County of San Francisco*, 570 F.3d 1078 (9th Cir. 2009) ..................... 18

*The Missing Link, Inc. v. eBay, Inc.*, No. C-07-04487 RMW, 2008 WL 1994886 (N.D. Cal. May 5, 2008) ............................................................................................................ 11

*Vestar Dev. II, LLC v. Gen. Dynamics Corp.*, 249 F.3d 958 (9th Cir. 2001) ............................... 23

*Whitlock v. Brueggemann*, 682 F.3d 567 (7th Cir. 2012) ................................................. 17

*Williams v. City of Merced*, No. 10-CV-01999, 2013 WL 498854 (E.D. Cal. Feb. 7, 2013)....... 24

*Williams v. Horvath*, 16 Cal. 3d 834 (1976) ..................................................... 24, 25

*Wilson v. City of Chicago*, 120 F.3d 681 (7th Cir. 1997) ................................................ 25

*Woodrum v. Woodward County*, 866 F.2d 1121 (9th Cir. 1989)............................................. 20

*Wright v. City of Santa Cruz*, No. 13-CV-01230-LHK, 2014 WL 217089 (N.D. Cal. Jan. 17, 2014) .......................................................................................................... 16

**Other Authorities**

Federal Civil Procedure Before Trial § 9:211 (2004) ..................................................... 10

**Rules**

Federal Rule of Civil Procedure 12(b)(6) ........................................................... 2, 10, 12

Federal Rule of Evidence 201(b) .................................................................. 10

1

## <u>INTRODUCTION</u>

2      Plaintiff Jamal Rashid Trulove, a young father and aspiring entertainer, was sentenced to

3  50 years to life in prison and spent over six years imprisoned for a crime that he did not

4  commit—the July 2007 murder of Seu Kuka. Plaintiff's First Amended Complaint ("FAC")

5  alleges in great detail that this wrongful conviction was caused by the specific misconduct of the

6  San Francisco Police Department ("SFPD") officers investigating the Kuka shooting. These

7  officers manipulated an eyewitness, Priscilla Lualemaga, into misidentifying Mr. Trulove as the

8  shooter. Defendants then hid the blatantly improper means they had used to obtain the

9  misidentification, one instance of which was only uncovered through a remarkable coincidence

10  after Mr. Trulove's wrongful conviction. The officers also engaged in misconduct with another

11  supposed eyewitness, Latisha Meadows-Dickerson, but she was never called to testify—likely

12  because of her unreliable identification—so that misconduct also never came to light during the

13  criminal prosecution. The sole evidence incriminating Mr. Trulove was Lualemaga's

14  misidentification unlawfully procured by the SFPD Defendants.

15      Defendants do not dispute that Plaintiff's claims against SFPD lead investigators

16  Maureen D'Amico and Michael Johnson and Officers Carla Lee and John Doe #1 must proceed

17  to discovery. Defendants instead argue nine of the officers involved in the investigation can hide

18  behind the lead investigators and be shielded from liability. They cannot. While the investigation

19  was led by Johnson and D'Amico, Plaintiff has pleaded abundant factual allegations showing

20  several other officers—Inspector Robert McMillan and Officers Shawn Phillips, Daniel Silver,

21  Kevin Knoble, Michael Androvich, James Trail, and Francis Hagan—played integral roles in the

22  investigation, and, more importantly, engaged in misconduct directed by Johnson and D'Amico.

23  Plaintiff also sufficiently alleges two SFPD supervisors—Sergeant Robert Daniele and

24  Lieutenant Michael Slade—were aware of and condoned the officers' misconduct, given their

25  roles and responsibilities while the investigation was taking place. In context, these allegations

26  are certainly plausible enough to entitle Plaintiff to discovery against these officers, as well.

27

28

1  Defendants' motion to dismiss ignores the specific allegations of misconduct by these

2  nine officers, inappropriately introduces evidence outside the record, and asks the Court to

3  presume that their version of the facts is accurate. This is not the standard for a motion to

4  dismiss. This Court must only evaluate whether Plaintiff has pled sufficient facts that would

5  allow it to draw the reasonable inference that Defendants are liable for the alleged misconduct.

6  Plaintiff has met his burden; Defendants' motion should be denied.

7  **STANDARD**

8  "A Rule 12(b)(6) motion tests the legal sufficiency of a claim." *Cook v. Brewer*, 637 F.3d

9  1002, 1004 (9th Cir. 2011) (internal quotations and citation omitted). Dismissal under Rule

10  12(b)(6) is appropriate only if the complaint lacks a cognizable legal theory, or fails to allege

11  sufficient facts to support a legal theory. *See, e.g.*, *Somers v. Apple, Inc.*, 729 F.3d 953, 959 (9th

12  Cir. 2013). When considering a motion to dismiss, "'[a]ll allegations of material fact are taken as

13  true and construed in the light most favorable to the nonmoving party.'" *Stapley v. Pestalozzi*,

14  733 F.3d 804, 809 (9th Cir. 2013) (quoting *Cousins v. Lockyer*, 568 F.3d 1063, 1067 (9th Cir.

15  2009)); *see also Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011) (explaining that allegations

16  of underlying facts are sufficient when they "give fair notice and . . . enable the opposing party to

17  defend itself effectively."). A complaint "'must contain sufficient factual matter, accepted as

18  true, to state a claim to relief that is plausible on its face.'" *Stapley*, 733 F.3d at 809 (quoting

19  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). Even if a defendant presents his own plausible,

20  innocent explanation, the plaintiff's complaint "may be dismissed only when defendant's

21  plausible alternative explanation is so convincing that plaintiff's explanation is *im*plausible. The

22  standard at this stage of the litigation is not that plaintiff's explanation must be true or even

23  probable." *Starr*, 652 F.3d at 1216–17.

24  **FACTS**

25  The facts, as alleged in the FAC and which must be taken as true, are as follows:

26  Shortly before 11:00 p.m. on July 23, 2007, Seu Kuka was shot and killed on a sidewalk

27  in front of 140 Blythedale Avenue in San Francisco's Sunnydale Housing Projects. (FAC ¶27).

28

Defendants Johnson and D'Amico were assigned to lead the investigation of the homicide. (¶31.) As lead investigators, Johnson and D'Amico directed and were informed of all aspects of the Kuka investigation. (¶54). They directed several other SFPD officers to assist them, including Defendants Lee, Phillips, Silver, Knoble, McMillan, Androvich and Trail. (¶55). These defendants participated in the investigation by interviewing witnesses, directing witnesses to Johnson and D'Amico, sharing notes and reports, regularly meeting, discussing case strategy and progress, sharing information, and dividing tasks throughout the investigation. (*Id.*) In addition to the lead investigators and assisting officers, Defendant Daniele was also aware of and involved in the investigation as the supervisor of Defendants Lee and Phillips. (¶58). Likewise, Defendant Slade, who was responsible for supervising and monitoring all activities happening at the station on the night of July 23, 2007, was aware of and involved in the Kuka investigation. (¶59). Pursuant to the policies, practices and customs of the SFPD, all officers assisting and involved in the investigation were aware of the conduct of other officers in the investigation. (¶56.)

Although there were as many as 25 people on the street at the time of Kuka's murder, most fled at the time of the gunshots. (¶29). However, Priscilla Lualemaga came out from her apartment at 140 Blythedale and told SFPD officers that she saw the shooting. (*Id.*) She was the only witness to do so. Defendants Lee and Phillips took Lualemaga to Ingleside Police Station, where Lualemaga waited to be interviewed by Johnson and D'Amico. (¶30).

