Nick J. Brustin, NY Bar No. 2844405
  Email:  nick@nsbcivilrights.com
Anna Benvenutti Hoffmann, NY Bar No. 4412011
  Email:  anna@nsbcivilrights.com
Vishal Agraharkar, NY Bar No. 4931457
  Email:  vishal@nsbcivilrights.com
Jael Humphrey-Skomer, NY Bar No. 4697231
  Email: jael@nsbcivilrights.com
Meghna Philip, NY Bar No. 5527148
  Email: meghna@nsbcivilrights.com
NEUFELD, SCHECK AND BRUSTIN, LLP
99 Hudson Street, 8th Floor
New York, NY 10013
Telephone: (212) 965-9081

Kate Chatfield, State Bar No. 245403
  Email:  klchatfield@usfca.edu

Alex Reisman, State Bar No. 45813
  Email: areisman@msn.com
P.O. Box 10
Brisbane, CA 94005
Telephone: 415-608-0240

Attorneys for Plaintiff
JAMAL RASHID TRULOVE

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA, OAKLAND DIVISION

| | |
|---|---|
| JAMAL RASHID TRULOVE, | Case No.  16-cv-00050-YGR |
| Plaintiff, | |
| vs. | **MEMORANDUM IN SUPPORT OF MOTION TO EXCLUDE TESTIMONY OF DEFENDANTS' PROPOSED EXPERT CRAIG FRIES** |
| THE CITY AND COUNTY OF SAN FRANCISCO, ET AL, | |
| Defendants. | Hearing Date: November 14, 2017<br>Time:          2 p.m.<br>Place:         Courtroom 1, 4th Fl.<br>                  1301 Clay St., Oakland<br>Trial Date:   March 5, 2018 |

# TABLE OF CONTENTS

I.   INTRODUCTION ..........................................................................................................1

II.  ARGUMENT ..............................................................................................................4

   A.   The district court must act as gatekeeper to exclude junk science. .................................. 4

   B.   Fries lacks the necessary qualifications to offer his opinions. ......................................... 5

   C.   Fries lacks the medical education, training or experience to offer his opinions. ............. 6

   D.   Fries offers opinions on blood stain analysis, shell casings analysis and forensic reconstruction despite no relevant background in any of those disciplines, either.................... 10

   E.   Expertise in computer animation does not provide a foundation for the substantive opinions Fries offers. ........................................................................................................ 12

   F.   Fries's methodology is unscientific and unreliable. ......................................................... 13

     a.   None of the Daubert factors support a finding of reliability. ......................................... 14

     b.   Fries's methodology is not reliable. ................................................................................ 15

   G.   Fries relies on speculative factual assumptions unsupported by the record.................... 21

   H.   Fries's visualization of the shooting is extremely prejudicial........................................ 24

III.  Conclusion .............................................................................................................25

1

## <u>TABLE OF AUTHORITIES</u>

2

**Cases**

3

*Avila v. Willits Envtl. Remediation Tr.*, 633 F.3d 828 (9th Cir. 2011) ............................................ 5

4

*Bowoto v. Chevron Corp.*, No. C 99-02506 SI, 2006 WL 1627004 (N.D. Cal. June 12, 2006)... 24

5

*Brothers v. Akshar*, 383 Fed. Appx. 47 (2d Cir. 2010).................................................................. 8

6

*Bullock v. Daimler Trucks North America, LLC.*, 819 F. Supp. 2d 1172 (D. Colo. 2011).......... 24

7

*Cabrera v. Cordis Corp.*, 134 F.3d 1418 (9th Cir. 1998) .............................................................. 15

8

*Cooper v. Brown*, 510 F.3d 870 (9th Cir. 2007) .......................................................................... 14

9

*Dasho v City of Federal Way*, 101 F. Supp. 3d 1025 (W.D. Wash 2015).............................. 17, 19

10

*Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993).............................................. 5, 14, 24

11

*Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 43 F.3d 1311 (9th Cir. 1995) .......................... 15

12

*Domingo ex rel. Domingo v. T.K.*, 289 F.3d 600 (9th Cir. 2002) ................................................ 14

13

*Estate of Barabin v. AstenJohnson, Inc.*, 740 F.3d 457 (9th Cir. 2014) .............................. 4, 5, 14

14

*Estate of Gonzales v. Hickman*, No. ED CV 05-660 MMM (RCx), 2007 WL 3237727 (C.D. Cal.

15

   May 30, 2007)........................................................................................................................ 21

16

*Fancher v. Barrientos*, No. CIV 11-118 JAP/LAM, 2015 WL 5090360 (D.N.M. May 27, 2015)

17

   ............................................................................................................................................ 11

18

*Flores v. McDonald*, No. CV 09-5780 GW, 2014 WL 102343 (C.D. Cal. Jan. 7, 2014) ............. 7

19

*Foster v. City of Fresno*, 392 F. Supp. 2d 1140 (E.D. Cal. 2005) ................................................ 11

20

*Guidroz-Brault v. Missouri Pac. R. Co.*, 254 F.3d 825 (9th Cir. 2001) ...................................... 21

21

*Jinro Am. Inc. v. Secure Investments, Inc.*, 266 F.3d 993 (9th Cir. 2001)................................. 5, 9

22

*Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137 (1999)......................................................... 5

23

*Lewis v. City of Hayward*, No. C 03-5360 CW, 2006 WL 436134 (N.D. Cal. 2006) ................... 8

24

*Menjivar v. City of Los Angeles*, No. CV 06-02201, 2007 WL 4662062 (C.D. Cal. Jul. 24, 2007)

.................................................................................................................................... 11, 17

*Metabolife Intern., Inc v. Wornick*, 264 F.3d 832 (9th Cir. 2001) ................................................. 15

*Newkirk v. ConAgra Foods Inc.*, 438 Fed. Appx. 607 (9th Cir. 2011) ......................................... 23

*Ochoa v. Davis*, No. CV 99-11129, 2016 WL 3577593 (C.D. Cal. June 30, 2016) ...................... 9

*Ollier v. Sweetwater Union High Sch. Dist.*, 768 F.3d 843 (9th Cir. 2014) .................... 13, 19, 22

*People of the Territory of Guam v. Reyes*, 879 F.2d 646 (9th Cir. 1989) ....................................... 7

*Pooshs v. Phillip Morris USA, Inc.*, 287 F.R.D. 543 (N.D. Cal. Dec. 5, 2012) ............................. 8

*Primiano v. Cook*, 598 F.3d 558 (9th Cir. 2010) ........................................................................... 8

*Sigler v. American Honda Motor Co.*, 532 F.3d 469 (6th Cir. 2008) ........................................... 13

*Stathakos v. Columbia Sportswear Co.*, No. 15-CV-04543-YGR, 2017 WL 1957063 (N.D. Cal.

May 11, 2017) ............................................................................................................................ 5

*Tubar v. Clift*, No. C05-1154-JCC, 2009 WL 1325952 (W.D. Wash. May 12, 2009) ................ 11

*United States v. Sandoval-Mendoza*, 472 F.3d 645 (9th Cir. 2006) .............................................. 8

*United States v. Santini*, 656 F.3d 1075 (9th Cir. 2011) ............................................................... 6

*Valtierra v. City of Los Angeles*, 99 F. Supp. 3d 1190 (C.D. Cal. 2015) ....................................... 8

*Wettlaufer v. Mt. Hood R. Co.*, No. 95-35016, 77 F.3d 491 (Table), 1996 WL 48400 (9th Cir.

