DENNIS J. HERRERA, City Attorney
CHERYL ADAMS, State Bar #164194
Chief Trial Deputy
MARGARET W. BAUMGARTNER, State Bar #151762
RENÉE L. ROSENBLIT, State Bar #304983
KELLY COLLINS, State Bar #277988
Deputy City Attorneys
1390 Market Street, 6th Floor
San Francisco, California 94102-5408
Telephone:     (415) 554-3859 [Baumgartner]
Telephone:     (415) 554-3853 [Rosenblit]
Telephone:     (415) 554-3914 [Collins]
Facsimile:      (415) 554-3837
E-Mail:          margaret.baumgartner@sfcityatty.org
E-Mail:          renee.rosenblit@sfcityatty.org
E-Mail:          kelly.collins@sfcityatty.org

Attorneys for Defendants
MAUREEN D'AMICO, JOHN EVANS,
MICHAEL JOHNSON, CARLA LEE,
ROBERT MCMILLAN and RONAN SHOULDICE

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JAMAL RASHID TRULOVE,<br><br>        Plaintiff,<br><br>    vs.<br><br>THE CITY AND COUNTY OF SAN FRANCISCO, ET AL.,<br><br>        Defendants. | Case No. 16-cv-00050-YGR<br><br>**DECLARATION OF MAUREEN D'AMICO IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**<br><br>Hearing Date:  February 27, 2018<br>Time:              2:00 p.m.<br>Place:             Courtroom 1, 4th Floor<br>                      1301 Clay Street<br>                      Oakland, CA<br><br>Trial Date:       March 5, 2018 |

I, Maureen D'Amico, declare as follows:

1. I am a retired homicide inspector with the San Francisco Police Department. I have personal knowledge of the facts contained herein, and if called upon to testify, I could and would testify competently hereto.

2. I was one of the two homicide inspectors assigned to investigate the murder of Seu Kuka in the Sunnydale Housing development on July 23, 2007. My regular partner, Michael Johnson, also was assigned to this matter.

3. I never pointed to a clipboard and asked Priscilla Lualemaga if the person she saw shoot Seu Kuka was named Trulove. I never observed anyone do that, or heard that anyone else had done that until I learned of the statement made by Oliver Barcenas, many years later. I did not know the name Trulove the night of the murder, and did not know the night of the murder that Joshua Bradley had a brother or was related to someone named Trulove.

4. I was not aware that anyone attempted to have Ms. Lualemaga identify anyone named Trulove prior to showing her the photo array on July 25, 2007. I was with my partner, Michael Johnson, each time that he walked with Ms. Lualemaga through Ingleside station and I never observed him to have a clipboard or mention the name Trulove. Johnson never indicated to me or in my presence to Ms. Lualemaga that evening that he believed that the shooter might be a person named Trulove. Ms. Lualemaga never gave any indication that any officer had ever attempted to get her to identify Trulove prior to our photo array.

5. None of the times that Johnson and I walked through the station were we accompanied by a female uniformed officer.

6. I did not ever present any information that I believed to be false or intentionally misrepresent any evidence, to anyone related to this matter, including the District Attorney.

7. I never engaged in any identification procedure that I believed had any significant risk of resulting in a false identification, nor did I observe or learn that anyone else had done so. I believed then, and continue to believe now, that Ms. Lualemaga's identification of Jamal Trulove as the murderer of Seu Kuka was truthful and accurate. There are many facts that I believed then, and continue to believe now, corroborated by her testimony, including her description of the suspect prior to her arriving at the station, her description of the car, and the information she provided regarding the relationship of the shooter to Mr. Bradley, the person being chased. The fact that Mr. Bradley's cell phone indicated that he was present, even though he told the police he was not, was further information making me believe that Trulove committed the murder.

8. The only representations I made to the District Attorney's office or the court concerning Ms. Lualemaga's identification of Jamal Trulove was that she picked his photograph out of the lineup. I did not use the words "positive" or "tentative" with regard to that identification. I believe that my representations regarding the identification were truthful and accurate.

9. At some point, I became aware of the second eyewitness, Latisha Meadows-Dickerson. I was not present during her interview, and never met her. I never made any representations to the District Attorney or the Court about her identification, or anything about Ms. Meadows-Dickerson.

10. I never made any representation to the District Attorney or the Court about the meaning of the shell casings found at the scene. I never discussed that subject matter at all with either the District Attorney or the Court. I believed then, and I believe now, that the location of the found shell casings does not definitively place the shooter in the location identified by either witness nor does it definitively place the shooter in a location different from that stated by either eyewitness. Among other things, the number of people who were present (the Incident Report indicates there were 30 to 40) made me believe that the shell casings did not necessarily remain in the location where they landed.

11. I disclosed to the District Attorney all of the statements and evidence I had in this case. I never intentionally withheld any information that I thought could potentially be exculpatory, or could be used for impeachment. I am not aware of any exculpatory or impeachment evidence that I did not disclose.

12. I never made any agreement, direct or implied, with any other person to violate any of Jamal Trulove's constitutional rights.

13. As a homicide inspector, I do not supervise uniformed officers. I was not responsible for directing the work of any uniformed officer on the night of the Seu Kuka's murder, and neither was my partner. I did not direct anyone to have the witness review the photos posted on the wall of the report writing room in Ingleside Station. I did not direct anyone to see if the eyewitness could or would identify anyone named Trulove.

14. The day after the murder, I went to the Sunnydale to canvas for additional witnesses. This was noted in the chronology of investigation. I did not want to skip Ms. Lualemaga's door, because I

did not want anyone to think she had already spoken to the police. Therefore, like with every other apartment, I knocked on Ms. Lualamaga's door.

15. I did not engage in any show up or other identification procedure with Ms. Lualamaga during our conversation outside her door during my canvas on July 24, 2007. I do not believe that I showed her a mugshot photo of anyone, but if I did it would have been the photo of the victim. I certainly did not show her a photo of any member of the Trulove family, of ▮▮▮▮▮ anyone else that was ultimately included in the photo array used the following day or anyone I believed to be a suspect.

16. I heard from Malo Kuka a rumor about someone not from the neighborhood who might have been involved in the shooting. Because Kuka could not identify the person who provided that information, we could not follow up on it. Nothing I was told by Malo Kuka or anyone else ever provided me with sufficient information that someone other than Jamal Trulove committed the murder such that we could reasonably follow up on it.

I declare under penalty of perjury under the laws of the State of California that the preceding declaration is true and correct.

Dated: December 19, 2017.

_____
MAUREEN D'AMICO