DENNIS J. HERRERA, City Attorney
CHERYL ADAMS, State Bar #164194
Chief Trial Deputy
MARGARET W. BAUMGARTNER, State Bar #151762
RENÉE L. ROSENBLIT, State Bar #304983
KELLY COLLINS, State Bar #277988
Deputy City Attorneys
1390 Market Street, 6th Floor
San Francisco, California 94102-5408
Telephone:    (415) 554-3859 [Baumgartner]
Telephone:    (415) 554-3853 [Erickson]
Telephone:    (415) 554-3914 [Collins]
Facsimile:    (415) 554-3837
E-Mail:    margaret.baumgartner@sfgov.org
E-Mail:    renee.erickson@sfgov.org
E-Mail:    kelly.collins@sfgov.org

Attorneys for Defendants
MAUREEN D'AMICO, JOHN EVANS, MICHAEL JOHNSON,
CARLA LEE, ROBERT MCMILLAN, and RONAN SHOULDICE

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JAMAL RASHID TRULOVE,<br><br>  Plaintiff,<br><br>vs.<br><br>THE CITY AND COUNTY OF SAN FRANCISCO, ET AL.,<br><br>  Defendants. | Case No. 16-cv-00050-YGR<br><br>**DECLARATION OF FORMER ASSISTANT DISTRICT ATTORNEY GEORGE BUTTERWORTH IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**<br><br>Hearing Date:  Feb. 27, 2018<br>Time:           2:00 p.m.<br>Place:          4th Fl., 1301 Clay St., Oakland, CA<br><br>Trial Date:    March 5, 2018 |

I, GEORGE BUTTERWORTH, declare as follows:

1. I have personal knowledge of the following facts except for those stated on information and belief and as to those facts I believe them to be true. If called upon to testify to the facts stated in this declaration, I could and would do so competently.

2. I served as an Assistant District Attorney with the San Francisco District Attorney's Office from 1976 to 2010. I served in the homicide unit from 2006 to June 30, 2010. I was the head of the homicide unit throughout that period, including in 2008 when the Trulove homicide case was charged. Over my career, I have reviewed for charging somewhere around 200 homicide cases. I have tried at least 20 homicide and conspiracy to commit homicide cases through verdict.

3. In 2007 and 2008, I was responsible for authorizing the arrest warrant application for Jamal Trulove for the murder of Seu Kuka. In 2008, the process for obtaining an arrest warrant for a homicide required that the District Attorney approve the warrant application. I reviewed the warrant application for the arrest warrant in this matter. I relied not just on the homicide file or the statements of the officers, but conducted by own my independent evaluation of the matter. Among other things, I visited the scene to evaluate whether the witnesses could have seen what they reported having seen.

4. After reviewing the Inspectors' file, listening to the audio tapes of the interviews and the identification procedures, speaking to Inspectors Michael Johnson and Maureen D'Amico, and visiting the scene, I approved the warrant application. I reviewed the available evidence for accuracy, lawfulness, competency and credibility. I believed that the warrant affidavit accurately summarized all of the evidence. I believed that it met the standards of the District Attorney's office for charging and prosecution. Judge Susan Breall signed the warrant. A copy of the warrant is attached hereto as Exhibit A.

5. In addition to Priscilla Lualemaga, another eyewitness, Latisha Meadows-Dickerson, identified Trulove as the murderer. I also independently evaluated her statement. Although I had some concern about her testimony, and the circumstances under which she provided it, I also believed that she could have seen enough of the events to accurately identify Trulove. I independently evaluated her statement, including the circumstances under which she provided the information to the police, and how that impacted her credibility. I also independently evaluated the identification procedure used with Ms. Meadows-Dickerson to determine if it was unlawful, or overly suggestive, or whether it would be unfair to rely on the identification in my evaluation of the case. I believed her testimony to be honest, lawful, competent and credible. It provided

additional support within the totality of the evidence to authorize the arrest warrant and ultimately prosecute Trulove for the murder. It was my professional opinion then, and is my personal and professional opinion now, that she was not coached or influenced to falsely identify Trulove as the murderer.

6. I did not believe that any of the identification procedures in this case were abusive or coercive. I did not believe that the inclusion of Joshua Bradley in the lineup shown to Lualemaga was abusive or coercive, or would cause a false identification of the shooter, even though Ms. Lualemaga had previously seen his photo and identified him as the person being chased. I did not believe that including other persons from the neighborhood in the photo array shown to both eyewitnesses, who I believed looked similar to Jamal Trulove, was abusive or coercive, or would cause a false identification, because both Ms. Lualemaga and Ms. Meadows-Dickerson had already said that they knew the murderer from the neighborhood.

7. After Trulove's arrest, I was responsible for filing the charges and appearing as a representative of the People at the initial court proceedings. A copy of the Complaint filed in *People vs. Jamal Trulove,* San Francisco Superior Court No. 208898, is attached hereto as Exhibit B.

