# EXHIBIT I

**DECLARATION OF MARGARET W. BAUMGARTNER**

**IN SUPPORT OF DEFENDANTS'**

**MOTION FOR SUMMARY JUDGMENT**

Priscilla Faleafaga
February 13, 2017                                                    1

```
 1              IN THE UNITED STATES DISTRICT COURT
            FOR THE NORTHERN DISTRICT OF CALIFORNIA
 2                      OAKLAND DIVISION

 3    JAMAL RASHID TRULOVE,        )
           Plaintiff,             )
 4                                 )
      VS.                          )   CIVIL ACTION NO.
 5                                 )   16-CV-00050-YGR
      THE CITY AND COUNTY OF       )
 6    SAN FRANCISCO, et al.,       )
           Defendants.            )
 7
```

 8              ****************************************

 9                      ORAL DEPOSITION OF

10                PRISCILLA LUALEMAGA FALEAFAGA

11                      February 13, 2017

12                          VOLUME 1

13              ****************************************

14              ANSWERS AND DEPOSITION OF PRISCILLA

15    LUALEMAGA FALEAFAGA, produced as a witness at the

16    instance of the Defendants, taken in the above-styled

17    and -numbered cause on the 13th day of February, 2017,

18    from 9:02 a.m. to 5:41 p.m., before Jamie K. Israelow, a

19    Certified Shorthand Reporter in and for the State of

20    Texas, Registered Merit Reporter and Certified Realtime

21    Reporter, reported in machine shorthand at the offices

22    of US Legal Support, located at 5910 North Central

23    Expressway, Suite 100, in the City of Dallas, County of

24    Dallas and State of Texas.

25

Priscilla Faleafaga
February 13, 2017                                    2

```
 1                    A P P E A R A N C E S

 2

 3   FOR THE PLAINTIFF:
         Mr. Nick J. Brustin
 4       NEUFELD, SCHECK AND BRUSTIN, LLP
         99 Hudson Street, 8th Floor
 5       New York, New York  10013
         212.965.9081
 6       nick@nsbcivilrights.com
         -- and --
 7       Ms. Kate Chatfield (By telephone)
         UNIVERSITY OF SAN FRANCISCO
 8       2130 Fulton Avenue, KN 211
         San Francisco, California  94117
 9       415.422.4385
         chatfield@legalprivilege.ch
10       -- and --
         Mr. Alex Reisman (By telephone)
11       Attorney at Law
         P.O. Box 10
12       Brisbane, California  94005
         415.608.0240
13       areisman@msn.com

14

15   FOR THE DEFENDANTS:
         Ms. Margaret W. Baumgartner
16       Deputy City Attorney
         CITY AND COUNTY OF SAN FRANCISCO
17       1300 Market Street, Sixth Floor
         San Francisco, California  94102
18       415.554.3859
         margaret.baumgartner@sfgov.org
19

20   FOR THE DEPONENT:
         Mr. Warren Metlitzky
21       CONRAD & METLITZKY, LLP
         Four Embarcadero Center, Suite 1400
22       San Francisco, California  94111
         415.343.7103
23       wmetlitzky@conradmetlitzky.com

24   ALSO PRESENT:
         Madhu Srikantha
25
```

```
 1   Rosa's house?

 2       A.    Yes.

 3       Q.    Where had he been?

 4       A.    Jail.

 5       Q.    Do you know what he was in jail for?

 6       A.    No.

 7       Q.    When you were talking -- when we were talking

 8   about the people who were hanging around at the place

 9   next door, I know that it may have varied, but was there

10   generally a number of people that would hang out there?

11   Can you estimate the number that would be there on a

12   fairly regular basis?

13       A.    Like 7 to 10, maybe even more.

14       Q.    Do you know any of those people by name that

15   you would see regularly next door?

16       A.    At the time or --

17       Q.    In 2007.  Not just the night of the murder, but

18   generally speaking, who would hang out at Seu and Rosa's

19   house?

20             MR. METLITZKY:  Objection, vague.

21       Q.    (By Ms. Baumgartner)  You can still answer if

22   you understand the question.

23       A.    Could you rephrase the question for me?

24       Q.    Certainly.  I'm just wondering if you know any

25   of the people who would regularly hang out next door in
```

Priscilla Faleafaga
February 13, 2017                                    26

```
 1   2007 at Rosa's house.
 2        A.   Yes.
 3        Q.   Who were they?
 4        A.   One of them was Jamal and then his -- I believe
 5   his brother, Seu, of course, a couple of other guys; I
 6   don't know the names.
 7        Q.   Did you recognize these couple of other guys
 8   from the neighborhood?
 9        A.   Yes.
10        Q.   Do you know when -- whether -- or do you know
11   where any of these other people that you would see
12   hanging out at Seu's house, where they -- where
13   specifically they lived in Sunnydale?
14        A.   No.
15        Q.   When you say "Jamal's brother," who are you
16   speaking of?  Do you know his name?
17        A.   I forgot his name.
18        Q.   Do you know whether it was -- that brother was
19   older?  Younger?
20        A.   I believed he was younger.
21        Q.   Did you know one of Jamal's brothers by the
22   name of David Trulove?
23        A.   Yes.
24        Q.   Was he one of the people that would be at Seu's
25   house regularly a few months before the murder?
```

