# Exhibit 5

Deposition of Priscilla Lualemaga

February 13-14, 2017

(Excerpts of Testimony)

*Jamal Trulove v. CCSF, et al.*

1              IN THE UNITED STATES DISTRICT COURT
         FOR THE NORTHERN DISTRICT OF CALIFORNIA
2                      OAKLAND DIVISION

3    JAMAL RASHID TRULOVE,      )
          Plaintiff,            )
4                               )
     VS.                        )  CIVIL ACTION NO.
5                               )  16-CV-00050-YGR
     THE CITY AND COUNTY OF     )
6    SAN FRANCISCO, et al.,     )
          Defendants.           )
7

8         *****************************************

9                   ORAL DEPOSITION OF

10             PRISCILLA LUALEMAGA FALEAFAGA

11                   February 13, 2017

12                        VOLUME 1

13        *****************************************

14              ANSWERS AND DEPOSITION OF PRISCILLA

15   LUALEMAGA FALEAFAGA, produced as a witness at the

16   instance of the Defendants, taken in the above-styled

17   and -numbered cause on the 13th day of February, 2017,

18   from 9:02 a.m. to 5:41 p.m., before Jamie K. Israelow, a

19   Certified Shorthand Reporter in and for the State of

20   Texas, Registered Merit Reporter and Certified Realtime

21   Reporter, reported in machine shorthand at the offices

22   of US Legal Support, located at 5910 North Central

23   Expressway, Suite 100, in the City of Dallas, County of

24   Dallas and State of Texas.

25

1   2007 at Rosa's house.

2       A.   Yes.

3       Q.   Who were they?

4       A.   One of them was Jamal and then his -- I believe

5   his brother, Seu, of course, a couple of other guys; I

6   don't know the names.

7       Q.   Did you recognize these couple of other guys

8   from the neighborhood?

9       A.   Yes.

10      Q.   Do you know when -- whether -- or do you know

11  where any of these other people that you would see

12  hanging out at Seu's house, where they -- where

13  specifically they lived in Sunnydale?

14      A.   No.

15      Q.   When you say "Jamal's brother," who are you

16  speaking of?  Do you know his name?

17      A.   I forgot his name.

18      Q.   Do you know whether it was -- that brother was

19  older?  Younger?

20      A.   I believed he was younger.

21      Q.   Did you know one of Jamal's brothers by the

22  name of David Trulove?

23      A.   Yes.

24      Q.   Was he one of the people that would be at Seu's

25  house regularly a few months before the murder?

Priscilla Faleafaga
February 13, 2017                                    27

1      A.    Yes.

2      Q.    Had you -- how long -- well, did you know David

3   Trulove before he started hanging out next door?

4      A.    Yes.

5      Q.    How did you know him?

6      A.    It was a long time ago.  He knew, like,

7   probably one of my cousins that lived in the area at the

8   time.

9      Q.    So one of your cousins knew David?

10     A.    Yeah, they knew each other.

11     Q.    Had you met David previously before -- before

12   the few months previous to the murder?

13     A.    Yes.

14     Q.    In what circumstance did you meet him?  How was

15   it that you met him?

16     A.    He was just with -- I know he knew my cousin,

17   and I would see him regularly.  This was a long time

18   ago, when I was really younger.  And I remember my

19   cousin just introducing us when he came around, but it

20   was just David, yeah.  "The Trulove," they called him.

21     Q.    Which cousin was this that knew David?

22           MR. METLITZKY:  Hold on.

23           You can answer that.

24     A.    Jared.

25           MR. BRUSTIN:  Could you spell it, please?

Priscilla Faleafaga
February 13, 2017                                     55

1    A.   Did I say anything?  Yes.  Just told my

2    boyfriend what happened.

3              MR. BRUSTIN:  I couldn't hear.  I

4    apologize.

5    A.   I just told my boyfriend what happened, what I

6    seen.

7    Q.   (By Ms. Baumgartner)  And what did you do after

8    you saw Jamal shoot Seu?

9    A.   I called my cousin.

10    Q.   Did you go anywhere in your apartment to look

11    further out in the street before you called your cousin?

12    A.   Yes, because my boyfriend went to the front --

13    to the other room, that was facing the front of the

14    house, just to look to see what -- because Seu was

15    there.

16    Q.   Did you look out the window from the front room

17    as well?

18    A.   Yes, I did.

19    Q.   What did you see when you looked out the front

20    window?

21    A.   I just seen people, a lot of people, and Seu's

22    body lying there.

23    Q.   Was there anybody within arm's reach of Seu's

24    body when you looked out the front window?

25    A.   Yeah.

Priscilla Faleafaga
February 13, 2017                                    64

1    A.   It could have been maybe 15 minutes, but I'm
2  not sure.
3    Q.   How was it that you came to talk to the police
4  officer?  Did the officer approach you?  Did you
5  approach the officer?  Some other way?
6    A.   She was going around asking if they seen what
7  happened, if they seen anything.
8    Q.   And you say "she."  Can you describe the
9  officer?
10    A.   Yes.  It was -- it was a -- it was a lady
11  officer.  Her hair was pulled back, I think.
12    Q.   Was she wearing a uniform?
13    A.   She was wearing a uniform.
14    Q.   What color was -- was she wearing a hat?
15    A.   No.
16    Q.   What color was her hair?
17    A.   I'm not sure.
18    Q.   What was her race?
19    A.   She could have been white or Latina.
20    Q.   So when you first spoke to her, were you
21  responding to her questions about whether anybody had
22  seen anything, or did you approach her?  How did that
23  work?
24    A.   She just asked everybody:  Did anybody see
25  anything?  Did anybody know what happened?

1  that met us on the other side of the block.

2      Q.    And who was driving that car?

3      A.    It was another police officer.

4      Q.    Male?  Female?

5      A.    It was a guy.

6      Q.    At some point, did you provide a description of

7  the person you had seen shooting Seu?

8      A.    Yes.

9      Q.    Where were you when you provided that

10 description?

11     A.    In the car.

12     Q.    Did you provide any other information other

13 than the description of the guy?

14     A.    I know it was the car that they drove.

15     Q.    When you say "they," who are you speaking --

16     A.    Or whoever's car it was, Jamal's, Joshua's.  I

17 assumed it was one of their cars.