Defendants McMillan, Knoble, and Androvich of the SFPD Gang Task Force suggested Defendants Johnson and D'Amico focus the investigation on Jamal Trulove as a suspect. (¶57). Defendants thought Mr. Trulove was a gang member based on his associations as a child. (¶32). But Mr. Trulove was not a gang member; he was also completely innocent of the murder of Kuka. (*Id.*; ¶28).

While Lualemaga waited for the inspectors, Defendant Lee instructed her to examine a bulletin board of suspected gang members, which included a photograph of Mr. Trulove. (¶¶30, 32). The bulletin board also included photographs of Mr. Trulove's brothers, Joshua Bradley and David Trulove, who were also suspected, falsely, of being gang members. (¶32). Lualemaga

looked at the bulletin board for at least two hours. (¶36). She recognized several men on the bulletin board, including David Trulove. (*Id.*) Lualemaga did not recognize or identify in any way Plaintiff Jamal Trulove during the two hours that she stared at the photos. (¶37).

At approximately 1:00 a.m. that night, Defendants Johnson and D'Amico interviewed Lualemaga. (¶38). During the recorded part of the interview, Lualemaga reported that she saw, from her second story window at 140 Blythedale, Kuka chasing one man and being shot by another man. (¶41–42). Lualemaga told the inspectors that she "didn't really get a good look at the shooter" as the fight and shooting happened "so fast." (¶48). Defendant D'Amico, focused on Plaintiff Trulove as a suspect, asked her if the shooter had any distinguishing characteristics, such as a tattoo.[1]  Ms. Lualemaga answered equivocally that she could not tell and did not remember. (¶49). Lualemaga then returned with the inspectors to the bulletin board and stated that the man Kuka was chasing was Joshua Bradley. (¶¶45–46, 52). Joshua's photograph was immediately below Jamal Trulove's on the bulletin board. (¶34, 47). During that second time that Lualemaga looked at the bulletin board photos, she again did not identify Jamal Trulove as someone involved in the Kuka shooting or present that night, nor did she indicate in any way that she recognized him as associated with Joshua Bradley. (¶53).

After Lualemaga's interview, Defendants Johnson and D'Amico were stuck: Lualemaga had not identified Plaintiff Trulove—or anyone else—as the shooter, and no other witnesses had come forward.  (¶¶29, 53). As Lualemaga remained in the station, Defendants Lee, Phillips, Silver, Knoble, McMillan, and John Doe #1 had numerous conversations in which they improperly suggested, pressured, and/or coerced Lualemaga to identify Mr. Trulove as the shooter. (¶¶60, 66). These conversations were either made at the direction of Defendants Johnson and D'Amico, and/or they were made aware that conversations occurred. (¶67). Most of this misconduct was not witnessed by neutral observers who would later have an opportunity to report it. (¶66)

---

[1]Jamal Trulove has, and had in July 2007, a large tattoo on his neck that reads "Cheryl Trulove."

However, one of these conversations was witnessed by a 17-year-old boy, Oliver Barcenas, who had been brought to Ingleside Station that night and handcuffed to a bench 10-12 feet away from Lualemaga and the officers. (¶¶46, 152). Barcenas saw Defendant Lee and SFPD Officer John Doe #1[2] speaking with Lualemaga. (*Id.*) John Doe #1 pointed to a photograph on a clipboard and asked Lualemaga, "Are you sure it wasn't Jamal Trulove?" (¶62). Lualemaga said to the officer, "No, I don't know." (¶63). John Doe #1 was visibly frustrated by Lualemaga's refusal to identify Mr. Trulove at that time. (¶64). Defendant Daniele—Defendants Lee and Phillips's supervisor—was aware of the conversation witnessed by Barcenas and other conversations, and condoned the misconduct. (¶68). Likewise, Defendant Slade, who was Officer-in-Charge, was also aware of the misconduct—which occurred in the middle of the police station while he was "in charge" (¶69).

Despite the officers' suggestion, pressure and/or coercion that night, Lualemaga never identified Plaintiff Trulove. Sometime in the early morning hours of July 24, 2007, Defendants Johnson and D'Amico drove Lualemaga home. (¶70). Later that day, Defendant Johnson went back to Lualemaga's home, along with Defendants McMillan, Androvich and Trail. (¶72). These four officers continued to improperly exert direct pressure on Lualemaga to identify Mr. Trulove as the shooter. (¶73). The officers never disclosed this misconduct. (¶74).

On July 25, 2007, Defendants Johnson and D'Amico met Lualemaga at her work and showed her a photograph line-up in their car. (¶¶79, 80.) They recorded some, but not all, of their conversation with Lualemaga. (¶82). Though the inspectors had previously created four photograph line-ups by computer using the standard procedure at the time, which did not involve suggestion, the recorded portion of the conversation reveals that the inspectors showed Lualemaga a different, improper line-up. (¶¶76–78, 80). That photographic line-up was unduly suggestive in the following ways: 1) the photograph of Jamal Trulove was the exact same

---

[2] Absent adequate discovery, Plaintiff has not been able to ascertain the identity of John Doe #1, an older, white, male officer in plainclothes working July 23–24, 2007. He may well be one of the named defendants, given that it is unlikely that an officer who was not otherwise involved in the investigation would have been conducting an identification procedure with Lualemaga.

photograph that was on the bulletin board that Lualemaga did not recognize nor identify the previous day; 2) Jamal Trulove was the only person in the line-up wearing a jail-issued orange sweatshirt while the people were in street clothing; 3) two of the photographs were of men Lualemaga had previously identified—Joshua Bradley, who she said was being chased by Kuka, and David Trulove, who Lualemaga told officers was not involved. (¶¶80–81).

Because Johnson and D'Amico were determined to get Ms. Lualemaga to identify Jamal Trulove, either they showed Ms. Lualemaga the four proper photographic line-ups and, when Ms. Lualemaga failed to identify anyone in the line-ups as the individual who shot Kuka, never disclosed the exculpatory results; or they deliberately chose not to use the four line-ups, and instead showed Ms. Lualemaga the suggestive, improper photograph line-up. (¶88). In any event, when presented with the tainted line-up, Lualemaga finally told Johnson and D'Amico what they wanted to hear: she picked out Jamal Trulove's photograph—the same photograph that she had been with for hours before on July 24, 2007 and had failed to recognize or identify in any way— and said, "Um, he looks like the person that could have shot Seu" and "the shooter, I want to say it's him." (¶86).

Even with the inspectors' improper assistance, Ms. Lualemaga's identification of Mr. Trulove as the shooter was equivocal. It was also uncorroborated—SFPD Defendant Officers knew Lualemaga's story was completely inconsistent with the forensic evidence. (¶¶164–171). At some point during the investigation, the officers learned that physical evidence showed that Kuka was shot from someone who was below him, running up the street and from west to east— not down the street and from east to west as Lualemaga had told police. (¶¶164, 168).