Feb. 6, 1996) ............................................................................................................................. 8

*White v. Ford Motor Co.*, 312 F.3d 998 (9th Cir. 2002) ................................................................ 6

*Wilson v. Woods*, 163 F.3d 935 (5th Cir. 1999) .......................................................................... 13

*Yeti by Molly, Ltd. V. Deckers Outdoor Corp.*, 259 F.3d 1101 (9th Cir. 2001) .......................... 21

**Other Authorities**

Aisling A. Galligan, Craig Fries, & Judy Melinek, *Gunshot wound trajectory analysis using forensic animation to establish relative positions of shooter and victim*, 271 Forensic Science Int'l e8, e8 (2017) ................................................................................................................ 7

**Rules**

Federal Rules of Civil Procedure 26(a)(2)(B) ............................................................... 21

Federal Rules of Evidence 702 ...................................................................................... 5, 21

Federal Rules of Evidence 703 ...................................................................................... 5, 21

**TABLE OF EXHIBITS**
(*Denotes Exhibit Filed Under Seal)

**Exhibit A** – Report of Plaintiff's Expert Dr. Judy Melinek, July 28, 2017, *Trulove v. CCSF, et al.**

**Exhibit B** – Report of Plaintiff's Expert Dan Kruger, Aug. 25, 2017, *Trulove v. CCSF, et al.**

**Exhibit C** – Report of Defendants' Expert Craig Fries, July 27, 2017, *Trulove v. CCSF, et al.**

**Exhibit D** – Deposition of Craig Fries–Excerpts, Sept. 12, 2017, *Trulove v. CCSF, et al.*

**Exhibit E** – Drawing of scene from 7/24/2007, Various photos marked by Priscilla Lualemaga*

**Exhibit F** – Deposition of Priscilla Lualemaga–Excerpts, Feb. 13–14, 2017, *Trulove v. CCSF, et al.*

**Exhibit G** – Excerpts of Deposition Exhibit 201, *Fries Website Exhibit*, Marked at Deposition of Craig Fries on 9/12/2017, *Trulove v. CCSF, et al.*

**Exhibit H** – Rebuttal Report of Plaintiff's Expert Dr. Judy Melinek, Aug. 11, 2017, *Trulove v. CCSF, et al.**

**Exhibit I** – Declaration of Dr. Judy Melinek, Oct. 8, 2017, *Trulove v. CCSF, et al.*

**Exhibit J** – Order on Motions in Limine, *Knox v. Fresno, et al.*; Case No. 1:14-cv-00799-EPG

**Exhibit K** – Plaintiff's Motions in Limine, *Knox v. Fresno, et al.*; Case No. 1:14-cv-00799-EPG

**Exhibit L** – *Gunshot wound trajectory analysis using forensic animation to establish relative positions of shooter and victim*, Article co-authored by Dr. Judy Melinek and Craig Fries

**Exhibit M** – *Curriculum Vitae* of Craig Fries, *Trulove v. CCSF, et al.*

**Exhibit N** – Rebuttal Report of Plaintiff's Expert James Norris, Aug. 11, 2017, *Trulove v. CCSF, et al.*

**Exhibit O** – Declaration of James Norris, Oct. 5, 2017, *Trulove v. CCSF, et al.*

**Exhibit P** – Declaration of Megan Caulder, Membership Secretary of the California Association of Criminalists, Sept. 20, 2017, *Trulove v. CCSF, et al.*

**Exhibit Q –**    Deposition of Dan Kruger–Excerpts, Sept. 19, 2017, *Trulove v. CCSF, et al.*

**Exhibit R –**    Expert report of James Norris, July 28, 2017, *Trulove v. CCSF, et al.**

**Exhibit S –**    Addendum Report of Dr. Judy Melinek (Parts 1–3), Aug. 25, 2017, *Trulove v. CCSF, et al.*

**Exhibit T –**    Deposition of Judy Melinek–Excerpts, Sept. 1, 2017, *Trulove v. CCSF, et al.*

**Exhibit U –**    2010 Trial in *People v. Trulove*, Jan. 21, 2010, Excerpts of Testimony by Priscilla Lualemaga

**Exhibit V –**    Preliminary Hearing in *People v. Trulove*, May 19, 2009, Excerpts of Testimony by Priscilla Lualemaga

**Exhibit W –**    2015 Trial in *People v. Trulove*, People's Exhibit CCC

**Exhibit X –**    2015 Trial in *People v. Trulove*, Feb. 18, 2015, Excerpts of Testimony by Priscilla Lualemaga

**Exhibit Y –**    2015 Trial in People v. Trulove, Feb. 17, 2015, Excerpts of Testimony by Inspector John Evans

## I.     INTRODUCTION

In this § 1983 suit, Plaintiff has amassed overwhelming evidence that he is innocent of the murder of Seu Kuka, and that it was only due to the misconduct of the Defendant San Francisco Police Department ("SFPD") officers that he was wrongly prosecuted and convicted. This misconduct included, for example, engaging in improper suggestion with the sole testifying witness, Priscilla Lualemaga, and suppressing forensic evidence that contradicts her account of the shooting. Plaintiff designated two experts with stellar credentials in their fields—forensic pathologist Dr. Judy Melinek and former director of the SFPD Crime Lab James Norris—who together describe how medical and forensic evidence disproves Ms. Lualemaga's account of the crime. Ms. Lualemaga claimed she saw the shooter standing uphill and to the west of the victim when he shot Kuka on the sidewalk next to her building; medical and forensic evidence demonstrates the shooter was actually on the *complete opposite* side—downhill and east—of the victim at the time of the shooting, in an area outside of Ms. Lualemaga's view from her window. *See* Ex. A, Melinek Rpt. ¶¶ 2–68; Ex. B, Kruger Rpt. ¶¶ 19, 21 & Appx. E (images depicting manner in which shooting may have occurred consistent with the medical and forensic evidence).

In response, Defendants did not designate a single qualified forensic pathologist or ballistics expert to dispute the conclusions reached by Dr. Melinek and Mr. Norris. This is not an accident. The Medical Examiner who conducted the autopsy, Dr. Ellen Moffatt, whom Defendants designated as an expert, does not dispute any of Dr. Melinek's claims. SFPD Crime Lab firearms analyst Gerald A. Smith, who testified for the prosecution at Mr. Trulove's retrial and whom Plaintiff deposed about firearm ejection patterns, offered opinions so supportive of Plaintiff's case that we designated him as our own unretained expert.

1    Unable to obtain opinions helpful to their case from qualified experts, Defendants instead

2  produced a lengthy report from Craig Fries, a computer animator with no science background

3  and no medical or forensic education or training, who nevertheless issued thirteen specific

4  conclusions "to a reasonable degree of scientific certainty" as to how the shooting occurred.

5  Fries claimed "the most natural and likely reconstruction of the event" was that the shooter

6  started off uphill and to the west of the victim, as Ms. Lualemaga had testified, but that the

7  shooter then ran down the hill to the east of the victim, shooting a number of the nine shots at the

8  victim's prone body as he backed down the hill. *See* Ex. C, Fries Rpt. 58–59, ¶¶ 1–10; *see also*

9  33–39, 43–45 (and accompanying graphics). But despite Fries's claim that his illustration

10  "align[s] well" with Ms. Lualemaga's statements, Ex. C, Fries Rpt. 58 ¶ 9, Fries has admitted

11  that Ms. Lualemaga never suggested the shooter was backing down the hill. Ex. D, Fries Dep.

12  285:21–86:22. Rather, Ms. Lualemaga's consistent account was that the shooter chased Mr.

13  Kuka down the hill in front of her apartment building and then shot Kuka from behind while

14  standing just west of him, facing downhill (to the east).[1] Ms. Lualemaga confirmed the shooter

15  stood directly behind Kuka and did not move "more than a few inches or a foot" while shooting.

16  Ex. F, Lualemaga Dep. 360:19–61:25. The only person to ever suggest the shooter backed down

17  the hill while shooting was Fries—presumably in an attempt to account for the shell casings.

18

19  _____

20  [1] Over the course of the investigation, including in her first recorded interview with officers, and
in her repeated sworn testimony (three times during criminal proceedings and twice in
deposition) Ms. Lualemaga not only consistently gave this account but also drew images and

21  marked photographs with an 'x' or an 's' to indicate the position of the shooter at the time of the
shooting. *See* Ex. E, Lualemaga Marked Photos at 1, 2, 4; *see also infra* note 12. The only

22  exception was on cross-examination during her deposition, after it was pointed out that based on
this description she could not have seen the shooter's face; Ms. Lualemaga then suddenly

23  claimed the shooter faced north. *See* Ex. E, Lualemaga Marked Photos at 5; Ex. F, Lualemaga
Dep. 369:1–79:11. But even this new version was inconsistent with Fries's illustration. Ex. C,

24  Fries Rpt. 27–29, 44–45 (and accompanying images).

1    Fries also criticized Mr. Norris's firearm analysis, concluding that the description of the

2    shooting given by Dr. Melinek and Mr. Norris "is demonstrably incorrect…[and] is not

3    supported by the physical evidence." Ex. C, Fries Rpt. 59 ¶¶ 11–13. Fries provided a series of 3D

4    illustrated stills depicting his hypothesis about how the shooting occurred, purporting to illustrate

5    portions of Ms. Lualemaga's account, and rebutting the opinions of Dr. Melinek and Mr. Norris.