8. A copy of the minutes from my appearances in this matter are attached hereto as Exhibit C.

9. Within a few days of Trulove's arrest, and after the initial appearances, I assigned the case to Eric Fleming. Assistant District Attorney Fleming reported to me.

10. As the trial approached, I assigned Linda Allen to the case. I spoke with Linda Allen about the case after her assignment. On information and belief, she also reviewed all the evidence in the file, spoke with one or more of the homicide investigators, and also interviewed and spoke with Ms. Lualemaga.

11. It was the policy of the District Attorney's office that every Assistant District Attorney reviewing a case file for charging make an independent evaluation as to the lawfulness, competency, fairness and credibility of the investigation, and review all of the evidence to determine whether the case meets the standards for charging and prosecution. On information and belief, the ADAs under my supervision did so and, throughout a case if new information arose, would continue to evaluate

the case for legality, competency, fairness and credibility and any other factor that could affect whether the case remained strong enough to continue to prosecute.

12. It was my understanding that Ms. Lualemaga and her family were relocated due to legitimate concerns for her safety in testifying against Trulove. I am informed and believe that the fact that she and her family had been relocated was disclosed to Trulove's trial counsel in the course of discovery. When discussing the case with ADAs Fleming and Allen, I considered the extent to which Ms. Lualemaga's testimony could have been influenced by being relocated. I concluded that she was reliable, her eyewitness testimony was reliable, and that any bias she may have had by being forced to relocate did not materially affect the credibility of her testimony.

13. I did not in this case rely on an officer's characterization of any evidence, whether contained in the file or any affidavit, or given to me verbally, in making my determination whether or not to authorize an arrest warrant or charge the case, and to approve the continuing prosecution. I independently reviewed the evidence, listened to the interviews and any other audio recordings including any identification procedures, reviewed the photo lineups, and spoke with the homicide investigators. For example, an inspector's characterization of a witness identification as "positive" or "tentative" did not influence my decision one way or another. I decided for myself that all of the evidence, including the eyewitness identifications, lawfully and substantially supported my decision to authorize the arrest warrant, bring charges, and continue to prosecute the case.

14. There is no bright-line rule differentiating a positive or tentative identification. In all cases, including this one, I examined the identification procedures in detail to form my own opinion as to whether the evidence is sufficiently certain and reliable to lawfully authorize a warrant, bring charges, and continue to prosecute. In the Trulove homicide matter, the combination of both identifications, and not any characterization of any identifications, caused me to authorize the arrest warrant and file charges in this case, and continued to support the both prosecutions.

15. One of the pieces of evidence I examined during my review was the photos depicting the location of the shell casings found at the scene, as well as the crime scene investigator's report. No officer I spoke to about this matter ever informed me that the officer believed that the shell casing

evidence either supported or contradicted the testimony of the eye witnesses. Even if an officer had tried to convince me that the shell casing evidence corroborated or supported the eye witness testimony, I evaluated the significance of the evidence independently. Based on my training and experience, I do not believe that any definitive conclusions regarding the location of the shooter could be reached from that evidence. I have had significant experience with cases where a criminal defense attorney attempts to argue about the conclusions that can or should be drawn from the location of shell casings. Even prior to this case, I was aware of the limited evidentiary value of shell casing evidence in coming to conclusions regarding the location or path of a person shooting a gun, particularly when there was such limited information about the shooting, including the manner in which the shooter held the gun and the shooter's arm position.

16. Although I was not aware of it at the time I was working on the case, I have subsequently reviewed the 2001 memo prepared by Ronan Shouldice, which is attached hereto as Exhibit D. This memo does not provide any information that would have impacted any decision I made. Even if I had known of this memo while I was evaluating this case, it would not have impacted my conclusion that the case had merit, and should be charged. Moreover, in my opinion Shouldice's conclusions are entirely unremarkable, and matched my previous understanding of the conclusions that can or cannot be drawn from shell casing evidence. The memo's conclusions matched my understanding of how 9mm guns work and how shell casings are ejected. This memo would have had no signficance in this case. I would not have considered it as "evidence," I do not believe it to be exculpatory, and I do not believe that I would have been required to disclose it to the defense.

17. It is common that officers will speak with potential witnesses prior to starting an audio tape of an interview. Sometimes interviews are not even recorded. That can occur for many reasons, including that officers do not always know when an interview will be sufficiently important to tape-record. It also can occur because the officer needs to develop a rapport with the witness prior to turning on the audiotape. Nothing about the statements of these witnesses or the officers suggested to me that the officers attempted to influence the identification of Trulove by the

eyewitnesses, or otherwise raised any significant questions regarding the lawfulness or genuineness of the identifications or the competency or credibility of the witnesses.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Dated: December 23, 2017

_____
GEORGE BUTTERWORTH