Priscilla Faleafaga
February 13, 2017                                    73

```
 1       Q.    So somebody had told you detectives would be

 2   arriving?

 3       A.    Yeah.  But I remember that one of them brought

 4   me a piece of paper to write down everything that I

 5   seen, and I remember drawing a picture of the car.  And

 6   then they told me to wait, yeah.

 7       Q.    So I believe that one of the officers who

 8   transported you, who drove you to the station, went into

 9   the report-writing -- or we call it the "report-writing

10   room."  That's the room with the mugshots.  Okay?

11       A.    Okay.

12       Q.    At least one of them went into that room with

13   you initially?

14       A.    Yes.

15       Q.    Did that officer then stay with you, or did the

16   officer leave and come back or anything like that?

17       A.    He could have been in there.  I'm not sure.  I

18   don't --

19              MR. BRUSTIN:  Did you say "he"?

20              THE WITNESS:  He could have been in there,

21   but I'm not sure.

22       A.    I just know he gave me the piece of paper to

23   write down what I seen.

24       Q.    (By Ms. Baumgartner)  All right.  Now, the --

25   I'll get to that officer in a moment, but when you went
```

Priscilla Faleafaga
February 13, 2017                                    75

1      A.   No.

2      Q.   So after the officers brought you in and sat

3  you down, was there at least some period of time where

4  there were no officers specifically with you while you

5  were sitting in that room?

6      A.   Yes.

7      Q.   How long were you sitting there before the

8  officer actually brought you the piece of paper with the

9  statement?

10     A.   I don't remember.  10 minutes, it seems.  It

11 could have been.

12     Q.   The officer who brought you the piece of paper

13 to fill out, which officer -- was it an officer you had

14 seen before?

15     A.   No.

16     Q.   Do you know what the officer --

17            MR. BRUSTIN:  I'm sorry.  I didn't hear

18 the answer.

19            THE WITNESS:  No.

20     Q.   (By Ms. Baumgartner)  Was it an officer that --

21 was it one of the officers that had transported you?

22     A.   I don't remember.

23     Q.   Was it -- what -- do you remember what that

24 officer looked like?

25     A.   No.  I can't remember if it was the lady

Priscilla Faleafaga
February 13, 2017                                           76

1    officer or the man officer that gave me the paper.

2         Q.    But do you believe that it was one of the

3    officers who actually -- it was -- you had seen before?

4         A.    That brought --

5         Q.    That brought you --

6         A.    That brought me in?  It could have been.

7         Q.    But you don't specifically remember?

8         A.    I don't specifically remember.

9         Q.    Was it an officer wearing a uniform?

10        A.    Yes.

11        Q.    I know that you eventually went and gave a

12   statement to the two homicide inspectors.  But other

13   than those homicide inspectors, did you ever interact

14   that evening with any other officers wearing plain

15   clothes, in other words, not in uniform?

16        A.    No.

17        Q.    When the officer brought you the piece of paper

18   to fill out the statement, was part of it already filled

19   out -- the top part of it already filled out?

20        A.    I don't remember.

21        Q.    I'm just going to get an exhibit marked.

22             MS. BAUMGARTNER:  I actually -- I think

23   this has -- may have been marked before, but I don't

24   actually remember.

25             MR. BRUSTIN:  If you tell me what it is, I

Priscilla Faleafaga
February 13, 2017                    77

1  might know.

2              MS. BAUMGARTNER:  It's her written

3  statement.

4              MS. CHATFIELD:  It's part of Exhibit 12.

5              MR. BRUSTIN:  Yeah, it's part of

6  Exhibit 12.  Have we marked it separately?  I don't

7  think so.

8              MS. CHATFIELD:  We haven't marked it.

9              MR. BRUSTIN:  It's part of Exhibit 12.

10             MS. BAUMGARTNER:  Okay.  You don't need to

11  separately mark it, then.  I'm just going to refer it as

12  part of Exhibit 12 that's Bates-stamped at the bottom

13  CCSF_TRULOVE_3251 through 3 -- no -- yes -- through

14  3252.  So there's two pages.

15             MR. METLITZKY:  Do you have a copy?

16             MS. BAUMGARTNER:  Yes.

17             MR. METLITZKY:  Thank you.

18      Q.  (By Ms. Baumgartner)  Is that your signature on

19  the bottom of the page?

20             MR. METLITZKY:  Well, which page?

21      Q.  (By Ms. Baumgartner)  Actually, it's on the

22  bottom of both pages, right?

23      A.  Yes.

24      Q.  And is that your handwriting on the lined part,

25  the part of the pages that have the -- just the lines

Priscilla Faleafaga
February 13, 2017                                    78

1   across them?

2         A.   Yes.

3         Q.   Now, there is a box on the upper part of the

4   page.

5              MR. METLITZKY:  Which page?

6         Q.   (By Ms. Baumgartner)  Or upper part of both

7   pages, where there are actual boxes as opposed to just

8   lines, and there's some writing in there.  Is that your

9   writing?

10             MR. BRUSTIN:  Objection, vague.  You want

11  to give her an example of the word?

12             MR. METLITZKY:  Are you asking about all

13  of it?

14        Q.   (By Ms. Baumgartner)  Any of the upper part.

15        A.   The boxes?

16             MR. BRUSTIN:  Are you pointing to where it

17  says "Lualemaga" at the top?

18             MS. BAUMGARTNER:  Partly, yes.

19        A.   Yeah, I filled out where it says:  Name -- like

20  my information.

21        Q.   (By Ms. Baumgartner)  Okay.  That's your

22  writing there, that you filled that out?

23        A.   Yes.

24             MR. METLITZKY:  Objection, vague.

25        Q.   (By Ms. Baumgartner)  So let me -- let me more

Priscilla Faleafaga
February 13, 2017                                      79

 1   specify it.  It has, for example, an incident number.

 2   Did you write that?

 3        A.    No.

 4        Q.    And then it says:  Name:  Lualemaga, Priscilla

 5   Maliolagi.  Did you write that?

 6        A.    Yes.

 7        Q.    And did you also write your date of birth,

 8   residence, phone number, address, ZIP code, business

 9   address, ZIP code and date of statement?