18     Q.    What made you assume that it was one of their

19 cars?  Had you seen them in it?

20     A.    Uh-huh.  Yes.  Sorry.

21     Q.    Had you seen them in it that day?

22     A.    I don't remember.

23     Q.    Did you volunteer that information about the

24 car, or was it something that was asked of you?

25     A.    I only volunteered it because I -- from that

1  time when we were driving, I believe I seen the car

2  passing by when we were going wherever the police were

3  taking us.

4      Q.    How -- had you driven -- how far had you driven

5  from the time that you first got in the car until the

6  time that you actually saw the car?

7      A.    Maybe a mile or so.

8      Q.    Where was that location that you were in when

9  you actually saw the car?

10     A.    I know it was on Sunnydale Avenue, and then

11  there was a school, an old school -- I forgot the name

12  of the school -- where I think that's where we had

13  pulled to the side, and I told them:  That's the car

14  they drive.

15     Q.    When you were in the car, were you in the --

16  where were you sitting?

17     A.    In the back.

18     Q.    Was anybody sitting in the back with you?

19     A.    No.

20     Q.    The car that you saw that you thought -- the

21  one with Jamal and Joshua, was it driving opposite you?

22     A.    Opposite.

23     Q.    So it drove by you on the other side of the

24  car?

25     A.    Yes.

Priscilla Faleafaga
February 13, 2017                                              76

1   officer or the man officer that gave me the paper.

2        Q.   But do you believe that it was one of the

3   officers who actually -- it was -- you had seen before?

4        A.   That brought --

5        Q.   That brought you --

6        A.   That brought me in?  It could have been.

7        Q.   But you don't specifically remember?

8        A.   I don't specifically remember.

9        Q.   Was it an officer wearing a uniform?

10       A.   Yes.

11       Q.   I know that you eventually went and gave a

12   statement to the two homicide inspectors.  But other

13   than those homicide inspectors, did you ever interact

14   that evening with any other officers wearing plain

15   clothes, in other words, not in uniform?

16       A.   No.

17       Q.   When the officer brought you the piece of paper

18   to fill out the statement, was part of it already filled

19   out -- the top part of it already filled out?

20       A.   I don't remember.

21       Q.   I'm just going to get an exhibit marked.

22            MS. BAUMGARTNER:  I actually -- I think

23   this has -- may have been marked before, but I don't

24   actually remember.

25            MR. BRUSTIN:  If you tell me what it is, I

Priscilla Faleafaga
February 13, 2017                                    78

1   across them?

2       A.   Yes.

3       Q.   Now, there is a box on the upper part of the

4   page.

5                   MR. METLITZKY:  Which page?

6       Q.   (By Ms. Baumgartner)  Or upper part of both

7   pages, where there are actual boxes as opposed to just

8   lines, and there's some writing in there.  Is that your

9   writing?

10                  MR. BRUSTIN:  Objection, vague.  You want

11  to give her an example of the word?

12                  MR. METLITZKY:  Are you asking about all

13  of it?

14      Q.   (By Ms. Baumgartner)  Any of the upper part.

15      A.   The boxes?

16                  MR. BRUSTIN:  Are you pointing to where it

17  says "Lualemaga" at the top?

18                  MS. BAUMGARTNER:  Partly, yes.

19      A.   Yeah, I filled out where it says:  Name -- like

20  my information.

21      Q.   (By Ms. Baumgartner)  Okay.  That's your

22  writing there, that you filled that out?

23      A.   Yes.

24                  MR. METLITZKY:  Objection, vague.

25      Q.   (By Ms. Baumgartner)  So let me -- let me more

1    finished filling it out?

2       A.    I know I called them and told them I was done

3    with the statement.

4       Q.    What do you mean, "called them"?

5       A.    I was looking for the nearest officer to tell

6    them I was done filling out my statement.

7       Q.    Okay.  At the time that you filled out this

8    statement, had you looked at any of the photos on the

9    wall?

10      A.    Yes.

11      Q.    Had you -- so -- so before you filled out the

12   statement, you had looked at the photos?

13      A.    Yes, because they were just right there.

14      Q.    So before you filled out the statement, did you

15   recognize any of the photos on the wall?

16      A.    Yes.

17      Q.    Who did you recognize on the wall?

18      A.    Joey, David, the brother -- Jamal's brother.

19   That was it.

20      Q.    So when you filled out this form, you didn't

21   write down anybody's name.  Is there a particular reason

22   that you didn't?  Well, except for Seu.

23      A.    Yeah.

24      Q.    You didn't write down the name of the guy Seu

25   was chasing or the guy who did the shooting.  Is there a

1    particular reason you didn't write down the names on

2    this form?

3        A.    I didn't know their names.

4        Q.    So had you -- had you -- could you see the name

5    of the person you recognized on the wall as the

6    person -- as one of the people involved when you were

7    filling out this form?

8        A.    I don't remember.  It could have been.  The

9    names?  I don't remember.

10        Q.    Do you remember seeing the names on the

11    pictures that were on the wall of the people that you

12    recognized?

13        A.    I mean, I just recognized the pictures.  The

14    names?  Were they list on the pictures?  I don't -- I

15    don't remember if they were or not.

16        Q.    Okay.  But it's not -- that's not something

17    that you noted at the time.

18        A.    Yeah.

19        Q.    The first time that you looked on the wall and

20    you recognized some of the pictures, had anybody -- had

21    any police officer specifically asked you at that time

22    to look at those pictures?

23        A.    Yes.

24        Q.    Who had asked you to do that?

25        A.    I believe it was the ones that brought me into

1   the station.  I can't remember specifically if it was

2   her or the guy officer.

3       Q.   But you think it was one of the ones that

4   brought you into the station?

5       A.   Yes.

6       Q.   When the -- whatever officer it was that

7   brought you these forms to fill out, did you tell that

8   officer that you had recognized any of the pictures on

9   the wall?

10      A.   Yes.

11      Q.   Did that officer respond in some way?

12      A.   He just said -- he just told me:  Look at the

13  pictures.  Do you see anybody?  And I just pointed out

14  who -- the people that I recognized and the people that

15  I remember being there at the time of the shooting.

16      Q.   Okay.  Did the officer that -- that you said

17  you told that you recognized some people, did that

18  officer say anything about making sure you told the

19  detectives or anything like that?