Given the weak case against Plaintiff Trulove, the SFPD Defendant Officers needed additional evidence to seek an arrest warrant. (¶90). On August 9, 2007, Mr. Trulove's brothers were pulled over by SFPD officers, and Defendant Phillips contacted Defendant Silver, who brought Mr. Trulove's brothers to Ingleside to be interrogated by D'Amico and Johnson. (¶91). Later that month, SFPD officers conducted a thorough search of Joshua Bradley and Jamal

1    Trulove's home in Oakland. (¶92). They found nothing connecting Mr. Trulove in any way to

2    Seu Kuka's homicide, so did not seek an arrest warrant. (¶¶92–93).

3         With no evidence of any kind to corroborate Lualemaga's weak and improperly-obtained

4    identification of Mr. Trulove, the SFPD Defendant Officers were stalled for the next ten months.

5    (¶96). Then, in June 2008, Defendants Hagan and McMillan were conducting surveillance of a

6    drug house in San Francisco. (¶¶96–97). Latisha Meadows-Dickerson was in the passenger seat

7    of a car associated with the trafficking. When police arrived at the car, she stuffed a loaded

8    firearm into her pants. (*Id.*). Meadows-Dickerson had been convicted of two prior serious

9    felonies. (¶98). Instead of charging Meadows-Dickerson with a crime, which would have been

10   her third "strike," Defendants Hagan and McMillan asked her if she had any information for

11   them. Ms. Meadows-Dickerson told them that she had seen Kuka's murder. (¶99).

12        Defendants Johnson, McMillan and Hagan then conducted an interview of Meadows-

13   Dickerson, a portion (but not all) of which was recorded. (*Id.*). In addition to Meadows-

14   Dickerson's obvious incentive to lie, her recorded statement was incredible on its face. She says

15   "Kamal" then "Jamal" shot and killed Kuka at around 5:00 or 6:00 p.m. one evening. Kuka was

16   actually shot at almost 11:00 p.m. (¶100). She then told officers that when Kuka was killed "it

17   was still light outside" and, after pressure from Defendant McMillan, stated it was "twilight."

18   (¶101). Additionally, Meadows-Dickerson said she heard and saw Kuka shot once; Kuka was

19   actually shot nine times. (¶105). During unrecorded portions of the interview, Defendants

20   continued to engage in suggestion to encourage Meadows-Dickerson's identification of Mr.

21   Trulove and attempted to alter her statement to better fit the known facts of the murder. (¶107).

22        Defendants Johnson and D'Amico went even further to shore up Meadows-Dickerson's

23   weak identification. Meadows-Dickerson claimed she saw the shooting from her apartment in a

24   building uphill and a substantial distance from 140 Blythedale. (¶102). She further claimed that a

25   third man, Tumo Vaovasa, witnessed the shooting. (¶103). Defendants Johnson and D'Amico

26   had interviewed Vaovasa months earlier; Vaovasa was a friend of Kuka's and wanted to assist in

27   the investigation. (¶104). Not only did Vaovasa deny witnessing the shooting, he also told the

28

inspectors that from where he was—where Meadows-Dickerson claimed that she was also—he *could not see* the shooting. (*Id.*). Officers could themselves verify what Vaovasa said was true—it was not possible to see the shooting from that vantage point. (¶106). Knowing that Meadows-Dickerson's account of the homicide was completely contradicted by credible information from Vaovasa, Defendants Johnson and D'Amico concealed or failed to disclose his statement. (¶104).

By August 2008, over a year after the Kuka shooting, Defendants had cobbled enough "evidence"—these two false identifications—to finally apply for an arrest warrant for Jamal Trulove. (¶109). To bolster the case, Defendant Johnson made a number of misrepresentations and omissions in his arrest warrant affidavit. Defendant Johnson omitted several weaknesses in the witnesses' identification of Mr. Trulove, including that Lualemaga had failed to identify Plaintiff Trulove in any way when she viewed his photograph below Joshua Bradley's on July 24, 2007 (¶112); the photo of Plaintiff Trulove the inspectors showed Lualemaga on July 25, 2007, and which she falsely identified as the shooter, was the exact same photograph she viewed and failed to identify on July 24, 2007 (¶113); it was impossible to see the Kuka shooting from where Meadows-Dickerson claimed she was (¶114); and Meadows-Dickerson's account of the shooting was contradicted by Vaovasa, a cooperative witness with no incentive to lie (¶116). Most notably, the affidavit omitted the conversation witnessed by Barcenas, which was not documented or memorialized by Defendants, or, if it was, it was concealed. (¶61).

Based on Johnson's misrepresentations and omissions, Mr. Trulove was arrested on October 27, 2008 and the prosecution against him proceeded. (¶173). At Mr. Trulove's preliminary hearing and trial, the prosecution based their entire case on Lualemaga's identification of Mr. Trulove as the shooter. (¶133). Lualemaga further testified that she did not initially tell police that Mr. Trulove was the shooter because she was afraid of having to testify. (¶137). In fact, this explanation of fear was only to hide Defendants' misconduct—directly suggesting, pressuring and coercing Lualemaga to obtain a false identification of Mr. Trulove. (¶138). To hide the Defendants' additional misconduct, the prosecution never called Meadows-Dickerson to testify at any proceeding against Mr. Trulove (¶117). Therefore, on February 9,

1   2010, based solely on the identification by Ms. Lualemaga, and without knowledge of the direct

2   suggestion used to procure that identification, Mr. Trulove was convicted of first-degree murder

3   and the use of a firearm enhancement. (¶139).

4       After Mr. Trulove was convicted and awaiting sentencing in San Francisco County Jail,

5   he was placed in a 12-person cell with Oliver Barcenas. (¶143). Mr. Trulove and Mr. Barcenas

6   had no connection prior to being housed together. (¶144). While in the cell, Barcenas saw the

7   large tattoo on Jamal's neck that reads "Cheryl Trulove." (¶145). Barcenas remembered the

8   distinctive name "Trulove" as he had heard it years before, while he was sitting at Ingleside

9   Station on the night of July 23–24, 2007. (*Id.*) Barcenas said he witnessed Defendants Lee and

10  John Doe #1 pressure Lualemaga to identify Mr. Trulove as Kuka's shooter. (¶¶146–51).

11  Barcenas was able to draw a diagram of Ingleside Police Station where this occurred; police

12  reports document he was arrested that night and at Ingleside at the same time as Lualemaga.

13  (¶¶152, 154).

14      In October 2010, Mr. Trulove was sentenced for the Kuka murder. (¶140). At his

15  sentencing, Mr. Trulove professed his innocence; he addressed Kuka's family stating: ""I fought

16  this case in a matter of innocence, because I know I didn't do it…I would not have took a year in

17  jail and admitted to something I did not do. Period. I just want to say, I didn't do it. I didn't do

18  it." (¶141). Mr. Trulove was sentenced to fifty years to life in prison. (¶1).

19      Mr. Trulove's conviction was reversed on direct appeal by the California Court of

20  Appeals, which held that the prosecution had committed misconduct by arguing, erroneously,

21  that Ms. Lualemaga had faced threats which caused her to fear for her life. (¶¶5, 158–59). At his

22  re-trial in January 2015, Lualemaga again testified and identified Mr. Trulove as the man who

23  shot Kuka (¶162). Mr. Trulove's counsel presented experts at the re-trial who testified that, after

24  reviewing all of the forensic evidence, Lualemaga's version of events—that the shooter was

25  uphill from Kuka and shot him moving east to west—was contradicted by the physical evidence.

26  The forensic evidence revealed that the exact opposite was true: Kuka was shot from someone

27  below him moving west to east. (¶¶164, 168). Mr. Trulove put on additional expert testimony

28

1   showing that Lualemaga had an inability to accurately perceive where the shots came from and

2   who the shooter was. (¶171). The jury acquitted Mr. Trulove on all counts. (¶172).