6    *See* Ex. C, Fries Rpt. 33–45 (and accompanying graphics) & Rpt. Exhibits S–Y.

7    As Fries emphasizes on his own website, for one of his 3D models to be admissible, a

8    qualified expert "must act and testify as the foundational sponsor for all critical inputs to the

9    animation," which must be "an illustration of the experts' opinions," Ex. G, Fries's Website,

10   Dep. Exhibit 201 at 34 (advertising "an animation that is akin to the experts themselves drawing

11   on a white board, albeit with much better accuracy, fidelity to their opinions, and graphic

12   quality"); Ex. D, Fries Dep. 139:19–42:25. Thus, in the past, Fries has typically illustrated the

13   opinions of qualified experts in their fields—forensic pathologists, ballistics experts, crime scene

14   reconstructionists—which is the standard practice in his field of computer animation and digital

15   modeling. *See* Ex. B, Kruger Rpt. ¶ 4; Ex. H, Melinek Rebuttal Rpt. ¶ 4.

16   Here, however, Fries skipped that critical step. Rather than illustrate the opinions of

17   qualified experts, Fries *himself* provided those foundational opinions in a diverse array of fields

18   including forensic pathology, bullet trajectory analysis, blood stain analysis, and shell casing

19   analysis; the only thing they have in common is that Fries is manifestly unqualified to opine in

20   any of them. As one might expect, this leads to fatal errors in the analysis. For example, the

21   medical evidence is completely inconsistent with the order of shots Fries describes. The shot

22   Fries claims is first could *not* have been first because there was no bleeding associated with it in

23   the peritoneum; this indicates that shot must have come later in the sequence, after the victim's

24

1    heart had stopped beating. Ex. H, Melinek Rebuttal Rpt. ¶ 9; Ex. I, Melinek Decl. ¶¶ 20–22. Nor

2    would any of the shots that Fries concludes were the first three have been immediately

3    incapacitating, meaning there is no reason they would have led the victim to immediately drop to

4    his knees as Fries depicts. Ex. I, Melinek Decl. ¶¶ 22–23; Ex. C, Fries Rpt. 24 (image). To the

5    extent Fries's methodology is identifiable, it is unscientific and unreliable—little more than an

6    amateur's personal opinion and speculation. Moreover, many of the foundational assumptions on

7    which Fries relies are either unsupported or directly contradicted by the evidence in the record.

8        Fries is no doubt skilled at creating realistic, 3D visual models; he advertises that these

9    "turn jurors into witnesses" and often are the "single most intuitive, compelling, and memorable

10   piece of information that a jury will see." Ex. D, Fries Dep. 30:11–31:10; Ex. G, Fries's Website,

11   Dep. Exhibit 201 at 281. But due to their dramatic power to create lasting impressions on jurors,

12   these models carry a concomitant potential to mislead and confuse the jury, particularly where—

13   as here—they are unsupported by reliable or accurate foundations. This was precisely the

14   conclusion reached by a neighboring district court last year, which excluded Fries's animation as

15   unreliable and prejudicial.[2] The same is true here. The opinions and illustrations Fries has

16   provided here are the epitome of junk science; they must be excluded in their entirety.

17   **II.    ARGUMENT**

18       **A.  The district court must act as gatekeeper to exclude junk science.**

19       "The duty falls squarely upon the district court to act as a gatekeeper to exclude junk

20   science that does not meet Federal Rule of Evidence 702's reliability standards." *Estate of*

21   *Barabin v. AstenJohnson, Inc.*, 740 F.3d 457, 463 (9th Cir. 2014) (internal citations and

22

23   _____
     [2] *See* Ex. J, Order on Motions in Limine at 3, *Knox v. Fresno*, No. 1:14-cv-00799-EPG (E.D.
24   Cal.  June 2, 2016); Ex. K, Pls. Mot. in Limine at 4–7, *Knox v. Fresno*, No. 1:14-cv-00799-EPG
     (E.D. Cal.  Apr. 29, 2016).

1   quotation marks omitted). This includes taking care "to assure that a proffered witness truly

2   qualifies as an expert" based on relevant "knowledge, skill, experience, training, or education."

3   *Jinro Am. Inc. v. Secure Investments, Inc*., 266 F.3d 993, 1004 (9th Cir. 2001); Fed. R. Evid. 702.

4   And it also requires that "an expert's testimony has 'a reliable basis in the knowledge and

5   experience of the relevant discipline.'" *Barabin*, 740 F.3d at 463 (quoting *Kumho Tire Co., Ltd.*

6   *v. Carmichael*, 526 U.S. 137, 149 (1999)). This ensures that any admitted expert "employs in the

7   courtroom the same level of intellectual rigor that characterizes the practice of an expert in the

8   relevant field." *Kumho Tire Co.,* 526 U.S. at 152. "In a case involving scientific evidence,

9   *evidentiary reliability* will be based upon *scientific validity*." *Daubert v. Merrell Dow Pharm.,*

10  *Inc.*, 509 U.S. 579, 590 n.9 (1993) (emphasis in original). Further, a court must confirm that

11  proffered opinions fit "the facts of the case" and are based on "sufficient facts or data" of the sort

12  "experts in the particular field would reasonably rely on." Fed. R. Evid. 702(b), (d), 703.

13  Defendants, as the proponents of Fries's testimony, bear the burden of convincing the Court he

14  meets each of these three requirements: (1) that he is qualified and (2) that his opinions are the

15  product of reliable methods (3) which have been applied to facts for which there is support in the

16  record. *See Stathakos v. Columbia Sportswear Co.*, No. 15-CV-04543-YGR, 2017 WL 1957063,

17  at *2–3 (N.D. Cal. May 11, 2017). Fries fails all three tests.

18  **B.  Fries lacks the necessary qualifications to offer his opinions.**

19  Experts who lack appropriate qualifications are properly excluded on that basis alone. *See*

20  *Avila v. Willits Envtl. Remediation Tr.*, 633 F.3d 828, 839 (9th Cir. 2011) (holding district court

21  may properly exclude expert who offers opinions outside "the reasonable confines of his subject

22  area" without even evaluating the reliability of his methods). "An expert in one field…cannot

23  express an opinion relying on data that requires expertise in another field." *United States v.*

24

*Santini*, 656 F.3d 1075, 1078–79 (9th Cir. 2011) (holding district court abused its discretion in permitting expert to testify outside his field, requiring retrial). An "expert" witness who testifies outside his or her area of expertise is in fact a layperson, and "ought not to be anointed with ersatz authority as a court-approved expert witness for what is essentially a lay opinion." *White v. Ford Motor Co.*, 312 F.3d 998, 1008–09 (9th Cir. 2002).

Although Fries is qualified to create courtroom graphics, nothing in his background qualifies him to offer foundational opinions about how a shooting occurred. Such opinions require a specialized knowledge in medicine—specifically forensic pathology—shell casings analysis, and other scientific disciplines in which Fries has no education or requisite experience.

**C. Fries lacks the medical education, training or experience to offer his opinions.**

The bulk of Fries's proffered opinions—numbers 1 through 10 and 13—purport to analyze the physical and forensic evidence (including the victim's injuries noted in the autopsy report, blood stains that appear in photographs, the geography of the crime scene, and witness testimony) to conduct a bullet trajectory analysis and conclude, to a reasonable degree of scientific certainty, how the shooting occurred.[3] As Fries himself acknowledged in the *first sentence* of an article he co-authored earlier this year with Plaintiff's forensic pathologist, Dr. Melinek, this is a job for a forensic pathologist, i.e., a medical doctor with specialized training in determining cause of death: "Forensic pathologists who perform autopsies in gunshot cases may

---

[3] Fries's report presents these conclusions as definitive statements about what happened during the shooting. *See, e.g.,* Ex. C, Fries Rpt. 58 ¶ 1 ("Seu Kuka was shot initially from behind at intermediate range by a shooter who was in the location described by the eyewitness. This caused gunshot wound H/P."). After Dr. Melinek criticized Fries's conclusions in part because there was not enough medical evidence to determine with certainty the precise order of shots—and the available evidence contradicted the shot order that he endorsed—Fries revised his opinion at his deposition, claiming he had only presented "one of the potential" shot sequences that matches the physical evidence. *See* Ex. D, Fries Dep. 14:15–16:7; 16:21–17:23, 23:5–14.