10        A.    Yes.

11        Q.    And is that the same for both of these pages,

12   that you filled out that information?

13        A.    Yes.

14        Q.    There's also, on the page that's marked at the

15   bottom 3252, there's a cell phone number written at the

16   top, where it says "Cell," and then a 650 number.  Did

17   you write that as well?

18        A.    Sorry.  Oh, no.

19        Q.    So that's somebody else's handwriting?

20        A.    Yeah.

21        Q.    What -- did the officer sit with you -- the

22   officer that brought you the form sit with you while you

23   filled this out?

24        A.    It could have been, but I don't remember.

25        Q.    What did you do with this form after you

Priscilla Faleafaga
February 13, 2017                                    80

1   finished filling it out?

2       A.   I know I called them and told them I was done

3   with the statement.

4       Q.   What do you mean, "called them"?

5       A.   I was looking for the nearest officer to tell

6   them I was done filling out my statement.

7       Q.   Okay.  At the time that you filled out this

8   statement, had you looked at any of the photos on the

9   wall?

10      A.   Yes.

11      Q.   Had you -- so -- so before you filled out the

12  statement, you had looked at the photos?

13      A.   Yes, because they were just right there.

14      Q.   So before you filled out the statement, did you

15  recognize any of the photos on the wall?

16      A.   Yes.

17      Q.   Who did you recognize on the wall?

18      A.   Joey, David, the brother -- Jamal's brother.

19  That was it.

20      Q.   So when you filled out this form, you didn't

21  write down anybody's name.  Is there a particular reason

22  that you didn't?  Well, except for Seu.

23      A.   Yeah.

24      Q.   You didn't write down the name of the guy Seu

25  was chasing or the guy who did the shooting.  Is there a

Priscilla Faleafaga
February 13, 2017                                    81

```
 1   particular reason you didn't write down the names on

 2   this form?

 3       A.   I didn't know their names.

 4       Q.   So had you -- had you -- could you see the name

 5   of the person you recognized on the wall as the

 6   person -- as one of the people involved when you were

 7   filling out this form?

 8       A.   I don't remember.  It could have been.  The

 9   names?  I don't remember.

10       Q.   Do you remember seeing the names on the

11   pictures that were on the wall of the people that you

12   recognized?

13       A.   I mean, I just recognized the pictures.  The

14   names?  Were they list on the pictures?  I don't -- I

15   don't remember if they were or not.

16       Q.   Okay.  But it's not -- that's not something

17   that you noted at the time.

18       A.   Yeah.

19       Q.   The first time that you looked on the wall and

20   you recognized some of the pictures, had anybody -- had

21   any police officer specifically asked you at that time

22   to look at those pictures?

23       A.   Yes.

24       Q.   Who had asked you to do that?

25       A.   I believe it was the ones that brought me into
```

Priscilla Faleafaga
February 13, 2017                                    82

1    the station.  I can't remember specifically if it was

2    her or the guy officer.

3         Q.    But you think it was one of the ones that

4    brought you into the station?

5         A.    Yes.

6         Q.    When the -- whatever officer it was that

7    brought you these forms to fill out, did you tell that

8    officer that you had recognized any of the pictures on

9    the wall?

10        A.    Yes.

11        Q.    Did that officer respond in some way?

12        A.    He just said -- he just told me:  Look at the

13   pictures.  Do you see anybody?  And I just pointed out

14   who -- the people that I recognized and the people that

15   I remember being there at the time of the shooting.

16        Q.    Okay.  Did the officer that -- that you said

17   you told that you recognized some people, did that

18   officer say anything about making sure you told the

19   detectives or anything like that?

20             MR. BRUSTIN:  Objection, leading.

21        A.    Could you repeat the question again?

22        Q.    (By Ms. Baumgartner)  Sure.  When you informed

23   the officer that you had recognized some of the people

24   on the wall, did that officer specifically say anything

25   about what to do with that information, whether to tell

1  the detectives or put it in the form or anything like

2  that?

3              MR. BRUSTIN:  Same objection.

4      A.   I don't remember.

5      Q.   (By Ms. Baumgartner)  When the officer was

6  talking to you about the pictures on the wall, did the

7  officer ever suggest to you that you should -- that --

8  suggest to you that there was a particular person on the

9  wall that had been involved in the incident?

10             MR. BRUSTIN:  Objection, form, vague,

11  leading.

12             MR. METLITZKY:  Do you understand the

13  question?

14      A.   I don't understand the question.  Sorry.

15      Q.   (By Ms. Baumgartner)  Did the officer say

16  something like:  Was that person involved, or wasn't it

17  that person, or anything like that?  Did the officer

18  indicate to you any particular person on the wall that

19  the officer wanted you to specifically look at?

20             MR. BRUSTIN:  Objection.

21             Go ahead.

22      A.   I'm sorry.  No.  No.

23             I do remember one thing.  I remember

24  Joshua's picture, when I had told him that that was who

25  Seu was chasing.

Priscilla Faleafaga
February 13, 2017                                        84

1        Q.   (By Ms. Baumgartner)  But did the officer ever

2   indicate to you something like:  Isn't it that person,

3   or anything like that?

4                MR. BRUSTIN:  Objection.

5        A.   No, he didn't.

6        Q.   (By Ms. Baumgartner)  At any point in the time

7   that you were at the police station the night of the

8   murder, did anybody make any suggestion to you about who

9   was -- who might be the shooter that you should

10  identify?

11       A.   No.

12       Q.   That evening, was -- did you identify by name

13  Jamal Trulove as the person who shot Seu?

14       A.   That night in the police station?

15       Q.   Yes.

16       A.   No.

17       Q.   Why not?

18       A.   I forgot his name, probably.  I -- I didn't

19  know his name at the time.