20           MR. BRUSTIN:  Objection, leading.

21      A.   Could you repeat the question again?

22      Q.   (By Ms. Baumgartner)  Sure.  When you informed

23  the officer that you had recognized some of the people

24  on the wall, did that officer specifically say anything

25  about what to do with that information, whether to tell

```
 1   the detectives or put it in the form or anything like

 2   that?

 3                  MR. BRUSTIN:  Same objection.

 4       A.   I don't remember.

 5       Q.   (By Ms. Baumgartner)  When the officer was

 6   talking to you about the pictures on the wall, did the

 7   officer ever suggest to you that you should -- that --

 8   suggest to you that there was a particular person on the

 9   wall that had been involved in the incident?

10                  MR. BRUSTIN:  Objection, form, vague,

11   leading.

12                  MR. METLITZKY:  Do you understand the

13   question?

14       A.   I don't understand the question.  Sorry.

15       Q.   (By Ms. Baumgartner)  Did the officer say

16   something like:  Was that person involved, or wasn't it

17   that person, or anything like that?  Did the officer

18   indicate to you any particular person on the wall that

19   the officer wanted you to specifically look at?

20                  MR. BRUSTIN:  Objection.

21                  Go ahead.

22       A.   I'm sorry.  No.  No.

23                  I do remember one thing.  I remember

24   Joshua's picture, when I had told him that that was who

25   Seu was chasing.
```

Priscilla Faleafaga
February 13, 2017                                    139

```
 1      Q.   And you've been married since then?

 2      A.   Yes.

 3      Q.   Without any separation or divorce or anything

 4 like that?

 5      A.   No.

 6      Q.   And the only question I'm going to ask you

 7 about your children is when they were born.  If you

 8 could tell me that, please.

 9      A.   The oldest, 2008; the second, 2009; and then

10 the third, 2012.

11           MR. METLITZKY:  Thank you for keeping that

12 little bit ^ listen.

13      Q.   (By Mr. Brustin)  There was another alleged

14 witness in this case named Latisha Meadows-Dickerson.

15 Do you know that person?

16      A.   I don't.

17      Q.   Okay.  Is it fair to say you've never met in

18 your life anyone named Latisha Meadows-Dickerson?

19      A.   By the name, no.

20      Q.   And even if not by the name, you're not aware

21 of any other witnesses that came forward in this case;

22 fair to say?

23      A.   Yes.

24      Q.   You don't know anybody who fits that bill?

25           MS. BAUMGARTNER:  Objection, asked and
```

1  answered.

2              MR. METLITZKY:  You can go ahead.

3      A.   I don't.

4      Q.   (By Mr. Brustin)  Okay.  And you -- you

5  testified earlier, when Ms. Baumgartner was asking you

6  questions, that you didn't speak to anybody in the world

7  about what you had seen other than your husband and

8  attorneys, correct?

9              MS. BAUMGARTNER:  Objection,

10 mischaracterizes the testimony.

11             MR. METLITZKY:  Join.

12     Q.   (By Mr. Brustin)  And police.

13             MR. METLITZKY:  Same objection.

14     A.   I'm sorry.  Could you repeat the question?

15     Q.   (By Mr. Brustin)  Sure.  You testified earlier

16 that you didn't speak to anybody else in the world about

17 what you saw that night when you say you saw Jamal shoot

18 Seu Kuka other than your husband, the police and

19 attorneys, correct?

20             MR. METLITZKY:  Objection, misstates her

21 testimony.

22     A.   My cousin.

23     Q.   (By Mr. Brustin)  And your cousin.

24             Anybody else in the world?

25     A.   Not that I can remember.

1    correct?

2       A.   Yes.

3       Q.   All right.  Did you have any other addresses at

4    that time?

5                  MR. METLITZKY:  Objection, vague.

6       Q.   (By Mr. Brustin)  So between sometime in 2005

7    or 2006 and 2007, did you have any other address?

8       A.   Well, I was just mostly staying there at

9    140 Blythedale.

10      Q.   Okay.  Let's be clear:  The only home you had

11   between 2006 and 2007 was the 140 Blythedale, correct?

12                 MR. METLITZKY:  Objection, vague.

13      A.   No.  I had other places I would just go sleep

14   over at.

15      Q.   (By Mr. Brustin)  Okay.  But you didn't have

16   any other -- you didn't have any other homes; is that

17   fair to say?

18                 MS. BAUMGARTNER:  Objection, vague.

19                 MR. METLITZKY:  Join.

20      A.   Yes.

21      Q.   (By Mr. Brustin)  Okay.  So there was no other

22   place in 2006 or 2007 where you had a lease, for

23   example?

24      A.   No.

25      Q.   And there was no other place in 2006 and 2007

1  where your then-boyfriend had a lease, correct?

2      A.   No.

3      Q.   You were living at 140 Blythedale, correct?

4              MS. BAUMGARTNER:  Objection,

5  argumentative, vague.

6              MR. METLITZKY:  And I join that.  It's

7  also asked and answered.

8      A.   Yes.

9      Q.   (By Mr. Brustin)  Okay.  Now, let's take the

10  three or four months before the shooting.  You with me?

11      A.   Yes.

12      Q.   So the shooting is in July.  I'm talking about

13  the three or four months before.  Would it be fair to

14  say that to the best of your recollection, every night

15  during the three or four months before the shooting you

16  stayed at 140 Blythedale?

17      A.   Yes.

18      Q.   All right.  And would it be fair to say that in

19  the six months before the shooting, every night you

20  stayed at 140 Blythedale?

21      A.   Yes.

22      Q.   Same would be true for the year before,

23  correct?

24      A.   2006?

25      Q.   Yes.

1      Q.    You didn't have any -- you weren't storing any

2  of your belongings anywhere else?

3      A.    No.

4      Q.    And the same with your boyfriend?  He kept all

5  of his stuff at 140 Blythedale, correct?

6      A.    Well, he -- he was staying there, too, but he

7  was back and forth with his parents.

8      Q.    Where did his parents live?

9      A.    At the time, Walnut Creek.

10     Q.    Walnut Creek.

11           But you weren't staying there; you were

12  always at Blythedale?