3       As a result of his wrongful imprisonment, Mr. Trulove was torn away from his family

4   and budding entertainment career. (¶¶6, 182, 201). Mr. Trulove bears psychological scars of

5   being tried twice for a crime that he did not commit; his children bear additional scars of losing

6   their father for over six years. (¶¶206–07).

7                               **ARGUMENT**

8   **I.      The Court must ignore evidence outside the FAC.**

9       On a motion to dismiss under Rule 12(b)(6), the Court must limit its review to the

10  operative complaint and may not consider facts presented in briefs or extrinsic evidence. *See Lee*

11  *v. City of Los Angeles*, 250 F.3d 668, 688 (9th Cir. 2001); William W. Schwarzer, A. Wallace

12  Tashima & James M. Wagstaffe, Federal Civil Procedure Before Trial § 9:211 (2004) ("[T]he

13  court cannot consider material outside the complaint (*e.g.*, facts presented in briefs, affidavits or

14  discovery materials).").

15      One exception to this rule permits courts to take judicial notice of facts presented outside

16  the complaint that are "not subject to dispute" in that they are "either (1) generally known within

17  the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by

18  resort to sources whose accuracy cannot reasonably be questioned." Fed.R.Evid. 201(b); *United*

19  *States v. Mariscal*, 285 F.3d 1127, 1131 (9th Cir. 2002). Under this exception, courts may take

20  judicial notice of records such as judicial proceedings. "[H]owever, courts may not take judicial

21  notice for *the truth of the matters asserted* in the other litigation, but rather to establish the fact of

22  such litigation and related filings." *Employers Ins. of Wausau v. California Water Serv. Co.*, No.

23  C–06–03002 RMW, 2008 WL 3916096, at *1, n.1 (N.D. Cal. Aug. 25, 2008) (internal quotations

24  and citation omitted, emphasis added).

25      Defendants ask the Court to take judicial notice of seven documents; some of which are

26  court proceedings. *See* D.E. 51. None of these court proceedings are cited in Defendants'

27  arguments for dismissal, but instead, apparently in support of their version of the facts.  But on a

28

motion to dismiss, the Court must consider Plaintiff's version of the facts as alleged in the FAC; the Court may not consider extra facts presented by Defendants. *Stapley*, 733 F.3d at 809. Moreover, Defendants request more than judicial notice that the proceedings occurred; they also offer the Court factual assertions made during the proceedings. For example, Defendants cite court minutes from Mr. Trulove's preliminary hearing, apparently as evidence that there was probable cause to prosecute him. Def. Br. at 7. This is clearly impermissible. This Court may only consider that the hearing occurred, not that any findings from the hearing were true. *Lee*, 250 F.3d at 690 (holding the district court may *only take* judicial notice "of the existence of another court's opinion" and finding error that the court took notice of disputed facts in opinion); *The Missing Link, Inc. v. eBay, Inc.*, No. C-07-04487 RMW, 2008 WL 1994886, at *4 (N.D. Cal. May 5, 2008) (noting offering court filings "for their contents" is "impermissible").

The two other documents Defendants request the Court take judicial notice of are not judicial proceedings but rather police documents—Defendant Johnson's arrest warrant affidavit and Meadows-Dickerson's recorded statement taken by the police. These documents are not properly the subject of judicial notice; they do not come close to meeting the threshold criterion of having undisputed accuracy. *See The Missing Link, Inc.*, 2008 WL 1994886, at *4. By contrast, Plaintiff has alleged that Defendant Johnson misrepresented and omitted key evidence in his affidavit and Meadows-Dickerson was improperly encouraged and pressured into giving a false statement. *See, e.g.*, ¶¶105, 107, 111–16. And Defendants cite both police documents for the truth of matters asserted. For example, they seek to introduce Meadows-Dickerson's recorded statement to show the officers did not engage in any misconduct. Def. Br. at 13. This is impermissible—even on summary judgment, the Court would have to view this evidence in the light most favorable to the Plaintiff; at no point would it be appropriate for the Court to take judicial notice of disputed facts which a jury would then be required to believe. *See Employers Ins. of Wausau*, 2008 WL 3916096, at *1, n.1. As a result, the Court must ignore these exhibits— and the many factual assertions Defendants make based on them. *See Adams v. Kraft*, No. 10-

CV-00602-LHK, 2011 WL 846065, at *19 (N.D. Cal. Mar. 8, 2011) (refusing to consider police documents relied on in plaintiff's complaint because plaintiff disputed their truthfulness).[3]

When matters outside the pleadings are presented and not excluded in Rule 12 papers, the district court must treat the motion as one for summary judgment "*and all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56.*" *Garaux v. Pulley*, 739 F.2d 437, 438 (9th Cir. 1984) (emphasis in original). It is reversible error to consider matters outside the pleadings on a Rule 12 motion without giving the plaintiff notice and an opportunity to marshal opposing evidence. *Id.* Here, no one has requested conversion to summary judgment, which would be inappropriate, in any event, where no discovery has yet taken place. *See Hotel Employees & Rest. Employees Local 2 v. Vista Inn Mgmt. Co.*, 393 F. Supp. 2d 972, 978, n.3 (N.D. Cal. 2005) (holding conversion to a Rule 56 motion was not proper "as plaintiff did not have the opportunity to discovery or submit materials to such a disposition.")

## II.   Mr. Trulove sufficiently alleges Defendants Phillips, Silver, Knoble, McMillan, Androvich, Trail, and Hagan were integral participants in constitutional violations which caused his wrongful conviction.

There is no question Plaintiff has alleged actionable misconduct by Defendants Johnson, D'Amico, Lee and John Doe #1. The crux of Defendants' argument is that Plaintiff fails to allege that the nine moving defendants were sufficiently involved in this misconduct. Def. Br. at 2–3. However, under the Ninth Circuit's "integral participation" analysis, Plaintiff's allegations are sufficient at this stage to identify each of the seven officers involved in the Kuka investigation as an integral participant in the constitutional violations alleged in the FAC.[4]

Under *Chuman v. Wright*, an officer's liability under § 1983 is predicated on his "integral participation" in the alleged violation. 76 F.3d 292, 294–95 (9th Cir. 1996); *see also Jones v.*

[3] Courts may also take judicial notice of documents referenced in a complaint, but "*only* when a document is central to plaintiff's claim and no party questions its authenticity" *Gerritsen v. Warner Bros. Entm't Inc.*, 112 F. Supp. 3d 1011, 1024 (C.D. Cal. 2015) (emphasis in original). Defendants do not claim that their exhibits meet this exception—nor could they, since none of these documents have undisputed accuracy and relevance to Plaintiff's claims.
[4] Defendants' argument for the two supervisory defendants is addressed in Part V, *infra*.

*Williams,* 297 F.3d 930, 935 (9th Cir. 2002). Officers who are "integral participants" in a constitutional violation are potentially liable under § 1983, even if each officer's actions themselves did not rise to the level of a constitutional violation. *See Boyd v. Benton County,* 374 F.3d 773, 780 (9th Cir. 2004) ("An officer who does not enter an apartment, but stands at the door, armed with his gun, while other officers conduct the search, can...be a full, active participant in the search" and therefore can be subject to § 1983 liability) (internal quotations and citation omitted). Integral participation requires some fundamental involvement in the conduct that allegedly caused the violation. *See Boyd,* 374 F.3d at 780 (holding that every officer who provided backup for another officer who unconstitutionally deployed a flash-bang device to enter a suspect's home could be held liable because "every officer participated in some meaningful way" in the arrest and "every officer was aware of the decision to use the flash-bang, did not object to it, and participated in the search operation knowing the flash-bang was to be deployed").