1   be asked to determine the bullet trajectories in the body in order to elucidate the circumstances of

2   a homicide and answer questions about range of fire, the order of shots fired, and the relative

3   positions of the shooter and victim at the scene." Ex. L[4]; *see also People of the Territory of*

4   *Guam v. Reyes*, 879 F.2d 646, 650–51 (9th Cir. 1989) (holding testimony as to "the position of

5   the decedent when she was shot based on the path of the bullet through her body…required

6   scientific and specialized knowledge…well within the…experience and expertise" of a qualified

7   forensic pathologist); *Flores v. McDonald*, No. CV 09-5780 GW, 2014 WL 102343, *15 (C.D.

8   Cal. Jan. 7, 2014) ("A forensic pathologist is qualified to testify about bullet trajectories.").

9        Dr. Melinek, to whom Fries has personally referred others for expert opinion in this area,

10   Ex. D, Fries Dep. 238:24–39:7, and whose "knowledge in this area" he has described as

11   "unimpeachable," Ex. G, Fries's Website, Dep. Exhibit 201 at 109; Ex. D, Fries Dep. 237:10–

12   239:17, makes clear that these opinions are medical ones that require medical expertise. Ex. H,

13   Melinek Rebuttal Rpt. ¶ 3; Ex. I, Melinek Decl. ¶¶ 3, 14–46. Dr. Melinek explains in detail why

14   that is so. For example, her opinion as to a possible sequence of shots relies on forensic medical

15   knowledge and training including whether wounds would be immediately incapacitating;

16   whether the amount and location of internal bleeding is consistent with a shot being earlier or

17   later in the sequence; and the extent of bullet fragments a pathologist would expect to see based

18   on the specific organs and bones it intersected. Ex. H, Melinek Rebuttal Rpt. ¶¶ 6–9, 11; Ex. I,

19   Melinek Decl. ¶¶ 14–46. Indeed, this analysis requires not only a medical degree but also the

20

21   ───────────────

22   [4] Aisling A. Galligan, Craig Fries, & Judy Melinek, *Gunshot wound trajectory analysis using forensic animation to establish relative positions of shooter and victim*, 271 Forensic Science Int'l e8, e8 (2017). As Dr. Melinek explained, she wrote the portions of those articles related to the medical evidence and medical opinion, which Mr. Fries is not qualified to do. Mr. Fries wrote the portions related to computer illustration, but signed on to the article in full. Ex. I, Melinek Decl. ¶¶ 44–45.

23

24

1   specialized experience and training that come with a board certification as a forensic pathologist;

2   as Dr. Melinek explains, peer-reviewed literature has reported that even trauma surgeons and

3   emergency medical personnel "incorrectly identify the entrance and exit wounds in fatal cases

4   and make serious errors in trajectory analysis." Ex. I, Melinek Decl. ¶ 15.

5       The practice of medicine is a "learned profession," and "much of medical decision-

6   making relies on judgment—a process that is difficult to quantify or even to assess

7   qualitatively." *Primiano v. Cook*, 598 F.3d 558, 565 (9th Cir. 2010). Thus, in discharging their

8   gatekeeping responsibilities under *Daubert*, courts "focus[] especially on [the] *experience*" of the

9   proffered medical expert. *Id*. at 566 (emphasis added). Courts routinely preclude individuals

10  without medical training from offering medical opinions. *See, e.g.*, *Wettlaufer v. Mt. Hood R.*

11  *Co.*, No. 95-35016, 77 F.3d 491 (Table), 1996 WL 48400, at *2–3 (9th Cir. Feb. 6, 1996)

12  (holding district court abused its discretion in admitting medical opinion testimony from

13  qualified biomechanical engineer); *Brothers v. Akshar*, 383 Fed. Appx. 47, 49 (2d Cir. 2010)

14  (affirming exclusion of opinions from expert who lacked qualifications to testify to forensic

15  pathology or crime scene reconstruction); *Pooshs v. Phillip Morris USA, Inc.*, 287 F.R.D. 543,

16  550–51 (N.D. Cal. Dec. 5, 2012) (excluding epidemiologist from opining on cause of plaintiff's

17  cancer as he was not a medical doctor); *Lewis v. City of Hayward*, No. C 03-5360 CW, 2006 WL

18  436134 at *9 (N.D. Cal. 2006) (precluding police practices expert from opining as to cause of

19  death); *Valtierra v. City of Los Angeles*, 99 F. Supp. 3d 1190, 1196–97 (C.D. Cal. 2015) (same).

20      The key question for admissibility of proffered medical opinion is whether "physicians

21  would accept [the testimony] as useful and reliable." *United States v. Sandoval-Mendoza*, 472

22  F.3d 645, 655 (9th Cir. 2006). The answer here is a resounding no. Fries's only higher-education

23  degree is a B.A. in psychology. Ex. M, Fries C.V. at 2. The only medical training he purports to

24

have consists of whatever expertise has "rubbed off" while "working with biomechanics and sometimes medical doctors [and] pathologists" during his career as an animator. Ex. D, Fries Dep. 67:9–17, 266:25–67:13. This theory of expertise by osmosis, without any education or training in the relevant field, was thoroughly repudiated by the Ninth Circuit in *Jinro Am. Inc. v. Secure Investments, Inc.*, which called the proffered expert's qualifications "glaringly inadequate." 266 F.3d 993, 1005–06 (9th Cir. 2001); *see also Ochoa v. Davis*, No. CV 99-11129, 2016 WL 3577593, at *46–48 (C.D. Cal. June 30, 2016) (describing it as "obvious" that trained homicide investigator was unqualified to testify to matters requiring training in forensic science such as location and angle of wounds and significance of blood smear evidence).

As one might expect when someone without even rudimentary background in the field attempts to offer medical opinions, Fries fails badly. Thus, for example, Fries apparently did not understand that the two shots he identifies as the first to hit Kuka—H/P and F—were not immediately incapacitating and would not have caused the victim to stop and fall immediately to his knees upon being shot, as Fries depicts them doing. Ex. I, Melinek Decl. ¶¶ 22–23; Ex. C, Fries Rpt. 24 (image). And if Kuka had fallen on the concrete path as Fries depicts, there would be injuries to his knee; but the autopsy report and diagrams reveal no such injury. Ex. I, Melinek Dec. ¶ 23. Even worse, shot H/P could *not* have been one of the first in the sequence, because the lack of hemoperitoneum (blood in the peritoneal cavity) means Kuka's heart had already stopped beating when that shot was sustained—a clear indication it came late in the sequence of gunshots. Ex. H, Melinek Rebuttal Rpt. ¶ 9; Ex. I, Melinek Decl. ¶¶ 20–22. Another obvious failure is Fries's depiction of all 6 head shots occurring while Kuka was lying on the ground. As Dr. Melinek explained, despite the existence of 5 single exit wounds, the shrapnel fragments recovered from his face and arm are of insufficient mass to account for 5 bullets, and many of

1    these rounds would not have been expected to completely disintegrate based on what bones and

2    tissues they went through. If all 6 head shots occurred while Kuka was on the pavement, one

3    would expect to see either several deformed bullets on the ground or enough shrapnel to account

4    for the rounds that exited his face. Ex. H, Melinek Rebuttal Rpt. ¶ 11; Ex. I, Melinek Decl. ¶ 34.[5]

5    **D.  Fries offers opinions on blood stain analysis, shell casings analysis and forensic reconstruction despite no relevant background in any of those disciplines, either.**

6    In addition to lacking medical expertise, Fries also lacks the relevant *forensic* expertise to

7    offer his opinions. Fries does not have the training or experience to analyze crime scene

8    evidence. Ex. M, Fries C.V. at 2; Ex. I, Melinek Decl. ¶ 14; Ex. N, Norris Rebuttal Rpt. 2; Ex. B,

9    Kruger Rpt. ¶ 15; Ex. O, Norris Decl. ¶ 7. For example, Fries testified he gave the location and

10   pattern of bloodstain evidence "primary weight" in his visual images and used the stains to draw

11   conclusions about the victim's positioning before he was shot. *See, e.g.* Ex. C, Fries Rpt. 16, 18–

12   20, 36, 37, 39; Ex. D, Fries Dep. 158:25–59:2. Yet, as Dr. Melinek notes, the interpretation of

13   blood stains requires specialized training Fries does not have. According to a 2009 study by the

14   National Academy of Sciences, interpreting and integrating bloodstain patterns into a

15   reconstruction is its own specialized field requiring, at a *minimum*, an appropriate scientific

16   education, as well as an understanding of the physics of fluid transfer, the pathology of wounds,

17   and the general patterns blood makes after leaving the human body; a professional group in the

18   field recommends at least a 240-hour course in this field alone. Ex. I, Melinek Decl. ¶ 29. Fries

19   does not have any of those qualifications; his only proffered source of expertise is "working in

20

21

22

23   [5] For a more complete description of the many medical errors Fries makes, read Dr. Melinek's reports in full. Ex. A, Melinek Rpt.; Ex. H, Melinek Rebuttal Rpt.; Ex. I, Melinek Decl.; Ex. S, Melinek Addendum.