20       Q.   Had you yet talked to your cousin when you were

21  in the --

22                MR. BRUSTIN:  Objection, asked and

23  answered.  She already described that conversation.

24                MR. METLITZKY:  Excuse me.

25                MR. BRUSTIN:  What's the problem?

Priscilla Faleafaga
February 13, 2017                              115

```
 1              MR. BRUSTIN:  Objection, leading, vague.

 2      A.   Could you repeat the question?

 3      Q.   (By Ms. Baumgartner)  Yes.

 4              MS. BAUMGARTNER:  Can you read it back?

 5              (The reporter read back the

 6              requested text.)

 7      A.   No.

 8      Q.   (By Ms. Baumgartner)  And when you testified at

 9  the various proceedings at which you testified, were you

10  telling the truth to the best of your ability?

11      A.   Yes.

12      Q.   Did you have a specific conversation with Linda

13  Allen with regard to your identification of Jamal

14  Trulove in the photos in the car?

15      A.   Yes.

16      Q.   Did you talk to her about a concern that you

17  had that you -- that it might have appeared that you

18  were being uncertain?

19              MR. BRUSTIN:  Objection, leading.

20      A.   Yes.

21      Q.   (By Ms. Baumgartner)  What did you say about

22  that?

23      A.   I know -- what we were talking about that, I

24  can't remember specifically.

25      Q.   Did you have a concern that it might have
```

1  appeared that you were uncertain in your identification,

2  even though you were certain?

3              MR. BRUSTIN:  Same objection.

4      A.   Yes.  Do you have the actual conversation?

5      Q.   (By Ms. Baumgartner)  Well, I have a -- I have

6  a memo about the conversation, but I don't know.  I'm

7  just trying to get your memory of -- of what happened

8  with respect to that.

9              Let me just go back to the very basics,

10  right?  When you were shown the photos when you were

11  sitting in the car with the detectives, did you have any

12  doubt in your mind that you picked out the photo of the

13  person that shot Seu Kuka?

14      A.   No.

15      Q.   And the night of the murder, you had clearly

16  seen the -- had you clearly seen the face of the person

17  that shot Seu Kuka?

18      A.   Yes.

19      Q.   And at the time, even before he had shot Seu

20  Kuka, you had recognized him, correct?

21      A.   Yes.

22      Q.   In your memory, were you -- when you

23  expressed -- when you were talking about -- when you

24  were in the car and you were talking about the

25  identification, did you feel like you hadn't come across

Priscilla Faleafaga
February 13, 2017                                    117

1   as certain as you meant to be?

2                MR. BRUSTIN:  Objection, vague, confusing,

3   leading.

4      A.    Yes.

5      Q.    (By Ms. Baumgartner)  Do you have a belief as

6   to why it was that you did not speak so certainly?

7      A.    Yes.

8      Q.    And why was that?

9      A.    I knew it was him; I was just -- when they had

10  shown me the pictures, I -- just at that moment, I was

11  thinking, like -- I just started to get scared, if that

12  makes any sense.

13     Q.    It does to me.

14               What were you scared of?

15     A.    Retaliation.

16     Q.    Did you believe that Jamal -- well, let me ask

17  this:  What made you believe that it was possible that

18  there could be retaliation?

19               MR. BRUSTIN:  Objection, vague, leading --

20               MR. METLITZKY:  Go ahead and answer.

21               MR. BRUSTIN:  -- calls for speculation.

22     A.    Just because I seen him do it in front of

23  everybody; it's, like, easy for him to -- to do

24  something like that.  That's what I was scared of.

25  Maybe he could have done it for me just for talking to

Priscilla Faleafaga
February 13, 2017                    121

```
 1      Q.   Do you know who wrote that in there?

 2      A.   One of the detectives did.

 3      Q.   All right.

 4           MS. BAUMGARTNER:  Let's go off the record

 5  for a moment.

 6           (A recess was taken from

 7           12:33 p.m. to 12:37 p.m.)

 8           MS. BAUMGARTNER:  So let's go back on the

 9  record.

10           I am going to be marking as Exhibit 84 a

11  CD that I -- that's marked CCF_TRULOVE_2940.

12           MR. METLITZKY:  85.

13           THE REPORTER:  85 is next.

14           MS. BAUMGARTNER:  Oh, 85.  Thank you.

15           This is Exhibit 85.

16           MR. BRUSTIN:  Could you just represent

17  what it is?

18           MS. BAUMGARTNER:  Yes.  It is the

19  interview of Priscilla Lualemaga on 7/24/07.

20           So this is Exhibit --

21           THE REPORTER:  85.

22           MS. BAUMGARTNER:  -- 85.

23           (Exhibit 85 was marked.)

24      Q.   (By Ms. Baumgartner)  Do you want me to

25  specifically give the court reporter a copy of this
```

Priscilla Faleafaga
February 13, 2017                                    122

1   exhibit or -- yeah, I better.  Okay.  That's what I'll

2   do.  I will give the court reporter a copy of this.

3                    MR. BRUSTIN:  I don't care.

4                    MS. BAUMGARTNER:  So that we know what it

5   is.

6        Q.   (By Ms. Baumgartner)  So, Ms. Faleafaga -- did

7   I get that right?

8        A.   Faleafaga.

9        Q.   Faleafaga.  Thank you.  I'm sorry.

10                   I'm going to play this for you, and I'm

11  going to play it until we hear a voice that I believe

12  may be yours, and I just need you to make sure that that

13  is, in fact, your voice.  That's what I'm going to be

14  asking you:  Whether that is, in fact, your voice.

15  Okay.

16                   THE REPORTER:  Do you want me to record

17  that?