13     A.    Yes.

14     Q.    Did your boyfriend keep most of his stuff at

15  140 Blythedale?

16     A.    Just his clothes but not all of it.  He was

17  bouncing around a lot.

18     Q.    But you weren't; you were living at

19  140 Blythedale, right?

20     A.    Yes.

21           MS. BAUMGARTNER:  Objection, asked and

22  answered.

23     Q.    (By Mr. Brustin)  Now, your sister had the room

24  next to yours, right?

25           MS. BAUMGARTNER:  Objection, vague as to

Priscilla Faleafaga
February 13, 2017                                    146

```
 1  time.
 2     Q.   (By Mr. Brustin)  Withdrawn.
 3              Let's say in 2006 and 2007, your sister
 4  was also living at 140 Blythedale with her husband and
 5  two children, correct?
 6              MR. METLITZKY:  Objection, vague.
 7     A.   Yes.
 8     Q.   (By Mr. Brustin)  All right.  And they had the
 9  room next to you, right?
10     A.   Yes.
11     Q.   And the only address, official address, that
12  your sister had was 140 Blythedale; fair to say?
13              MR. METLITZKY:  Objection, lacks
14  foundation.
15              Go ahead and answer the question.
16     A.   Yes.
17     Q.   (By Mr. Brustin)  And all their belongings were
18  there as well, right?
19              MR. METLITZKY:  Objection, lacks
20  foundation.
21              Answer to your knowledge.
22     A.   To my knowledge, yes.
23     Q.   (By Mr. Brustin)  All right.  You may have
24  answered this.  I apologize.  If you could just tell me
25  one more time the month that you were married.
```

1      Q.    I'm going to ask you the same questions anyway.

2  Would it be fair to say that that house was very

3  crowded?

4                MR. METLITZKY:  Objection, argumentative.

5      A.    It was crowded, but that's how we all grew up.

6      Q.    (By Mr. Brustin)   Okay.

7      A.    We have a big family.

8      Q.    So you're okay -- it was crowded, but it was

9  okay?

10     A.    Yes.

11     Q.    All right.  Now, there was a total of how many

12  bedrooms at 140 Blythedale?

13     A.    Two.

14     Q.    Okay.  All right.  And so where would -- when

15  your grandmother wasn't staying somewhere else, where

16  would she stay?  When you were there with your boyfriend

17  and your sister and her kids and husband were there,

18  where would your grandmother sleep?

19     A.    Sometimes she would sleep downstairs.  She

20  could have the bed.  You know, she's an older lady.  She

21  would probably just sleep on a couch in the living room.

22     Q.    Okay.  You mentioned that you had 10 relatives

23  that also lived in the area; is that right?

24                MS. BAUMGARTNER:  I don't know if that

25  mischaracterizes the testimony, but --

1    A.    Yes.

2    Q.    Very early, right?

3    A.    Yes.

4    Q.    All right.  And I take it your plan on the

5  night of the murder was to take the bus the next day.

6    A.    I can't remember.

7    Q.    How long would it take if your husband drove

8  you?  A little bit less?

9    A.    Yes.

10    Q.    How much less?

11    A.    20 minutes.

12    Q.    Okay.  Still had to get up really early, right?

13    A.    Yes.

14    Q.    All right.  So during the week around the time

15  of the murder, you had to get up between, say, 4:15 and

16  4:45 in the morning; fair to say?

17    A.    Yes.

18    Q.    So I take it you had to go to bed early.

19    A.    Yes.

20    Q.    And you mentioned that you were getting in --

21  you were getting to bed on the night of the murder at

22  around 10:00; is that right?

23    A.    Yes.

24    Q.    Now, you couldn't remember what you wore that

25  night to bed, but would it be fair to say that,

1  generally, the kind of thing you would wear to bed would

2  be sweatpants?

3      A.   Yes.

4      Q.   Okay.  Something comfortable like that, right?

5      A.   Something comfortable, yes.

6      Q.   Were sweats something you wore around that

7  time?

8      A.   I don't remember.

9      Q.   Did you own some sweatpants?

10     A.   I wear -- yes.  I wear sweatpants a lot.

11     Q.   Okay.  And what was your routine when you would

12  go to bed?  You said you and your boyfriend at that

13  time, around July of 2007, would go to bed around the

14  same time.

15     A.   Yes.

16     Q.   Once you were ready for bed, would it be fair

17  to say, given how early you had to get up, you would get

18  in bed and try to go to sleep as quickly as you could?

19     A.   Yes.

20     Q.   All right.  So I guess the question is:  You

21  said that you -- you were getting -- getting into bed

22  around 10:00 on the night of the murder, right?

23     A.   Yes.

24     Q.   The murder didn't happen until about 10:50.  Is

25  it possible that you might have fallen asleep before

Priscilla Faleafaga
February 13, 2017                    230

```
 1      Q.   All right.  An Officer Androvich has testified
 2  in this case that he drove D'Amico and Johnson to
 3  140 Blythedale on 7/24, later in the day on 7/24.  Do
 4  you remember the police coming to your house in between
 5  when you were at the precinct and when you were in the
 6  car the next day?
 7              MS. BAUMGARTNER:  Objection,
 8  mischaracterizes the testimony.
 9              MR. METLITZKY:  Lacks foundation, lacks
10  personal knowledge.  Counsel is testifying.
11      A.   I'm sorry.  Could you --
12      Q.   (By Mr. Brustin)  Sure.  Do you remember the
13  police, as he talked about, coming to 140 Blythedale in
14  between when you talked to them at the police station
15  and when you were in the car on the 25th?
16              MS. BAUMGARTNER:  Objection,
17  mischaracterizes the testimony.
18              MR. METLITZKY:  Join.
19      A.   If there was a police officer that came --
20      Q.   (By Mr. Brustin)  So you -- you remember
21  D'Amico and Jonathan, the two detectives?
22      A.   Yes.
23      Q.   Do you remember them coming to your house,
24  the -- coming to 140 Blythedale the next day?
25      A.   Yes.
```

1    Q.   Okay.  So tell me -- why don't you tell me

2  about that.

3              MR. METLITZKY:  Belated objection.  That

4  was vague.

5    Q.   (By Mr. Brustin)  All right.  So you had -- you

6  had a meeting at your home, at 140 Blythedale, with

7  D'Amico and Johnson, right?

8              MR. METLITZKY:  Mischaracterizes her

9  testimony.