   Plaintiff sufficiently alleges each officer named in the FAC was an "integral participant" in the fabrication and suppression of evidence that resulted in his wrongful conviction. Plaintiff has alleged Defendants Phillips, Silver, Knoble, and McMillan, at the behest of Defendants Johnson and D'Amico, participated in the fabrication of Lualemaga's false identification of Mr. Trulove by improperly suggesting, pressuring and/or coercing her at Ingleside Police Station on the night of July 23–24, 2007 and then suppressing that they had ever done so. ¶¶60, 66–67. Further, Plaintiff alleges Defendants McMillan, Androvich and Trail, along with Defendant Johnson, continued to improperly exert pressure on Lualemaga to identify Mr. Trulove at her home on July 24, 2007, and never disclosed this information. (¶¶72–73).[5] Plaintiff also alleges

_____

[5] Defendants misconstrue Plaintiff's allegations by cherry-picking the word "possibly" from one sentence in Plaintiff's 47-page complaint to argue that Plaintiff fails to allege a July 24 meeting occurred. Not so. Plaintiff unequivocally alleges this meeting occurred and Defendants engaged in improper suggestion/pressure at that meeting. *See, e.g.,* ¶¶71–74 (titled "Officers visit Priscilla Lualemaga's home on the evening of July 27, 2007"). In the one sentence Defendants' focus on—the only time the word "possibly" appears in the FAC—Plaintiff alleges that it was possible Lualemaga was *also* shown Plaintiff's photo at that meeting, in addition to seeing his photo at other times. (¶132).

Defendants Johnson, McMillan and Hagan participated in the fabrication of Meadows-Dickerson's false identification of Mr. Trulove by engaging in suggestion to encourage Meadows-Dickerson's identification of Mr. Trulove and attempting to alter her statement to better fit the known facts of the murder. (¶107). Finally, Plaintiff alleges all nine officers were aware of the conversation witnessed by Barcenas at Ingleside Police Station on the night of July 23, 2007 between Defendants Lee, John Doe #1, and Lualemaga in which those officers improperly suggested to and pressured Lualemaga to identify Mr. Trulove as the shooter (¶¶56, 146–151), and intentionally hid it (¶61).

Plaintiff's allegations, taken as true, show these officers were not "mere bystanders" with no role in the unlawful conduct. *Chuman*, 76 F.3d at 294. To the contrary, Plaintiff alleges that each officer "participated in some meaningful way" in obtaining false identifications of Lualemaga and Meadows-Dickerson by improperly suggesting, pressuring, or coercing these witnesses on several occasions before they falsely identified Plaintiff, and hiding their misconduct throughout Plaintiff's criminal prosecution. Absent adequate discovery, it is impossible to tell the precise level of knowledge and involvement of each Defendant, but that is not Plaintiff's burden at the pleadings stage. As in *Boyd*, Plaintiff alleges each officer was aware of this misconduct, did not object to it, and—even stronger than the allegations in *Boyd*—did not just have knowledge misconduct would occur, but directly participated in the misconduct. Under the applicable legal authority, this is enough to show Defendants Phillips, Silver, Knoble, McMillan, Androvich, Trail, and Hagan were integral participants and therefore subject to § 1983 liability. *See Boyd* 374 F.3d at 780; *see also Allen v. Cty. of Lake*, No. 14-CV-03934-TEH, 2015 WL 434990, at *3 (N.D. Cal. Feb. 2, 2015) (finding adequate allegations that defendant was "present" at scene where alleged violations occurred because it was "plausible, within the context of the SAC as a whole, that a County employee who is present…in fact held a participatory role in the activities alleged."); *Bark v. Chacon*, No. 10-CV-01570-WYD-MJW, 2011 WL 1884691 (D. Colo. May 18, 2011) (denying motion to dismiss claims against a group

1  of individual defendants involved in single incident because all the grouped defendants were law

2  enforcement officials alleged to have been present at the incident and to have acted in concert).

3  **III.     Plaintiff has well-pleaded fabrication, suppression, and malicious prosecution**

4  **claims against Defendants Phillips, Silver, Knoble, McMillan, Androvich, Trail,**

5  **and Hagan.**

6  **a.     Fabrication of evidence**

7  To state a plausible claim for deliberate fabrication of evidence under *Devereaux v.*

8  *Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001), the plaintiff must first identify the evidence he

9  "contends the government deliberately fabricated." *Bradford v. Scherschligt*, 803 F.3d 382, 386

10  (9th Cir. 2015). Once that evidence is identified, Plaintiff must then allege the fabrication was

11  deliberate. *Id.* Reporting information known to be false is deliberate fabrication. *Costanich v.*

12  *Dep't of Soc. & Health Servs.*, 627 F.3d 1101, 1111–12 (9th Cir. 2010). But because alleging and

13  proving intent is often difficult, the Ninth Circuit has established "two circumstantial methods of

14  proving that the falsification was deliberate." *Bradford*, 803 F.3d at 386. First, Plaintiff can

15  allege facts showing the relevant defendants continued their investigation of him "even though

16  [they] knew or should have known that [he] was innocent." *Id.* Second, Plaintiff can allege the

17  relevant defendants "used investigative techniques that were so coercive and abusive that [they]

18  knew or should have known that those techniques would yield false information." *Id.*

19  Mr. Trulove's complaint clearly alleges that all the officers working on the investigation,

20  including the seven moving defendants, participated in fabrication of false identifications from

21  Lualemaga and Meadows-Dickerson claiming Mr. Trulove was the murderer of Kuka. (¶220(b)).

22  Plaintiff therefore meets the first prong of *Devereaux*. Moving to the second prong, Plaintiff's

23  allegations clearly meet the second method of proving the fabricated identifications were

24  deliberate. On two occasions, the Defendants improperly pressured, suggested or coerced

25  Lualemaga into Mr. Trulove as the shooter (¶¶66–67, 72–73). The officers knew or should have

26  known their direct pressure would yield false information since they knew Lualemaga 1) "didn't

27  really get a good look at the shooter" (¶48), so she would not have been capable of identifying

28

anyone, and 2) had previously failed to identify Mr. Trulove as the shooter after staring at his photograph at Ingleside Police Station for more than two hours, (¶¶37, 53). On another occasion, Plaintiff alleges that Defendants Johnson, McMillan and Hagan fabricated a false identification from Meadows-Dickerson. (¶107). They knew or should have known their direct pressure would yield false information since they knew Meadows-Dickerson was facing her third strike and so had an incentive to lie, and that her account of the shooting was entirely inconsistent with details they knew about the shooting. (¶¶100–01, 104, 105).[6]

Defendants offer the very statement Plaintiff alleges was fabricated to argue the officers did not engage in illegal investigative techniques. Def. Br. at 13. Clearly, the Court may not consider it, *see* Part I, *supra*.