24

1    this field as long as I have and looking at the photographs and the bloodstain evidence, which is

2    always critical data in many of these cases." Ex. D, Fries Dep. 121:12–25.

3         As another example, Fries offers some minimal opinions on the significance of shell

4    casings found at the scene, as well as criticizing the conclusions and methodology of Plaintiff's

5    firearms expert, James Norris. *See* Ex. C, Fries Rpt. 58–59 ¶¶ 11–12. But unlike Norris or the

6    SFPD Crime Lab analyst Smith that Plaintiff deposed in this suit, Fries has never worked in a

7    crime lab, and his only education or training related to ballistics is one 24-hour class from

8    Michael Haag on shooting reconstruction. Ex. D, Fries Dep. 67:21–68:3, 76:1–83:17; Ex. O,

9    Norris Decl. ¶ 7. Nothing in his experience and education provides him with the expertise

10   required to opine on "predictive power of the found location of shell casings." *See, e.g., Menjivar*

11   *v. City of Los Angeles*, No. CV 06-02201, 2007 WL 4662062, at *6 n.54 (C.D. Cal. Jul. 24,

12   2007) (excluding testimony from qualified "shooting scene reconstruction" expert regarding the

13   significance of the location of the bullet casings found at the scene where proffered expert had no

14   education or experience in the field of firearms analysis and relied on a bullet trajectory analysis

15   that he had conducted himself); *Tubar v. Clift*, No. C05-1154-JCC, 2009 WL 1325952, *7–8

16   (W.D. Wash. May 12, 2009) (precluding Dr. Bill Lewinski, whose "degrees and experience are

17   in social sciences, not physical sciences" or engineering, from opining "as to the legitimacy of

18   determining a shooter's location by the pattern of spent shell casings"); *Foster v. City of Fresno*,

19   392 F. Supp. 2d 1140, 1155–56 (E.D. Cal. 2005) (precluding police practices expert with no

20   expertise in "ballistics or crime scene reconstruction" from testifying as to the significance of

21   "the location of the shell casings"); *compare Fancher v. Barrientos*, No. CIV 11-118 JAP/LAM,

22   2015 WL 5090360, *2–8 (D.N.M. May 27, 2015) (allowing criminalist who "conducted,

23   supervised, and trained personnel in forensic investigations, shooting reconstruction, and the

24

1   dynamics involved in shooting incidences," and who investigated 125 police-involved shootings,

2   to testify as to likely location and movement of officer based on location of shell casings).

3        The only potentially legitimate qualification in the field of forensic science that Fries

4   listed on his C.V. was his asserted membership in the California Association of Criminalists

5   ("CAC")—a professional organization whose membership is restricted to laboratory forensic

6   scientists who have demonstrated an ability to conduct work that requires a college-level

7   education in physico-chemical or biological sciences. *See* Ex. P, Caulder Decl. ¶ 4; Ex. M, Fries

8   C.V. at 3. But this asserted qualification was false—as the current membership secretary

9   declared, Fries is not now, and has never been, a member. Ex. P, Caulder Decl. ¶¶ 6–10.

10  Plaintiff's own firearm expert, James Norris, is a former President and Membership Secretary of

11  the CAC; he immediately recognized that Fries did not meet the basic membership criteria. Ex.

12  O, Norris Decl. ¶ 5. But at Fries's deposition, Fries repeatedly falsely claimed that not only was

13  he qualified to belong but he was a member in good standing, even seeking confirmation from

14  his office assistant that he was current on his dues. Ex. D, Fries Dep 97:22–98:17.

**E. Expertise in computer animation does not provide a foundation for the substantive opinions Fries offers.**

15

16        Plaintiff does not dispute that Fries is qualified to create computer illustrations—that is,

17  to take laser scans of a location, and work with computer programs to create a 3D image of that

18  scene and depict people in the scene as well. But as Fries himself has admitted in the past,

19  computer illustration and animation are simply technologically advanced versions of white

20  boards that experts might use to illustrate their opinions; they are a means to convey opinions,

21  not the opinions themselves. Ex. G, Fries's Website, Dep. Exhibit 201 at 34. There is nothing

22  about those computer programs or the experience that comes from using those computer

23  programs that would enable someone to reach the *foundational* opinions on which the

illustrations are based—i.e., here, how the shooting occurred. Unlike Fries, who has no scientific training or education, Plaintiff's rebuttal computer animator, Dr. Dan Kruger, has a Ph.D in aerospace engineering. Ex. B, Kruger Rpt. ¶ 1. Dr. Kruger has worked as an expert on nearly 500 animation projects for all types of litigation. Ex. B, Kruger Rpt. ¶ 1. Despite this, Dr. Kruger is crystal clear that the *reconstruction* of an incident is an entirely different field (or, actually, several distinct fields, depending on what type of crime or accident is being reconstructed) that requires separate expertise; nothing about experience in 3D animations qualifies someone to opine in those areas. Ex. B, Kruger Rpt. ¶ 15; Ex. Q, Kruger Dep. 29:10–30:19; 110:17–16:8; 135:24–36:7.

Thus, Fries lacks any relevant qualifications to support the opinions he offers; they must be excluded on that basis. *See, e.g., Wilson v. Woods*, 163 F.3d 935, 937–38 (5th Cir. 1999) (affirming exclusion of testimony of witness who, despite his background as an engineer, had never taught, experimented, or published in the field of accident reconstruction, "leading ineluctably to the impression that his 'expertise' in accident reconstruction was no greater than that of any other individual with a general scientific background"); *Sigler v. American Honda Motor Co.*, 532 F.3d 469, 478–79 (6th Cir. 2008) (holding district court properly precluded auto mechanic from offering testimony regarding car's speed at the time of an accident, because opinion was a matter of accident reconstruction, in which he did not have expertise).

### F.  Fries's methodology is unscientific and unreliable.

Rule 702 "requires district courts, acting in a gatekeeping role, to assess whether the reasoning or methodology underlying [proffered expert] testimony is valid and…properly can be applied to the facts in issue." *Ollier v. Sweetwater Union High Sch. Dist.*, 768 F.3d 843, 860 (9th Cir. 2014) (internal quotation marks and citations omitted). To be reliable, the expert's method

must be sound: "The reasoning between steps in a theory must be based on objective, verifiable

evidence and scientific methodology of the kind traditionally used by experts in the

field." *Domingo ex rel. Domingo v. T.K.*, 289 F.3d 600, 607 (9th Cir. 2002). A court's analysis of

the "reliability of expert testimony is vital to ensure accurate and unbiased decision-making by

the trier of fact"; evidence that "lacks…reliability…must be excluded." *Cooper v. Brown*, 510

F.3d 870, 943 (9th Cir. 2007). A court properly excludes expert opinion that "is connected to

existing data only by the *ipse dixit* of the expert." *Domingo*, 289 F.3d at 607.

### a.   None of the *Daubert* factors support a finding of reliability.

Fries himself claims his method is scientific, and that it permits him to testify to his

conclusions "to a reasonable degree of scientific certainty." Ex. D. Fries Dep. 10:18–23, 18:9–

25:8. That would make this "a case involving [proffered] scientific evidence" in which the

Court's assessment of "*evidentiary reliability* will be based upon *scientific validity*." *Daubert*,

509 U.S. at 590 n.9 (emphasis in original); *see also Domingo*, 289 F.3d at 605 ("Scientific

evidence is deemed reliable if the principles and methodology used by the expert proffering it are

grounded in the methods of science.").