18                   MS. BAUMGARTNER:  You don't need to record

19  it.

20                   I'm going 13 seconds in and we'll go from

21  there.

22                   (Playing CD.)

23                   MS. BAUMGARTNER:  It's unfortunately not a

24  very good recording, but --

25       Q.   (By Ms. Baumgartner)  Do you hear that voice,

Priscilla Faleafaga
February 13, 2017                                    123

1  where it said:  141, 142?

2      A.   That's my voice.

3      Q.   Okay.  That is your voice?  Okay.

4           MR. METLITZKY:  You said:  That's my

5  voice?

6           THE WITNESS:  That's my voice.

7      Q.   (By Ms. Baumgartner)  Okay.  A couple of

8  questions about that.  First of all, do you remember

9  what time it was that the interview with D'Amico and

10 Johnson started?

11          MR. BRUSTIN:  You mean the taped

12 interview?

13     Q.   (By Ms. Baumgartner)  The taped interview.

14          MR. METLITZKY:  At the police station?

15          MS. BAUMGARTNER:  Yes.

16     Q.   (By Ms. Baumgartner)  The first one at the

17 police station the night of the murder.

18     A.   You talking about the one from the CD?

19     Q.   Yes.  Do you know what time of day that was?

20     A.   I know it was pretty late at night.

21     Q.   What time did you get home that night?  Do you

22 know?

23     A.   I know it was really late.  It could have been

24 maybe 2:00, 3:00.

25     Q.   I'm now going to -- this next CD is

Priscilla Faleafaga
February 13, 2017                                    124

1   CCS_TRULOVE_2941, and it's dated 7/25/07, and I believe

2   it's a recorded statement by you.

3                  MS. BAUMGARTNER:  And this is

4   exhibit what?

5                  THE REPORTER:  86.

6                  (Exhibit 86 was marked.)

7      Q.   (By Ms. Baumgartner)  And again, I just want to

8   play it and see if you recognize your voice.  I have no

9   idea how loud this is going to be.  Let's try this.

10                 (Playing video.)

11                 MS. BAUMGARTNER:  I'm going to skip ahead

12  a little to see if I can get to your voice.  Okay?  I'm

13  skipping ahead to one minute.

14                 (Playing video.)

15                 MR. BRUSTIN:  You picked the worst

16  possible place.

17                 MS. BAUMGARTNER:  I guess I did.  Let me

18  see if I can skip forward a little more.  One minute --

19  1:45.

20     Q.   (By Ms. Baumgartner)  Is that your voice?

21     A.   Yes.

22     Q.   Okay.  Let me close that for a minute.

23                 MS. BAUMGARTNER:  Let me just double-check

24  my notes, and I may reserve the rest.

25                 (An off-the-record discussion was held

Priscilla Faleafaga
February 13, 2017                    214

```
 1        Q.    Okay.   And tell me about that conversation.
 2   What did you say to him and what did he say to you?
 3        A.    I just told him everything that I seen and just
 4   shocked, really.
 5        Q.    Okay.   Now, did you mention anything about
 6   Jamal at that point or no?
 7                    MS. BAUMGARTNER:   Objection, vague.
 8        Q.    (By Mr. Brustin)  So when you spoke to him the
 9   next -- withdrawn.
10                    When you got home, did you wake him up?
11        A.    Yes.
12        Q.    Did you talk about what had happened at the
13   police station, or did you wait till the next morning?
14        A.    We talked about what happened at the police
15   station.
16        Q.    Okay.   And that night when you got back, did
17   you say anything to your hus- -- to your boyfriend about
18   Jamal?
19                    MS. BAUMGARTNER:   Objection, vague.
20                    MR. METLITZKY:   Join.
21        A.    Yes.   But I don't remember just what we -- we
22   were just talking about what we seen, how we just looked
23   out the window, what we saw, Seu in the middle of the
24   street and then him hitting Jamal.   But at the time, I
25   didn't know his name.
```

Priscilla Faleafaga
February 13, 2017                                  232

1      Q.    All right.  So tell me about when they came to

2    the door.  What did they say to you?  What did you say

3    to them?

4      A.    She was just asking if I knew -- she had like a

5    piece of paper in her hand, and she said if I knew -- if

6    I've seen this person, and it was just like a mugshot of

7    somebody that I didn't -- I didn't know who it was.

8      Q.    Okay.  She showed you a mugshot of somebody?

9      A.    Yes.

10     Q.    And D'Amico and Johnson were together?

11     A.    I just remember D'Amico.  If Johnson was there,

12   he might have been there, but I just -- I don't know why

13   I specifically remember D'Amico.

14     Q.    Okay.  But it was a single mugshot?

15     A.    Yes.

16     Q.    Okay.  Do you -- did you have any idea who that

17   person was?

18     A.    No.

19     Q.    Okay.  And so I want to just get a little more

20   specific, if I can.  Okay?

21     A.    Okay.

22     Q.    First of all, it sounds like you're not --

23   you're not sure one way or another whether or not

24   Johnson was there, or you don't think he was there?

25             MS. BAUMGARTNER:  Objection, argumentative

Priscilla Faleafaga
February 13, 2017                    235

1    A.   Yes.

2    Q.   So it was this size?

3    A.   Yes.

4    Q.   But it was a single mugshot?

5    A.   Yes.

6    Q.   And do you recall if it was one of the pictures

7  that's contained in 83 that you looked at?

8    A.   To be honest, I don't remember the picture.  I

9  just -- when she had asked if I had seen this person, I

10  said -- or if I knew the person, I said:  No.

11    Q.   Okay.  And did she tell you any other -- did

12  she tell you anything about why she was showing you that

13  photo?