10   A.   What do you mean by "meeting"?

11   Q.   (By Mr. Brustin)  They were at your house.

12             MR. METLITZKY:  Objection, vague.

13   A.   They were at the front door.

14   Q.   (By Mr. Brustin)  Okay.  And the other thing

15  that D'Amico testified to was that soon after the

16  homicide, she went into the apartment.  Do you remember

17  her coming in?

18             MS. BAUMGARTNER:  Objection, may

19  mischaracterize the testimony.

20             MR. METLITZKY:  Join.  Vague.  Counsel is

21  testifying.

22   A.   I don't remember.

23   Q.   (By Mr. Brustin)  All right.

24   A.   I know they were at the door.  I don't remember

25  her coming in the apartment.

1    Q.   All right.  So tell me about when they came to

2  the door.  What did they say to you?  What did you say

3  to them?

4    A.   She was just asking if I knew -- she had like a

5  piece of paper in her hand, and she said if I knew -- if

6  I've seen this person, and it was just like a mugshot of

7  somebody that I didn't -- I didn't know who it was.

8    Q.   Okay.  She showed you a mugshot of somebody?

9    A.   Yes.

10   Q.   And D'Amico and Johnson were together?

11   A.   I just remember D'Amico.  If Johnson was there,

12  he might have been there, but I just -- I don't know why

13  I specifically remember D'Amico.

14   Q.   Okay.  But it was a single mugshot?

15   A.   Yes.

16   Q.   Okay.  Do you -- did you have any idea who that

17  person was?

18   A.   No.

19   Q.   Okay.  And so I want to just get a little more

20  specific, if I can.  Okay?

21   A.   Okay.

22   Q.   First of all, it sounds like you're not --

23  you're not sure one way or another whether or not

24  Johnson was there, or you don't think he was there?

25                MS. BAUMGARTNER:  Objection, argumentative

Priscilla Faleafaga
February 13, 2017                          244

1      A.   I don't know.

2      Q.   Okay.

3      A.   Sorry.

4      Q.   So is it possible that it was that day when you

5   were home when D'Amico was going door to door?

6               MS. BAUMGARTNER:  Objection,

7   argumentative.

8      A.   I don't know the specific day.

9      Q.   (By Mr. Brustin)  Okay.  Could have been that

10  day or could have been a day after -- could have been

11  later?

12     A.   Yes.

13     Q.   Is that what you're saying?

14     A.   Yes.

15     Q.   All right.  Now, you mentioned that you knew

16  that D'Amico was showing that mugshot to a number of

17  people, correct?

18     A.   Yes.

19     Q.   And how did you know that?

20     A.   Because she was knocking at the door next door.

21     Q.   Okay.  So -- that was Rosa's house, right?

22     A.   Yes.

23     Q.   All right.  So she was showing that mugshot to

24  somebody -- you believe that she was showing that

25  mugshot to somebody in Rosa's house, correct?

1    was asking you some questions about your statement; is

2    that right?

3                    MS. BAUMGARTNER:  Objection,

4    mischaracterizes the testimony, assumes facts not in

5    evidence, compound.

6                    MR. METLITZKY:  Join.

7        A.    I'm so sorry.

8        Q.    (By Mr. Brustin)  Sure.  You testified earlier

9    today that you wrote your statement in that room --

10       A.    Okay.

11       Q.    -- and you looked on the board and you

12   identified some people -- withdrawn.

13                   You told us what happened was, first, you

14   looked at the board and you identified some people,

15   correct?

16                   MS. BAUMGARTNER:  Objection,

17   mischaracterizes the testimony.

18                   MR. METLITZKY:  Join.

19       A.    Yes.

20       Q.    (By Mr. Brustin)  Okay.  And the people you

21   remembered identifying were David Trulove, Josh Bradley

22   and Joey, correct?

23       A.    Yes.

24       Q.    All right.  Then you wrote the statement,

25   right?

Priscilla Faleafaga
February 13, 2017                                    307

1      A.    Yes.

2      Q.    Then you spoke to an officer in that room, not

3  a detective but an officer, where he asked you some

4  questions about the statement you had written.

5      A.    Yes.

6      Q.    Okay.  Now, did that officer ask you questions

7  about the people you identified on the board:   David

8  Trulove, Josh Bradley and Joey?

9              MR. METLITZKY:   Objection, compound.

10     A.    Like what questions?

11     Q.    (By Mr. Brustin)  How you recognized them,

12 whether you saw them the night of the shooting,

13 questions like that.

14             MR. METLITZKY:   Objection, assumes facts

15 not in evidence.

16     A.    I'm confused.

17     Q.    (By Mr. Brustin)  Okay.  When he was asking you

18 about your statement, did he ask you whether or not you

19 saw the person that did the shooting on the board?

20     A.    Yes.

21     Q.    Okay.  That's what they were most interested

22 in, right?

23     A.    Yes.

24             MS. BAUMGARTNER:   Objection.

25             MR. METLITZKY:   Hold on.

1    other things, talked to you about whether or not you

2    also recognized the shooter from any of the pictures on

3    the board in addition to the other people you

4    recognized?

5              MS. BAUMGARTNER:  Objection,

6    mischaracterizes the testimony.

7              MR. METLITZKY:  Join.

8              (The reporter read back the

9              requested text.)

10   A.    No.

11   Q.    (By Mr. Brustin)  Okay.  When you came back

12   down with the police officer -- withdrawn.

13             When you came back to the report-writing

14   room with Detectives Johnson and D'Amico after your

15   interview and you went back and looked at the "Up the

16   Hill" board, at that time did they ask you if you

17   recognized the shooter on the board?

18   A.    They did.

19   Q.    Okay.  And what did you tell them?

20   A.    I told them I didn't recognize.

21   Q.    All right.  Now, would it be fair to say that

22   when you looked at that board, you were doing your very

23   best to identify anybody that you could?