At the pleadings stage, these allegations suffice. Defendants are incorrect that Plaintiff must state "what forbidden techniques these officers actually used" at the pleadings stage. Def. Br. at 12. Nothing in *Devereaux* suggests there are prerequisite allegations for every fabrication claim. Rather, in *Devereaux*, the Court was required to dissect the particularities of the investigative techniques used by law enforcement officials in order to decide *summary judgment*. 263 F.3d at 1074–76. On a motion to dismiss, Plaintiff's factual allegations—including the allegations that Defendants fabricated evidence and engaged in other misconduct—must be accepted as true. *Stapley*, 733 F.3d at 809. Particularly given the detailed allegations of misconduct by Defendants Johnson, D'Amico, Lee and John Doe #1, and the allegations that Defendants suppressed evidence of their misconduct, Plaintiff is entitled to discovery to establish the other officers' involvement in the misconduct. *See Wright v. City of Santa Cruz*, No. 13-CV-01230-LHK, 2014 WL 217089, at *3 (N.D. Cal. Jan. 17, 2014) (denying dismissal for failure to

---

[6] Mr. Trulove's fabrication theory of the Meadows-Dickerson identification also falls comfortably within the first *Devereaux* prong of continuing to investigate Mr. Trulove despite his innocence. Mr. Trulove has clearly alleged that no physical or forensic evidence tied him to the Kuka murder, no statements implicated him, and he consistently denied any involvement in the crime. (¶¶3, 91–92). By the time of Meadows-Dickerson's false identification, all Defendants knew or were willfully blind to the fact that there was no real evidence inculpating Mr. Trulove, and the only evidence they relied on was false and fabricated.

identify defendants' involvement "with greater precision" before discovery and when plaintiffs had identified specific acts that violated their constitutional rights).[7]

### b.   Suppression of evidence

Count I of the FAC also pleads a suppression of evidence claim: that officers violated Mr. Trulove's due process rights when they failed to disclose exculpatory and impeachment evidence under *Brady v. Maryland*, 373 U.S. 83 (1963), and its progeny. Specifically, the FAC alleges the seven moving defendants hid that they participated in the fabrications of Lualemaga and Meadows-Dickerson's false identifications. *See* ¶¶66, 73–74, 107, 146–151.

Defendants do not address the majority of Plaintiff's allegations of suppression of evidence. They focus on the suppression of their misconduct on July 24, 2007 at the home of Lualemaga, arguing Plaintiff's allegations are implausible. But Defendants misstate the test for plausibility in this circuit. In *Starr*, the Court held "Plaintiff's complaint may be dismissed only when defendant's plausible alternative explanation is so convincing that plaintiff's explanation is *im*plausible." 652 F. 3d at 1216 (emphasis in original). Defendants do not come close to meeting this high burden.

Their explanation for Defendants McMillan, Androvich, and Trail's failure to disclose the July 24, 2007 meeting—that it was Defendant Johnson's responsibility, not theirs—merely proposes an unsupported factual assertion; this issue cannot be decided as a matter of law on a motion to dismiss. *Whitlock v. Brueggemann*, 682 F.3d 567, 589 (7th Cir. 2012) (holding whether defendants met their Brady obligations is a question of fact for the jury). Nor is Defendants' alternative explanation of reliance on Johnson to disclose evidence so convincing to render Plaintiff's explanation—that the officers knowingly suppressed evidence of their own

---

[7] Defendants are not clear as to whether they are asserting a qualified immunity defense with respect to all of Mr. Trulove's fabrication claim. At a minimum, Defendants claim they are immune with regard to Mr. Trulove's allegations that they fabricated/coerced Lualemaga's identification at her home on July 24, 2007. Def. Br. at 12. This defense fails, as there is no question that the alleged fabrication of evidence were clearly unlawful in 2007, and no reasonable officer could have believed that fabricating evidence was constitutionally acceptable. *See, e.g.*, *Hayes v. Brown*, 399 F.3d 972, 980–84 (9th Cir. 2005) (declaring right not to have evidence fabricated against defendant has been "clear for decades").

misconduct—implausible. In this situation, as in *Starr*, where "there are two alternative explanations, one advanced by defendant and the other advanced by plaintiff, both of which are plausible," the Ninth Circuit directs: "plaintiff's complaint survives a motion to dismiss under Rule 12(b)(6)." 652 F. 3d at 1216.

Defendants cite *Tennison v. City and County of San Francisco* to suggest that only lead investigators have a duty to disclose under *Brady*. Defendants' reliance is misplaced—not only does *Tennison*, a summary judgment decision, not address a plaintiff's burden on the pleadings stage, it also does not squarely address whether officers involved in the case, other than the lead investigators, could be liable for withholding evidence. The court did tangentially address this issue when deciding whether Plaintiffs had to establish that the lead investigators acted in bad faith in withholding the evidence. The court cited to a Seventh Circuit case holding police officers and their supervisors could be liable for withholding evidence because: "*all of the police officers involved in this case[ ]* had ample notice that the knowing suppression of exculpatory material that was in the files at the time of the trial violated the defendant's constitutional rights." 570 F.3d 1078, 1088 (9th Cir. 2009) (quoting *Steidl v. Fermon*, 494 F.3d 623 (7th Cir. 2007)). Defendants have not provided any legal authority that all police officers involved in a case do not have a duty under *Brady*; and *Tennison* and *Steidl* suggest otherwise.[8]

---

[8] Plaintiff has also pleaded a claim for failure to disclose highly significant exculpatory evidence leading to his continued pre-trial detention. The Ninth Circuit has recognized a specific claim of "concealing or failing to turn over exculpatory evidence leading to prolonged detention" which is distinct from a *Brady* claim. *Tatum v. Moody*, 768 F.3d 806, 814–16 (9th Cir. 2014), *cert. denied*, 135 S. Ct. 2312 (2015) (noting defendants' description of plaintiff's claim as one based on the right to disclosure under *Brady* was "incorrect"). Defendants mischaracterize Plaintiff's claim under *Tatum* as a *Brady* claim and do not address its merits. There is no question Plaintiff's allegations meet the requirements laid out in *Tatum*: (1) a detention of unusual length—here, more than 16 months (¶244); (2) caused by the investigating officers' failure to disclose highly significant exculpatory evidence—here, Lualemaga's fabricated identification, highly significant because it was the sole evidence used against Plaintiff (¶¶241–42), and (3) due to culpable conduct in that the officers understood or were completely indifferent to the risks to the plaintiff's rights from withholding the information—here, Plaintiff alleges Defendants disregarded the risk of his deprivation of liberty, (¶243). 768 F.3d at 819–20.

1

### c. Malicious prosecution

2      Mr. Trulove's malicious prosecution claim alleges that Defendants caused his

3 prosecution without probable cause. *See Awabdy v. City of Adelanto*, 368 F.3d 1062, 1066 (9th

4 Cir. 2004). Under § 1983, a plaintiff may demonstrate malicious prosecution by establishing that

5 the underlying prosecution (1) was commenced by or at the direction of the defendant and was

6 pursued to a legal termination in his, plaintiff's, favor; (2) was brought without probable cause;

7 and (3) was initiated with malice. *Moore v. City of Oakland*, No. 14-CV-05637-JSC, 2015 WL

8 831612, at *2 (N.D. Cal. Feb. 23, 2015) (citation omitted). Defendants do not address the heart

9 of Mr. Trulove's allegations—that Defendants had no probable cause to arrest and prosecute

10 him. Instead, Defendants argue that only Johnson, who provided false information in his arrest

11 warrant, can be held liable for Mr. Trulove's malicious prosecution. Def. Br. at 16.