Courts evaluating the reliability of scientific opinion typically consider the four factors

laid out by the Supreme Court in *Daubert*: "1) whether a theory or technique can be tested;

2) whether it has been subjected to peer review and publication; 3) the known or potential error

rate of the theory or technique; and 4) whether the theory or technique enjoys general acceptance

within the relevant scientific community." *Barabin*, 740 F.3d at 463 (internal citation and

quotation marks omitted). One important test of whether expert testimony is grounded in good

science is that it is based on research conducted independent of the litigation—and without any

incentive to reach a particular outcome—rather than for purposes of the litigation. *See Daubert v.*

*Merrell Dow Pharmaceuticals, Inc.,* 43 F.3d 1311, 1317 (9th Cir. 1995) (*"Daubert II"*);

*Metabolife Intern., Inc v. Wornick*, 264 F.3d 832, 841 (9th Cir. 2001). If the expert evidence "is

not based on independent research, the district court must determine whether there exists any

other objective, verifiable evidence that the testimony is based on scientifically valid principles."

*Metabolife Intern., Inc.*, 264 F.3d at 841. Courts look primarily to peer review to satisfy this

criterion, but they may also look to the testimony of the experts to determine if they can:

> Precisely [explain] how [they] went about reaching their conclusions and pointing
> to some objective source—a learned treatise, the policy statement of a professional
> association, a published article in a reputable scientific journal or the like—to show
> that they have followed the scientific method, as it is practiced by (at least) a
> recognized minority of scientists in their field.

*Metabolife Intern., Inc.*, 264 F.3d at 841 (citing *Daubert II*, 43 F.3d at 1318–19).

Here, it is difficult to ascertain what Fries's methodology even is. But what is clear is that

he has provided no support for his method from any objective source. *See Daubert II*, 43 F.3d at

1319 (holding proponents failed to demonstrate reliability of proffered expert testimony where

"they neither explain the methodology the experts followed to reach their conclusions nor point

to any external source to validate that methodology"); *Cabrera v. Cordis Corp.*, 134 F.3d 1418,

1421–23 (9th Cir. 1998) (affirming exclusion of all four proffered experts where one was

irrelevant and three failed to provide external validation for the reliability of their methodology).

To the contrary, the uniform evidence is that what Fries is doing is far afield from the accepted

methodology. Ex. H, Melinek Rebuttal Rpt. ¶¶ 4, 5, 12–16; Ex. I, Melinek Decl. ¶¶ 26, 30, 41–

42; Ex. B, Kruger Rpt. ¶¶ 4, 7, 12, 17, 24; Ex. R, Norris Rpt. ¶ 3.

**b.  Fries's methodology is not reliable.**

The first step of Fries's analysis was to create a 3D model of the victim and bullet

trajectories that he would later use to position the victim and shooter; Fries claimed to be doing

1   this directly from the measurements and descriptions of the wounds in the autopsy report, as

2   supplemented by the autopsy photos.[6] Ex. C, Fries Rpt. 8. But our attempt to test that assertion

3   proved it false. The autopsy *measurements* alone were insufficient to provide the locations of the

4   entry and exit wounds because—as demonstrated by Dr. Kruger's report, and subsequently

5   admitted to at Fries's deposition—use of the measurements alone placed several of the wounds

6   well outside the victim's head. *See* Ex. B, Kruger Rpt. ¶¶ 9–12, Appx. C; Ex. S, Melinek

7   Addendum ¶ 4. Nor could the autopsy *photos* alone provide the location sufficient to create

8   bullet trajectories. As Dr. Kruger explained, it is a basic principle of photogrammetry that you

9   need three separate orthographic views (two-dimensional views of a three-dimensional object) to

10  create a 3D model. Because there weren't autopsy photos covering each of those views, this was

11  not an option. Ex. Q, Kruger Dep. 106:7–07:8. Instead, placement of the bullet trajectories in 3D

12  space required medical judgment—of the type Dr. Melinek is qualified to give, and Fries is not.

13  Ex. S, Melinek Addendum ¶ 4. But rather than admit that he had to abandon some of the written

14  measurements—and that he was just eyeballing the placement of the trajectories based on his

15  untrained judgment—Fries pretended in his report that he was faithfully using those written

16  measurements.[7] At his deposition, he acknowledged noticing that the measurements in Dr.

17  Moffatt's autopsy report were incorrect and, rather than consulting with a pathologist—such as

18  Dr. Moffatt, whom Defendants had retained—adjusted them himself based on his own review of

19

20  _____

21  [6] Fries falsely suggested he mechanically applied the autopsy measurements to make his 3D
    model: "[t]hese entry and exit/rest locations were connected by a straight line to create the
    wound path and then extended to allow alignment with a shooter's location." Ex. C, Fries Rpt. 8.

22  [7] *See, e.g.* Ex. D, Fries Rpt. at Exhibit G (Gunshot Wound Models) (listing specific wound
    placements). As Dr. Kruger notes, the background grid in these images falsely suggests

23  systematic plotting of coordinates; not only are no numbers or scale used, but the placement of
    the grid changes from image to image, making clear this is an illusion. Ex. B, Kruger Rpt. ¶ 12;

24  Ex. Q, Kruger Dep. 104:13–5:2.

1    the autopsy photos, without documenting that he had done so. Ex. D, Fries Dep. 245:10–49:24.[8]

2    As Dr. Melinek explains, that is a gross departure from proper use of scientific methods. Ex. I,

3    Melinek Decl. ¶¶ 5, 41–42. Accepted methodology in the field of trajectory analysis requires

4    continued input from a forensic pathologist—preferably one with special training and knowledge

5    in wound ballistics—especially prior to the manipulation of evidence, as Fries did with the

6    position of wounds in this case. Ex. I, Melinek Decl. ¶ 44.

7           Given that the bullet trajectories are the foundation for all his opinions, and that Fries

8    does not use a reliable method (or appropriate expertise) to create those trajectories, that alone is

9    sufficient basis to strike his opinions as unreliable. *See Menjivar*, 2007 WL 4662062, at *6 n.54

10   (excluding testimony where unqualified expert relied on self-conducted bullet trajectory

11   analysis); *Dasho v City of Federal Way*, 101 F. Supp. 3d 1025, 1031–33 (W.D. Wash 2015)

12   (same). But the problems continue.

13          At times, Fries suggests in his report that the 3D model *itself* determines precisely the

14   sequence of the shots and the body position of the shooter and victim when each shot was fired:

15   "The 3D model [of the victim] is…articulated so that the wound path trajectories align with the

16   muzzle of the shooter's firearm. When the trajectory aligns, the resultant posture matches the

17   physical evidence and depicts the position and orientation of the shooter and Mr. Kuka, this is

18   repeated for each of the gunshot wounds." Ex. C, Fries Rpt. 18.[9] But as he had to admit at his

19

20   _____

21   [8] Fries apparently did attempt to consult Dr. Melinek in July 2017 about the measurements.
     Melinek Rebuttal Rpt. ¶ 4. However, Dr. Melinek informed him that she had testified at the 2015
     trial on behalf of Mr. Trulove and would be continuing to work for him. Fries never then sought
22   out assistance from any other medical expert. Ex. D, Fries Dep. 99:17–20.

23   [9] *See also* Ex. C, Fries Rpt. 10 ("Using the 3D working model I can see the spatial relationships
     between the evidence and the environment and determine which relationships match the physical
     evidence and which do not."); *id.* at 15 ("In reconstructing this shooting event, I made effective
24   use of the 3D working model.… By combining all the physical evidence and characteristics of

1    deposition, this is false. There are "potentially an infinite number of possibilities" for the

2    positions of the shooter and victim, and the trajectory paths alone—even assuming they were

3    accurate—cannot limit those infinite possibilities to one. Ex. D, Fries Dep. 16:21–18:2, 25:9–

4    26:11. As Dr. Kruger explains, there is nothing inherent in the 3D model that would allow Fries

5    to eliminate possible reconstruction possibilities. Nor is the computer program doing any

6    analysis—such as running an algorithm to determine which paths provide the best fit. All the

7    model does is illustrate based on inputs given, which is why a qualified expert "must act and

8    testify as the foundational sponsor for all critical inputs to the animation." Ex. G, Fries's

9    Website, Dep. Exhibit 201 at 34; see also Ex. B, Kruger Rpt. ¶¶ 14, 17, 23, 27. Thus, in creating

10   his 3D visuals for this case, Dr. Kruger could have created many different arrangements based

11   solely on the model; he needed constant input from Dr. Melinek, based on her medical expertise,

12   as to which scenarios were possible and probable. Ex. B, Kruger Rpt. ¶¶ 4, 5, 7–16, 22.