14           MR. METLITZKY:  Go ahead.  Did she tell

15  you anything about why she was showing you that photo?

16    A.   I can't remember.

17    Q.   (By Mr. Brustin)  Did she suggest to you that

18  that might be somebody who could have been the shooter?

19    A.   It wasn't about Seu.  I don't think it was.  I

20  just remember she handed me a folder and said:  Do you

21  recognize this person?  And I said:  No.

22    Q.   Okay.  And -- but she didn't give you any

23  other -- any other information about the photo she was

24  showing you?

25    A.   She gave me no information.

1       A.    Not in the police station.

2       Q.    (By Mr. Brustin)  Okay.  Where else did you

3   meet with them?

4               MR. METLITZKY:  Objection, assumes facts

5   not in evidence.

6       A.    They came to our apartment in South San

7   Francisco with Eric Fleming --

8       Q.    (By Mr. Brustin)  Okay.

9       A.    -- the other attorney.  It was D'Amico and

10  Johnson, I believe.  It was both of them.

11      Q.    Okay.  Tell us about that meeting.

12              MS. BAUMGARTNER:  Objection, vague.

13      Q.    (By Mr. Brustin)  What did they say to you?

14  What did you say to them during that meeting?

15      A.    I was served with a subpoena, and I remember I

16  called Eric Fleming to find out what was going on, you

17  know, about the subpoena, and he told me that they

18  wanted to meet with me.

19      Q.    Okay.

20      A.    So he came.  D'Amico and Johnson came inside

21  the house.  We were just talking about the trial that --

22  that could be coming.  He was just describing -- because

23  I didn't know anything about the subpoena at the time.

24  I didn't know anything about what was going to happen,

25  as far as the trial.  They just told us that they caught

Priscilla Faleafaga
February 13, 2017                                    240

1    Jamal.

2        Q.   Okay.  Is that the first time you ever talked

3    about witness protection?

4        A.   Yes.

5        Q.   Okay.

6        A.   I believe so.

7        Q.   And did they raise it or did you raise it?

8        A.   I didn't know that they had one.

9        Q.   Okay.  So up to that point in time, you never

10   thought about it, right?

11       A.   Yes.

12       Q.   The first time you thought about witness

13   protection is when it was raised in that meeting with

14   Fleming, D'Amico and Johnson?

15       A.   Yes.

16             MS. BAUMGARTNER:  Can we take a short

17   break?

18             MR. METLITZKY:  That would be great.

19             (A recess was taken from

20             3:36 p.m. to 3:46 p.m.)

21       Q.   (By Mr. Brustin)  Who did you speak to during

22   the break?

23       A.   I'm sorry?

24       Q.   Who did you speak to during the break?

25             MR. METLITZKY:  Just identify the persons

Priscilla Faleafaga
February 13, 2017                                          334

```
 1              Are you telling us now that you're not
 2    certain whether or not you saw the person you've
 3    identified as Jamal at the time that he shot Seu Kuka?
 4              MS. BAUMGARTNER:  Objection,
 5    mischaracterizes the testimony and is vague.
 6              MR. METLITZKY:  Join.  It's --
 7         Q.   (By Mr. Brustin)  You understand?
 8         A.   Yes.  I'm pretty -- I'm 100 percent sure that I
 9    seen Jamal shoot Seu.
10         Q.   You saw his face at the time he shot Seu Kuka,
11    correct?
12              MS. BAUMGARTNER:  Objection, vague,
13    argumentative, been asked and answered.
14              MR. METLITZKY:  Join.
15         A.   You're confusing me.
16         Q.   (By Mr. Brustin)  Okay.  Let me show you the
17    testimony.
18              MR. BRUSTIN:  You know what would make
19    sense?  So I can get organized, why don't we stop now
20    for the night.
21              (Off the record at 5:41 p.m.)
22                     - - - - -
23
24
25
```

Priscilla Faleafaga
February 13, 2017                                                    335

1              IN THE UNITED STATES DISTRICT COURT
          FOR THE NORTHERN DISTRICT OF CALIFORNIA
2                      OAKLAND DIVISION

3    JAMAL RASHID TRULOVE,      )
          Plaintiff,            )
4                               )
     VS.                        )   CIVIL ACTION NO.
5                               )   16-CV-00050-YGR
     THE CITY AND COUNTY OF     )
6    SAN FRANCISCO, et al.,     )
          Defendants.           )
7

8            REPORTER'S CERTIFICATION OF THE ORAL

9         DEPOSITION OF PRISCILLA LUALEMAGA FALEAFAGA

10                    February 13, 2017

11          I, Jamie K. Israelow, a Certified Shorthand

12   Reporter duly commissioned and qualified in and for the

13   State of Texas, Registered Merit Reporter and Certified

14   Realtime Reporter, do hereby certify to the following:

15          That the witness, PRISCILLA LUALEMAGA

16   FALEAFAGA, was duly sworn by the officer and that the

17   transcript of the oral deposition is a true record of

18   the testimony given by the witness:

19          That the original transcript was delivered to

20   Ms. Margaret W. Baumgartner.

21          That a copy of the certificate was served on

22   all parties and/or the witness shown herein on

23   _____.