24             MS. BAUMGARTNER:  Objection, vague,

25   overbroad.

```
 1                    MR. METLITZKY:  Join.
 2                    MR. BRUSTIN:  Let me withdraw the
 3   question.
 4        Q.   (By Mr. Brustin)  When you were looking at the
 5   board the first time when you came in, before you did
 6   your statement, your written statement, would it be fair
 7   to say you were doing your best to look carefully at
 8   that board and identify anybody that you recognized from
 9   the scene of the shooting?
10                    MS. BAUMGARTNER:  Objection, vague.
11                    MR. METLITZKY:  Join.
12        A.   Yes.
13        Q.   (By Mr. Brustin)  Okay.  And you were in that
14   room for a long time, right?
15        A.   (Witness nods.)
16                    MR. METLITZKY:  Objection, vague.
17        A.   Yes.
18        Q.   (By Mr. Brustin)  Would it be fair to say that
19   you could have spent as long as an hour or more looking
20   at that board?
21                    MS. BAUMGARTNER:  Objection, vague.
22                    MR. METLITZKY:  Yes.  Calls for
23   speculation.  Join.
24        A.   Yes.
25        Q.   (By Mr. Brustin)  Okay.
```

1  a -- reading a page.

2              MR. METLITZKY:  Objection.

3      Q.   (By Mr. Brustin)  Is that how you looked at it?

4      A.   I don't remember.

5      Q.   Okay.  Fair enough.

6              Would it be fair to say, though, that you

7  did your very best to look at every single photo?

8              MS. BAUMGARTNER:  Objection, vague,

9  argumentative.

10             MR. METLITZKY:  Join.

11     A.   Yes.

12     Q.   (By Mr. Brustin)  Okay.  Now, take a look at --

13  okay.  Now -- so take a look at this -- at 90.  Now, if

14  you look at the -- start at the top with me.  Okay?  On

15  the left corner, and you go three down.  You see the

16  picture of David Trulove there?

17     A.   Yes.

18     Q.   Okay.  And do you see the writing next to that?

19     A.   On his picture?

20     Q.   Yes.

21     A.   I see writing.

22     Q.   Okay.  And I'll represent to you that that's

23  his name there.  Okay?  And which picture is next to

24  David Trulove?

25     A.   It is Jamal's.

1    Q.   Okay.  And then you see -- you see the name --
2   you see the writing next to Jamal's picture?
3              MR. METLITZKY:  Objection, vague.
4    A.   I see writing but not clear enough --
5    Q.   (By Mr. Brustin)  Okay.
6    A.   -- to see what's written on it.
7    Q.   On this picture, in this photograph.
8    A.   I just see what -- it looks like writing.
9    Q.   I understand.
10              MR. METLITZKY:  Can I see your exhibit?  I
11   want to make sure we're looking at the same quality
12   photo.
13              MR. BRUSTIN:  You are.  It's bad quality.
14              MR. METLITZKY:  Okay.
15    Q.   (By Mr. Brustin)  I'll represent to you that
16   when you were looking at the board, you were able to see
17   the actual writing on the board.
18              MR. METLITZKY:  Hold on.  Counsel is
19   testifying.  That is argumentative.
20    Q.   (By Mr. Brustin)  You know what?  Let me ask
21   you this.  Let's forget the writing for now.  And you
22   see the picture that's right below Jamal Trulove?
23    A.   Yes.
24    Q.   And who is that?
25    A.   That is Joshua.

```
 1   argumentative.

 2       A.   At the --

 3       Q.   (By Mr. Brustin)  Before the shooting -- I'm

 4   talking about before the shooting -- before the shooting

 5   that night, did you know Josh Bradley by name?

 6       A.   No.

 7       Q.   Okay.  On the tape recording that night, on

 8   July 24th, you say the name "Joshua" on the tape.  My

 9   question is:  Is it your belief that you got that name

10   from reading it on the board?

11            MR. METLITZKY:  Counsel is testifying.

12       A.   I don't know.

13       Q.   (By Mr. Brustin)  Okay.  Now, one of the

14   reasons you said that you didn't notice -- withdrawn.

15            So what must have happened that night is

16   that even though you recognized David and Josh, you

17   didn't recognize Jamal, who was right next to David and

18   right above Josh; is that correct?

19            MS. BAUMGARTNER:  Objection,

20   argumentative.

21            MR. METLITZKY:  It also -- it is

22   argumentative.  It calls for speculation.  It is an

23   incomplete hypothetical.

24       A.   I didn't recognize him at that time.

25       Q.   (By Mr. Brustin)  Okay.  And other than his
```

1    Q.   (By Mr. Brustin)  Okay.  Now, did any of the

2   police officers or detectives in the precinct on the

3   23rd or the 24th, that night, ask you any questions

4   about David Trulove?

5    A.   They might have.

6    Q.   Nothing you recall today?

7    A.   Yes.

8    Q.   Okay.  Can I -- let's take a look at the first

9   transcript -- the first interview, which is Exhibit 7.

10               MR. METLITZKY:  It should be over there.

11  It's probably on the top.  The little one.  It's right

12  there.  That's a photocopy.

13   Q.   (By Mr. Brustin)  Take a look and read Line 10

14  to Line -- did I tell you Page 10 already?  I didn't.

15               MS. BAUMGARTNER:  No.

16   Q.   (By Mr. Brustin)  Page 10, Line 10 to Line 15.

17   A.   What was the first --

18   Q.   Page 10, Line 10 to Line 15.

19   A.   Okay.

20               MR. METLITZKY:  Hang on.  Let me catch up.

21               Okay.

22   Q.   (By Mr. Brustin)  First of all, you told them

23  that you didn't see where the shooter guy went, right?

24               MR. METLITZKY:  Objection.

25   Q.   (By Mr. Brustin)  After the shooting.

1              MR. METLITZKY:  Objection, misstates the

2    testimony.

3        A.   Yes.

4        Q.   (By Mr. Brustin)  You didn't see where --

5    withdrawn.

6              Would it be fair to say you didn't see

7    where the person who shot went after the shooting; is

8    that correct?

9              MR. METLITZKY:  Objection, misstates the

10   testimony.

11       Q.   (By Mr. Brustin)  Withdrawn.

12             You saw him come to the front of the

13   house.  After that, you didn't see where he went; is

14   that fair to say?

15             MS. BAUMGARTNER:  Objection, vague.

16             MR. METLITZKY:  Yes, vague.

17       A.   I'm --

18       Q.   (By Mr. Brustin)  I don't want to confuse you.

19   I want to be very clear.

20             After the shooting, you saw the shooter

21   run some distance in front of the house, correct?