12      However, Plaintiff argues the other officers were integral participants in the falsification

13 and suppression of evidence in Johnson's affidavit. *See* Part II, *supra*. In malicious prosecution

14 claims, officers can be held liable not only for providing misinformation to a prosecutor, but also

15 for concealing exculpatory evidence and "otherwise engag[ing] in wrongful or bad faith conduct

16 that was actively instrumental in causing the initiation of legal proceedings." *Awabdy*, 368 F.3d

17 at 1067–68; *see also Galbraith v. Cty. of Santa Clara*, 307 F.3d 1119, 1126 (9th Cir. 2002)

18 (holding allegations that police officers knowingly withheld relevant information with the intent

19 to harm plaintiff, or knowingly supplied false information would adequately state a claim against

20 officers); *Harris v. Roderick,* 126 F.3d 1189, 1198 (9th Cir. 1997) (holding that a probable cause

21 determination "that is tainted by the malicious actions of the government officials [involved]

22 does not preclude a claim against the officials involved.") (internal quotation and citations

23 omitted). Plaintiff's allegations of malicious actions of the officers suffice at the pleadings stage;

24 he is entitled to discovery to prove that the Defendants' malicious actions "and other similarly

25 conspiratorial conduct" were "instrumental in causing the filing and prosecution of the criminal

26 proceedings." *Awabdy*, 368 F.3d at 1068.

27

28

**IV.    Mr. Trulove's conspiracy claim is well-pleaded.**

"To support a claim of a conspiracy under § 1983, [p]laintiff's [c]omplaint must contain sufficient factual matter to show: (1) the existence of an express or implied agreement among the defendant officers to deprive him of his constitutional rights, and (2) an actual deprivation of those rights resulting from that agreement." *Avalos v. Baca*, 596 F.3d 583, 592 (9th Cir. 2010) (citation omitted). Although an "agreement or meeting of minds to violate [the plaintiff's] constitutional rights must be shown," *Woodrum v. Woodward County*, 866 F.2d 1121, 1126 (9th Cir. 1989), "[d]irect evidence of improper motive or an agreement to violate a plaintiff's constitutional rights will only rarely be available." *Mendocino Environmental Center v. Mendocino County*, 192 F.3d 1283, 1302 (9th Cir. 1999). Even on summary judgment or at trial, "it will almost always be necessary to infer such agreements from circumstantial evidence or the existence of joint action." *Id.*

Defendants do not contest that withholding exculpatory evidence and fabricating inculpatory evidence violated Mr. Trulove's rights, so the overt acts requirement is met. Defendants claim Plaintiff fail to sufficiently allege an agreement among the SFPD Defendants Officers to violate Mr. Trulove's rights. Def. Br. at 17. Contrary to Defendants' assertion, Plaintiff alleges more than mere cooperation in a joint homicide investigation. Indeed, at ¶237, and throughout the FAC's factual allegations, Plaintiff makes specific allegations that early on in the investigation, Defendants decided to focus on Plaintiff Trulove, and then, when no witnesses came forward and they could not get a positive identification of Plaintiff as the shooter, they acted in concert to fabricate Lualemaga and Meadows-Dickerson's identifications. These allegations of concerted effort meet Plaintiff's burden at the pleadings stage. *See*, *e.g.*, *Harris*, 126 F.3d at 1196 (holding plaintiff meets pleading standard by alleging "which defendants conspired, how they conspired and how the conspiracy led to a deprivation of his constitutional rights even though he does not identify which officer said or did what at which particular time."); *Dinius v. Perdock*, No. C 10-3498 MEJ, 2012 WL 1925666, at *13 (N.D. Cal.

May 24, 2012) (denying motion to dismiss where plaintiff pled that defendants reached an agreement to fabricate evidence against him).

And, the case Defendants cite in support of their argument, *Beaman v. Freesmeyer*, 776 F.3d 500, 510 (7th Cir. 2015), is procedurally distinguishable from this case. In that case, the Seventh Circuit was reviewing a motion *for summary judgment,* so discussed and evaluated the evidence in detail. That has nothing to do with whether Plaintiff has met the pleading standard. More apt is *Gressett v. Contra Costa Cty.*, where Gressett alleged that members of the DA's office were part of a conspiracy to frame him. No. C-12-3798 EMC, 2013 WL 2156278, at *16 (N.D. Cal. May 17, 2013). Gressett alleged the defendants took acts suggestive of an agreement to go after him because of their previous animosity towards him and then withheld impeachment evidence against the alleged victim and exculpatory evidence about the inconsistencies in several witnesses' statements. *Id.* This Court held that Gressett's claim of a conspiracy among the DA's office defendants was sufficiently plausible given "the specific facts regarding the [defendants'] animosity (*i.e.*, motive), their acts consistent with a conspiracy to maliciously prosecute Gressett, and the fact that these Defendants worked together within the same office, which would have offered a heightened opportunity for collusion." *Id.* Like Gressett, Plaintiff has pleaded allegations regarding the Defendants' animosity towards him—since he was a child, they had suspected and targeted him as gang member (¶32); Defendants' acts suppressing and fabricating evidence consistent with malicious prosecution, *see* Part III, *supra*; and how the nature of the joint investigation heightened the opportunity for collusion (¶¶55–56). This circumstantial evidence is sufficient to state a conspiracy claim that is plausible on its face—all that is required at this stage. *See Mendocino Environmental Center*, 192 F.3d at 1302.

## V.    Mr. Trulove's supervisory liability claim against Defendants Johnson, D'Amico, Daniele and Slade is well–pleaded.

In order to hold these Defendants liable as supervisors, Plaintiff is not required to allege their presence at or personal involvement with the constitutional violation. *See Starr*, 652 F.3d at 1205, 1207. Plaintiff need allege only "a sufficient causal connection between the supervisor's

wrongful conduct and the constitutional violation." *Id.* at 1207 (quoting *Hansen v. Black*, 885 F.2d 642, 646 (9th Cir. 1989)). "The requisite causal connection can be established . . . by setting in motion a series of acts by others, or by knowingly refus[ing] to terminate a series of acts by others, which [the supervisor] knew or reasonably should have known would cause others to inflict a constitutional injury," *Id.* at 1207–08 (citations and quotation marks omitted). Plaintiff has certainly met that burden at this stage.

Defendants do not dispute Plaintiff's allegations suffice against Defendants Johnson and D'Amico in their roles as supervisors of the investigation; they argue the allegations against Defendants Sergeant Daniele and Officer-in-Charge Slade are not pled with sufficient particularity. However, these are not mere bare allegations. In fact, they are supported by specifics of what SFPD policy required at the time. (*See* ¶¶58–59.) These supervisors can claim during discovery that they did not follow their own policies, but certainly it is *plausible* they did. For example, Plaintiff asserts that as the supervisor of Lee and Phillips, Defendant Daniele monitored, directed, and evaluated the officers, in addition to reviewing and signing off on their reports. (¶58). Given these responsibilities, it is plausible Daniele would have known about Lee and Phillips's misconduct on the night of July 23, 2007, which suffices at this stage to support Daniele's personal or constructive knowledge of constitutional violations committed by his subordinates. *See Godoy v. Cty. of Sonoma*, No. 15-CV-00883-WHO, 2016 WL 269867, at *7 (N.D. Cal. Jan. 22, 2016) (holding allegations that a subordinate officer committed misconduct "under the supervision and view" of supervisory defendant who "did nothing to reprimand, retrain or otherwise discipline" officer was enough to attach supervisory liability to defendant).