13           Fries also claims he relied on the bloodstains found at the scene as the fixed/known

14   starting location for the body, from which he was able to determine where Mr. Kuka was running

15   beforehand. Ex. C, Fries Rpt. 18–20. But as Dr. Melinek explains, the resting location alone tells

16   you "nothing" about where the body was seconds before. That is because unless the bullet

17   wounds are immediately incapacitating (a medical determination based on the tissue hit), a

18   person can run a large distance, twist, stumble, turn, fall, etc., after he is shot. Ex. H Melinek

19   Rebuttal Rpt. ¶ 5, Ex. T, Melinek Dep. 67–69. Similarly, the movement of the victim is not

20   determined by "Newtonian physics" as Fries asserted in his deposition.[10] See Ex. D, Fries Dep.

21

22   the environment and involved parties I can analyze the data with a specificity and accuracy that
     far exceeds that available through other means.").

23   [10] If it were, it is still unclear on what basis Fries would be more qualified than the laypeople on
     the jury to explain these concepts; although presumably he took physics in high school, his C.V.

24   does not describe any physics instruction after then.

1    120:10–21:25. Newtonian physics applies to inanimate objects; the human body is capable of

2    independent motion and its systems are far more complicated. Ex. I, Melinek Decl. ¶¶ 19, 30.

3         At other times, Fries admits that the methodology is just his own opinion: "For each of

4    the following positions, I analyzed the data." *See, e.g.*, Ex. C, Fries Rpt. 22. That is insufficient.

5    *See Ollier*, 768 F.3d at 860–61 (affirming exclusion of expert testimony where court "could not

6    discern what, if any, method [expert] employed in arriving at his opinions" which "appear to be

7    based on his personal opinions and speculation"). Another district court reviewing precisely the

8    same methodology for determining shot sequence and the location of shooter and victim—where

9    the proffered expert "analyzes the available pieces of physical evidence…[and] then gathers that

10   information and superimposes on it a sequence of events that seems to him to be the best overall

11   match"—provides a helpful explanation of why that methodology is unreliable and the opinions

12   inadmissible. *See Dasho*, 101 F. Supp. 3d at 1031–32. The court noted it had seen no evidence

13   that this methodology "is in fact standard in the field of forensic science and accepted as

14   producing reliable results" and that "the court's legal research has not revealed a single instance

15   of a federal court allowing a forensic expert to offer opinions of this type based on a like

16   methodology." *Id.* at 1032.

17        Fries attempts to make his approach sound more reliable by claiming he gave some

18   evidence "primary weight" and other evidence "secondary weight." *See* Ex. C, Fries Rpt. 16–18.

19   But as Fries admitted at his deposition, these are just terms he made up. Ex. D, Fries Dep.

20   159:10–15. And as Dr. Melinek explains, prejudging the importance of any particular piece of

21   evidence is actually *contrary* to accepted forensic practice. Ex. I, Melinek Decl. ¶ 26.  In other

22   words, the fancy terms are an attempt to hide that the true basis for Fries's opinions is just his

23   *ipse dixit* made without even relevant experience or qualifications. *See Jinro Am. Inc.,* 266 F.3d

24

at 1006 (holding witness's "sweeping generalizations, derived from his limited experience and knowledge…were unreliable and should not have been dignified as expert opinion").

Finally, as described more below, Fries does not even follow the methodology he claims to be using. Although he asserts he considered the totality of the evidence ("It is critical that the totality of the physical evidence be considered.") Ex. C, Fries Rpt. 15, he actually selectively picks evidence at every step, while ignoring evidence inconsistent with his conclusions. *See Avila*, 633 F.3d at 839–40 (endorsing district court's exclusion of expert as unreliable where expert's method "had no scientific support" and expert "did not follow his own…procedure").[11]

Similar flaws infect Fries's methodology in arriving at his opinions about the significance of the shell casing evidence. Not only does Fries lack training or experience in these fields, but he did not even review the vast majority of the relevant evidence developed in this case—including the testimony of Defendants Evans and Shouldice, SFPD Criminalist Smith, and the Shouldice study. Instead, Fries appears to be merely parroting the conclusions expressed in one flawed study by the discredited Dr. Bill Lewinski—who himself has been prohibited from testifying on shell casing analysis due to his lack of relevant qualifications. *See Tubar*, 2009 WL 1325952, at *7–8. Fries also sought to supplement his opinions with a study he conducted for this litigation—despite his lack of qualifications to do so, and despite that this study was un-reviewed by experts in the field—and which he disclosed in the form of raw data for the first time *at* his deposition. Ex. D, Fries Dep. 77:22–83:17. Fries's completely unjustified late

---

[11] For example, Fries's opinion that Ms. Lualemaga "had a line of sight to the pre-shooting and shooting event as she described and as depicted in my reconstruction," Ex. C, Fries Rpt. 59 ¶ 10, completely ignores Ms. Lualemaga's testimony at the 2015 trial that photos taken by Inspector Evans from her window, Ex. W 2015 Trial Exhibit CCC; Ex. C, Fries Rpt. 10, fairly represented her view. Ex. X, 2015 Trial, Lualemaga Test. 629–30; *see also* Ex. Y, 2015 Trial, Evans Test. 479–82. Based on that view, as Fries admits, Ms. Lualemaga would not have been able to see the shooter in all the shots as he depicts them. Ex. D, Fries Dep. 303:20–15:18.

1  disclosure of this study provides yet another basis to exclude both the study and this opinion. *See*

2  Fed. R. Civ. P. 26(a)(2)(B) (Expert reports must include "a complete statement of all opinions

3  the witness will express and the basis and reasons for them" and "the facts or data considered by

4  the witness in forming them."); *Yeti by Molly, Ltd. V. Deckers Outdoor Corp.*, 259 F.3d 1101,

5  1106 (9th Cir. 2001) (Rule 37(c)(1) "gives teeth" to the Rule 26(a) requirements "by forbidding

6  the use at trial of any information required by Rule 26(a) that is not properly disclosed.").

7  **G. Fries relies on speculative factual assumptions unsupported by the record.**

8  To be admissible, expert testimony must be based on facts in the record. *Guidroz-Brault*

9  *v. Missouri Pac. R. Co.*, 254 F.3d 825, 830–32 (9th Cir. 2001) (affirming exclusion of accident

10  reconstruction with no factual basis in the record); *see also Estate of Gonzales v. Hickman*, No.

11  ED CV 05-660 MMM (RCx), 2007 WL 3237727, at *3, n. 34 (C.D. Cal. May 30, 2007)

12  (excluding expert testimony where expert "cite[d] no specific facts in the record…which support

13  the opinion, and the only available evidence contradicts it"); Fed. R. Evid. 702(b)(d), 703. Fries

14  repeatedly bases his opinions on factual assumptions with no basis in the record.

15  For example, the bulk of Fries's opinion is a shot-by-shot description of what he calls

16  "the most natural and likely reconstruction of the event"; he opines Ms. Lualemaga's "statements

17  and account of the shooting and pre-shooting events are consistent with the physical evidence

18  and align well" with that reconstruction. Ex. C, Fries Rpt. 58 ¶¶ 1–9. But Fries's hypothesized

19  version of six of the nine shots finds absolutely *no* support in Ms. Lualemaga's account (or

20  anyone else's).[12] Ms. Lualemaga consistently stated that the shooter shot Kuka as they were

21

22  [12] In written statements and testimony over the course of two trials and a preliminary hearing,
Ms. Lualemaga consistently testified that she saw the shooter run downhill and east after Mr.

23  Kuka; that the shooter was always facing downhill and fired his shots into Kuka's back in the
same direction; at her deposition she confirmed that the shooter did not move more than a few

24  inches or at most a foot in any direction. Ex. E, Marked Photos at 1–2, 4–5 (*see supra* note 1);

1   running downhill; she never described the shooter as facing west and she confirmed the shooter

2   did not move more than a few inches or at most a foot while shooting at Kuka's prone body. *See*

3   *supra* note 12. In his report, Fries recognized that Ms. Lualemaga described the shooter standing

4   still at the victim's feet, and that "this statement is not supported by the physical evidence." Ex.