24          I further certify that pursuant to FRCP Rule

25   30(f)(1) that the signature of the deponent:

Priscilla Faleafaga
February 13, 2017                                                336

```
 1              ___ was requested by the deponent or a party

 2    before the completion of the deposition and that

 3    signature is to be before any notary public and returned

 4    within 30 days from date of receipt of the transcript.

 5    If returned, the attached Changes and Signature Page

 6    contains any changes and the reasons therefor;

 7              _X_ was not requested by the deponent or a

 8    party before the completion of the deposition.

 9              I further certify that I am neither attorney

10    or counsel for, nor related to or employed by any of the

11    parties to the action in which this deposition is taken,

12    and further that I am not a relative or employee of any

13    attorney or counsel employed by the parties hereto, or

14    financially interested in the action.

15              CERTIFIED TO BY ME on this 21st day of

16    February, 2017.

17

18

19              _____

20              Jamie K. Israelow, CSR, RMR, CRR
                Texas CSR 3801
21              Expiration Date:  12/31/18
                US Legal Support-Dallas
22              CRCB Registration No. 343
                100 Premier Place
23              5910 North Central Expressway
                Dallas, Texas  75206
24              214.741.6001

25    Job No. Job#
```

1                    IN THE UNITED STATES DISTRICT COURT
         FOR THE NORTHERN DISTRICT OF CALIFORNIA
2                            OAKLAND DIVISION

3     JAMAL RASHID TRULOVE,        )
              Plaintiff,           )
4                                  )
      VS.                          )  CIVIL ACTION NO.
5                                  )  16-CV-00050-YGR
      THE CITY AND COUNTY OF       )
6     SAN FRANCISCO, et al.,       )
              Defendants.          )

7

8              ******************************************

9                        ORAL DEPOSITION OF

10                  PRISCILLA LUALEMAGA FALEAFAGA

11                        February 14, 2017

12                             VOLUME 2

13             ******************************************

14                    ANSWERS AND DEPOSITION OF PRISCILLA

15    LUALEMAGA FALEAFAGA, produced as a witness at the

16    instance of the Defendants, taken in the above-styled

17    and -numbered cause on the 14th day of February, 2017,

18    from 9:25 a.m. to 11:33 a.m., before Jamie K. Israelow,

19    a Certified Shorthand Reporter in and for the State of

20    Texas, Registered Merit Reporter and Certified Realtime

21    Reporter, reported in machine shorthand at the offices

22    of US Legal Support, located at 5910 North Central

23    Expressway, Suite 100, in the City of Dallas, County of

24    Dallas and State of Texas.

25

Priscilla Faleafaga
February 14, 2017                                         338

```
 1                 A P P E A R A N C E S

 2

 3   FOR THE PLAINTIFF:

 4        Mr. Nick J. Brustin
          NEUFELD, SCHECK AND BRUSTIN, LLP
 5        99 Hudson Street, 8th Floor
          New York, New York  10013
 6        212.965.9081
          nick@nsbcivilrights.com
 7        -- and --
          Ms. Kate Chatfield (By telephone)
 8        UNIVERSITY OF SAN FRANCISCO
          2130 Fulton Avenue, KN 211
 9        San Francisco, California  94117
          415.422.4385
10        chatfield@legalprivilege.ch

11

12   FOR THE DEFENDANTS:

13        Ms. Margaret W. Baumgartner
          Deputy City Attorney
14        CITY AND COUNTY OF SAN FRANCISCO
          1300 Market Street, Sixth Floor
15        San Francisco, California  94102
          415.554.3859
16        margaret.baumgartner@sfgov.org

17

18   FOR THE DEPONENT:

19        Mr. Warren Metlitzky
          CONRAD & METLITZKY, LLP
20        Four Embarcadero Center, Suite 1400
          San Francisco, California  94111
21        415.343.7103
          wmetlitzky@conradmetlitzky.com

22

23   ALSO PRESENT:

24        Madhu Srikantha

25
```

1  put all of that away.

2        Q.   (By Mr. Brustin)  Okay.  All right.  Now, when

3  you were in -- you can put that away.  Thank you.

4             You told us about going to the Ingleside

5  station with some officers and going into the

6  report-writing room.  Do you recall that?

7        A.   Yes.

8        Q.   All right.  Now, would it be fair to say that

9  anytime you left -- you were not in the report-writing

10 room that night, you were with Officer -- Inspector

11 Johnson?  Do you understand the question?  If it's not

12 clear, I want to make it clear.  You spent a number of

13 hours at the Ingleside station that night, correct?

14       A.   Yes.

15       Q.   All right.  Would it be fair to say that at all

16 times when you were at the Ingleside station and you

17 weren't in the report-writing room, you were with

18 Inspector Johnson?

19             MR. METLITZKY:  Object that it's

20 overbroad.

21             Go ahead.

22       A.   I might have been.

23       Q.   (By Mr. Brustin)  Okay.  Well, Inspector

24 Johnson is the one who picked you up in the

25 report-writing room and brought you upstairs, correct?

Priscilla Faleafaga
February 14, 2017                                        346

```
 1      A.    Okay.

 2      Q.    Is that correct?

 3      A.    Yes.

 4      Q.    And he's also the one who brought you back

 5   downstairs from the interview when you were on the

 6   second floor, correct?

 7      A.    Yes.

 8      Q.    And he's the one who drove you home.

 9      A.    Yes.

10      Q.    Do you remember ever being apart from Inspector

11   Johnson while you were at the Ingleside station after

12   you got into the report-writing room?

13      A.    Could you please repeat that?

14      Q.    Sure.

15      A.    I'm sorry.

16      Q.    Do you remember ever being without Inspector

17   Johnson after you got into the report-writing room?

18            MR. METLITZKY:  Vague.

19      A.    Yeah.  I don't understand the question.

20      Q.    (By Mr. Brustin)  Okay.  Do you remember ever

21   being with -- without Inspector Johnson when you were

22   outside of the report-writing room?

23            MS. BAUMGARTNER:  Objection.  Same

24   question.

25            MR. BRUSTIN:  It's a different question.
```

Priscilla Faleafaga
February 14, 2017                                            349

1        A.   At the Ingleside station?

2        Q.   Yes.

3        A.   He never showed me a picture of Jamal Trulove

4   at the Ingleside station.