22             MR. METLITZKY:  Misstates her testimony.

23       A.   Yes.

24       Q.   (By Mr. Brustin)  And then you lost sight of

25   that person, correct?

Priscilla Faleafaga
February 13, 2017                                    325

```
 1      A.   Yes.

 2      Q.   You have no idea where that person went.

 3              MR. METLITZKY:  Misstates her testimony.

 4      Q.   (By Mr. Brustin)  Is that correct?

 5      A.   Yes.

 6      Q.   And then prior to the shooting, you -- you

 7   saw -- you lost -- withdrawn.

 8              You say you saw Josh Bradley being chased,

 9   correct?

10      A.   Yes.

11      Q.   And would it be fair to say that at the time

12   that Seu Kuka bumped into the person that you say was

13   Jamal Trulove, you had lost sight of Josh Bradley by

14   then?

15              MR. METLITZKY:  Objection, argumentative.

16      A.   Yes.

17      Q.   (By Mr. Brustin)  You have no idea where

18   Josh -- you have no idea where Josh Bradley went after

19   that?

20      A.   I think he was running down the hill.

21      Q.   Were you watching?

22              MS. BAUMGARTNER:  Objection, argumentative

23   and vague.

24              MR. METLITZKY:  Join.

25      A.   I'm assuming.
```

1  put all of that away.

2       Q.   (By Mr. Brustin)  Okay.  All right.  Now, when

3  you were in -- you can put that away.  Thank you.

4            You told us about going to the Ingleside

5  station with some officers and going into the

6  report-writing room.  Do you recall that?

7       A.   Yes.

8       Q.   All right.  Now, would it be fair to say that

9  anytime you left -- you were not in the report-writing

10  room that night, you were with Officer -- Inspector

11  Johnson?  Do you understand the question?  If it's not

12  clear, I want to make it clear.  You spent a number of

13  hours at the Ingleside station that night, correct?

14       A.   Yes.

15       Q.   All right.  Would it be fair to say that at all

16  times when you were at the Ingleside station and you

17  weren't in the report-writing room, you were with

18  Inspector Johnson?

19            MR. METLITZKY:  Object that it's

20  overbroad.

21            Go ahead.

22       A.   I might have been.

23       Q.   (By Mr. Brustin)  Okay.  Well, Inspector

24  Johnson is the one who picked you up in the

25  report-writing room and brought you upstairs, correct?

Priscilla Faleafaga
February 14, 2017                                        346

1      A.    Okay.

2      Q.    Is that correct?

3      A.    Yes.

4      Q.    And he's also the one who brought you back

5  downstairs from the interview when you were on the

6  second floor, correct?

7      A.    Yes.

8      Q.    And he's the one who drove you home.

9      A.    Yes.

10     Q.    Do you remember ever being apart from Inspector

11  Johnson while you were at the Ingleside station after

12  you got into the report-writing room?

13     A.    Could you please repeat that?

14     Q.    Sure.

15     A.    I'm sorry.

16     Q.    Do you remember ever being without Inspector

17  Johnson after you got into the report-writing room?

18               MR. METLITZKY:  Vague.

19     A.    Yeah.  I don't understand the question.

20     Q.    (By Mr. Brustin)  Okay.  Do you remember ever

21  being with -- without Inspector Johnson when you were

22  outside of the report-writing room?

23               MS. BAUMGARTNER:  Objection.  Same

24  question.

25               MR. BRUSTIN:  It's a different question.

1    A.    Only the time when the police officers brought

2  me in from Sunnydale.

3    Q.    (By Mr. Brustin)  Okay.  And same question --

4  withdrawn.

5          Would it be fair to say that the only two

6  plainclothes, non-uniformed officers that you dealt with

7  at the Ingleside police station on July 23rd and

8  July 24th were Inspectors Johnson and D'Amico?

9          MS. BAUMGARTNER:  Objection.  It's been

10  asked and answered.

11          MR. METLITZKY:  Join.  And it's vague.

12    A.    Sorry.  One more time.

13    Q.    (By Mr. Brustin)  Sure.  Do you agree that the

14  only two plainclothes, non-uniformed police officers

15  that you dealt with at the Ingleside police station on

16  July 23rd and July 24th were D'Amico and Johnson?

17          MS. BAUMGARTNER:  Same objection.

18          MR. METLITZKY:  Same.

19    A.    Yes.

20    Q.    (By Mr. Brustin)  And just to be clear, you

21  deny being -- withdrawn.

22          Do you recall any time when you were

23  walking in the Ingleside station with Inspector Johnson

24  and others when Inspector Johnson attempted to show you

25  a picture of Jamal Trulove?

1  the witness, but I need to have mine match up.

2              MR. METLITZKY:  Hang on.

3              (An off-the-record discussion was held

4              from 9:42 a.m. to 9:43 a.m.)

5      Q.    (By Mr. Brustin)  I'm going to show you what's

6  been marked Exhibit 19 previously, which is a

7  photograph -- I will represent to you this is a

8  photograph that was taken from your window at

9  140 Blythedale by an inspector named Evans.  I don't

10  know if he's an inspector, but he's a police officer.

11  Do you recognize this view from the window?

12      A.    Yes.

13      Q.    Okay.  Was this the view, approximately, that

14  you had on the evening of July 23rd, 2007?

15              MS. BAUMGARTNER:  Objection, vague.

16              MR. METLITZKY:  Join.

17      Q.    (By Mr. Brustin)  Obviously, this is a daytime

18  picture.

19      A.    Yeah.

20      Q.    Let me ask you again:  Does this represent the

21  daytime view that you had from the position you were in

22  on the night of July 23rd, 2007?