Plaintiff also makes sufficient allegations that Defendant Slade knew or should have known about the misconduct occurring by all the SFPD Defendant Officers involved in the Kuka investigation, at least on the night of July 23, 2007 when he was "in charge." Plaintiff alleges that under the SFPD's own policies, to be "in charge" meant to monitor activities happening at Ingleside Station; direct and manage subordinate personnel;  and perform any duties required to ensure the station operations ran smoothly. (¶59). Given the misconduct witnessed by Barcenas

and other conversations occurred in an open area of the precinct while Slade was "in charge," it is certainly plausible that Slade knew about the conversations. These allegations are sufficient to support Slade's supervisory liability at the pleadings stage. *See, e.g., Isakhanova v. Muniz*, No. 15-CV-03759-TEH, 2016 WL 1640649, at *3 (N.D. Cal. Apr. 26, 2016)(declining to dismiss search and seizure allegations as against the sergeant who was "in charge of" the location where the alleged constitutional injuries occurred over a period of hours).

## VI.    Defendants are not immune against Plaintiff's state law claims.

Defendants seek dismissal of Plaintiff's state law claims, arguing that the individual defendants and the City and County of San Francisco are immune under California Government Code § 821.6. Defendants contend that this provision immunizes police and prosecutors against any misconduct during the course of an investigation prior to the filing of criminal charges. Def. Br. at 20–21. But the California Supreme Court has taken a "narrow interpretation of § 821.6's immunity, confining its reach to malicious prosecution actions." *Sullivan v. County of Los Angeles*, 527 P.2d 865, 871 (Cal. 1974) (holding lower court improperly dismissed false imprisonment claim, which is not shielded by § 821.6 immunity). Plaintiff did not bring a state-law malicious prosecution action here. And when interpreting state law, this Court is "bound by decisions of the state's highest court." *Vestar Dev. II, LLC v. Gen. Dynamics Corp.*, 249 F.3d 958, 960 (9th Cir. 2001) (internal citation and quotation omitted).

Defendants do not address *Sullivan*. Nor do they cite a single federal decision interpreting § 821.6. Rather, they rely on subsequent decisions of the California courts of appeals that directly contradict the central holding of *Sullivan*. But the courts of appeal cannot overrule a decision of the California Supreme Court. *See Auto Equity Sales, Inc. v. Superior Court*, 369 P.2d 937, 940 (Cal. 1962). ("The decisions of [the California Supreme Court] are binding upon and must be followed by all the state courts of California. . . . Courts exercising inferior jurisdiction must accept the law declared by courts of superior jurisdiction. It is not their function to attempt to overrule decisions of a higher court.").

This Court, along with the Eastern District Court of California, has recognized this inconsistency and, as they are required to do, have followed the Supreme Court and rejected the paths of the courts of appeal. *See, e.g.*, *Luong v. City & Cnty. of San Francisco*, No. C 11-5661, 2012 WL 5519210, at *8 (N.D. Cal. Nov. 14, 2012) ("[T]his Court has previously held that Section 821.6 only immunizes public employees from malicious prosecution claims and not other tort claims."); *Williams v. City of Merced*, No. 10-CV-01999, 2013 WL 498854, at *17 (E.D. Cal. Feb. 7, 2013) ("The Court agrees with the California Supreme Court's decision in *Sullivan* and finds that Section 821.6 only applies to claims for malicious prosecution.").[9] Dismissal of Plaintiff's state law claims based on immunity is inappropriate at this stage.

### VII.    Plaintiff's state law indemnification claim should not be dismissed.

Defendants have not demonstrated that Plaintiff's indemnification claim should be dismissed. Their reliance on *Williams v. Horvath* as authority that § 825 of the California Government Code does not provide Plaintiff with a separate cause of action against the City and County of San Francisco is misguided. The court in that case did not hold that § 825 does not give plaintiffs a separate cause of action, nor was that even the question before it.  The court addressed whether Supreme Court precedent implied that public entities were prohibited from indemnifying employees for § 1983 violations. *See* 16 Cal. 3d 834, 844 (1976) ("Though none of the parties to this litigation raise the issue, we realize that *Monroe* and *Moor* might conceivably be read to deny the states the right to provide indemnity for liability in a section 1983 action").

---

[9] *See also Myers v. City & Cnty. of San Francisco*, No. C 08-1163, 2012 WL 4111912, *7 (N.D. Cal. Sept. 18, 2012) ("It is true that some California appellate courts have interpreted this immunity broadly…This Court, however, has previously analyzed this specific issue and explicitly held that Section 821.6 only immunizes public employees from malicious prosecution claims."); *Tucker v. City of Richmond*, No. C 12-18239, 2012 WL 2571314, at *4–5 (N.D. Cal. July 2, 2012) ("This Court agrees with the California Supreme Court's decision in *Sullivan* and finds that Section 821.6 only applies to claims for malicious prosecution."); *Dinius*, 2012 WL 1925666, at *9 (N.D. Cal. May 24, 2012) (same); *see also* Frank J. Menetrez, *Lawless Law Enforcement: The Judicial Invention of Absolute Immunity for Police and Prosecutors in California,* 49 Santa Clara L. Rev. 393 (2009) (discussing *Sullivan* and the subsequent misinterpretation by the California court of appeals).

The court held public entities could indemnify employees in § 1983 cases. *Id.* at 848. Defendants have not provided any cases since *Williams* that resolve this issue; Plaintiff has found none.

However, plaintiffs may bring causes of action against public entities based on the doctrines of supplemental jurisdiction and necessary parties. For example, the Seventh Circuit held that federal courts have supplemental jurisdiction over "a state claim advanced in order to enable the collection of a judgment against the original defendant." *See Wilson v. City of Chicago*, 120 F.3d 681 (7th Cir. 1997). In that case, the plaintiff had a claim against an individual police officer, Jon Burge, whom the city was required to indemnify. *Id.* at 683. The court held that "[i]t does not follow that Wilson could not proceed under [the indemnification statute] until the judgment against Burge became final." *Id.* at 685. *See also IFC Interconsult, AG v. Safeguard Int'l Partners, LLC.*, 438 F.3d 298, 317 (3d Cir. 2006); *Hanania v. Loren-Maltese*, 56 F. Supp. 2d 1010, 1019 (N.D. Ill. 1999), aff'd, 212 F.3d 353 (7th Cir. 2000).

Additionally, in *Robinson v. Sappington*, the court held that a county that was required by statute to indemnify its employees was a necessary party to a suit against its employees because it had a financial interest in the outcome of the case. 351 F.3d 317, 339 (7th Cir. 2003). At least one court in the Ninth Circuit has recognized the validity of this reasoning. *See Brown v. Arizona*, No. CV-09-2272-PHX-GMS, 2010 WL 396387, at *2 (D. Ariz. Jan. 28, 2010) (citing *Robinson* and holding a public entity may be a necessary party to a suit, regardless of liability, if they are responsible for the payment of an adverse judgment). Plaintiff's indemnity claim should not be dismissed under either of these theories; Defendants have failed to demonstrate otherwise.

DATED: June 3, 2016

By:    /s/ Danielle Hamilton

Danielle Hamilton, NY Bar No. 5352653 (*pro hac vice*)

*One of Plaintiff Jamal Rashid Trulove's Attorneys*