5   C, Fries Rpt. 46; *see also* Ex. D, Fries Dep. 285:21–86:22, 291:21–92:6 (admitting Ms.

6   Lualemaga never described shooter backing downhill). Yet Fries depicts the shooter moving

7   substantially backward down the hill while firing several of the shots. *See* Ex. C, Fries Rpt. 44–

8   45 (accompanying graphics), 58 ¶¶ 7–8.[13] Fries's version is rank speculation and thus,

9   inadmissible. *See Ollier*, 768 F.3d at 861 ("[E]xpert testimony based on mere subjective belief or

10  unsupported speculation is inadmissible.") (internal citation and quotations omitted).

11      As another example, at Mr. Trulove's second trial which ended in his acquittal, his

12  defense attorney argued that Ms. Lualemaga's description of the moments before the shooting

13  was not plausible. Ms. Lualemaga claimed Mr. Kuka ran into the shooter and knocked him to the

14  ground below her window; that Mr. Kuka did not fall and continued running fast down the hill;

15  but that the shooter recovered from the fall, got to his feet and drew his weapon, all while

16  running fast enough to catch up to Mr. Kuka within several feet of where the collision had

17  occurred. During the criminal prosecution, Ms. Lualemaga repeatedly marked photographs

18  depicting the collision in the same location, approximately 30 feet from where the shooting

19

20  ───────────────────────

21  Ex. V, Prelim. Hrg., Lualemaga Test. 4–5, 21–22; Ex. U, 2010 Trial, Lualemaga Test.  667–70; Ex. X, 2015 Trial, Lualemaga Test. 574–580, 625–646, 700–701; Ex. F, Lualemaga Dep. 50–53, 359–361, 386–87, 414–15.

22  [13] Fries appears to have placed the shooter on the path downhill from the body to align his reconstruction with the row of shell casings, but there is no testimony suggesting that this

23  happened *after* Mr. Kuka was first shot as the victim was walking backwards away from the scene, as opposed to the shooter beginning to the east of the victim and shooting as he was

24  approaching the body walking uphill and to the west (as other witnesses describe).

1    occurred. At his deposition, Fries claimed that he had conducted an informal analysis—a "sniff

2    test" that he did not document—which he claimed confirmed the plausibility of Ms. Lualemaga's

3    account. Ex. D, Fries Dep. 199:21–201:3. But when Fries depicted the collision in his still

4    images, he ignored the spot Ms. Lualemaga had consistently marked to move it 10–12 feet

5    farther west and up the hill, giving the shooter more room to make up the distance between him

6    and Kuka. Ex. D, Fries Dep. 190:15–93:9; *see* Ex. E, Marked Photos at 2–3. This is an implicit

7    admission that Ms. Lualemaga's *actual* account is not plausible.[14]

8            Finally, in his attempt to harmonize the location of the casings with Ms. Lualemaga's

9    account of the shooting, Fries depicts the shooter as holding his gun canted at a 45-degree angle

10   for the first three shots, but then in a police grip (perpendicular to the ground) for the next 6

11   shots. Ex. D, Fries Dep. 349:1–55:4. There is no evidentiary basis for the assumption that the

12   shooter would ever hold his gun at a 45-degree angle, let alone that he would do that for three

13   shots and then switch to a different grip for the next six. *Id.* at 350:22–24. This is yet another

14   "foundational assumption" Fries improperly makes with no justification in the record. *See*

15   *Newkirk v. ConAgra Foods Inc*., 438 Fed. Appx. 607, 609 (9th Cir. 2011) (affirming exclusion of

16   testimony of expert whose foundational assumptions were not based on sufficient facts or data).

17   Indeed, Ms. Lualemaga repeatedly testified she never even saw the gun, let alone saw it being

18

19

---

20   [14] As another example, when questioned at his deposition about a reasonable time estimate for the shooter's fall and recovery, Fries first acknowledged the obvious point that he "would expect

21   the average person would take longer to get up off the ground than a world class athlete who's currently involved in a world class running event." Ex. D, Fries Dep. 168:6–69:13. But despite

22   being given examples that world class athletes take at least 2 seconds for such recovery, *see, e.g.*, Seth Rubinroit, *Mo Farah wins back-to-back 10,000m gold medals*, Aug. 13, 2016,

23   http://www.nbcolympics.com/news/mo-farah-wins-back-back-10000m-gold-medals (collision occurs at 1:01 mark of the video, 10:56 of the race clock), Fries asserted he thought it reasonable

24   to assume the shooter here recovered in half that time. Ex. D, Fries Dep. 169:15–72:5, 202:2–20.

1    held in the manner in which Fries depicts it. Ex. U, 2010 Trial, Lualemaga Test. 669:6–11,

2    670:18–22; Ex. X, 2015 Trial, Lualemaga Test. 575:11–18; Ex. F, Lualemaga Dep. 51:20–52:7.

3    **H.  Fries's visualization of the shooting is extremely prejudicial.**

4         "Expert evidence can be both powerful and quite misleading because of the difficulty in

5    evaluating it. Because of this risk, the judge in weighing possible prejudice against probative

6    force under Rule 403 of the present rules exercises more control over experts than over lay

7    witnesses." *Daubert*, 509 U.S. at 595. Those concerns weigh even more strongly when

8    evaluating compelling and realistic visual images like the ones Fries created here. An inaccurate

9    computer model could "affirmatively mislead the jury" in a way that cannot be adequately

10   addressed through cross-examination, because "[t]he computer model is a powerful tool,

11   and…runs a risk of making a strong impression on the mind of the jury." *Bowoto v. Chevron*

12   *Corp.*, No. C 99-02506 SI, 2006 WL 1627004, at *3 (N.D. Cal. June 12, 2006) (excluding

13   inaccurate computer model under Rule 403); *see also Bullock v. Daimler Trucks North America,*

14   *LLC.*, 819 F. Supp. 2d 1172, 1175 (D. Colo. 2011) ("Because of its dramatic power, trial judges

15   should carefully and meticulously examine proposed animation evidence for proper foundation,

16   relevancy and the potential for undue prejudice.").

17        For these very reasons, the animations Fries created for defendants in a § 1983 police

18   shooting case, *Knox v. Fresno*, were excluded just last year by the Eastern District of California.

19   Ex. J, Order on Motions in Limine at 3, *Knox v. Fresno*, No. 1:14-cv-00799-EPG (E.D. Cal.

20   June 2, 2016) at 3. The motion was brought on the grounds that Fries's 3D renderings were

21   merely animations of cherry-picked evidence—primarily the defendant officers' statements—

22   and were therefore unreliable and prejudicial, because they cloaked the officers' recollection

23   with the veneer of expert testimony. Ex. K, Pls. Mot. in Limine at 4–7, *Knox v. Fresno*, No.

24

1   1:14-cv-00799-EPG (E.D. Cal. Apr. 29, 2016) at 4–7. Despite this ruling excluding his

2   animation (in a case in which he probably charged $50–75,000, *see* Ex. D, Fries Dep. 32:9–20),

3   Fries continues to advertise throughout his website, as well as at the bottom of every page of his

4   C.V. and on the cover page of his expert report in this case, that his company's work has never

5   been excluded. Ex. D, Fries Dep. 41:14-18; Ex. G Ex. G, Fries's Website, Dep. Exhibit 201 at

6   271, 275–76, 281, 283 (claiming that PSI's work has "never been excluded at trial," that Fries

7   "has maintained a 100% record of non-exclusion at trial," and noting "Never Excluded" at the

8   bottom of every page); Ex. C, Fries Rpt. at cover page (advertising "NEVER EXCLUDED").

9   When confronted about that discrepancy at his deposition, Fries denied any of those assertions

10  were misleading. Ex. D, Fries Dep. 46:2–23, 53:15–58:8. Fries's cavalier relationship with the

11  truth only underscores the danger of permitting him to testify before the jury, cloaked with a

12  false veneer of expertise.

13  **III.    Conclusion**

14          Fries's expert report is junk science. His testimony and illustrations must be excluded.

15

16  Dated: October 10, 2017                    Respectfully Submitted,
                                               By: /s/ Anna Benvenutti Hoffmann
                                               Anna Benvenutti Hoffmann
17                                             NY Bar No. 4412011 (pro hac vice)
                                               *One of Plaintiff Jamal Trulove's Attorneys*

18

19

20

21

22

23

24