5        Q.   You deny that happening?

6             MS. BAUMGARTNER:  Objection, been asked

7   and answered, argumentative.

8             MR. METLITZKY:  Join.

9        A.   I deny that.

10        Q.   (By Mr. Brustin)  Okay.  And you deny that

11   while walking through the Ingleside station, Inspector

12   Johnson showing you a single photograph of anybody; fair

13   to say?

14        A.   He did not show me any other single mugshots of

15   any other individuals.

16        Q.   And you deny Inspector Johnson telling you or

17   suggesting to you that you should identify somebody

18   named Trulove while you were walking through the

19   Ingleside station; is that correct?

20        A.   I deny that.

21        Q.   All right.  The only time you were shown a

22   single photograph of a mugshot was at your home by

23   D'Amico; is that right?

24        A.   That's correct.

25             MR. BRUSTIN:  What did we mark this as?

1   preliminary hearing and the first trial you recalled in

2   your mind that his -- the shooter's hood was actually

3   down; is that right?

4        A.   Yes.

5        Q.   All right.

6              MR. BRUSTIN:  Can I have the photograph?

7              MR. METLITZKY:  This is from ours?  96?

8              MS. SRIKANTHA:  Yes.  Please have her mark

9   it.

10             (Exhibit 96 was marked.)

11             MR. BRUSTIN:  Are these numbered?

12             MS. SRIKANTHA:  Just use Bates.

13        Q.   (By Mr. Brustin)  Okay.  Now, I would like you

14   to -- so I'm showing you what's marked as Exhibit 96 for

15   identification, and it's a series of photo arrays.

16   Okay?

17        A.   Okay.

18        Q.   And I want to -- I want to turn first to

19   Page -- Bates-stamped Page 119.

20             MR. METLITZKY:  And for the record, these

21   are not sequentially Bates-stamped, and they're not all

22   Bates-stamped.  It's an assortment.

23             MR. BRUSTIN:  That's right.

24             MR. METLITZKY:  Okay.

25             MR. BRUSTIN:  That's correct.

Priscilla Faleafaga
February 14, 2017                              407

```
 1      Q.   Okay.  So this is someone in the photo array

 2  you didn't know.  What were you going to say?  Go ahead.

 3      A.   These are the same person, right?

 4      Q.   Yes.

 5      A.   The --

 6      Q.   Yes, the two pictures are the same person.

 7      A.   Okay.

 8      Q.   And take a look at 131.  You know who that is,

 9  right?

10           MS. BAUMGARTNER:  Okay.

11      A.   David.

12           MR. METLITZKY:  And again, you're

13  referring to the Bates stamp --

14           MR. BRUSTIN:  Right.

15           MR. METLITZKY:  -- 131?  Because the David

16  one says:  124.

17      Q.   (By Mr. Brustin)  And then the bottom, 123, you

18  know who that is.  The sixth photo you saw, that's who?

19      A.   Yes.

20      Q.   Who's that?

21      A.   This is Jamal.

22      Q.   And that's your writing to the left?

23      A.   Yes.

24      Q.   It says "Shooter" and then your initials?

25      A.   Yes.
```

1                  IN THE UNITED STATES DISTRICT COURT
            FOR THE NORTHERN DISTRICT OF CALIFORNIA
2                         OAKLAND DIVISION

3     JAMAL RASHID TRULOVE,        )
           Plaintiff,             )
4                                 )
      VS.                          )   CIVIL ACTION NO.
5                                 )   16-CV-00050-YGR
      THE CITY AND COUNTY OF       )
6     SAN FRANCISCO, et al.,       )
           Defendants.            )
7

8              REPORTER'S CERTIFICATION OF THE ORAL

9          DEPOSITION OF PRISCILLA LUALEMAGA FALEAFAGA

10                         Volume 2

11                     February 14, 2017

12              I, Jamie K. Israelow, a Certified Shorthand

13    Reporter duly commissioned and qualified in and for the

14    State of Texas, Registered Merit Reporter and Certified

15    Realtime Reporter, do hereby certify to the following:

16              That the witness, PRISCILLA LUALEMAGA

17    FALEAFAGA, Volume 2, was duly sworn by the officer and

18    that the transcript of the oral deposition is a true

19    record of the testimony given by the witness:

20              That the original transcript was delivered to

21    Ms. Margaret W. Baumgartner.

22              That a copy of the certificate was served on

23    all parties and/or the witness shown herein on

24    _____.

25              I further certify that pursuant to FRCP Rule

Priscilla Faleafaga
February 14, 2017                                   442

1   30(f)(1) that the signature of the deponent:

2           ____ was requested by the deponent or a party

3   before the completion of the deposition and that

4   signature is to be before any notary public and returned

5   within 30 days from date of receipt of the transcript.

6   If returned, the attached Changes and Signature Page

7   contains any changes and the reasons therefor;

8           _X_ was not requested by the deponent or a

9   party before the completion of the deposition.

10          I further certify that I am neither attorney

11  or counsel for, nor related to or employed by any of the

12  parties to the action in which this deposition is taken,

13  and further that I am not a relative or employee of any

14  attorney or counsel employed by the parties hereto, or

15  financially interested in the action.

16          CERTIFIED TO BY ME on this 21st day of

17  February, 2017.

18          _Jamie K. Israelow_

19

20          _____
            Jamie K. Israelow, CSR, RMR, CRR
21          Texas CSR 3801, Exp. Date:  12/31/18
            US Legal Support-Dallas
22          CRCB Registration No. 343
            100 Premier Place
23          5910 North Central Expressway
            Dallas, Texas  75206
24          214.741.6001

25  Job No. 233539