23              MS. BAUMGARTNER:  Objection, vague.

24              MR. METLITZKY:  Join.

25      A.    Okay.

```
 1              MR. METLITZKY:  No.

 2              THE WITNESS:  I'm sorry.

 3     A.   Yes.

 4     Q.   (By Mr. Brustin)  Now, take a look at --

 5     A.   Can I ask a question?  Is this the same window,

 6  the back window or the front window?

 7     Q.   It's the window that you said you were looking

 8  out of, the front window.

 9     A.   This is the window I was looking out of?

10     Q.   Yes.  Do you recognize that view?

11     A.   Yes.

12     Q.   Okay.  Now, keep that in front of you.

13              And take a look at Exhibits 93 and 94.

14  Now, let's start with 93.  I believe it was during the

15  preliminary hearing, but it could have been the first

16  trial.  Do you recall drawing an "S" where you first saw

17  the shooter fire shots at the preliminary hearing?

18     A.   I might have.

19     Q.   You do recognize that -- is that -- do you

20  recognize the "S"?  Do you see the "S" on 93?  You can

21  see it even closer on 94.

22              MR. BRUSTIN:  Don't turn them over, if you

23  don't mind.

24              MR. METLITZKY:  Are we talking about --

25  you have this as 93 (indicating)?
```

Priscilla Faleafaga
February 14, 2017                                407

```
 1      Q.    Okay.  So this is someone in the photo array
 2  you didn't know.  What were you going to say?  Go ahead.
 3      A.    These are the same person, right?
 4      Q.    Yes.
 5      A.    The --
 6      Q.    Yes, the two pictures are the same person.
 7      A.    Okay.
 8      Q.    And take a look at 131.  You know who that is,
 9  right?
10            MS. BAUMGARTNER:  Okay.
11      A.    David.
12            MR. METLITZKY:  And again, you're
13  referring to the Bates stamp --
14            MR. BRUSTIN:  Right.
15            MR. METLITZKY:  -- 131?  Because the David
16  one says:  124.
17      Q.    (By Mr. Brustin)  And then the bottom, 123, you
18  know who that is.  The sixth photo you saw, that's who?
19      A.    Yes.
20      Q.    Who's that?
21      A.    This is Jamal.
22      Q.    And that's your writing to the left?
23      A.    Yes.
24      Q.    It says "Shooter" and then your initials?
25      A.    Yes.
```

1    Q.   Okay.  Now take a look at the second trial

2   transcript.

3               MR. METLITZKY:  It's right here

4   (indicating).

5    Q.   (By Mr. Brustin)  Page 654.

6               MR. METLITZKY:  I think that's Exhibit 91.

7               You said "654"?

8               MR. BRUSTIN:  Yeah.

9    Q.   (By Mr. Brustin)  I want to read you from

10   Line 20 on Page 654.  Let me know when you're with me.

11               Question:  Did they tell you that they

12   might have identified somebody and they wanted you to

13   look at some pictures?

14               Answer:  Yes.

15               Do you remember giving that testimony?

16    A.   Yes.

17    Q.   Okay.  And so is that true, that at the time

18   that -- at the time that they showed you pictures in the

19   car, the police officers had told you in substance that

20   they may have identified and they wanted you to look at

21   pictures?

22               MS. BAUMGARTNER:  Objection,

23   mischaracterizes the testimony.

24               MR. METLITZKY:  Join.  It's also vague.

25    A.   When you say "the car" and you say "police

1  officers," are you referring to detectives?

2      Q.    (By Mr. Brustin)  I am.

3      A.    Yes.

4      Q.    Okay.  And so you understood that when you were

5  in that car looking at photos, you were looking at

6  photos including a picture of somebody they thought may

7  have committed the crime, correct?

8              MR. METLITZKY:  Objection, vague.

9      A.    Yes.

10     Q.    (By Mr. Brustin)  Okay.

11             MR. BRUSTIN:  Okay.  I think I'm going to

12  reserve the rest of my time.

13             (A recess was taken from

14             10:45 a.m. to 10:46 a.m.)

15             MR. METLITZKY:  So we have here Faleafaga

16  Pages Bates-stamped 1 through 600 -- sorry -- that's

17  621, and we are producing CDs that have a pdf of that

18  production.  There is, in the middle -- there are some

19  Bates stamps missing in the middle of the production.

20  There's one document that was un-Bates-stamped, which is

21  376 through, I believe, 404.  And that document is

22  entitled the Statement -- it's People v. Jamal Trulove,

23  Statement of Priscilla Lualemaga; date:  July 24, 2007.

24  It's a transcript.

25             I assume the parties already have that.

Priscilla Faleafaga
February 14, 2017                                    426

1      A.   I don't remember.

2      Q.   Do you know what the word "scruffy" means?  Do

3  you have an idea what that word might mean?

4      A.   Yes.

5      Q.   Did he look scruffy to you?

6           MR. BRUSTIN:  Objection, vague.

7      A.   I'm sorry.

8      Q.   (By Ms. Baumgartner)  Would you describe him as

9  scruffy?

10          MR. BRUSTIN:  Same objection.

11     A.   No.

12     Q.   (By Ms. Baumgartner)  I want to show you

13  quickly -- there's an exhibit that has the mugshot on

14  the wall.

15          MS. BAUMGARTNER:  Can I look at that real

16  quick?  Sorry.  I need to look at the --

17          MR. BRUSTIN:  90.

18          THE REPORTER:  That one (indicating).

19     Q.   (By Ms. Baumgartner)  I'm going to show you

20  what's been marked as Exhibit 90.  On the night of the

21  murder, you recognized a couple of people in this -- on

22  this wall, right, photos on the wall?

23     A.   Yes.

24     Q.   And can you point to me which photos it was

25  that you recognized at the time?

1           MR. BRUSTIN:  Objection, asked and

2    answered.

3        A.   It was David, Joshua, Joey.

4        Q.   (By Ms. Baumgartner)  Do you -- as you sit here

5    today, do you recognize other people on this wall?

6        A.   Today?

7        Q.   Yes.

8        A.   Yes.

9        Q.   Who?

10       A.   Jamal.

11       Q.   And can you point him out?

12       A.   (Witness complies.)

13       Q.   And do you recognize any of the other people in

14   this photograph?

15       A.   No.

16           MR. BRUSTIN:  For the record, she took

17   about five seconds or less.

18           MR. METLITZKY:  "This photograph" being?

19   Just so we have the exhibit number.

20           MR. BRUSTIN:  Exhibit 90.

21       Q.   (By Ms. Baumgartner)  Do you know who that is?

22           MR. BRUSTIN:  Can you show me?

23       A.   No, I don't know who that is.

24           MR. BRUSTIN:  And this is the -- in the

25   third column from the right, the fourth person down with