Pages 1 - 178

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Yvonne Gonzalez Rogers, Judge

```
JAMAL RASHID TRULOVE,            )
                                 )
            Plaintiff,           )
                                 )
     vs.                         )   No. CV 16-0050 YGR
                                 )
MAUREEN D'AMICO, MICHAEL         )
JOHNSON, ROBERT McMILLAN, and    )
JOHN EVANS, et al.,              )
                                 )   Pretrial Conference
            Defendants.          )
                                 )
_____)
                                     Oakland, California
                                     Friday, March 2, 2018
                                     8:02 p.m.
```

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES:**

For Plaintiff:              NEUFELD SCHECK & BRUSTIN LLP
                            99 Hudson Street, 8th Floor
                            New York, New York 10013
                       BY:  **ANNA B. HOFFMANN, ATTORNEY AT LAW**
                            **NICK J. BRUSTIN, ATTORNEY AT LAW**
                            **MEGHNA PHILIP, ATTORNEY AT LAW**
                                     (via CourtCall)


                            UNIVERSITY OF SAN FRANCISCO
                            2130 Fulton Avenue, KN 211
                            San Francisco, California 94117
                       BY:  **KATE CHATFIELD, ATTORNEY AT LAW**
                            **ALEXANDER B. REISMAN, ATTORNEY AT LAW**


            (APPEARANCES CONTINUED ON FOLLOWING PAGE)


Reported by:  Sarah Goekler, CSR No. 13446, RMR, CRR, CCRR
              Official Reporter
     *Proceedings recorded by mechanical stenography; transcript*
              *produced by computer-aided transcription*

1    **APPEARANCES:**    (CONTINUED)

2    For Defendant:         CITY ATTORNEY'S OFFICE
                            City & County of San Francisco
3                           Fox Plaza
                            1390 Market Street, 6th Floor
4                           San Francisco, California 94102
                    BY:    **MARGARET BAUMGARTNER, ATTORNEY AT LAW**
5                           **RENEE ROSENBLIT, ATTORNEY AT LAW**
                            **KELLY M. COLLINS, ATTORNEY AT LAW**

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1   Friday, March 3, 2018                          8:02 a.m.

2                      P R O C E E D I N G S

3                          ---o0o---

4        THE CLERK:  Calling Civil Action 16-050, Trulove vs.

5   D'Amico.

6      Counsel, please come forward and state your appearances.

7        THE COURT:  We'll start with plaintiffs.

8        MS. HOFFMANN:  Good morning, Your Honor.  Anna

9   Benvenutti Hoffmann for the plaintiff Mr. Trulove.

10       MR. BRUSTIN:  And Nick Brustin, also for the

11  plaintiff.  Good morning, Your Honor.

12       THE COURT:  Good morning.

13       MS. REISMAN:  Alex Reisman for the plaintiff.

14       THE COURT:  Good morning.

15       MS. CHATFIELD:  Kate Chatfield for the plaintiff.

16  Good morning.

17       MS. BAUMGARTNER:  Good morning.  Margaret Baumgartner

18  for --

19       THE COURT:  Hold on just a minute.

20     Do I have Meghna Philip on the phone listening or not?

21       THE CLERK:  She should be.  Let me see if I've got

22  everything.

23       THE COURT:  Let me know.  That's fine.

24     Ms. Chatfield, I can't -- okay.  Thank you.  I just -- I'm

25  still trying to get faces to names.
```

1    All right.  Ms. Baumgartner, good morning.

2         **MS. BAUMGARTNER:**  Good morning, Your Honor.

3         **MS. ROSENBLIT:**  Good morning, Your Honor.  Renee

4    Rosenblit for defendants.

5         **THE COURT:**  Okay.

6         **MS. COLLINS:**  Good morning, Your Honor.  Kelly

7    Collins for defendants.

8         **THE CLERK:**  Can I ask, is Ms. Philip on the line?

9         **MS. PHILIP:**  Yes.

10         **THE COURT:**  Okay.  So let's start with -- I've got my

11    list of things that I think we need to cover.  Let's begin with

12    your list of what I think we need to cover.

13    Ms. Hoffmann.

14         **MS. HOFFMANN:**  I believe there are a few pending

15    motions before the Court about admissibility of testimony from

16    the prosecutors.  There's a pending submission about

17    Ms. Meadows.  There's a pending submission about Mr. Trainum.

18    And then there's designations of testimony for Ms. Lualemaga

19    and her husband -- I don't know how to pronounce it.

20         **MS. BAUMGARTNER:**  Lau Faleafaga.

21         **MS. HOFFMANN:**  Lau.

22    There's the issue about the amount of trial time.  And

23    then any rulings on exhibits.

24         **THE COURT:**  And what?

25         **MS. HOFFMANN:**  Any rulings on the admissibility of

1   the exhibits.

2           THE COURT:  Ms. Baumgartner, what's on your list?

3           MS. BAUMGARTNER:  We have a couple of -- we have one

4   pre-instruction issue.  That's in addition to the ones that

5   plaintiffs said we have the issue of the pre-instruction.

6       And I think -- we have the issue of what bad acts come in.

7   We have to discuss that.  We also have -- I have to raise

8   issues about status of service of certain witnesses.  We've

9   been diligently attempting to serve some of the witnesses and

10  have been unsuccessful.  And so we have to figure out what to

11  do about that.  We can talk about that in the status of that.

12      And that is what is on my list.

13          THE COURT:  Okay.  We'll try to get at everything

14  today.

15      So let me begin with the following.  I have -- let's

16  see -- two binders up here.

17      Who gave me these binders?

18          MS. HOFFMANN:  Those are from the plaintiff.  And I

19  apologize, Your Honor, that we don't have the labels on the

20  outside.

21          THE COURT:  That's all right.  What are they?

22          MS. HOFFMANN:  One is the designations -- plaintiff's

23  designations from the testimony of Mr. Lualemaga, Mr. David

24  Trulove, and Lau, along with any accompanying exhibits that are

25  referenced within that testimony.  And then the second is

1  plaintiff's exhibits that we intend to offer to the extent that
2  those may be discussed today.
3            **THE COURT:**  All right.
4      Yes, ma'am?
5            **MS. BAUMGARTNER:**  We have also depo designations that
6  we had submitted as part of the initial trial readiness binder.
7  We have additional ones from Ms. Lualemaga in the order that --
8            **THE COURT:**  So with respect to what you did the first
9  time, I thought the way we left it was that I gave you guidance
10 and you all were going to go back and figure stuff out.
11           So as far as I'm concerned, there's nothing for me to do
12 on that until you resubmit it, so to speak, or at least tell me
13 what the issues are.  But I just want you to know that on my
14 list of to-dos, I did not have that to do.
15           **MS. BAUMGARTNER:**  So we have here for the Court the
16 copy of Ms. Lualemaga's submissions.  We continue to have
17 issues regarding objections.  The ones regarding -- I think we
18 had resolved the ones regarding David Trulove and Lau
19 Faleafaga, but this is Ms. Lualemaga.  We still have issues
20 regarding objections.
21           **THE COURT:**  All right.  Let me start with some basics
22 with you all.  I still continue to get documents filed that do
23 not have the proper caption.
24     It still shows, Ms. Baumgartner, from your office, the
25 City and County of San Francisco.

1           MS. BAUMGARTNER:  Oh.  As the name of the case?

2           THE COURT:  Yes.

3           MS. BAUMGARTNER:  I'll make sure that gets changed.

4    I know we changed who we represent as to who remains the

5    defendants, but I haven't realized that the actual caption

6    itself has not changed.  I'll make sure that happens.

7           THE COURT:  We just want to make sure everything is

8    cleaned up.  All right.  So make sure that you change the

9    caption.

10       I think the biggest issue and in part it impacts the --

11   thank you -- impacts the outstanding motions in limine is what

12   is the status of the revelation by the plaintiffs that they are

13   potentially dismissing the claims for malicious prosecution and

14   punitives.

15       You said that you were going -- I mean, it hasn't been

16   done.  So as far as I'm concerned, it's still in until it's

17   actually dismissed, and I didn't know if you were thinking

18   about it or not.  I can tell you today -- I'll have some

19   comments on the time, but I have not talked to your references,

20   and I'm not giving more time until I do.

21          MR. BRUSTIN:  I apologize, Your Honor.  We are

22   dismissing the malicious prosecution claims.  We are also

23   dismissing putative damages and we can do that today.

24          THE COURT:  It's an oral motion?

25          MS. HOFFMANN:  Yes.

1              **MR. BRUSTIN:**  Yes, Your Honor.

2              **THE COURT:**  That motion is granted.

3         Okay.  So what does that mean?  What is the effect of

4    that?  I have been contemplating it since I received your

5    notice.

6              **MS. BAUMGARTNER:**  Well, I know one effect,

7    Your Honor, and just from my point of view, is that we don't

8    have to sort of take into account the possibility of having a

9    second phase of the trial.  So that's in terms --

10             **THE COURT:**  Well, the punitives would have been very

11   short to begin with.  I don't know -- you know, plaintiffs

12   frequently throw punitives in there.  What I've seen, this

13   wasn't a real punitives case, but I haven't heard the

14   testimony.  So that's not -- that wouldn't have taken much time

15   in any event.

16        The bigger issue is the malicious prosecution and what

17   that means under the law.

18        So how does it change things?

19             **MS. HOFFMANN:**  Well, I think it's our position that

20   without a malicious prosecution claim, the issue of probable

21   cause is no longer relevant.  I think it takes out the argument

22   about the presumption of independent prosecutorial judgment

23   under *Spencer v. Peters* and the other leading cases from the

24   Ninth Circuit on fabrication claims and *Brady* claims.

25        I think the questions before the jury are much narrower.

1  It's whether there was a fabrication of evidence and whether

2  that caused detention.  It's whether there was a suppression of

3  material favorable evidence and whether that caused the

4  conviction under *Brady* or the prolonged detention under *Tatum*.

5          THE COURT:  Response.

6          MS. BAUMGARTNER:  I submitted something last night

7  about this particular issue.  I --

8          THE COURT:  I haven't read it.

9      Do you have a copy for me?  If you don't, I'll get it up

10  electronically, but --

11          MS. BAUMGARTNER:  I do have a copy right here, I

12  believe.  I thought I had printed out a copy.

13          THE COURT:  I'll find it.

14      Go ahead.

15          MS. BAUMGARTNER:  Okay.  So the case law is quite

16  clear that the issue of the prosecutor's independent

17  decision-making breaks causation in all types of constitutional

18  claims, not simply that of malicious prosecution.

19      The problem in this case is that they're not just saying

20  the officers made up the identification and fed Ms. Meadows

21  information.  They're also submitting a lot of evidence about

22  other complaints about what the officers did with respect to

23  this investigation, which the prosecutor knew about and went

24  forward anyway.  And that leaves in this whole issue.  If all

25  they were saying is what happened with Barcenas happened -- you

know, the Barcenas thing happened and that meant that the
identification was suggestive, we might maybe be at a different
situation, but that's not what we have here.

The plaintiff's police practices expert has got criticisms
with all kinds of parties of this particular investigation, all
of which, again, the prosecutor evaluated and determined to go
forward with.

And, therefore, the issue of the prosecutor's discretion
continues to be in this case the basis of using that as a way
of cutting off liability relates to all kinds of constitutional
torts.  In the Ninth Circuit, the *McSherry* case, which was a
summary judgment case, but nonetheless specifically applies
this prosecutorial independent decision-making issue to claims
of fabrication and cuts off liability or indicates that
liability could be cut off because of it.  Therefore, it
continues to be an issue, and the prosecutor's view of the
evidence continues to be a critical issue in this case.

**THE COURT:**  Response.

**MS. HOFFMANN:**  So *McSherry* is distinguishable.  In
*McSherry*, there was no evidence of suggestion with the IDs.
There's a question of potentially a fabrication on kind of a
side issue and in that case they found that because the bulk of
the evidence there were -- there essentially was no evidence
challenging.  There was no evidence of misconduct.  There was
no evidence that anything was withheld from the prosecutor that

1  in that case you couldn't show causation.

2      I agree that we have to show causation that any

3  fabrication of evidence caused an injury.  But there's no

4  question definitionally that there's no independent judgment if

5  the prosecutor is relying on fabricated evidence.

6      So in this case in order to prove our fabrication claim,

7  we have to show that there was fabricated evidence, that was

8  then relied on to either cause a conviction or to cause the

9  prosecution.  And also even in the situation where there is the

10 presumption of independent prosecutorial discretion, which only

11 arises in the Fourth Amendment context, there is no independent

12 prosecutorial discretion when the prosecutor's relying on

13 fabricated evidence.  So the whole thing collapses together.

14     The only time -- the time when independent prosecutorial

15 discretion, that presumption makes sense is when there's a

16 claim that the officer should have known that there wasn't

17 probable cause.  They provide the information to the

18 prosecutor.  The prosecutor evaluates all that same evidence

19 and makes a decision that there is probable cause.

20     In that case, the officer's no longer responsible for the

21 continuing effects of the arrest or prosecution because the

22 prosecutor's independent decision is an intervening cause, but

23 there is no independent decision.  And this is what all the

24 cases say.  This is what *Awbady* says, A-W-B-A-D-Y.

25     There is no independent prosecutorial discretion.  There

1    is no independent judgment by definition when the prosecutor is

2    relying on evidence that is fabricated or when the prosecutor

3    does not have all the facts because material exculpatory

4    information has been withheld.

5        And so if all we have are fabrication claims and *Brady*

6    claims, this whole issue is removed.  As long as we prove that

7    there's a fabrication that caused the -- that was relied on to

8    cause the detention or there was the suppression of material

9    exculpatory evidence, then we proved our claim.  If we can't

10    prove that, we can't prove our claim.

11        **THE COURT:**  Well, I think there are a couple of

12    things going on.  And I'll let you respond, Ms. Baumgartner.

13        I do agree that the elements of proof for you change or at

14    least there are some things if you take that without the

15    malicious prosecution claim that no longer have to be proved

16    that are distinctly different from the Fourteenth Amendment

17    claims for fabrication and *Brady*.

18        The complication comes with respect to causation.  And

19    causation is still there.  Causation is there in both the

20    deliberate fabrication and in the *Brady* claim.  And so the

21    issue in part is what is the claim under *Spencer*, you have to

22    have but for causation.  Right?  We all agree?

23        **MS. HOFFMANN:**  (Nonverbal response.)

24        **MS. BAUMGARTNER:**  (Nonverbal response.)

25        **THE COURT:**  Yes?

1        **MS. BAUMGARTNER:** Yes.

2        **MS. HOFFMANN:** Yes.

3        **THE COURT:** I like yeses on the record, actually,

4    when people agree with me, not just your nods of head because

5    the court of appeal can't see that.

6        **MS. BAUMGARTNER:** Thank you.

7        **THE COURT:** So is it -- if I look at the new

8    Ninth Circuit instruction, 9.33, is the jury going to be

9    instructed that the potentially unconstitutional conduct caused

10   the plaintiff to be charged or/and caused the plaintiff to be

11   prosecuted or/and caused the plaintiff to be convicted?  Those

12   are each options.  And depending on what it is alleged to have

13   caused, the evidence relative to causation may, in fact,

14   differ.

15       So if you're only alleging that it caused the charge, then

16   I don't see how the prosecutor's role in this comes in or how

17   it's relative other than what did you know.

18       **MS. HOFFMANN:** Right.

19       **THE COURT:** But if you're saying that it caused the

20   prosecution, that's a little bit different.  If you're saying

21   that it caused the conviction, that's different.

22       And then the question is:  What damages are you asking

23   for?  Because the causation that -- the damages flow from the

24   nature of the injury and the injury flows from the nature of

25   causation.

```
1        So if I break it down, it really depends on what you're
2   asking.
3             MS. HOFFMANN:  So -- I mean, I agree -- I agree that
4   the question depends on what we're asking.  And I also think
5   that there's no question that what's in the prosecutor's head
6   is not relevant when we're talking about whether fabricated
7   evidence caused a conviction or whether a Brady violation
8   caused a conviction, other than for Brady knowing obviously
9   whether the prosecutor was aware of the exculpatory evidence,
10  because the questions then are just, was there a fabrication?
11  And then it's -- what you're looking at is in terms of how it
12  affects the evidence before the jury or what was withheld in
13  light of the evidence before the jury.
14        I agree it's a slightly more complicated question when
15  we're talking about whether it caused the prosecution, which we
16  are alleging in this case we're alleging both, that it caused
17  the wrongful conviction, the fabrication of evidence; and also
18  that it caused the prosecution.  But in this case this is not a
19  case where there's independent evidence that could have been a
20  basis for a prosecution.
21        This is a case where we are alleging -- there's no dispute
22  that the -- both identifications, the identification by
23  Ms. Lualemaga and the identification by Ms. Meadows were relied
24  upon in order to approve the charges.  And there's no dispute
25  that if those identifications are fabricated which is what we
```

1    allege, you cannot go forward with the prosecution.  There's no
2    possible way to prosecute Mr. Trulove without those
3    identifications.
4        So the question -- really the question here and what's at
5    issue is what can the prosecutors testify about at this trial;
6    right?  So there's no question what they did, which is what was
7    permitted in *Cameron*.  What they knew about, we agree is
8    admissible.  The separate question is, can they testify as to
9    their own evaluation of the evidence?  Which is essentially
10   vouching for, you know, who they believe is telling the truth;
11   what they believe corroborates other evidence; their
12   understanding of the significance of shell casing evidence,
13   which is, you know, undisclosed, expert testimony really trying
14   to bring in through the backdoor.  I've talked to lots of
15   experts before, and this is what they've told me.
16       And in this case, I think it is -- there's no question
17   that that's either not relevant or to the extent it has any
18   minimal relevance under the facts of this case, it is far
19   outweighed by the prejudice of permitting the recognized
20   prejudice in the law of permitting a prosecutor to come in and
21   tell the jury, "This is who you should believe, this is what
22   you should think about the evidence, and this is what the
23   evidence corroborates."
24       There's no question -- there's just no dispute that if we
25   prove that the identifications are fabricated, the charge --

1    the charges could not have been brought.  The prosecution could

2    not have gone forward.

3         **MS. BAUMGARTNER:**  Notably, in this particular case,

4    it was the district attorney who decided from the very

5    beginning what to do with this case.

6         The arrest warrant did not issue because of the police

7    department.  The arrest warrant issued because of the DA's

8    office.  The way it works in San Francisco is the investigators

9    bring the case to the DA.  The DA makes an independent

10   determination of whether the evidence is going to support an

11   arrest warrant.  As a matter of fact, there'll be testimony

12   that the court required that the district attorney sign off on

13   the application for the arrest warrant before it was issued.

14        In this particular case, the district attorney examined

15   the evidence to the point where the -- he went to the scene to

16   determine whether the eyewitness testimony had any value at all

17   and what value it did have.  That was his determination based

18   on what it is that the police department presented to him.

19        And, again, we could potentially be in a different place

20   if all they were saying is that the investigation was just

21   fine, except for this one event that occurred in Ingleside

22   station, but that is not what this case is going to be

23   presented as.

24        The plaintiff has throughout this case argued that there

25   was all kinds of different things that the officers did wrong,

1  including the issue of not simply stopping the investigation

2  essentially once they found out that the walls in the Ingleside

3  station contained the photo of the plaintiff.  And the DA was

4  very aware of that fact.  Spoke to the eyewitness about it;

5  made independent determinations about what to do with that

6  information.

7       In San Francisco, the way it works is the police officers,

8  even if they have some concern about an identification, because

9  of all the reasons that there are concerns about

10  identifications, they don't just refuse to bring the case to

11  the DA's office; they consult with the DA.  And the DA makes

12  the ultimate determination about what to do about that.  The DA

13  makes the determination about whether the identification is so

14  suggestive that it's not going to be -- they don't feel

15  comfortable using it in court.

16       We can't -- I mean, there are certain cases obviously

17  where if a police officer brings a case forward where it's very

18  clear that the eyewitness never saw it or something like that,

19  we might be in a different situation, but that's not where we

20  are here.  We have a taped statement from the eyewitness who --

21  you know, and, again, the information about how that witness

22  gave the taped statements, the information about how the photos

23  were selected for that particular identification, all of that

24  information was known to the DA.

25       And we can't -- it's not fair to have the jury look at

 1    that and not have the information about what the DA did with

 2    that information.  And that's what we're here about.

 3         And also, keep in mind the DA did a lot of additional

 4    information gathering with respect to this particular case

 5    after the arrest warrant that the officers didn't really have

 6    anything to do with.  They -- for example, it was the DA who

 7    found out that the haircut matched the description of the

 8    eyewitness the night of the murder.  That was not the police

 9    officers.  They spoke to the eyewitness --

10         **THE COURT:**  We aren't -- look, even with a malicious

11    prosecution case, there are limits on what the prosecutor can

12    say.  This isn't -- I will say, it is not the Second Circuit.

13    And I know you guys are from New York.  The Second Circuit --

14    if we were sitting in a Second Circuit, this would actually be

15    an easier case because the Second Circuit is very clear; none

16    of it comes in.  That is not the Ninth Circuit.

17         But the Ninth Circuit also does not give carte blanche for

18    a prosecutor to come in and vouch and say everything about what

19    he or she necessarily did.  So there are limits.

20         **MS. BAUMGARTNER:**  Your Honor, can I address the shell

21    casings issue real quick?

22         This is the *Brady* claim that the 2001 memo was not turned

23    over.  Again, in *Brady* claims what you have to evaluate is what

24    effect the disclosure of that evidence would have had on the

25    prosecution in general.  Obviously, if the district attorney's

1  aware of how that works in court with respect to what expert

2  testimony there is, what science there is.  They've litigated

3  this issue over and over and over.  And their viewing of the

4  evidence showing that this -- these shell casings mean little

5  to nothing --

6          THE COURT:  Except there's -- I thought, potential

7  evidence that the investigator lied on the stand.

8          MS. BAUMGARTNER:  So, first of all, he didn't lie on

9  the stand.  Second of all, if he did lie on the stand, that is

10  subject to absolute privilege.

11      The question is what he disclosed during --

12          THE COURT:  Right.  That is, he lied on the stand and

13  didn't tell the prosecutor what he knew.

14          MS. BAUMGARTNER:  Except he did tell the -- there's

15  no question that he did tell the prosecutor what he knew.  The

16  problem is, what plaintiff is saying is that what he knew was

17  wrong.

18          THE COURT:  He didn't tell the prosecutor -- well,

19  all right.

20          MS. HOFFMANN:  If I can, Your Honor, I just want to

21  clarify.

22      We are in no way saying that the defendant should be

23  precluded from putting on evidence or that we might elicit

24  evidence about what the DAs knew.

25      Obviously, the fact that certain information is in the

```
 1   file and it's turned over to --
 2          THE COURT:  I'll tell you what.  Let's do it this
 3   way -- and I will give you a few minutes to write it down; you
 4   don't have to tell me right now.
 5       I want to know what it is you specifically want me to
 6   exclude.  So I want the language.  That is -- because you both
 7   have your perspectives, but until I have an actual -- the
 8   actual language of what you want excluded, it's hard to parse
 9   hairs, which is what we're doing.  And I believe that impacts
10   Motions 1 and 4.  So we won't do that right now.  I won't ask
11   you to do it on the fly but I do want it.
12       I sent you the jury questionnaire.  Did you have any quick
13   comments?  I need to get that to the jury office.
14       There is the issue about does the police -- do they cut
15   corners kind of thing.  As I continue to reflect on that topic,
16   I decided I'll ask that question in some manner orally.  I'm
17   not going to put it on a questionnaire.
18          MS. BAUMGARTNER:  I'm sorry, Your Honor.  In all of
19   the filings and all of the emails back and forth, that's one
20   document I do not have in my file.
21          MS. HOFFMANN:  Do you want to look -- we brought a
22   copy.
23          MS. BAUMGARTNER:  Thank you.  I appreciate it.
24          MS. HOFFMANN:  Give it back when you're done because
25   that's the only one I have.
```

1    THE COURT:  It's the one that has Draft-2.

2    MS. BAUMGARTNER:  I do see that now, Your Honor.

3    THE COURT:  And the only thing I would say is on the

4  list of people, I think I'm going to add the words for

5  San Francisco Police Department, the City Attorney's Office,

6  and district attorney people in.

7    So it's not just like, well, yeah, of course I've heard

8  about the police department.  I've heard about city attorneys.

9  But I -- and that, you know -- what I'm interested in is, does

10 anybody know someone in those departments that I need to ask

11 them about?

12   MS. HOFFMANN:  Right.

13   THE COURT:  So I would amend those three.

14   MS. HOFFMANN:  We do not have any objections.

15   MR. BRUSTIN:  One question, Your Honor.  I just

16 thought of this.  We're going to be having a jury consultant

17 with us in the courtroom.

18   THE COURT:  Okay.

19   MR. BRUSTIN:  Should he be on the list of people they

20 might know?

21   THE COURT:  Is he local?

22   MS. HOFFMANN:  No.

23   MR. BRUSTIN:  Well, he's --

24   MS. HOFFMANN:  He used to be.

25   MR. BRUSTIN:  No, he's not.

1          **MS. HOFFMANN:**  He's from Texas.

2          **THE COURT:**  I think we're fine.  I can put him on if

3     you want.  I'm just running out of space.

4          **MS. HOFFMANN:**  Yeah.

5          **MR. BRUSTIN:**  While we're talking about him, do you

6     have a problem -- he's not an attorney.  Do you have a problem

7     with him sitting at counsel table for jury selection?

8          **THE COURT:**  No.  That's fine.

9      Go ahead.

10         **MS. BAUMGARTNER:**  Just because I've run across weird

11    problems before.  Certainly if he's going to be at counsel

12    table, I think his name should be on the list.

13         **THE COURT:**  All right.  What's his name?

14         **MR. BRUSTIN:**  Jim Stiff, Dr. Jim Stiff.

15         **THE COURT:**  J-I-M.  S-T.

16         **MS. HOFFMANN:**  I-F-F.

17         **MR. BRUSTIN:**  I-F-F.

18         **THE COURT:**  Okay.

19     Any other comments?

20         **MS. HOFFMANN:**  I only have some questions about

21    logistics.

22         **THE COURT:**  Okay.  Go ahead.

23         **MS. HOFFMANN:**  So literally how we coordinate making

24    copies of the --

25         **THE COURT:**  Sure.

1          **MS. HOFFMANN:**  -- questionnaire and getting them on
2    Thursday.
3          **THE COURT:**  I'll run through this quickly because I
4    know we have a bunch of other things to do.
5          On Thursday morning, what will happen is jurors will be
6    called to report in.  And you should note this because the line
7    will be long.  They're going to be called to report in at
8    8:00 o'clock, so the line will start pretty early.  And the
9    goal is to have them in the courtroom at 9:00 a.m.
10         While they're in the jury room, what will happen is
11   they'll sign them in.  It always takes a while to get them
12   checked in.  They watch a video and then they'll come in here.
13   When they come in here, they'll be sworn and I will make
14   opening remarks.  I'll tell them a little bit about the case
15   and I will issue certain orders, primarily about not
16   researching, trying to scare them just a little bit so that we
17   make sure that the pool's not tainted in any way.
18         Then I will send them back into the jury assembly room to
19   fill out the questionnaires.
20         If they have -- and I'm hoping that it'll work okay.  I am
21   told that we sent out questionnaires -- or the jury office sent
22   out questionnaires and we have about 50 people who indicated,
23   at least on the summons, that they did not have a time conflict
24   with a trial that would last about a month.  So I'm hoping not
25   to have too many hardships.  But I've picked enough juries to

1  know that people always have hardships anyway.

2      So after they finish the questionnaires, if they have a

3  hardship request, then they will be brought into the courtroom

4  one by one.  And we have a process by which I do that with my

5  law clerks.  They'll be brought into the courtroom one by one,

6  and I'll hear their hardship requests.  You will be here.

7      You're not entitled to ask questions on hardships.  But if

8  for some reason I invite you, I will.  I will ask you -- be

9  prepared.  If I feel inclined to grant the request, then I will

10  ask whether you have any objections to my releasing the person.

11  If you do, we'll probably do it at sidebar because I'll have

12  the prospective juror at the microphone.  And then I can hear

13  what your concerns are at sidebar, and then I'll continue to

14  talk to the juror.  Okay?

15      So once that's all done, you know, I assume that we will

16  have two copies ready for you of all the questionnaires.  So

17  each side will get two copies.  If you want more than that,

18  there's a copy service in Civic Center, and you can go make

19  your copies.  And we will effectively terminate for the day so

20  you can do what you're going to do.  I've got a criminal

21  calendar in the afternoon.

22      And then on Friday, they will come back in, and then we

23  will go through the oral voir dire in the manner that I

24  communicated to you the last time.  So we will have 14 in the

25  box, plus four more chairs, so I'll call up 18 at a time.

1    You will get -- on Thursday, you will get the complete

2  alphabetical list and, as I indicated to you before, a random

3  list that is, like I said, probably -- it's -- it all depends

4  on how the pagination works, but it's two or three pages.  So

5  first 20 or so.

6         MS. BAUMGARTNER:  While I'm thinking about it,

7  Your Honor, this case was in the newspaper today.

8         THE COURT:  I saw that.

9         MS. BAUMGARTNER:  So I think we'll need to ask the

10 jurors whether they've --

11        THE COURT:  It's on here.

12        MS. BAUMGARTNER:  Okay.  Good.

13        THE COURT:  And I go through that with -- in detail

14 in terms of media.  And that's why I have -- that's why I give

15 them the talk before they fill out the questionnaire.  Okay?

16        MS. BAUMGARTNER:  I understand.

17        THE COURT:  Any other questions on that?

18        MS. HOFFMANN:  No, Your Honor.

19        MR. BRUSTIN:  No.  Thank you, Your Honor.

20        THE COURT:  Okay.  So as I indicated to you, I'm not

21 increasing the time until I -- I will talk to your references.

22 I've had litigators who are buddies who are litigators who say,

23 "You know, some of us are really good.  We really do know what

24 we're talking about."  And then I have litigators who think

25 they're really good but who are actually better when forced to

```
 1  do things under time limits.
 2        The other thing I will say -- and, again, you know, I -- I
 3  think if you talk to people who've litigated or tried cases in
 4  front of me, they will tell you that I'm fair.  If I think
 5  people are playing games, then I will deduct time from the --
 6  you know, if, for instance, the officers -- and I'm not saying
 7  they will.  If the officers are trying to chew up your time by
 8  not answering questions, then I will take that time away from
 9  the officers, and it will not count against you.  I do not
10  tolerate that kind of behavior.  If you think that is
11  happening, then you make a request on the day of so I can make
12  a call at the time of.
13        Now, if you don't know how to ask a question, that's on
14  you.  And I've had plenty of litigators who can't get the
15  answers to their questions because they don't know how to ask
16  questions.  I don't know what kind you are, but we'll see.
17  Proof is in the pudding.  But I don't tolerate games on either
18  side.  If you're trying to run down the clock of someone else,
19  it's going to be on you.  So you're warned.  All right?  So you
20  don't have to worry about that.
21        Curious what you're thinking about in terms of -- because
22  I'm trying to understand how this is going to play out.
23        How much time do you think you guys will use for closings
24  in this case?
25             MR. BRUSTIN:  The goal would be to be around an
```

1  hour 15.  Maybe an hour 30, but hopefully an hour 15.

2          **MS. BAUMGARTNER:**  About the same.  Probably -- my

3  goal is an hour, and I usually manage that.  So I'm hopeful.

4          **MR. BRUSTIN:**  And, Your Honor, by the way, do you

5  allow rebuttal closings?

6          **THE COURT:**  Yeah.  It's your burden.

7          **MS. BAUMGARTNER:**  But I presume that's part of their

8  time?

9          **THE COURT:**  Of course.

10          **MS. BAUMGARTNER:**  Yes.

11          **THE COURT:**  But the reason that I ask is because if

12  that's what we're looking at -- and it usually takes me about

13  an hour to do instructions -- then I can actually do it in a

14  day as opposed to splitting it up.  It may have to be a

15  slightly longer day, but that's -- that's helpful to know how

16  much time you're going to reserve for those things.

17      Okay.  With respect to Meadows, I am going to -- well, I

18  pulled -- I pulled her transcripts which I want to review

19  again.  I'd like to see the video.

20      Who can get me the video?

21          **MR. BRUSTIN:**  We can get it for you.  I don't know

22  exactly where it is right this second.  I think we have it in

23  New York.  I'm not sure we have it here.

24          **MS. REISMAN:**  I don't think I've seen it.

25          **THE COURT:**  Okay.

1          **MS. BAUMGARTNER:**  Well, it -- I'd have to figure out

2    logistically how to get it.  We do have a copy -- the City

3    Attorney's Office does.  So it's not -- it's too big to email,

4    so it would either have to be a physical copy or an FTP load.

5    We can probably get that done today if you have, for example,

6    an FTP site.

7          **THE COURT:**  Can someone -- can you send a note to

8    Rumar and see if we have a -- I don't know what that is, but

9    see if we have it.

10        Yeah, you know, Monday is fine, but I do want to see it.

11        The other thing -- a thumb drive would be great.  If we

12    could just get a thumb drive of it, then we can load it

13    ourselves.

14         **MS. BAUMGARTNER:**  Okay.  I -- yeah, I don't know --

15    FTPs are the modern way, but it sends through the email and you

16    click on a link and it uploads it.

17         **THE COURT:**  Yeah.  But with the courts we've got all

18    sorts of security protocols and everything, so I'm not exactly

19    sure that they allow us to be that modern.

20         **MS. BAUMGARTNER:**  Okay.  I will ask to get it on a

21    thumb drive delivered.

22         **MS. HOFFMANN:**  And we can look into it as well

23    whether we can do it on our end.

24         **THE COURT:**  Okay.  So I'm not going to do a separate

25    evidentiary hearing.  You can call her, either side.  We'll

1    follow the federal rules in terms of impeachment and/or

2    evidence that is affirmatively admissible.  So bone up on

3    801(d)(1) and 613.

4         I will authorize, to the extent I need to, but I will

5    allow the defense to obtain from the sheriff in San Francisco

6    medical records under a protective order that's been issued in

7    this case so that you can determine what medications, if any,

8    she was on during the period of December and January in terms

9    of that testimony.

10        I don't think that an expert is needed on that topic.  I

11   don't think -- I'm certain lit not going to have her undergo a

12   full evaluation.

13        I do want to know from both sides how you got to her, who

14   got to her, and all of those people, if they're not on the

15   witness list, should now be on the witness list in case they

16   need to be called.

17        So we'll begin with the defendants because you got to her

18   first.  Tell me what happened in December.

19             **MS. BAUMGARTNER:**  I asked my investigator to take one

20   last look for her because we've been looking -- his name is

21   George Cothran.  He is on the plaintiff's exhibit list.  He ran

22   the database; found that she was in jail.  She was in

23   regular -- she was in general population.

24        Mr. Cothran and one of my colleagues, Kelly Collins, went

25   to the jail, took a statement from her, a very short one, and

 1  returned with a declaration.

 2          THE COURT:  Ms. Kaufman, come to the mic.

 3          MS. BAUMGARTNER:  It's Collins, Your Honor.

 4          THE COURT:  Collins.  Sorry.  Thank you.

 5      Okay.  Tell me about the interview.

 6          MS. COLLINS:  We met with Ms. Dickerson in one of the

 7  interview rooms that was right off general population.  We went

 8  in.  We identified ourselves as individuals from the City

 9  Attorney's Office.  We said that we had nothing to do with her

10  criminal case and we would not be asking her any questions

11  related to it.

12      Mr. Cothran then explained that he was going to show her a

13  declaration that explained why we were there and just ask her

14  to read it.  She read it pretty quickly.  Upon looking at it,

15  she said, "Oh, I thought this was all over."  We explained this

16  was not related to the criminal case related to plaintiff, that

17  that had concluded; that we represented the city in a civil

18  matter.

19      She read the declaration.  We asked her if it was true and

20  accurate.  She said yes.  We asked her if she'd be willing to

21  sign it.  She said yes.  We were there probably no more than

22  five to ten minutes.

23          THE COURT:  Okay.  Thank you.

24          MS. COLLINS:  Thank you.

25          THE COURT:  All right.  Then what happened in

1  January?

2           **MS. CHATFIELD:**  This is Kate Chatfield.

3      So when we received the declaration dated December 21st,

4  2017, that evening, I realized that she may be in custody.  And

5  so I went on to the San Francisco Sheriff's Department website.

6  I saw that she was, in fact, in custody.  And I reached out to

7  the Public Defender's Office to see if she was being

8  represented by that office.  I then received the telephone

9  number for her public defender, and I talked to Ms. Nikita

10  Saini, S-A-I-N-I, the next day.

11           **THE COURT:**  How do you spell the first name?

12           **MS. CHATFIELD:**  Sorry.  N-I-K-I-T-A, I believe.

13           **THE COURT:**  And the last name again?

14           **MS. CHATFIELD:**  Saini, S-A-I-N-I.

15      I spoke to Ms. Saini on Saturday -- I believe that date

16  was January 6th -- as a professional courtesy.  I had no

17  interest in speaking to Ms. Meadows about her underlying

18  criminal case.  She was -- at that point, Ms. Saini had not

19  been contacted by defendants prior to them visiting her client,

20  but she had seen them exiting the jail when she went to see

21  Ms. Meadows in December.

22           **THE COURT:**  How did she know that they -- how did she

23  know that they were there to see Meadows?

24           **MS. CHATFIELD:**  I think she put that together when I

25  was on the conversation with her, that there was a -- she was

```
1   there to see Ms. Meadows, her own client, at San Francisco
2   County jail when the city staff had -- she couldn't get in to
3   see her because Ms. Meadows was in an interview is what she
4   explained to me.
5              THE COURT:  I see.
6              MS. CHATFIELD:  Mr. Reisman -- co-counsel,
7   Mr. Reisman and I and Investigator Andrew Koltuniak,
8   K-O-L-T-U-N-I-A-K, then went to San Francisco General Hospital
9   to see Ms. Meadows.
10             THE COURT:  How did you know that she was at the
11  hospital?
12             MS. CHATFIELD:  I had received that information from
13  her attorney, Ms. Saini.
14     Ms. Saini explained to me that she had been released
15  sometime just prior to Christmas and then had returned to
16  custody.  And we went to the Ward 7 -- I believe it's 7D, 7H --
17  at San Francisco General Hospital.  It's a -- the sheriff's
18  department ward there.  We presented our bar cards.  We
19  presented our driver's license, and Mr. Koltuniak asked
20  permission to bring in a recording device.  And then we went
21  into a visiting room where Ms. Meadows was.
22             THE COURT:  And?
23             MS. CHATFIELD:  And we began -- we introduced
24  ourselves as attorneys for Mr. Trulove.  We -- then she
25  immediately began talking with us about the case.  And we
```

```
 1   almost immediately asked to record her.  And she gave us
 2   permission, which I believe is reflected in the transcript.
 3        And then following that, it was relatively -- I mean, I
 4   don't know off the top of my head how long that interview
 5   was -- it's reflected in the recording -- and then we left.
 6        On Monday, we had some follow-up questions for her, so we
 7   returned to the hospital in the same interview room.  We
 8   interviewed her again and recorded it.
 9        THE COURT:  Now, there's an indication that with
10   respect to one of these, there's a gap in the recording.
11        MS. CHATFIELD:  Right.  I believe at the second, we
12   had some, you know, conversation with her prior to starting to
13   record her.  My recollection is that it was nonsubstantive, and
14   she may have been talking about her criminal case, of which we
15   didn't have an interest.
16        Oh, that's right.  I'm being reminded by counsel.  She was
17   also speaking about her children in that -- and her recent
18   pregnancy.  I guess -- I'm trying to recall to the best ...
19                      (Counsel confer.)
20        MS. CHATFIELD:  There was -- I guess -- counsel is
21   reminding me that there was something of substance.  Then we
22   led to the recording, which was -- I can't remember exactly
23   what that was.  I believe it was that she had informed maybe
24   Inspector McMillan and Inspector Johnson that she had, in fact,
25   told them she hadn't seen the homicide.  I'm really -- I'm
```

```
1  trying to remember.  But there was something that then led to
2  us recording.  It's the best I can remember, but there was also
3  information that was personal to her.
4     But she was dressed in orange.  She was in a -- you know,
5  visiting room.  There was no deputy in attendance with her.
6  You know, it was relatively pleasant.
7          THE COURT:  Okay.  And then the next encounter was
8  the videotape deposition; right?
9          MS. BAUMGARTNER:  Correct.
10         THE COURT:  All right.
11         MS. REISMAN:  I would just add one thing.  I was
12 there both days, Your Honor.  Alex Reisman.
13         THE CLERK:  Can you speak in the mic, please.
14         MS. REISMAN:  Sure.  I'm sorry.
15     On the first day we were there less than three minutes.
16 And we told her while we were there about when she said "I
17 didn't see the shooting" the first time and she was very
18 adamant about that, and that's what led us to ask her to
19 record.  That was all substantive that happened off tape that
20 day.
21         MS. BAUMGARTNER:  Your Honor, can I comment on a
22 couple of things?
23     First of all, there's no been no indication that counsel
24 knew that this was a psychiatric ward.  I believe that they did
25 know that.  I also want to point out that we filed our
```

1    motion -- I don't know -- 7:00, 8:00 o'clock at night on

2    Friday.  I don't know who they called at the Public Defender's

3    Office, but it was long after hours were closed on Friday night

4    to get this information.  Obviously, they had some access, for

5    example, that I don't have.

6        Also, it's fairly clear from her statements that she

7    was -- she said something more than "I didn't see it" when it

8    was off tape.  There's a particular line in the statement that

9    said, for example -- she references, quote, "sloppy cop work."

10   I do not believe that it is possible that she came up with that

11   on her own.  I believe that that was discussed -- the case was

12   discussed with her in terms of what the allegations were that

13   is not on tape.

14       The -- it's -- again, it's unclear to me that the tape was

15   turned on, quote, almost immediately, unquote.  It's also

16   unclear to me what else Ms. Saini might have told plaintiff's

17   counsel regarding the status of Ms. Meadows.  I presume that

18   Ms. Saini realized that she was there under a 5150 and

19   explained that to counsel.  I can't imagine that she wouldn't.

20       I also imagine that there was probably additional

21   conversations about Ms. Meadows' mental state, because it's my

22   understanding now -- I did not know that then -- now that I've

23   looked into it, that she's add ha number of 5150s; this is not

24   the only one, and that there's considerable question about her

25   ability to understand what's going on around her -- or was at

1  the time for sure.

2      Can I also point out, Your Honor, that you said that we

3  may get these records without an order from the Court.  We

4  cannot get them.

5          THE COURT:  I said to the -- if you can issue your

6  own subpoena.  If you need me to issue it, that's fine.  I just

7  don't know what the process is.  And it sounds to me like it

8  can issue to San Francisco General as well.

9          MS. BAUMGARTNER:  Yes.  It can be issued.  The

10  problem is without that, we need a HIPAA release, and we're not

11  going to be able to get one from her.

12          THE COURT:  So prepare an order.

13          MS. BAUMGARTNER:  I will, Your Honor.

14          MR. BRUSTIN:  Can I raise an additional point,

15  Your Honor?

16          THE COURT:  I'm not done with Ms. Chatfield.

17      Ms. Chatfield, respond to Ms. Baumgartner, please.

18          MS. CHATFIELD:  We gave no information other than

19  saying that we were from -- representing Jamal Trulove.  We did

20  not say anything about sloppy cop work.

21      We didn't give her -- you can see in the recording that

22  she is under the misapprehension that Mr. Trulove was still in

23  custody.  We did not give her information about Mr. Trulove's

24  case, about other things that she seemed to indicate that he

25  was on death row, things like this.  We did not give her that

1   information nor --

2          THE COURT:  Did you know she was in a psychiatric

3   ward?

4          MS. CHATFIELD:  I spoke to Ms. Saini the night

5   before -- or sorry, the day -- on Saturday.  And she informed

6   me that she was at San Francisco General Hospital when she --

7   that she was a drug addicted, and that she comes in and she has

8   a drug psychosis and that she gets cleaned up after a few days,

9   and then is moved to the -- you know, general population or,

10  you know, the women's jail.

11     And so that was my understanding.  I did not understand

12  her to be under a 5150 hold.  I was not informed of that.  That

13  was Ms. Saini's representation to me that, after a few days of

14  being cleaned up, she's -- you know, she gets better.

15         THE COURT:  Did you discuss the -- well, what was the

16  first time you had contact with her public defender?

17         MS. CHATFIELD:  The first time -- I believe I left a

18  message for her on Friday evening, and then I spoke with her on

19  Saturday during the day.

20         THE COURT:  Did you tell her what this case was

21  about?

22         MS. CHATFIELD:  I told her that Ms. Meadows -- my

23  recollection is that I told her that Ms. Meadows was in a

24  witness -- was a witness in a civil case that we had, and that

25  we were not interested in talking about her criminal case with

1  her.  And I believe I indicated to her that we had spent some

2  time trying to contact Ms. Meadows and had been unable to in

3  the past.

4         THE COURT:  Okay.  Mr. Brustin, you wanted to say

5  something?

6         MR. BRUSTIN:  Just very briefly, Your Honor.

7      In response to what Ms. Baumgartner talked about the

8  interviews, the first interview when the city attorney went and

9  the city lawyer went -- and, by the way, that's how they

10  described themselves, we just learned, as the city attorney

11  representing the city attorney.  They asked her to sign an

12  affidavit without asking her a single question about what

13  happened.

14        Now, this is the investigator who's been working on this

15  case for a year, where all we've been doing is calling into

16  question her ability to see all the inconsistencies.  They

17  asked her to sign a declaration without asking her a single

18  question, and then they submitted it as uncontested fact on

19  summary judgment.

20        Now, I --

21        THE COURT:  Did I grant summary judgment?  Did I

22  grant it, Mr. Brustin?

23        MR. BRUSTIN:  No, Your Honor.  Of course not.

24        THE COURT:  Do you understand that judges see this

25  stuff all the time and we take it with a grain of salt?

1          MR. BRUSTIN:  This is seemed unusual to me,

2   Your Honor.

3          THE COURT:  Really?  To have lawyers prepare

4   declarations?  That's unusual to you?

5          MR. BRUSTIN:  For this witness, not ask her a single

6   question about what happened, given what was known about her, I

7   think is unusual.

8          THE COURT:  My question was different.

9      Have you ever prepared a declaration for a fact witness?

10         MR. BRUSTIN:  Not without talking and questioning

11  them.  We have definitely prepared the declarations, but never

12  without asking them whether it was true and talking to them

13  about it.

14         THE COURT:  Well, except that their perspective is

15  that this is what she testified, so there's nothing really

16  different; right?  I didn't grant summary judgment,

17  Mr. Brustin.

18         MR. BRUSTIN:  Fair enough.

19     The other issue, though, Your Honor, is the fact that they

20  got a declaration as the city attorney and the city

21  investigator, means if they're going to use that declaration,

22  we should be able to bring out that she signed it for the city

23  attorneys.

24         THE COURT:  Denied.

25     I already told you we're not going there.  Until I hear

```
 1   some reason to -- and that's not a good enough reason -- we're
 2   not doing that.
 3            MR. BRUSTIN:  Your Honor, if she was pressured to
 4   sign -- if she felt pressured to sign it because --
 5            THE COURT:  Then you ask her if she felt pressured.
 6   And if she says yes, then you ask her why she felt pressured.
 7   And if she says it, then -- but I'm not going to give you
 8   carte blanche at this point.
 9        So you need to a ruling after we hear what she has to say,
10   this woman from whom you got a declaration or an audio tape
11   while she's 5150'd, I'm taking this question by question.
12   Neither of you get any quarter on this topic.
13        Understood?
14            MR. BRUSTIN:  Understood.
15            THE COURT:  All right.
16        So by Monday all you meet and confer.  One of you get me
17   that video deposition, please.
18            MS. BAUMGARTNER:  Yes, Your Honor.
19            THE COURT:  And, by the way, you can point to the
20   attorney and ask her whether she felt pressured by her without
21   saying she's the city attorney.
22        Bad acts were due today.  Do I have them?
23            MS. BAUMGARTNER:  Yes, Your Honor.  Ms. Collins will
24   be discussing those.
25            THE COURT:  Do I have something in writing?
```

1          MS. BAUMGARTNER:  It was my understanding that what

2     you required was the --

3          THE COURT:  I need the background, the foundation.

4          MS. BAUMGARTNER:  So Ms. Collins has that.

5          MS. HOFFMANN:  And, just to be clear, we were just

6     handed this morning in court, so we have not had a chance to

7     review anything about what it is they intend to introduce.

8          THE COURT:  What is it that you have?  And do I have

9     a copy set?

10         MS. COLLINS:  Your Honor, I brought them today.  Most

11    of these came to me yesterday afternoon, so what I provided

12    were certified prior convictions related to John Doe, Israel

13    Benson, and Oliver Barcenas that the purpose of these if these

14    witnesses are not truthful about their --

15         THE COURT:  I understand.  Give me my copy set.  And

16    then I'm going to give you a process by which we're going to

17    deal with this.

18         MR. BRUSTIN:  Your Honor, if it's helpful to the

19    Court, only one of these witnesses we will be calling

20    potentially during the first week is Barcenas.

21         THE CLERK:  You know what, you're going to have to

22    share that mic.

23         THE COURT:  Or you can stand at the other mic.  There

24    are two there.

25         Is that it?

```
1              MS. CHATFIELD:  It is, Your Honor.

2              THE COURT:  All right.  So I then have information on

3    John Doe, Barcenas, Benson -- and Benson.  Just those three?

4              MS. COLLINS:  Yes, Your Honor.

5              THE COURT:  All right.  Now, that we actually have

6    the documents, meet and confer.  As I indicated in my last

7    order, I follow the rule.  And if you are unfamiliar with it,

8    since you are not from this jurisdiction, there is a CEB guide,

9    California criminal law.

10       The nice thing about this particular guide is it's got a

11   nice little section on all of the California cases that have

12   interpreted whether something is a crime constituting a crime

13   of moral turpitude.  It's the first place I look.  If I find it

14   here, then I have my answer.

15       So what I need to know is whether there's an objection.

16   Now you have documents.  Now you can look.  Now you can meet

17   and confer.

18       So meet and confer.  Let me know whether there's a

19   disagreement.  And if there is a disagreement, identify for me

20   what it is, what you're asking for, and why you're objecting,

21   Tuesday by noon.  And then I'll look at it myself.  These

22   aren't things that, in my view, require much argument.

23             MS. HOFFMANN:  Thank you, Your Honor.

24             MR. BRUSTIN:  For clarification, Your Honor, my

25   understanding is if there are any other prior bad acts that are
```

```
1   not convictions, that they're intending on offering for any of
2   these witnesses, that was also to be submitted.
3        Am I correct in that understanding?
4            THE COURT:  That's what I thought I was getting
5   today.
6        So -- and what I did indicate, is they certainly couldn't
7   come in without a ruling from me.  So I know you all have been
8   working very hard.  There's a lot to do.
9        So where do we stand on that issue?
10           MS. COLLINS:  Your Honor, with regards to some of the
11  bad acts that were known to officers throughout the
12  investigation, I believe Your Honor had ruled on that at our
13  last appearance with regards to the homicide file and --
14           THE COURT:  No, I didn't.
15           MS. COLLINS:  Okay.
16           THE COURT:  I need to know what it is, because
17  there's an analysis that has to happen.  And I need to know
18  whether, you know, there are 403 grounds.  They can't just be
19  blurting this stuff out.
20       So I don't mind looking at original documents, if you
21  highlight them or whatever.  I'm not trying to make work for
22  you.  But I am trying to decide things in advance of having the
23  cat out of the bag and then having to strike it.  And then, you
24  know, once the jury's heard it, they've heard it.
25           So that ruling was not with respect to just these -- this
```

```
 1   was only one part of it.

 2        So how much time do you want?

 3             MS. COLLINS:  Well, I know there were proposed

 4   redactions at least to -- I believe it was Exhibit 56 that we

 5   had discussed that relate to this bad acts and what was known

 6   to officers as it relates to --

 7             THE COURT:  And of course you're not talking to him.

 8             MS. COLLINS:  I apologize.

 9        I'm seeing if they agree that that was something that

10   falls under this umbrella of what to discuss with the Court.

11             MS. HOFFMANN:  You mean the prior criminal histories

12   of --

13             MS. COLLINS:  Joshua Bradley and David Trulove.

14             MS. HOFFMANN:  Right.  That includes like arrest

15   histories and things which would generally not be admissible.

16             MR. BRUSTIN:  Our understanding, Your Honor, was that

17   we were going to get a list of bad acts:  If you carried a gun;

18   you were in a gang; you have tattoos; whatever they're using so

19   we could know so we could object to them or not.  That's what I

20   thought you were asking for.

21             THE COURT:  And at this point we're double teaming?

22             MR. BRUSTIN:  I'm sorry.

23             THE COURT:  Do you need to sit down so that you don't

24   interrupt?

25             MR. BRUSTIN:  No.  Unless you want me to.
```

 1          THE COURT:  I just want you to follow the protocol.

 2          MR. BRUSTIN:  I will.

 3          THE COURT:  So I need your bad acts that you want

 4  to -- so I guess we'll get to some Exhibit 56.  And we'll see

 5  what that gets us.  I'm not sure that it's going to get you

 6  everything you need.

 7          MS. COLLINS:  That, Your Honor, was just two pages of

 8  the homicide file that plaintiff had indicated they wanted

 9  redactions.  I believe it was clear.  And if it was not

10  previously, I'll make it clear that the homicide file in its

11  entirety, we believe, with the exception of the John Doe name

12  redactions and identifying information should be able to be

13  used, including all of the Klutz --

14          THE COURT:  Do you have --

15          MS. COLLINS:  I can identify the specific pages

16  within the homicide file.  Perhaps that would be the easiest

17  way to do that.

18          THE COURT:  All right.

19          MS. HOFFMANN:  Can we request a deadline of Tuesday,

20  the same deadline of Tuesday by noon so we have sufficient time

21  to respond and get a ruling to the Court before openings, if

22  necessary?

23          THE COURT:  I don't know that you'll get it before

24  openings.  You guys are behind.  But we'll see.

25          MS. COLLINS:  I can definitely get that submitted by

1    Tuesday at noon, at least.

2         **THE COURT:**  Okay.  Do I have a response from the

3    plaintiff on the Trainum issue, a written response or not?

4         **MS. HOFFMANN:**  Yes, Your Honor.  We filed one last

5    night, and I can provide the Court a copy.

6         **THE COURT:**  Well, I haven't read them because I

7    didn't -- I don't read one side without the other side's

8    submission.  So why don't you tell me what it is you want me to

9    know, and, if I can resolve this without further argument, I

10   will.  And if I can't, then I'll ask for further argument next

11   time.

12        So what's the issue?

13        **MS. BAUMGARTNER:**  The issue, Your Honor, is that we

14   have this concern because Mr. Trainum said he didn't know

15   California POST standards.  We moved to exclude him on that

16   ground because obviously California POST standards are what

17   apply in California.

18        He said in his deposition he had not reviewed California

19   POST standards in a number of places.  Plaintiff's counsel has

20   stated that's not actually true; he did review California POST

21   standards because it says so in the report.  I believe

22   plaintiff's counsel wrote this report.  Mr. Trainum himself did

23   not write it.  He may have reviewed it in some way, but he did

24   not actually write it.  And he certainly did not write the list

25   of things he had reviewed.  He said that in his deposition.

1    In my motion I cited to cases that say that if a expert is
2    simply adopting something that counsel wrote, that that is
3    inadmissible and inappropriate.  I also cited to cases that say
4    that if there's a question about this, we actually get to ask
5    the expert about it, and the -- ask the expert about the
6    drafting process.
7        That's what I would like to do.  Actually, I'd like to
8    have him excluded.  But to the extent he's not excluded, I
9    would like to have him, in the hour of deposition that the
10   Court has granted, answer questions about the drafting process.
11   And --
12           THE COURT:  Are the cases that you cited before or
13   after the revisions to the civil code?
14           MS. BAUMGARTNER:  After, Your Honor.
15       They specifically talk about those revisions and what they
16   mean and how, even though they're not -- they talk about the
17   revisions to the code.
18           THE COURT:  All right.  And the response.
19           MS. HOFFMANN:  That's partially accurate.  Some of
20   the cases they cite are from before the revisions.  They do
21   cite two out of circuit -- or two district court cases,
22   nonbinding, that did permit, in some circumstances, discovery
23   into draft reports.
24       But the clear law underneath the rule is that the
25   amendment was made for a particular reason, which was that

there was too much cost in litigation into the drafting process of reports and communications between experts and attorneys. And there was a decision made that it was better in general to prohibit that to allow the free communication between experts and attorneys.

The kinds of arguments they're making about it goes to the credibility of the expert, how much he drafted, is an argument that would apply across the board in every case, and it's directly contrary to the instruction made by -- in the rule. And as a number of many more courts that we cited, including other district courts in California, have said that it's -- for that reason you don't get discovery, you don't get the draft reports, and you don't get to ask questions about exactly what the communications were between the expert and counsel in drafting.

They had an extensive deposition of Mr. Trainum. They asked him the basis for his opinions. They asked how he came to those opinions. He talked about the 60 hours he spent reviewing documents, coming to opinions in this case. The expert report itself -- the purpose of the expert report is to disclose the opinions so that they understand what he's going to testify to at trial.

The report itself is not admissible. What's going to come in, to the extent he testifies, is what -- his testimony, which they have seven hours of deposition into his testimony. The

1    Court has already ordered -- we understand, at the last hearing

2    they could have an additional hour into this side issue of the

3    POST standards.  We don't believe what they're saying is

4    accurate, but that's fine; we're rearguing that.

5        But the separate question of whether they get to get

6    discovery into the drafting process or to get discovery of the

7    draft reports, it's clearly prohibited by the rule.

8            THE COURT:  Did either of you cite to *Wright* and

9    *Miller*?  And what does *Wright* and *Miller* have to say on it?

10           MS. BAUMGARTNER:  I did not actually look at *Wright*

11   and *Miller*, Your Honor.  I looked at the case law.

12       I would point out that this was a different scenario than

13   normal.  I did not move to compel entry into the drafting

14   process until we've gotten to this point where they're saying

15   he testified incorrectly and that I should have known that

16   because of the report.

17       So, again, this shows that this report is not actually his

18   report; that this is something that he sort of just adopted as

19   opposed to drafted.  And in this particular scenario, I don't

20   think that the -- counsel should be able to hide behind this

21   rule that says that you don't get to get into the drafting

22   process.  I agree normally that that is true.  This is an

23   unusual circumstance.

24           THE COURT:  Okay.  I'll try to get you a decision on

25   that one quickly.

1          **MS. BAUMGARTNER:**  Thank you, Your Honor.

2          **THE COURT:**  What were the issues, Ms. Baumgartner,

3    with respect to pre-instruction?

4          **MS. BAUMGARTNER:**  So we had discussed -- so I'm very

5    concerned that the jury is going to be very confused about what

6    it is that they're going to be deciding in this particular case

7    because, from what I can tell, the vast majority, which is what

8    I put in my brief, the vast majority of evidence is not going

9    to be about what the officers did, but rather about whether

10   Mr. Trulove actually committed this murder.

11         So I think that it's really important, before the jury

12   starts trying to absorb what information is important, that

13   they understand that they don't have to decide either guilt or

14   innocence, that that's not the elements of this claim and that

15   they should know that before they go in.

16         So we submitted a proposed instruction.  Plaintiff's

17   counsel has stated they don't think any instruction should be

18   given but then proposed an instruction, should one be given.  I

19   put down the objections to the plaintiff's instruction because

20   it actually doesn't say what we need it to say with respect to

21   the admission of evidence regarding whether Mr. Trulove

22   actually committed the crime.

23         I attempted to be as sort of neutral as possible when I

24   drafted the pre-instruction and to be as concise as possible on

25   the issue, but I think that the proposed instruction addresses

 1  the concern and lets the jury know what their job is going to

 2  be.

 3          THE COURT:  Yeah.  As I mentioned to you all before,

 4  I think that this is a case where pre-instruction is probably

 5  going to be helpful for the jury.

 6      I've rarely, if ever, done it.  But I think here it's --

 7  there's too much risk of confusion without the Court

 8  instructing.

 9      So I see -- I've pulled up your docket.  And your filing,

10  Ms. Baumgartner, is entitled "Counterproposals," which suggests

11  that there were proposals.

12      Where are the proposals?

13          MS. BAUMGARTNER:  So both proposals are in here,

14  Your Honor.

15          THE COURT:  So I should look at 410 on the topic?

16          MS. BAUMGARTNER:  Yes.  We have the defendants'

17  proposal, plaintiff's objections, plaintiff's proposal, and

18  defendants' objections.

19          THE COURT:  Okay.

20      All right.  Anything to be said on this topic?

21          MS. HOFFMANN:  Yes.

22      If the Court's inclined to give an instruction, I think

23  that defendant's instruction is improper in several different

24  ways.  They're listed in our objections.

25      But, in short, it's -- as the Court has already ruled,

1   innocence is relevant to a number of issues in this case,

2   including on both liability and damages.  It is not correct

3   that the majority of our evidence is going to innocence as

4   opposed to misconduct, our evidence is going to prove the

5   officers' misconduct and Mr. Trulove's damages of which

6   innocence is a part.

7        But defendants' proposed instruction is inconsistent with

8   the law, indicating that the jury does not have to make a

9   determination -- I don't have the exact wording in front of me.

10  But it's suggesting things that are inconsistent with what they

11  will ultimately be instructed, we believe, about the elements

12  and the law.  It also suggests that there'll be a later

13  instruction about how they should consider innocence, which I

14  don't believe the Court will be making, and certainly I don't

15  think it's included in anything --

16            **THE COURT:**  Well, I don't remember any instruction

17  that you've given me, a proposal, that deals with innocence.

18            **MS. BAUMGARTNER:**  We don't have one, as far as I'm

19  concerned.

20            **THE COURT:**  Okay.

21            **MS. BAUMGARTNER:**  And I don't think I implied there

22  was going to be one.

23       What I said is they will be instructed about the elements

24  of the claims, and they're going to have to follow that law --

25  you know, those instructions and the other instructions that

1  you give.

2          THE COURT:  All right.

3      If I have -- this is not very long.  It's four pages.  So

4  if I have time at the break, I'll take a quick look, and we can

5  have more of a discussion.

6      There will be -- obviously, there will be time.  You come

7  back on Wednesday --

8          MS. BAUMGARTNER:  Thursday, I think, Your Honor.

9          THE COURT:  Well, you fly back on Wednesday.

10         MS. HOFFMANN:  Right.

11         THE COURT:  So we have -- Thursday -- the amount of

12 time we have on Thursday is kind of dependent on how much

13 hardships I get.  And how much time we have on Friday depends

14 on how long voir dire takes.

15     I don't know that you want to meet on Wednesday, given --

16 but an option is to meet on Wednesday as well.  I don't know

17 that you want to do that.

18         MS. BAUMGARTNER:  I don't, Your Honor.  I have more

19 witnesses -- we have a lot of witnesses to coordinate here,

20 and --

21         THE COURT:  All right.  In any event, let's see if we

22 can get to that.  You just got it to me, so I haven't had a

23 chance to think about it.  But I have been -- I've been working

24 through a number of juror issues, and I do think that some kind

25 of instruction on the front end is going to be important in

this case.

Okay.  The next topic.  Let's go to -- well, hopefully
this is quick.

What is the issue with service of witnesses?

MS. BAUMGARTNER:  So we have a number of witnesses on
our list who plaintiff claims was out at the scene at the night
of the murder.  They've been deposed.  They claim they weren't
there.  And we have been trying to serve them, of course, to
come in because we can't just read their depositions if they're
not unavailable.  And we have been spending considerable time
and money to try and get them served.

We have gotten Jeremy Grady served.  We believe that we
are getting Mr. Benson served because he's getting -- he's in
Victorville at the moment.  It's my understanding that he's
getting out on March 22nd.  So we're telling him he has to be
here, but I don't know if he's -- it's hard to determine
whether somebody who's currently housed in jail more than
100 miles away is considered to be unavailable.  We've been
trying to get him so that we don't have that issue.  But we
may -- he may be technically unavailable.  We do have his
deposition.

John Doe -- excuse me.  Sorry.

THE COURT:  Strike that.

MS. BAUMGARTNER:  John Doe -- I'm sorry,
Your Honor -- we've had some communication with and appears to

```
 1   have now skipped town.  So we have not yet been able to
 2   subpoena him.  We have his deposition.
 3        Mr. Faletusi.  We've --
 4           THE COURT:  So do I have an incomplete witness list?
 5   Because as you've been talking -- because I try to take notes
 6   on the witness list.  I was looking for -- and I'm -- I'm
 7   looking at 365.  I don't see a Jeremy -- I understand why you
 8   all organized it as you did.
 9        The problem is, is that when I look for things quickly, I
10   can't find it because it's not alphabetized.
11           MS. BAUMGARTNER:  I understand, Your Honor.
12           MS. HOFFMANN:  I believe that that was the one
13   witness you had inadvertently omitted from that we agreed --
14           THE COURT:  I see.
15           MS. HOFFMANN:  -- that they could supplement with
16   because that was in the back and forth.  So that would have
17   been in the --
18           THE COURT:  That would have been in the changed one
19   that I did not print because I had already taken notes.  Okay.
20           MS. HOFFMANN:  Right.
21           MS. BAUMGARTNER:  So, yes, Mr. Grady is in there.  We
22   also have Jerome Bardell.  We are not yet -- these are on
23   page 11 and 12 of the witness list.
24        Mr. Bardell, we have not been able to serve either.
25           THE COURT:  And do you have his depo?
```

1          **MS. BAUMGARTNER:**  Yes, we do.

2          **THE COURT:**  Okay.  So -- and then who's the one who's

3    incarcerated?

4          **MS. BAUMGARTNER:**  Israel Benson.  He's on page --

5          **THE COURT:**  Yeah, I see it now.

6          **MS. BAUMGARTNER:**  And Mr. Faletusi is the other one

7    we have not yet been able to serve.

8          **THE COURT:**  And you have his depo?

9          **MS. BAUMGARTNER:**  We have his depo; right?

10     I'm sorry, Your Honor.

11     None of us took it, so -- I think we do.

12     Yes, we do.

13          **THE COURT:**  Okay.  So you -- Benson.  You have his

14    depo?

15          **MS. BAUMGARTNER:**  Yes, we do.

16     Mostly, in these depositions, the witness has taken the

17    Fifth, but we do have the depositions.

18          **THE COURT:**  Okay.  And are they all video or just --

19          **MS. BAUMGARTNER:**  No.  They're very short.

20          **MS. HOFFMANN:**  So, Your Honor, the -- that raises a

21    separate issue about whether the jury -- whether and under what

22    circumstances the jury would hear witnesses -- so there's two

23    issues.  It's whether the witnesses are unavailable, which

24    we've just gotten that proffer now about.  And I, frankly, have

25    not had a chance to research the law on this.  And there's a

second question about whether they come in person or whether
their testimony is read, whether the jury should be permitted
to hear anything about them pleading the Fifth.  It's another
issue that I have not had a chance to research it.

THE COURT:  Why would it be any different?  If they
can do it on the stand in court, why wouldn't we do it
otherwise?

MS. HOFFMANN:  Right.  But my -- what -- I don't
think that it would be any different whether it's a deposition
or they're live.  I think there is a question about whether the
witnesses can plead the Fifth in front of the jury.

THE COURT:  How would the jury -- how would that ever
happen?  If I don't -- if a witness is on the stand and someone
pleads the Fifth, how is the judge supposed to -- yeah, I don't
know where you're coming from on this point.

MS. HOFFMANN:  Again, I haven't had a chance to
research this.  My memory -- but it could be incorrect -- was
that in certain circumstances, particularly if you understand
in advance that a witness all they're going to do is plead the
Fifth, you may or may not be permitted to call the witness to
do that.  I don't know if that's under 403.  I don't know
the -- I have to research it.  I'm just flagging this as a
potential issue.

THE COURT:  All right.  Then I want the answer from
you, if that's the position you're going to take, by Tuesday.

1      MS. HOFFMANN:  Okay.

2      MS. BAUMGARTNER:  Your Honor, there's also -- if they

3  do take the Fifth -- again, this is a lot of ifs -- if they do

4  take the Fifth, I believe that there are inferences that are

5  entitled to be drawn from that and we would have to instruct

6  the jury about it.  But I don't know if that's going to be the

7  case.

8      THE COURT:  All right.  Well, then I would need

9  analysis from you on that topic Tuesday, but you don't have to

10  do it by noon.

11      MS. HOFFMANN:  Thank you, Your Honor.

12      THE COURT:  Okay.  Do you need a -- well, do you need

13  an order to get Benson here in custody?

14      MS. BAUMGARTNER:  Oh.  Hmm.  I had assumed that we

15  would be calling him in our case in chief, which would be after

16  the ten days after he's out, but it might actually be more

17  certain if we can get him here while he's in.  So let me ask

18  about that.

19      THE COURT:  Well, think about it.

20      MS. BAUMGARTNER:  Yes.  Thank you, Your Honor.  That

21  might work well.  He would probably have to be taken out of

22  order, but ...

23      THE COURT:  Okay.  Let me ask this.  Who's giving --

24  on the plaintiff's side, which of the two of you is the lead

25  attorney?  Who am I going to be introducing as lead?

1    MR. BRUSTIN:  I will be lead attorney at trial,

2    Your Honor.

3    THE COURT:  Okay.  On the day of Thursday, I will,

4    towards the end of my comments to the jury pool, have you

5    introduce your teams.  So I'll ask you, Mr. Brustin, and you,

6    Ms. Baumgartner.

7    And it is in that oral presentation that I will also

8    identify court staff and the name of John Doe, and we'll -- I

9    think, there will be enough names flying that no one will

10   really focus on it until -- or at least it is the best I can do

11   under the circumstances.

12   Okay.  Let's move to exhibits.  So I have litigators who

13   present evidence in a whole variety of different ways.  There

14   are some litigators who -- and perhaps this is primarily from

15   the big law firms it works, but it works well for them and

16   everybody, where every morning if I have five witnesses I get

17   five binders and each binder has the exhibits that that

18   litigator is going to use for that witness.

19   So when I have litigators do that, I don't ask them for my

20   10- or 15-binder set because every day I get the binders that I

21   need to look at the exhibits.

22   I'm assuming -- that's a very expensive process that they

23   go through.  It is incredibly efficient and effective.  They

24   hand one to me, they hand one for opposing counsel.  One for

25   the witness.  It works great, but it's expensive.

1      I assume you're not doing that?

2          **MS. BAUMGARTNER:**  No, Your Honor.  There's reasons

3   for that otherwise, including the fact that in these type of

4   cases, the plaintiff usually calls all of my witnesses.  What

5   my witnesses are going to talk about depends on where they come

6   in the order, and I do not have control of that.

7          **THE COURT:**  Okay.  And I take it you're not going to

8   do that on your side?

9          **MR. BRUSTIN:**  It's going to be more difficult given

10  that we're here, but --

11         **THE COURT:**  That's fine.  Look.  So I was assuming

12  the answer was no.  I'm not asking you to do it.  I've done it

13  plenty of ways the other way, which is that I have my binder

14  set of the exhibits that I need.  And they need to be

15  chronological so that, you know, you're suggesting to the

16  witness that they look at Exhibit 250, and I've got to go get

17  my binder that has number 250 in it and I look at it.

18     So I do need a set.  What I don't necessarily need, unless

19  it's an issue, is if there is, for instance, a -- business

20  records that are three-binders wide because that's the

21  foundation that one needs to admit the summary.  And if no one

22  disagrees on what the summary says -- and, frankly, I don't

23  need you to kill another tree by giving me a three-binder set

24  of paper.  All I really need is a summary because that's what

25  you're going to ask the witness about.

1        So in response to all of your questions about what I need,

2   I need a usable set of exhibits.  That's what I need.  So I

3   need that for me personally.  I mark up exhibits.  I have to

4   look at exhibits.  You have arguments about exhibits.  I need

5   my set.

6        I need the original set, one comprehensive original set.

7   That is the court set.  That goes to the courtroom deputy.

8   Those are the original exhibits.  Those are the ones that get

9   entered into evidence.  Those are the ones that stay with this

10  case for any appellate reason.  So I need an original set that

11  the courtroom deputy manages.

12       I would also like to have an electronic set.  And that

13  electronic set should be comprehensive.  So what -- whereas, my

14  workable set is just the stuff that I really -- you know, the

15  stuff that I really need to try the case, the electronic set --

16  so, for instance, let's say you didn't give me the three

17  binders of paper because no one thought I'd really need it, but

18  something happens.

19       Well, as long as I have the electronic set, then I can go

20  to it or -- it just helps us manage things to the extent that

21  unexpected issues come up.  And that gets -- we download it

22  into our -- I need a thumb drive, the old school, I guess.  Not

23  so old school, the new old school so that we can download it

24  into our system.

25            MS. BAUMGARTNER:  We want to let Your Honor know

```
1    we've printed your set, the clerk set.  We've given the set
2    that we marked to plaintiff's counsel.  We have a set.  The
3    witness will have a set.
4            THE COURT:  And do you have it here?
5            MS. BAUMGARTNER:  I gave the plaintiff's counsel
6    here.  I was told I didn't need to bring the court set until
7    next week.
8            THE COURT:  Yeah, you don't.  But if you have them,
9    then send them.  Then I can start to get organized.  I was
10   trying to give you guys more time.
11           MS. BAUMGARTNER:  Ah.
12           THE COURT:  And that's the reason why I was happy to
13   wait so that you didn't necessarily have to do all that extra
14   work, and I thought there was still meeting and conferring.  So
15   I was trying to give you as much time as I reasonably could
16   before demanding that a set be produced.
17           MS. BAUMGARTNER:  I appreciate that, Your Honor.  The
18   only thing that we have not yet put in there is the media
19   files, generally speaking, the CDs and various things like
20   that.  The clerk's file has a copy.
21       We don't -- unless the Court wants a separate copy for the
22   Court of the media files, we sometimes just copy the front
23   cover of the CD rather than giving you a whole nother copy.
24           THE COURT:  So obviously the court file needs the --
25           MS. BAUMGARTNER:  Yes.
```

 1              THE COURT:  The courtroom deputy needs the media

 2      files.  I only need a copy of the -- you know, I only need a

 3      photocopy of the CD --

 4              MS. BAUMGARTNER:  Great.

 5              THE COURT:  -- for my binders.  But if I have the

 6      electronic set, that allows me then, when I'm looking at my

 7      binders and I'm looking for the video of whatever, then I can

 8      see, "Oh, okay.  It's a video."  And then I go to my electronic

 9      version, and that's where I see it.

10              MS. BAUMGARTNER:  Great.

11              THE COURT:  Does that make sense?

12              MS. BAUMGARTNER:  Yes.  And I'll make sure that that

13      happens.

14              THE COURT:  Okay.

15              MS. HOFFMANN:  And just for clarification, my

16      understanding is what defendants have produced is the totality

17      of exhibits that they want to offer; is that right?

18              MS. BAUMGARTNER:  No, no.  It's the totality of

19      exhibits that we may use either to refresh your recollection,

20      to --

21              THE COURT:  Right.  So it's everything.

22              MS. BAUMGARTNER:  It's everything.

23              MS. HOFFMANN:  But only defendant's side; right?

24      It's not everything.

25              MS. BAUMGARTNER:  Right.  So we had -- we had agreed

1  that we would -- plaintiff submitted an exhibit list.  To the

2  extent that there were things on that exhibit list that we

3  wanted that stayed on that list --

4       THE COURT:  Did you take them out or are they still

5  in yours?

6       MS. BAUMGARTNER:  No, we took them out of ours.  So

7  it was my understanding that we were trying not to duplicate.

8       THE COURT:  Okay.

9       MS. BAUMGARTNER:  The plaintiff's exhibits marked 1

10  through 500 or whatever.

11       THE COURT:  And what is it?  How many do you have?

12       MS. BAUMGARTNER:  How many do we have?  We have

13  approximately 500 exhibits, I think, that they fit in three

14  boxes.

15       MS. HOFFMANN:  Sorry.  I'm not trying to criticize.

16  I just want to make sure we have clarification.

17       So my understanding -- and I have not been the one who's

18  been dealing with all the back-and-forth on this, so I could

19  have this wrong.  But my understanding is what defendants have

20  provided is only about half of the exhibits.

21       Taking Your Honor's instruction, which I think made a lot

22  of sense, we have a set of exhibits that we've indicated that

23  we may use in some -- we intend to use, likely use in some way,

24  either marking or introducing.  And then there's a much longer

25  list of -- you know, listed in a abundance of caution, but

```
1   nobody has indicated in any way that we intend to use those
2   yet.
3        My understanding was from that broader list, there would
4   be some period of time which we'd have to give notice before we
5   could use those.  I thought it was 24 hours.  I might be
6   misremembering.
7        My proposal, because we still haven't printed or done
8   anything with the exhibits on our half of the list, which my
9   understanding is many -- at least over a thousand pages, many
10  thousands of pages, I'm not sure, is that we provide -- based
11  on what you just said, we provide the comprehensive electronic
12  copy of everything.  We provide paper copies to -- one for you
13  and one for the deputy of the things on the "will use" list.
14  And that to the extent we ever give notice that we intend to
15  use something else off the broader list, we provide a paper
16  copy and amend the binders at that time.
17           MS. BAUMGARTNER:  That was not my understanding.
18           MS. HOFFMANN:  I'm --
19           THE COURT:  Do you have an objection to that?
20           MS. BAUMGARTNER:  Yes.  Because it is my experience
21  that unless you have a paper copy in chronological order of
22  entirety of exhibits in numerical order, it gets too confusing
23  to find them.  So, again, I don't -- we have agreed on the
24  limited list --
25           THE COURT:  So, first of all, you have the whole
```

 1    thing; right?

 2              **MS. HOFFMANN:**  No.

 3              **MS. BAUMGARTNER:**  No.

 4              **THE COURT:**  Okay.  So you need to give to the other

 5    side the whole thing?

 6              **MS. HOFFMANN:**  Oh, you mean do they have an

 7    electronic copy of everything?

 8              **MS. BAUMGARTNER:**  No.  Printed copy.

 9         **THE COURT:**  A printed copy.

10         **MS. HOFFMANN:**  A printed copy.

11         **THE COURT:**  You have to give a printed copy of the

12    whole thing to the ore side.

13         You must have -- how big is the distinction between what

14    you think you're using and then this other -- let's call it the

15    anticipated exhibits and the totality of potential exhibits?

16         **MS. HOFFMANN:**  I think it's pretty big.  I mean, the

17    totality of potential exhibits includes, you know, anything

18    that was ever marked in a deposition.  I mean, it's just --

19    it's the entire universe of what happened in this case.

20         The set of exhibits that we actually believe are going to

21    be used in any way is much smaller.

22              **THE COURT:**  And you don't know what the numbers are

23    at this point?

24         **MS. HOFFMANN:**  Let me see if I can.

25              **MS. BAUMGARTNER:**  So just as an example, Your Honor,

we didn't include on our "will admit" list all of the different

drawings that deponents have done.  Right?  So -- because we

have 16 versions of one particular photo, for example.  One

person marked on it this way.

       We haven't included those in the "will admit" list

because, again, we may show it to the witness to say, okay, how

did this work?  Did you say this here?  But we don't intend to

actually admit that, but those are things that we need

identified in chronological order so that we can find them

readily and so the witness can find them readily.  And we

haven't separated -- we don't have three categories.  Right.

So --

       **THE COURT:**  I understand, Ms. Baumgartner.  But yours

is already done?

       **MS. BAUMGARTNER:**  That's -- I assumed both sides

would be doing this, but, yes, mine's done.

       **MS. HOFFMANN:**  If the Court wants us to print all of

them, we'll print all of them.  It seemed like it was a lot of

paper and space in the courtroom for things that nobody was

actually -- gave any indication they were intending to use.

    Looking at it, I'm not entirely sure off the top of my

head.  My understanding from my junior attorney and paralegal

who were working on this going back and forth was that it

was -- it was much bigger, but I don't know the exact numbers.

       **MS. BAUMGARTNER:**  And, again, just in terms of the --

1    THE COURT:  So my view is that as long as the two of

2    you have the totality, then I can make it through the trial.

3    That's why we have ELMOs.  Right?  And if I have it

4    electronically, then I can look at it.  But having, you know,

5    five extra boxes of documents for no reason, I don't know that

6    I need that.

7            MS. BAUMGARTNER:  Again, I relied on them for --

8            THE COURT:  Ms. Baumgartner, it doesn't hurt you.

9            MS. BAUMGARTNER:  If they don't print it, I'm going

10   to have to print it because --

11           THE COURT:  They're going to -- you're getting a copy

12   set of everything.

13           MS. BAUMGARTNER:  Okay.  As long as that's clear --

14           THE COURT:  Yes.

15           MS. BAUMGARTNER:  -- I have no problem with what the

16   Court gets.

17           THE COURT:  So you need to produce everything to the

18   defendants and only the anticipated to the Court and to the

19   courtroom deputy.  But I need the totality of it

20   electronically.

21           MS. HOFFMANN:  Thank you, Your Honor.

22      While we're discussing --

23           THE COURT:  When can you get it to the defendants,

24   the totality?

25           MS. HOFFMANN:  We are planning on this by March 9th,

```
 1  which was my understanding of the Court's -- of the preexisting

 2  deadline date.

 3             THE COURT:  That was to me, not to the other side.

 4        MS. BAUMGARTNER:  I'm okay with that, Your Honor.

 5             THE COURT:  Okay.

 6        MS. HOFFMANN:  They have electronic copies of

 7  everything.  There's no dispute about that.

 8        MS. BAUMGARTNER:  Right.  I just need it in the

 9  courtroom.  I'm also concerned about the witness having a copy

10  because obviously if I'm going to be using one that's in their

11  list and they haven't reproduced it for the witness, it's a

12  problem.  So we need --

13             THE COURT:  We have the Court's copy.  I mean, what

14  are you -- again, this goes to how effectively you use your

15  time.  If you have copies of -- and I don't know how many

16  binders we're talking about.  Usually, a witness in big

17  document cases, that's why you give the witness the binder of

18  their documents.  You see what I'm saying?  Because then you

19  don't have to come and find them from the courtroom deputy and

20  get them over to the witness.

21        So if you want to use your time wisely, you will have this

22  all organized for the witness by witness, so that they can be

23  looking at the same documents that we are.  But if we're

24  talking about 25 binders, I can't have -- it's not effective to

25  have 25 binders behind the witness.
```

1      So what are you going to do?

2          **MS. BAUMGARTNER:**  We're not even close to 25 binders,

3  Your Honor.  It's like -- being incredibly generous, it would

4  be eight binders; we're not talk about 25.

5      And, again, the problem is, I don't -- I mean, I can

6  anticipate to a certain degree which documents might be used,

7  but I may need to refresh recollection.  I may need to --

8          **THE COURT:**  But if you're refreshing recollection,

9  you probably have the document itself.

10         **MS. BAUMGARTNER:**  Oh, I will have a copy,

11  unquestionably.  The question is, will the witness have a copy

12  up on the stand?  So that's the question.  And, again, for the

13  exhibits the defendants has marked, they will have it available

14  to them in chronological order.

15     The question is, is the -- are we going to provide a copy

16  of all of the exhibits that have been marked for the witness or

17  not?

18         **THE COURT:**  It's really your call.  I've given you

19  time limits, but my time limits anticipate that you're

20  organized.  And if you're scrambling around because you can't

21  find documents or your witness can't find documents, you're

22  wasting your time.

23         **MS. BAUMGARTNER:**  My way of having the witness find

24  documents --

25         **THE COURT:**  Great.  So yours are there.  So you don't

1    have any problem.

2         What are the plaintiffs going to do?

3         **MS. HOFFMANN:**  I think your suggestion about the

4    binders is terrific, if we can do it.  I need to talk to the --

5    our paralegal and figure out how feasible that is for us.  If

6    we can, I would love to do that.  If not, we're going to have

7    to be prepared with all the exhibits.  Again, my understanding

8    is anything that wasn't on the "will use" list, we already have

9    an obligation to give notice in advance before we use it.

10        **MS. BAUMGARTNER:**  That's not my understanding.

11        **MR. BRUSTIN:**  For every witness, Your Honor, we will

12   know exactly what exhibits we're going to use and when.  We

13   will have those in order, and we'll have those ready to go.

14   We're not going to waste any time with that.

15        **THE COURT:**  I don't -- okay.

16        **MS. BAUMGARTNER:**  So some of these documents may be

17   impeachment documents; some of these may be to refresh your

18   recollection; some of them may be in some ways a response to

19   whatever it is that plaintiff asks the witness that I haven't

20   anticipated.  There's all kinds of reasons that we're going to

21   be showing these witnesses records that I cannot anticipate in

22   advance.

23        **THE COURT:**  Okay.  But if you have the entire set,

24   that's all you need.

25        **MS. BAUMGARTNER:**  Again, that's all I need.

```
1            THE COURT:  I don't know why you keep raising this
2    issue of 48 hours because you're giving them everything you
3    have.  So what -- what are you giving notice of?
4            MS. HOFFMANN:  It would just be moving things from
5    the "may use" to the "will use," and then that would mean that
6    we would --
7            THE COURT:  That's only -- look.  Stop thinking about
8    it like that.  You're giving them everything.  It's all there.
9    It would be helpful to me, since I won't have those documents,
10   for you to give them to me in advance.  But as far as you're
11   concerned, it's all there for everybody -- or for both sides to
12   have access to.
13       And perhaps the easiest thing is to say given that you
14   don't have a clear view of how you're doing this is that we
15   need a binder set of everything for the witnesses.  I mean, I
16   just don't know how else to do it, given the lack of certainty.
17   And we'll see if we can find a bookshelf to put back there
18   because eight binders doesn't fit on the -- for the witnesses
19   because eight binders won't fit on that witness table.
20       We'll see what we can do.
21           MS. BAUMGARTNER:  Thank you, Your Honor.
22           MS. HOFFMANN:  While we're discussing exhibits,
23   Your Honor, I don't know if we --
24           THE COURT:  So you understand?  Everything to the
25   defendants and an extra set of everything for the witness.
```

1          **MS. HOFFMANN:**  Yes, Your Honor.

2      I don't know if we raised before whether we'd be permitted

3  to provide copies of certain exhibits once they've been

4  admitted to the jury.

5          **THE COURT:**  No.

6          **MS. HOFFMANN:**  No?

7          **THE COURT:**  Why would you do that?

8          **MS. HOFFMANN:**  So they could look at them.

9          **THE COURT:**  Give me a for instance.

10     So the answer is generally no.  Those jurors have screens

11  in front of them.  They'll look at the evidence all at the same

12  time.

13     What I will allow is if there are transcriptions of audio,

14  you can provide them with a copy of the transcription that they

15  can read as the audio is happening.  As soon as the audio

16  finishes, I collect the transcriptions because they are not

17  evidence; they are there just as tools to help them understand

18  the evidence.

19          **MS. BAUMGARTNER:**  Our system by that time should be

20  able to play the transcript at the same time that it plays the

21  audio, so they will be seeing it on their screens.

22          **THE COURT:**  So what are you thinking?  Why did you

23  ask the question?

24          **MR. BRUSTIN:**  Your Honor, my experience -- I'm old

25  fashioned this way -- is that sometimes you have a key

```
 1   document.  I like to have the juror hold and it read it while
 2   we're going through it.  I think it's more effective.  That's
 3   the only reason.
 4          THE COURT:  So that's why you blow up the portion
 5   that you're reading on the monitor so that they can read it
 6   while you're reviewing it.  That's what litigators do all the
 7   time now.
 8          MR. BRUSTIN:  We can do it that way.
 9          THE COURT:  It's highlighted.  It's blown up.  That's
10   why they have screens.
11          MS. BAUMGARTNER:  There's one other exhibit issue,
12   Your Honor, which is the original homicide file.
13      So everybody's been working with the homicide file for
14   ages.  It was reproduced in a number of different ways.  I
15   would like to bring in the original homicide file just because
16   the --
17          THE COURT:  Yes.
18          MS. BAUMGARTNER:  Homicide is concerned about keeping
19   that file and has requested that we request that it be kept by
20   the clerk and locked up at night during the course of the trial
21   so that it is not free-floating.
22          THE COURT:  That's fine.
23          MS. BAUMGARTNER:  Thank you, Your Honor.
24          THE COURT:  The other thing I was thinking about, the
25   defendants and the concern of photos.
```

 1          Where are you -- it seems to me that the jurors don't
 2     actually need photos of the parties.  That is, Mr. Trulove or
 3     the defendants as long as they can figure out and remember who
 4     they are.  I don't know whether -- I've not -- I think I've
 5     seen pictures of one of the inspectors.  I don't know if they
 6     look alike, if they look different.
 7          I don't -- one of the things I was thinking, depending on
 8     where you put them on the table, perhaps for a few days we
 9     could have placards with their names.  And once I have a sense
10     that the jury knows who's who, then we can take that stuff
11     down.  They don't need the pictures of them.  But there are
12     four defendants here, and the jury needs to have a sense of
13     who's who.
14          MS. BAUMGARTNER:  They're fairly distinctive.
15     Certainly, Marine D'Amico is the only female.  John Evans is
16     younger than the other two.  The other two are both sort of
17     gray-haired.  They're more alike than the others.  I certainly
18     think that by the end of opening statement they will know who's
19     who, but that's up to you.
20          I'm more concerned, actually, about the on-duty officers.
21     All four of my defendants are retired, so that's different.
22     But we will be having other police officers come and testify,
23     and that's my bigger concern.
24          THE COURT:  Oh, I see.  Well, their pictures we do
25     need.  And what you can do during a break -- we'll take a break

1    here in a minute not so much for me, but because I can't lose

2    Sarah on Day 1.

3        Can I see one -- oh, you did leave me one.  So I have for

4    you here just to look at -- this is the jury binder that the

5    jurors get.  As you can see, the very first page in that, I've

6    put this somewhere else in different iterations of this binder,

7    but have found that having that cell phone telling them,

8    reminding them on a daily basis what they're supposed to do,

9    that's the best place for it.

10        And then, see, they just have paper.  They will have a

11    calendar in here.  They will have phone numbers of the Court in

12    here, but then they have these tabs at the back to help them

13    manage all the pictures that they are going to get.

14        We will need nine pictures for the jurors, one for me.  So

15    ten.  You're welcome to number them so that when we collect

16    them at the end, I can make sure that I have all of them

17    because we'll destroy them.

18            MS. BAUMGARTNER:  May I ask to put a watermark on

19    them, Your Honor?

20            THE COURT:  Sure.

21            MS. BAUMGARTNER:  I'll make sure it doesn't obscure

22    anybody's face or anything like that, but, again, just so any

23    reproduction would be obvious.

24            THE COURT:  Yeah, that's fine.

25            THE CLERK:  And it should have their name listed

1  below the picture on it.

2          THE COURT:  It can say "Do not copy."  "Do not

3  photograph" or whatever.  That's fine.

4          MS. BAUMGARTNER:  And, again, just -- I was thinking

5  about this issue the other day.  So I anticipate taking a cell

6  phone picture of the witness, right, and then I have to get it

7  reproduced in some way.

8          THE COURT:  Right.

9          MS. BAUMGARTNER:  And when is it that the Court needs

10 the copies?

11         THE CLERK:  The next day.

12         MS. BAUMGARTNER:  The next day.  I'll have to figure

13 out how to get that done.

14         THE CLERK:  Kinko's.

15         MS. BAUMGARTNER:  I have to find somebody to do that,

16 Your Honor.  I think, I'll have a few other things to be doing.

17 We'll manage that.  But, yes, so next day we'll bring in the

18 color copies.

19         THE COURT:  I do think it would be helpful if you

20 have the defendants sit in order, please, at least for the

21 beginning.

22    So --

23         MS. BAUMGARTNER:  Okay.

24         THE COURT:  Because their binders will have, you

25 know -- we can, put on here the list and that way they know.

| | |
|---|---|
| 1 | And for the first couple days, I'm going to have people stand |
| 2 | as they get introduced.  So D'Amico, Johnson, McMillan, Evans. |
| 3 | And that way after a couple of days, I'll be -- you know, they |
| 4 | can have -- they can remember who's who. |
| 5 | Okay.  Any other questions on these kind of topics? |
| 6 | MS. BAUMGARTNER:  Let's see.  I got the photos.  We |
| 7 | had talked about 24 hours for witnesses. |
| 8 | I'm hoping that we can get agreement -- I'd asked this |
| 9 | question but I hadn't gotten response.  24 hours from Monday |
| 10 | means Friday morning that we know so I can figure out which |
| 11 | binders to take home for the weekend, that we get notified, for |
| 12 | example, on Friday morning who's going to be called on Monday. |
| 13 | THE COURT:  I think Friday afternoon. |
| 14 | MS. BAUMGARTNER:  That's fine. |
| 15 | THE COURT:  Does that work for you guys? |
| 16 | MR. BRUSTIN:  Yes, Your Honor. |
| 17 | THE COURT:  All right.  Friday by 5:00. |
| 18 | MS. BAUMGARTNER:  Or Thursday because for the two |
| 19 | days, the two weeks that we have off. |
| 20 | THE COURT:  Well, but you'll still be in the office |
| 21 | on Friday. |
| 22 | MS. BAUMGARTNER:  My binders will be here, |
| 23 | Your Honor, so I will need to know on Thursday which ones to |
| 24 | take. |
| 25 | THE COURT:  Ah.  I see.  Well, let's talk about that. |

```
1        Is that agreeable or not?
2             MR. BRUSTIN:  We certainly prefer a little extra time
3    for after a four-day week to consider who we're going to call
4    on Monday and in what order.  I guess we could do that.  If
5    it's really a problem, we could do that.
6             MS. BAUMGARTNER:  And also they -- because I'm
7    arranging for the majority of the witnesses, I need to know
8    that too so that I can get ahold of the people that I need to
9    get ahold of to make sure that they show up.  So that's --
10   sometimes that requires administrative work that -- to let
11   people know and send the right paperwork and various things
12   like that.
13        So, again, I'm --
14             THE COURT:  Well, usually the defense isn't
15   getting -- producing the witnesses for the plaintiff.  So if
16   they are --
17             MS. BAUMGARTNER:  We are.
18             THE COURT:   -- you guys need to work out something
19   that's going to work.
20             MR. BRUSTIN:  I think we can do that, Your Honor.
21        My only concern -- I think we can, frankly, give them
22   basically the order we're going to do by Thursday for Monday.
23   But there could be a few things as to which -- some of our
24   witnesses are not under as much control as others.  People are
25   worried about some people coming and showing up.  There could
```

```
 1   be a couple little difficulties, but I think generally we
 2   can ...
 3            THE COURT:  So that's fine.  You need to be explicit,
 4   and it needs to be in writing.  Because, again, if I have to
 5   resolve a dispute, I'm going to look to what you wrote.
 6   All right?
 7            MR. BRUSTIN:  That's fine.
 8            MS. BAUMGARTNER:  The one other thing about the
 9   witnesses, Your Honor, is that we have had some discussion
10   about calling witnesses once as opposed to calling them in the
11   plaintiff's case and then calling them in the defendants' case.
12   Obviously, the defendants -- you know, I think it's better for
13   the jury to call everybody once.  For the defendants, it's much
14   easier because they're actually here.
15        For all of the other city witnesses, I would request that
16   they be called once as opposed to twice, simply because, among
17   other things, they have to get here.  It can be difficult.  And
18   I actually think it's much easier for the jury to sort of
19   understand what's going on if witnesses go on the stand once.
20            MR. BRUSTIN:  I thought we agreed to this.
21            THE COURT:  All right.  If you agreed, it's ordered.
22            MR. BRUSTIN:  Except the only thing we didn't agree
23   to was having them call the defendants on our direct case for
24   their direct.  That's the only thing we didn't agree with.
25   Otherwise, witnesses should testify once.  We agree.
```

```
 1          THE COURT:  All right.  That's fine.
 2      So not to the defendants but to everybody else.
 3      Why don't we go ahead -- make sure I get those jury
 4  binders back.  Those aren't for you.  Why don't we go ahead and
 5  take a 15-minute break.
 6          MS. BAUMGARTNER:  Thank you, Your Honor.
 7          THE COURT:  We'll stand in recess until 10:15.
 8              (Recess taken at 10:03 a.m.)
 9          (Proceedings resumed at 10:18 a.m.)
10          THE COURT:  All right.  Okay.  You all wanted to talk
11  about designations and exhibits.
12      So how can we most efficiently get through those topics.
13          MS. HOFFMANN:  Your Honor, if I may just quickly I
14  wanted to give you a couple updates first from New York.  The
15  first is we are overnighting you a thumb drive of the Meadows
16  deposition so you should have -- the video.  So you should have
17  that on Monday.
18          THE COURT:  Okay.  Great.
19          MS. HOFFMANN:  And the second is that we will work
20  out everything with the exhibits, but just -- I do have the
21  exact numbers.  It's 64 on our "will use" list and 500 on the
22  "may use," just for your information.  Sorry.  I just wanted to
23  do that while I remembered.
24          THE COURT:  Okay.  Well, that's good to know.  That's
25  not much more than the defendants.  And since they're producing
```

1    500 to you, you can produce 560 to them.

2        I will still need in chron order one list with everything

3    on it.  And I need that list in a editable format.  Ideally, it

4    just has the number.  If you send it to me editable, I'll fix

5    it myself.  A column with the number, a column with the short

6    description so that we can manage the date -- we note when it's

7    been used in court and then the date it's admitted.

8            MS. BAUMGARTNER:  It was my understanding that we

9    had -- we were going to be submitting that yesterday.  It turns

10   out that we submitted that but with an extra column with

11   objections.  So I had thought that that was going to be the

12   list that the Court would use, but, apparently, we need to

13   slightly revise it.

14           THE COURT:  If you sent it to me editable for my

15   purposes of courtroom management, I can edit it.

16           MS. BAUMGARTNER:  I think we E-filed it last night.

17           THE COURT:  I see.

18           MS. BAUMGARTNER:  It was actually E-filed last night

19   in a landscape format.

20           THE CLERK:  Oh, okay.

21           MS. BAUMGARTNER:  With the right columns with date

22   used and --

23           THE COURT:  Okay.  I've got it now.

24           MS. BAUMGARTNER:  We can't have it landscaped.

25           THE CLERK:  Not for me, no.

1          MS. BAUMGARTNER:  Okay.

2          THE COURT:  It's in portrait.  The one I'm looking at

3     is in portrait.

4          MS. BAUMGARTNER:  That's not the one we filed last

5     night.  The one we filed last night is in landscape to fit

6     everything in.  We can revise it accordingly.

7          THE COURT:  This is Docket 413 and it is in portrait.

8          MS. BAUMGARTNER:  I'm sorry.  The version I saw was

9     in landscape, so ...

10         THE COURT:  Okay.  This one's fine.  Just send it to

11    me electronically, please.

12         MS. BAUMGARTNER:  Was that -- that was the entire

13    exhibit list, I believe.  That's what I anticipated filing.

14         THE COURT:  So if it is, then I take it we have no

15    Exhibit 1, 2, and 3?

16         MS. BAUMGARTNER:  Your Honor, I'm sorry.  That is not

17    the entire exhibit list.  I thought we were filing the entire

18    exhibit list.  We will make sure that that gets filed in the

19    proper format.

20         THE COURT:  Okay.

21       So I'm looking at 413.  Back to my -- let me just also

22    make a note that now that we're moving into trial, you can

23    communicate with YGR chambers, the same suffix, to communicate

24    with the Court.  So you can add that email to the distribution.

25    Don't take off Ms. Stone but add the YGR chambers because, as a

```
 1   for instance, I think, Ms. Stone and I were in court much of
 2   one day, you guys sent an email.  I didn't see it until the end
 3   of the day and so -- because we had been in court, so you
 4   didn't get a response.  If you sent it to YGR chambers, I have
 5   more people looking at.
 6           MS. BAUMGARTNER:  And that's
 7   ygrchambers@cand.uscourts.gov?
 8           THE COURT:  Yes.
 9           MS. BAUMGARTNER:  Thank you.
10           THE COURT:  Okay.  So you wanted to talk about
11   exhibits.  What do you want to talk about?
12           MS. BAUMGARTNER:  It's my understanding that we had
13   gone through basically defendants' objections to plaintiff's
14   exhibits, and it's my understanding that the plaintiff wanted
15   to raise objections to some of our exhibits.
16           MS. HOFFMANN:  Yes.
17       Let me see if I can -- because of this miscommunication
18   about what we were providing today between the parties to the
19   Court, we provided our exhibits.  The defendants did not bring
20   multiple copies of their exhibits, to which we object.
21       So I think the only copy we have of the exhibits that we
22   object to is the one that they gave us today of the entirety of
23   their exhibits for our personal use.
24           THE COURT:  And these are things that I can resolve
25   today?
```

```
 1              MS. HOFFMANN:  Yes.
 2              THE COURT:  Okay.
 3              MS. HOFFMANN:  But in order to show you, I can pull
 4    out the -- from the greater -- one greater set that they
 5    brought.
 6              THE COURT:  Okay.  Well, let's turn on the ELMO.
 7              MS. HOFFMANN:  Did you provide all the exhibits that
 8    you're offering or the back half of the list?
 9              MS. BAUMGARTNER:  The back half of the list, which is
10    what I said I'd provide.
11              MS. HOFFMANN:  Let me see what's in the binders that
12    we created.
13              THE CLERK:  Counsel, I'm going to show you.  You can
14    adjust this up here, the focus, when you put items on the ELMO.
15              MS. HOFFMANN:  It might be in the binder that we
16    brought.  I'm sorry.  There's a lot of things.
17                        (Counsel conferring.)
18              MS. HOFFMANN:  I think we're going to have to do this
19    another time.
20              THE CLERK:  In the mic.
21              MS. HOFFMANN:  The exhibits from the first half of
22    the list that only defendants want to offer are not here.
23              THE COURT:  So what are the issues?
24              MS. HOFFMANN:  I don't think there are that many.  A
25    number of these relate to the prior bad acts issues that we had
```

```
 1   started to raise.
 2        There's, for example --
 3            THE COURT:  Okay.  So bad acts, which I still have to
 4   get information on.
 5        What else?
 6            MS. HOFFMANN:  There's some hearsay questions.
 7            MS. BAUMGARTNER:  It might be -- I'm not sure that
 8   Your Honor actually needs to see the specific wording in the
 9   exhibits.  I think that mostly it's a concept issue.  I don't
10   know if -- perhaps we can go through these and just tell you
11   what they are and give you the general idea.
12        For example, the first one on the list is the audio and
13   video of the interview of David Trulove in the homicide
14   division a week later.  So we've submitted that as part of
15   the -- as something we've like admitted, and they've objected
16   on hearsay grounds.
17        So it's something that, again, this is what the officers
18   had, the information that the officers had in deciding how to
19   move forward.  So that's our basis for having that submitted.
20        There will also be portions of it, of course, that are
21   impeachment, potentially for David.  But our view is that the
22   whole thing comes in.
23            MS. HOFFMANN:  I think -- I don't think it's going to
24   be productive to try to do this without the actual exhibit in
25   front of us.
```

1    I do think that, as a number of these things are related

2  to prior bad acts or the Court's rulings related to the scope

3  of permissibility testimony with respect to probable cause, it

4  might make sense to wait on this until we've finished briefing

5  that, raising the prior bad acts issues, we have rulings and

6  then we can meet and confer to see if we have agreement based

7  on those concepts and, if not, raise issues at that time.

8          THE COURT:  What are the other categories?

9          MS. BAUMGARTNER:  I beg your pardon?

10          THE COURT:  What are the other categories?

11          MS. BAUMGARTNER:  There's the search warrants, all

12  the search warrants that were issued for various cell phones.

13  Again, my purpose in having these admitted is to show that the

14  inspectors were continuing to investigate.  There's -- those

15  are objected to on the grounds of not -- of lacking expertise

16  and 401, 402, and 403.

17    There's also the CAD audio transcript -- or the CAD audio

18  of what was going on that night.  There's objections on the

19  grounds that that is hearsay.  So we want to have those

20  admitted.

21          MS. HOFFMANN:  Looking at this list, I think we

22  addressed some of these things in the pretrial conference last

23  time and I'm not sure that the Court's rulings are incorporated

24  in -- for example, I thought that there was a ruling -- I could

25  be misremembering.  I haven't had a chance to review the

1    transcript we just got last night of that hearing.  But I

2    thought there was a ruling excluding a DA memo noting hearsay.

3    I still see it listed here.

4        So I think what probably makes sense is for both of us --

5            THE COURT:  I thought I told you the CAD stuff would

6    come in --

7            MS. HOFFMANN:  Right.

8            THE COURT:  -- the DA memo doesn't come in.  But I

9    looked at the specific text of two particular DA memos which

10   had -- which were just hearsay.  So ...

11           MS. HOFFMANN:  I think we should both review the

12   transcript.  We should meet and confer on the specifics.  We

13   should figure out to what extent based on that, and to the

14   extent the Court is -- issues any rulings about prior bad acts

15   or scope of admissible testimony related to, you know, things

16   that had been offered for the purpose of probable cause now

17   that we no longer have a malicious prosecution claim.

18   Hopefully, we can narrow down significantly any remaining

19   disputes and just present those to the Court later.

20           MS. BAUMGARTNER:  I'm sorry.  I somehow -- I think

21   the DA memo you're talking about is the one where Eric Fleming

22   explains how he heard certain information that somebody else

23   had heard.  So, in other words, hearsay information.

24       Again, it's my understanding there's going to be a lot of

25   testimony here about rumors that have been going around.

1          THE COURT:  That doesn't mean the memo comes in.

2          MS. BAUMGARTNER:  Okay.  That's fine.

3      The other big category here is the criminal trial

4  transcripts.  And, again, we discussed this in relation to the

5  motion for summary judgment.  The issue is whatever the

6  plaintiff is claiming the officers should have disclosed is

7  material.  And obviously --

8          THE COURT:  But the transcripts don't come in.

9          MS. BAUMGARTNER:  I don't know how else to convey to

10  the jury what other information was being provided to the

11  jurors so that they can determine whether this would be

12  material.  I don't know how else to do that.  Of course, it's

13  the plaintiff's burden.

14          THE COURT:  You're not retrying the criminal case.

15          MS. BAUMGARTNER:  Again, the issue is whether this

16  information is material in light of the record as a whole.  I

17  don't know how --

18          THE COURT:  What element?  So, again, if the

19  malicious prosecution is gone, that changes.

20          MS. BAUMGARTNER:  This is *Brady*.  So, again, the

21  *Brady* material there has to be a determination by the jury

22  about whether -- again, and it looks at, for example, *Brady*

23  looks at what other information might have come in had this

24  information come in.  There's all kinds of broad scopes of

25  *Brady* that sort of require the jury to know what the evidence

1    was.  And so they can evaluate this other evidence in light of

2    all of that.

3         THE COURT:  Not necessarily.  The question is whether

4    in and of itself it is material to the allegations that were

5    being brought, not whether it was supplemental information.  I

6    don't -- I don't see that there is a comparison.

7         When I have to determine whether or not something should

8    be disclosed in a criminal action and whether or not it's

9    *Brady*, I don't say to the prosecutor, "Tell me all of the

10   evidence that you have in your case."  I would never say that.

11   One can evaluate the materiality of information in its own

12   accord.  You don't do a comparison.

13        MS. BAUMGARTNER:  There -- in civil liability

14   cases -- this is different from determining in advance in a

15   criminal trial whether the information is *Brady* material.

16        What we're talking about here is the causation issue.  Did

17   the failure to disclose this information result in harm?

18   Right?  That's the issue.

19        MS. HOFFMANN:  Your -- sorry.

20        THE COURT:  Do not interrupt.

21        MS. BAUMGARTNER:  So that's -- again, I don't know

22   what the plaintiff is planning on saying in terms -- or arguing

23   with respect to how this information would be material.  But I

24   don't -- and I -- again --

25        THE COURT:  All right.  Now.

 1          **MS. HOFFMANN:**  I apologize.  I didn't mean to

 2    interrupt.

 3        We don't object to evidence coming in from the first

 4    trial.  I don't believe that there's any need to present all of

 5    the evidence certainly or the entirety of what the first jury

 6    heard.  But we agree that if the defendants want to present

 7    portions of what the first jury heard on -- not for the truth

 8    but as to causation or materiality, we agree that that's

 9    admissible.  We don't agree -- I think the only point of

10    dispute is whether they could read portions of the second

11    trial.  And in that case, because he was acquitted, we don't

12    believe it's admissible for materiality, and so there would

13    need to be another basis on which to admit the testimony.

14          **THE COURT:**  All right.  So?

15          **MS. BAUMGARTNER:**  That's fine if they're not seeking

16    damages after the first trial.  So that's the problem, is that

17    we have this whole damages question of what caused this

18    prosecution, et cetera.

19        And that -- it's my understanding that one of their

20    allegations is the failure to disclose this information caused

21    this prosecution and that the way that they basically prove

22    that is that it would have changed the outcome of the second --

23    well, it's a little confusing to me.  But it's possible that

24    what they're saying is the prosecutor should have anticipated

25    the outcome of the second trial.

1    And of course they couldn't do that.  They can't do that.

2    There was significant differences or there was some

3    differences, at least, in the second trial versus the first

4    trial.

5    I also think that the jury is going to need to know --

6    have some explanation as to differences between those two

7    trials so that they can sort of evaluate the harm and the

8    damages here and, again, understand that the acquittal had

9    nothing to do with the conduct of these officers, that they

10    need to know that.  There was no presentation of any evidence

11    at the second trial about misconduct by the officers.  So they

12    need to know that.  Even Barcenas didn't testify at the second

13    trial.

14    **MS. HOFFMANN:**  So I don't hear anything from what

15    defense counsel just said that -- I understand that any basis

16    from that to admit evidence from the second trial.  Generally,

17    I think the Court's inclination was right, that this prior

18    testimony is hearsay, and there has to be a reason --

19    independent reason it would be admissible.

20    While I agree that evidence from the first trial is

21    admissible not for the truth but as to materiality as to how it

22    would have changed what the first jury heard and whether that

23    would have made a difference in the outcome in this civil

24    context, there's no basis for introducing the evidence from the

25    second trial because it wouldn't have changed the outcome.  He

1  couldn't have had a better outcome than he had, which was he

2  was acquitted.  We do have to show that the defendants'

3  misconduct caused all damages we're claiming, but that has

4  nothing to do with the evidence actually presented at the

5  second trial.

6      And what defendants want to do is bring in issues that are

7  improper, which is trying to blame the defense lawyers for

8  their -- or bring in issues about their strategy, things like

9  that.  There's a lot of complications about the difference in

10 the burden.

11         **THE COURT:**  I've already ruled on that particular

12 topic.

13         **MS. HOFFMANN:**  Right.

14         **THE COURT:**  It seems to me there are four or five

15 categories of evidence that much of these objections fall into.

16 Right?  Not that much.

17     And given the various different approaches that are being

18 articulated, I want it in writing.

19     I see the audio, video, right, the search warrants, the

20 trial transcripts.

21     What are the other big categories?

22         **MS. HOFFMANN:**  There's a number of documents related

23 to cell phones that we believe are -- many of them are

24 inadmissible without an expert to explain them.

25         **THE COURT:**  If that's the basis, denied.

```
 1        What other basis do you have?  That is, if these officers
 2   had information -- well, they certainly can't opine.  We bring
 3   experts in on cell phone records to opine, for instance, as to
 4   precise locations or locations relative -- that, in fact,
 5   require expertise.
 6        MS. HOFFMANN:  Right.
 7        THE COURT:  Now, if I've got cell phone records that
 8   show that phone number 1 or phone number A communicated with
 9   phone number B, and I know that phone number B happened to be
10   in the courthouse at the time of the call and I glean something
11   from that, that's what investigators do.
12        So the fact that you might have an expert come in and make
13   certain opinions about what those records means is totally not
14   relevant to whether or not an inspector or an investigator
15   gleaned something with respect to their investigation from
16   having access to that information.
17        So if what you're telling me that they're seeking to offer
18   an expert opinion, that's one thing.  But if it's information
19   that a detective by the nature of their work they would do,
20   that's entirely something else.
21        MS. HOFFMANN:  I would have to look at the exact
22   documents to be sure.
23        My memory is that some of the documents, I agree, are
24   things that anyone just would understand from a subpoena.  You
25   might need testimony to lay a foundation, but about who was
```

called and the extent of the calls is just from phone records.
Some of them are purporting to give locations that calls were
made from which would be relying on expert analysis. So if the
investigator is going to say, this is my -- this is where this
person was at this time and they're moving and they're doing
these various things, I think that that's expert testimony.

I would also say that a lot of this goes only to the issue
of probable cause. It's not particularly relevant to any of
the misconduct or the issues that the jury has to decide in
terms of the misconduct in this case which is whether the
identifications were fabricated and whether exculpatory,
particular exculpatory information was withheld. And so even
if there was some minimal relevance to it, I think it would be
excluded under 403 as --

THE COURT: Well, you all have different perspectives
over what things are being proffered for, so I need to know --
I need a proffer and I need to know the basis for it. Then you
can object. You can tell me what your concerns are. And I can
give parameters. And if I need to instruct the jury over what
the relevance is or give a limiting instruction, then I can do
that. But you guys are coming at this from different vantage
points.

So we can do this, you know, at 5:00 p.m., 6:00 p.m.
during trial or we can do it in advance.

MS. BAUMGARTNER: So, quickly, with respect to the

1  phone records.  Again, during the course of the investigation,

2  the inspectors learned from subpoenaing these phone records

3  that Josh's cell phone was pinging in particular ways and that

4  that meant something to them.

5       THE COURT:  Right.  It meant that he was lying to

6  them about his location.

7       MS. BAUMGARTNER:  Exactly.

8       THE COURT:  Right.  And I think that's a valid --

9  that that is something that an inspector could testify to.

10      Now, it's not clear to me that you need the cell phone

11  records to do that.

12      MS. BAUMGARTNER:  I probably don't.  But, again, I --

13  in case there's an issue here with respect to foundation or

14  questioning them about what they actually learned, that would

15  be the only reason I would submit these.  I would prefer to do

16  this by testimony to show them -- they're not going to remember

17  exactly what they did when, but to show them the records and

18  say, you know, "Did you, in fact, subpoena so-and-so cell's

19  records at this particular date?  What did they show to you?"

20  That's what I'd like to do.  I just put them on the list in

21  case there's a problem with that.

22      THE COURT:  Then it could be that all of this is

23  premature.  And what I have done is, you know, if you need to

24  use it to refresh his memory and then you move to admit, you

25  object, and I tell the jury, well, I'll reserve.  And then the

1  jury leaves and then you have the legal argument in the context

2  of the testimony.

3          **MS. BAUMGARTNER:**  I think that makes sense,

4  Your Honor, for the cell phone records.

5          **THE COURT:**  If there's something -- I tell you,

6  again, you don't want to be wasting your time.

7          **MS. BAUMGARTNER:**  I do not.

8          **THE COURT:**  So if there is something, for instance,

9  maybe the audio video of Trulove; that's something we can

10  decide in advance.

11      The search warrants.  Again, it's not clear to me that

12  those come in.  I don't know what the basis would be for them

13  to come in.  If you think you really need it in, then I suggest

14  that you make the proffer in writing about why you want them in

15  and what the legal basis is to have them in, and then I can get

16  the objection.

17          **MS. BAUMGARTNER:**  So it sounds like what I should do

18  is -- again, the majority of these records, I think, are ones

19  that I want to reserve the right to put in if the testimony

20  does not come out in the way that I anticipate.  For those, I

21  will let plaintiff's counsel know that.  For the ones I do want

22  to come in -- for example, David's audio video -- I will let

23  plaintiff's counsel know that, and then we can limit, I

24  believe, the number that we actually have to argue about in

25  advance.

1          THE COURT:  Okay.  Well, then it seems to me if you

2    know that you want it to come in and I already know I have an

3    objection, then I'm going to want it in writing.

4          MS. BAUMGARTNER:  Correct.

5          THE COURT:  So when do you want to get that to me?

6          MS. BAUMGARTNER:  Well, I can indicate to plaintiff's

7    counsel which I think are -- should be admitted no matter what

8    the testimony is, by Monday at noon.

9          THE COURT:  Okay.  And that's fine.  But when are you

10   going to get something to me?  Because I'm assuming that

11   they're objecting anyway or no?  I don't know.

12         MS. HOFFMANN:  I mean, we'll have to hear what their

13   asserted basis is.  Certainly, we think they're objectionable

14   as of now.

15         THE COURT:  Who made these objections?

16      Did you?

17         MS. BAUMGARTNER:  Plaintiffs made the objection.

18         THE COURT:  I mean, specifically.  Sometimes junior

19   lawyers make all sorts of objections because they're junior

20   lawyers and they don't want to get in trouble.

21         MS. HOFFMANN:  Right.  So I reviewed the objections.

22   These are objections carried over from our original list.  I

23   reviewed them at the time they were made.  I did not have a

24   time to re-review them between when the parties finalized our

25   list at 10:00 o'clock last night and this morning.  So --

1          THE COURT:  All right.  So --

2          MS. HOFFMANN:  And I haven't checked the transcript

3     of the last court conference, which we only got last night, to

4     make sure -- to either raise issues that I thought defendants

5     should be withdrawing based on the rulings or to withdraw on

6     our objections based on the Court's rulings.  So that's what I

7     would like to do.

8          THE COURT:  So you will let them know by Monday at

9     noon what you're affirmatively moving on?

10          MS. BAUMGARTNER:  Correct.  And -- yes, assuming --

11          THE COURT:  And then when will you respond about

12     whether or not you object?

13          MS. HOFFMANN:  So why don't -- can we confer maybe

14     Tuesday morning?

15          THE COURT:  So you want to meet and confer on Tuesday

16     morning?

17          MS. BAUMGARTNER:  I'm trying to picture my witness

18     calendar in my head.

19          THE COURT:  Why don't you just do this.  By Tuesday

20     morning -- and what does morning mean, given that you're on the

21     East Coast and we're on the West Coast?

22          MS. HOFFMANN:  It'll be by the start of the day in

23     California.

24          THE COURT:  All right.  By 9:00 a.m. Pacific coast

25     time, you will advise defendants whether you maintain your

1   objections or advise defendants as to any exhibits where you

2   maintain your objections.  I'll give you some amount of time to

3   meet and confer.  But at some point I'm going to need something

4   in writing.

5       When can you do something in writing?  I'm assuming you're

6   not doing everything on your own, Ms. Baumgartner.

7       **MS. BAUMGARTNER:**  No, I am not.

8       So it's my understanding it's -- we're proffering the

9   evidence, and the plaintiff is objecting.  I think it would be

10  the plaintiff who actually has to state a basis for their

11  objection as opposed to me affirmatively stating why I want it.

12      **THE COURT:**  Well, if you're going to proffer -- if

13  we're going to do this in court, then you're going to have the

14  exhibit and you're going to have to give me the -- I'm going to

15  say -- you know, I'm going to say what's the -- you know, on

16  what ground is it admissible?

17      **MS. BAUMGARTNER:**  That's true.  Yes.  Okay.

18      By the end of the day on Tuesday -- the end of my day on

19  Tuesday as opposed to end of New York day on Tuesday.

20      **THE COURT:**  Well, and it can be any time Tuesday.  I

21  mean, it -- look.  We're not going to get to your part of the

22  case until a little bit later.

23      **MS. BAUMGARTNER:**  Correct.

24      **THE COURT:**  So --

25      **MS. BAUMGARTNER:**  Although, a lot of this comes in

```
 1  during --
 2          MR. BRUSTIN:  Right.
 3          MS. BAUMGARTNER:  -- their exam.
 4          THE COURT:  Okay.
 5          MS. BAUMGARTNER:  So I will -- I will by the end
 6  of -- before I go home on Tuesday, I will have something with
 7  the Court.
 8          THE COURT:  All right.  So assuming it gets filed
 9  sometime Tuesday night, then when am I going to have something
10  from you guys in response?
11          MS. HOFFMANN:  I think we can do the end of the day
12  Wednesday.  Most of us will be on a plane on Wednesday.  But if
13  we get it Tuesday night, we should be able to file by the end
14  of the day Wednesday.
15          THE COURT:  All right.  Then I will have it on
16  Thursday, and we'll try to talk about it as soon as we can.
17      Okay?  So those are the exhibits.
18          MS. HOFFMANN:  If I may, Your Honor, you had raised
19  earlier a question about what -- with respect to the motion
20  with the prosecutors, what specifically we wanted to -- what
21  testimony we wanted to exclude.
22      In our motion, we have some representative quotes from the
23  summary judgment declarations of the three prosecutors.
24          THE COURT:  Your motion was overbroad.
25          MS. HOFFMANN:  But it -- not the original motion, the
```

1    supplemental that we filed at Document Number 402.  We have

2    specific -- I don't know that this is the entirety of

3    everything that was in their summary judgment declarations.  I

4    could file something supplemental taking their summary judgment

5    declarations and highlighting every line that I think is

6    objectionable, if the Court would like me to do so or I think

7    that this is a representative sample of the testimony.

8         THE COURT:  You said Document Number 402?

9         MS. HOFFMANN:  Document Number 402.  If you turn to

10   pages 2 and 3, there's some long quotes from the three summary

11   judgment declarations from the three prosecutors who were

12   involved in the case.

13        MS. BAUMGARTNER:  I drafted these declarations

14   specifically with *McSherry* in mind, and the portions of the

15   prosecutor's declarations that the Court relied on and quoted

16   extensively in their opinion with respect to this issue of

17   causation and the prosecutorial's independent discretion.  So

18   that's where a lot of that language came from.

19        THE COURT:  Okay.  And are you seeking to introduce

20   these statements effectively during testimony?

21        MS. BAUMGARTNER:  The concepts, yes, not the

22   statements themselves, of course, not the declarations

23   themselves because the witnesses will be here.  But basically

24   their review of the evidence, what they did to review the

25   evidence, and the conclusions they drew from the evidence that

```
 1   they had.
 2          THE COURT:  So this is really -- you want them to
 3   testify as to the ultimate fact of their independent
 4   determination?
 5          MS. BAUMGARTNER:  That they did make an independent
 6   determination and the information that they had, yes.
 7          THE COURT:  Aren't those all legal conclusions?
 8          MS. BAUMGARTNER:  No, Your Honor.  And the reason for
 9   that is this is a -- it is a factual issue; right?  So there's
10   the issue of -- let's talk about Ms. Lualemaga.  Right.  So
11   they're claiming that -- if I have their claims correctly, that
12   the officers intentionally --
13          THE COURT:  I want to step back.
14      Given that the malicious prosecution claim is out, to what
15   element are any of these statements relevant?
16          MS. BAUMGARTNER:  Causation.
17          THE COURT:  Okay.
18          MS. BAUMGARTNER:  And, again, the issue that they're
19   going to be complaining about a lot of the things that are in
20   the file were not in the file and what the -- what a reasonably
21   competent investigator would have done, et cetera, et cetera.
22   It's up to the DA, essentially, to make that determination and
23   they did.  And so that's --
24          THE COURT:  But taken to its logical extreme, your
25   argument is that there would never be a claim for fabrication
```

whenever there was a prosecution.  That's effectively what you're arguing.

          MS. BAUMGARTNER:  No.  What I am arguing is that they actually have to prove the fabrication, that they can't just rely on the fact that they claim that this was a messy investigation, maybe they ignored this, maybe they ignored that, you know, maybe they should have gotten the name of the officer who was in the report writing room, those kind of things.  That's what I'm addressing through this testimony.

     If, in fact, the jury believes that what Barcenas happened was true and that it was these officers who did that, they -- we admit they didn't have that information.  The prosecutors will admit that they did not have that information.

     So what I'm trying to do is here is cut off the issue -- the argument that basically by being negligent they're liable. And by having the prosecutors talk about what they reviewed and they -- you know, again, what they thought about it and therefore what they did with it is critical to this issue of addressing all of the -- all of the evidence about these other things that plaintiff claims that defendants did wrong because those are not the source of liability here.

     The source of liability, again, are two particular -- well, not counting *Brady*, two particular things:  Whether the witness was shown a picture and pointed out and said Jamal Trulove or Jay Trulove and shook her head and said no and

whether Johnson and McMillan fed Latisha Meadows-Dickerson

information prior to the time she gave her statement.  Those

are essentially the fabrications here.

But what they're going to be saying is, you know, you had

this information in file.  You should have looked here.  You

should have documented it in this way.  You should have taken

from your notes and put it in the chron.  You should have done

all that kind of stuff.

And what is critical here is what the DA looked at.  The

DA knew that there were photos of the wall, in the gang wall,

for example.  The DA knew that there was no -- written down in

the file that -- who it was that had the witness say that,

those kind of things.

And there's also the issue that the investigation that the

prosecutors did as they went along added to their belief that

Mr. Trulove committed this crime.  So there's that too, what

else they gathered during the course of time and what they

thought about it, and, again, that breaks out the causation.

**THE COURT:**  You know, the evidence, it seems to me,

that you're talking about, or the lack thereof, what you call

negligence, they call deliberate indifference.  And a jury gets

to decide which of those two things it is.

If it's negligence, then I would agree with you; there

isn't a constitutional liability.  But those are factual -- I

mean, you know, you defend prosecutors -- or you defend police

1   officers.  You believe that they are doing their best.  That's
2   not everybody's belief.
3        And so the question is whether their lack of action rises
4   to a level of deliberate indifference, which is, in fact, an
5   element and which, in fact, gives rise to liability.  That's
6   what deliberate indifference is.
7        MS. BAUMGARTNER:  So the deliberate indifference is
8   whether they were deliberately indifferent in the way that they
9   gathered these particularly supposedly fabricated statements
10  only.  There's not a general deliberate indifference claim.
11  Right?  It's not generally whether they were deliberately
12  indifferent.  It's whether --
13       THE COURT:  No, it's not.  But it is the first
14  element -- it is a manner in which the first element of a
15  fabrication claim can be proved.  And it can be proved by
16  direct evidence and by circumstantial evidence.
17       And the deliberate indifference is, in fact, the conscious
18  or reckless disregard of the consequences of one's actions or
19  omissions.  Or omissions.
20       MS. BAUMGARTNER:  That is 100 percent true.  But what
21  that needs to do is it needs to cause something.  It needs to
22  cause somebody to have -- to --
23       THE COURT:  I don't disagree that there's the causal
24  issue here.
25       MS. BAUMGARTNER:  Right.  So the prosecutor's view of

1    what it means that they did not write down in the file who it

2    was that was in the report writing room is critical to this

3    causation issue and to whether this had an effect on the

4    ultimate -- the DA's ultimate decision here.

5         And part --

6         **THE COURT:**  Listen.  Like I said when we started

7    this, if we were sitting in the Second Circuit, the argument

8    would be different because in the Second Circuit in this kind

9    of claim -- and the constitution is the same.  The constitution

10   doesn't actually change words among circuits, but there are

11   different views about what it means.  You couldn't do what you

12   want to do.  I know that -- having read the cases, I believe

13   that under the Second Circuit, you couldn't do what you want to

14   do.  And there's a logic as to what the Second Circuit judges

15   think.

16        I don't think that that's the rule in the Ninth Circuit,

17   and that's why more of this will come in than the plaintiffs

18   probably want.  But I am trying to finally define it, given

19   that there are arguments on both sides.

20        **MS. BAUMGARTNER:**  Again, my goal here is to avoid

21   liability for the DA's decisions.  Right?

22        So we -- the police officers had a job to do, and their

23   job was to present evidence to the prosecutor.  We -- my

24   individual officers should not be liable for the DA's

25   decisions, so that's what the law holds, and that's what this

1  area of testimony is all about.

2      I've already told the prosecutors, for example, that they

3  cannot use the phrase "probable cause."  Again, we went over

4  that.  They're not going to be saying there was probable cause.

5  And that -- which is the legal term and the ultimate legal

6  determination.

7      But one of the things that will be played before the jury

8  here, for example, is the audio recording of the witnesses,

9  both witnesses, Ms. Lualemaga and Ms. Meadows, and that

10  information the prosecutors had.  They listened to those tapes.

11  It's very clear that they listened to those tapes.  They didn't

12  just rely on any representation by the officers about that.

13  They heard her voice, both their voices and that influenced

14  their decision.

15      So, for example, we need to able to say that, that it

16  wasn't just they're relying on something that an officer said

17  during a particular event.  They listened to that and they

18  heard it.  And they made a conclusion based on that.

19          **THE COURT:**  All right.  Let me hear from the

20  plaintiffs.

21          **MS. HOFFMANN:**  So, again, we don't dispute that what

22  the prosecutors knew, what was reported to them is obviously

23  admissible.  The question is, which is very different, and if

24  you look at the actual testimony from the excerpts from these

25  declarations, for example, Ms. Baumgartner just said -- and I

don't think there's any dispute about this, if the jury
believes that what Oliver Barcenas describes happened, then
we've -- then that was an unconstitutional identification
procedure.  There's -- you know, the prosecutors were not aware
of it and the identification was fabricated.

     We have a testimony that they want to introduce from Linda
Allen.  I decided that Barcenas was not credible.  What does
that have to do with anything?  It's so completely improper.
It's vouching.  It's a decision from the prosecutor saying,
"You should trust me" -- and this is straight from
Ninth Circuit law too; this is not just Second Circuit law.
You cannot have a prosecutor come in and say, "I evaluated this
witness' credibility and I made a decision and you should trust
me because this is what I do for a living."

     It's so completely prejudicial and improper, and it's also
not relevant to anything because it's undisputed that the
prosecutors believed that this didn't happen at the time.  If
they had known that it happened, they would have had to
disclose it as *Brady* material.  The identification would have
been fabricated.  It's not a close question.

     And so what they really want is they want the prosecutors
to come in and say, "We looked at all of this and we decided
the officers didn't do anything wrong."  That's what they want.
They want to say, "Look at the -- I made an independent
determination.  The identification procedures were lawful,

1    fair, competent, admissible, and otherwise supported the

2    prosecution.  I interviewed Ms. Lualemaga.  I believed her then

3    and I continue to believe her now that she observed Trulove

4    shoot Kuka."

5         This is -- you know, there's no question what the

6    prosecutors knew, what was reported is absolutely fair.

7         The question is, do they get to go the next step and say,

8    "Trust me because I do this for the living, and I work for the

9    Government and I'm telling you that, you know, you should

10   believe that the police officers did not engage in the

11   misconduct that's being charged."  That's what we're seeking to

12   exclude.

13              MS. BAUMGARTNER:  May I, Your Honor?

14              THE COURT:  You may.

15              MS. BAUMGARTNER:  This whole second trial was not

16   initiated in any way by my officers.  You know, they --

17              THE COURT:  I understand that.  But, here, there is

18   a -- it'll be up to you to decide how to deal with it

19   strategically or tactically.

20        They are obviously going to argue that the misconduct here

21   infected both the first and second trial, and they're going to

22   ask for damages through for his entire period of incarceration.

23        I would think that after 60 hours of testimony, plus, the

24   jury is going to understand that there are some logical breaks.

25   That is, you have an investigation and at some point the

1    prosecutors get into -- you don't find out.  That's one break.

2    You have a first trial which is another break.  You have a

3    court of appeal decision; that's another break.  And then you

4    have an acquittal, which is, yet, another break.

5        And they may decide that the officers violated the

6    constitutional rights of Mr. Trulove, but, really, only up

7    through the first trial.  And then they're going to have to

8    decide what number, what damages would justify injury through

9    the first trial, not necessarily the second trial.

10       Now, perhaps neither of you want to argue that because

11   you're going for a complete defense verdict or you're going

12   for, you know, all of the -- the whole fruit basket, so to

13   speak.  But those things are argument.  And the jury gets to

14   decide those questions.

15       So anyway.

16       **MS. BAUMGARTNER:**  I think I should be able to ask the

17   prosecutor, "Why did you go forward with the second

18   prosecution?"

19       **THE COURT:**  Well, I'll figure it out.  And, if not,

20   then the Ninth Circuit will tell us in three years whether I

21   did it wrong.  That's usually how long it takes.

22       **MS. BAUMGARTNER:**  I know it does, Your Honor.

23   They've been a little quicker recently, but ...

24       **THE COURT:**  Okay.  I think I have an understanding.

25   And, you know, the reality is that I don't think that we have

1    very good templates for how to try this particular kind of
2    case.  So I will create some boundaries and we'll live within
3    those boundaries and we'll move on.
4         **MS. BAUMGARTNER:**  Absolutely.
5         **THE COURT:**  Anything else you want me to think about?
6    Because that's really the big issue I have to decide, is what
7    are the boundaries?
8         **MS. HOFFMANN:**  So I will -- I mean, the other thing I
9    would say, Your Honor, is if you look at the cases that -- even
10   when there's a case, a situation where there is an
11   independent -- is a presumption of independent judgment which
12   has to be rebutted, the list of ways in which you rebut that
13   presumption is totally congruent with what we already have to
14   prove to win on our cases.
15        So, for example, the presumption is rebutted, there is no
16   presumption of breaking a causal chain when the prosecutors are
17   relying on fabricated evidence.  The whole idea of the
18   presumption is they can make an independent judgment based on
19   all of the evidence.
20        **THE COURT:**  Here's the problem that I've always had
21   with this issue of presumption.  And that is that it is fine in
22   the context of summary judgment -- and many of these cases come
23   in the context of summary judgment -- we, as lawyers and
24   practitioners in the law, judges were lawyers at one point, we
25   understand presumptions.  We understand that there are certain

1    things that create these presumptions and how one can overcome

2    those in the context of paper and how one rules on motions.

3    Jurors are not.

4        When you tell jurors that there is a presumption and that

5    someone can overcome that presumption, as a trial judge, it is

6    hard for me to understand how I charge a jury to do their duty

7    without a context.

8        So if I say that -- where the prosecutor went forward

9    independently, there's -- well, I don't know that I have to say

10   much more.  It's just that presumption needs to mean something

11   to jurors, and they cannot do that by me just saying the word

12   presumption.  It's meaningless.  There has to be -- there has

13   to be something tangible for them to understand that that

14   tangible evidence needs to be overcome.

15       **MS. HOFFMANN:**  I agree, Your Honor, that the whole

16   concept is confusing.

17       But what I'm trying to say is that there's absolutely no

18   reason in this case, given the claims that we are pressing, to

19   get into any of it because --

20       **THE COURT:**  I disagree, because you have causation.

21       **MS. HOFFMANN:**  Right.  We have to establish just

22   under the normal instructions that our -- that the fabrication

23   or the *Brady* violation was a cause -- proximate and but-for

24   cause of our -- Mr. Trulove's injuries.

25       But because we have to -- take the fabrication claim.  In

order to prove causation, we have to prove that they fabricated
evidence and that that fabrication caused his wrongful
detention.  That necessarily means that if you put in that
extra step, there's a presumption, but then you rebut the
presumption.

     If you prove the fabrication, that rebuts the presumption.
Right?  Because the fabrication -- the use of fabricated
evidence is an exception to the presumption.  So you don't need
to tell the jury there is a presumption but then it's rebutted
by fabrication because they necessarily have to find a
fabrication for us to win on our claim.

     The reason that the presumption matters is in cases when
you're talking about lack of probable cause.  So -- generally.
So you don't necessarily need a fabrication.  You don't
necessarily need a withholding exculpatory evidence.  You could
simply have, you know, this police officer made an arrest,
decided to go forward, and he should have known that there
wasn't enough.  It really is more like a negligence case in
that instance.

     In that circumstance, it makes sense to say if you -- if
you were totally upfront; you presented all the information to
the prosecutor.  The prosecutor looked at it and she said, "I
think this is enough to go forward," then the police officer is
no longer liable.  That is not this case.  That is not this
case.  That is not what we're alleging.  That has nothing to do

1   with what we're claiming here.  And that's not even our claim

2   anymore.  We dismissed our malicious prosecution.

3       So because in order to win we need to prove a fabrication

4   of evidence that --

5           THE COURT:  Your only focus has been on your burden

6   to win.  You keep forgetting the defense's burden or the

7   defense's ability to defend.  That's the problem that you fail

8   to consistently address, that if you happen to be defending

9   this case, what it would be.  I get what you have to prove, but

10  I also understand that the defense has a defense.

11          MS. HOFFMANN:  Right.  But the defense's only -- I

12  agree the defense has an opportunity to put on their defense,

13  but it's only in respect to the claims that we're making.  They

14  can't put on a defense that's only for a malicious prosecution

15  claim if we're no longer asserting a malicious prosecution

16  claim.

17      But what I'm also saying is that I believe it's confusing

18  to the jury and legally unnecessary even assuming that the --

19  this whole presumption of independent prosecutorial discretion

20  applied outside of a malicious prosecution claim, because --

21          THE COURT:  So what is the defense from your

22  perspective?  What is the defense's defense in causation?

23          MS. HOFFMANN:  I mean, I think their defense -- and I

24  don't think there's a dispute that if they fabricated either of

25  these statements, that that deprived Mr. Trulove of a fair

1    trial.  I think the defense is we didn't do it.  This didn't

2    happen.

3            THE COURT:  That's not their only defense.

4            MS. HOFFMANN:  I think Ms. Baumgartner already said

5    that there's no dispute that the DAs did not know about the --

6            THE COURT:  All right.  What is -- articulate it so

7    that she can respond.  On the causation issue.

8            MS. BAUMGARTNER:  Our office did an investigation.

9    They did the best they could do.  They presented it to the DA.

10   They did not make the decision.

11           THE COURT:  So the DA's actions, it seems to me, the

12   argument is cuts off the causation chain.

13           MS. BAUMGARTNER:  Absolutely.

14           THE COURT:  That is the argument that the defense is

15   making.

16           MS. HOFFMANN:  Right.  But, I mean -- if I may, I

17   don't believe you're arguing and I don't think --

18           THE COURT:  You don't believe that the defense is

19   arguing.

20           MS. HOFFMANN:  I'm about to ask her if it's okay.

21           THE COURT:  No, it's not.  Just talk to me and I can

22   ask her to respond.

23           MS. HOFFMANN:  Okay.

24       I don't believe there's any dispute that if the things

25   happened that we say happened -- there's a big dispute as to

1    whether they happened.  I don't think there's any dispute that

2    if they happened, the prosecutors did not know about them, and

3    if they --

4         THE COURT:  This is the reason why you haven't

5    settled this case.

6       But go ahead.

7         MS. HOFFMANN:  If what Oliver Barcenas describes

8    actually happened -- there's a dispute as to whether it

9    happened.  No questions about that and there's no dispute that

10   the -- none of the prosecutors were aware of what Oliver

11   Barcenas says.  Defendants say that's because it didn't happen.

12   We say it's because it happened and the police officers didn't

13   tell the prosecutors but there's no dispute that the

14   prosecutors did not know it.

15      I also do not believe that there's any dispute legally

16   that if -- if this happened, if the identification was

17   fabricated, either one of the two identifications was

18   fabricated, that that caused the prosecution and that caused

19   the wrongful conviction.

20        THE COURT:  Well --

21        MS. HOFFMANN:  It's a one-witness ID case.

22        THE COURT:  Maybe I should give you ten hours apiece

23   and you come in here and you put those witnesses on and we ask

24   the jury the question.  That's not what you're trying to do.

25      You're trying to litigate a case that is much broader than

1  what you just articulated and because you are, it opens the

2  door.  That's not what you're trying to do.  Look at your

3  witnesses.  Look at what you have been arguing.  That is not

4  what you're attempting to do.  If it's that narrow, that's

5  great.  I can try this case in a week and a half.

6       Do you really want to say that's all you're trying to do?

7            MS. HOFFMANN:  What we're trying to do is we're

8  trying to prove that two identifications were fabricated.

9            THE COURT:  So I can cut off the evidence then after

10 the identification.  I can cut your case -- who do you need?

11 Who do you need for that?

12           MS. HOFFMANN:  We need, as I think we've laid out in

13 our summary judgment papers, we need -- I mean, these are --

14 there's no question that these are heavy allegations that we

15 are making.  And the defendants are going to come up here and

16 say, "Absolutely we did not do this."  And, you know, "Trust

17 us.  We would not have done this."

18           THE COURT:  You are trying to re-litigate this case,

19 and that's the problem.  If we're only talking about two

20 identifications, then I can take a scalpel, as you describe it,

21 to these witnesses.  Shell casings never come in.  There's zero

22 mention of shell casings because, if we're only talking about

23 the identification, then it's really pretty narrow.  It's

24 really pretty narrow.

25      Go ahead, Mr. Brustin, you're chomping at the bit.

1          **MR. BRUSTIN:**  I am, Your Honor.  I'm sorry.

2      Everything we're putting in as we've laid out in our

3  papers is circumstantial evidence that they fabricated the two

4  IDs.  I think all the cases we cited, that's what they show

5  that's how it's done.

6      Everything is geared towards those IDs, circumstantial

7  evidence, that when the police officers come in and say "I

8  didn't do this," it's circumstantial evidence that, in fact,

9  they did.  That that's what we're doing in this case.  And I

10  think it's perfectly appropriate.  And, you know, that's the

11  only way we could do it.  That's the only way we could prove

12  it.  They're not admitting to it.  That's how you prove these

13  kinds of fabrications, by showing the things they did indicate

14  that they lied.

15          **THE COURT:**  And the problem is that by casting your

16  net as broad as you want to cast it, the issue with respect to

17  causation broadens because there is -- what I'm not going to

18  say is, unless I start instructing after every witness, "Now

19  remember, jury, everything he said here about everything else

20  is not relevant, except as circumstantial evidence to whether

21  or not there was these identifications were wrong.  Just

22  remember that."  Every single time.

23          **MS. HOFFMANN:**  Your Honor, we are not opposed -- and

24  I think the defendants were not opposed either in the ultimate

25  jury instructions making clear exactly what our -- what we're

1    alleging is a basis for a claim and what is not.

2        And I think -- you know, our intent is to make it

3    perfectly clear throughout the presentation of the evidence and

4    through our opening and closing that our argument is about the

5    fabrication of the two IDs and the suppression of the

6    exculpatory shell casing evidence and everything else is

7    circumstantial evidence to support that misconduct.  That's our

8    claim.  If you don't believe that they fabricated these IDs, if

9    you don't believe they suppressed the shell casings evidence,

10   then we lose.

11           THE COURT:  All right.

12       Ms. Baumgartner, you don't have to.  You don't have to

13   respond.  I'm allowing you to.

14           MS. BAUMGARTNER:  I've made my position fairly clear.

15   They're not admitting this evidence for circumstantial

16   evidence.  They're trying to make the officers look bad.

17   They're trying to say that they've -- and, again, they're --

18   keep in mind when they're talking about this, they're not

19   saying the question is whether what Barcenas said is true.

20   That's really the issue here.  Because if all the rest of this

21   is true and the Barcenas thing is not true, our officers have

22   no liability, and that's the issue here.  Right?  We have to

23   explain that to the jury in some way.  And the way that we

24   explain that is through this causation issue and what the --

25   you know, what the role of the police officers is compared to

1    the role of the prosecutor.

2        So that's my problem, is the jury is going to be hearing

3    all this evidence about this bad stuff that the officers did

4    and they should have looked at the evidence this way and they

5    should have looked at the evidence that way.  That's the

6    prosecutor's job.

7        I also want to make clear about some language here.

8    Nobody suppressed any evidence about the shell casings that

9    were found at the scene right.  What was suppressed here was a

10   six-year-old memo.  And so I -- I think that that needs to be

11   made clear.  Everybody had the information about the shell

12   casings.  The question was whether this memo from 2001 is *Brady*

13   material.  So there's not a suppression of evidence --

14           **THE COURT:**  I think that's right.  I use shell

15   casings as a shorthand for that particular issue.

16       And as I'm looking at the plaintiff's proposal with

17   respect to the jury instructions on the *Brady* topic, or not

18   just *Brady* but the procedural due process, there are five

19   issues that were proffered as the violations.

20       One, the failure to disclose that an officer attempted to

21   coerce Lualemaga to identify the plaintiff as the murderer by

22   pointing to a clipboard and saying, "Isn't it Jay Trulove?"

23   Right?  You're still proceeding on that?

24           **MS. HOFFMANN:**  Yes.

25           **THE COURT:**  And the evidence relevant to that is

1  Barcenas; correct?

2        **MS. HOFFMANN:**  There's a lot of circumstantial

3  evidence to support his allegations.  But, yes, it's -- that's

4  the direct evidence.

5        **THE COURT:**  And then the second, the failure to

6  disclose that they showed the eyewitness a single photograph of

7  Trulove the day after the murder; correct?

8        **MS. HOFFMANN:**  Yes.

9        **THE COURT:**  Third, the failure to disclose the 2001

10 memo; right?

11       **MS. HOFFMANN:**  Yes.

12       **THE COURT:**  Fourth, the failure to disclose that the

13 Meadows statement was fabricated?

14       **MS. HOFFMANN:**  Yes.

15       **THE COURT:**  And five, the failure to disclose that

16 the victim's brother told the officers he had heard a rumor

17 from an unidentified source that a third party other than the

18 plaintiff was -- had committed the murder.

19    Are you proceeding on that?

20       **MS. HOFFMANN:**  No, we're not.

21       **THE COURT:**  All right.  So that's withdrawn as a

22 theory?

23       **MS. HOFFMANN:**  Yes.  As a separate *Brady* claim, yes.

24    And just to clarify, I think connected with the first one

25 about the Priscilla Lualemaga identification, there's also the

1  fact that she identified David Trulove from the wall that night

2  which was not disclosed.  It's all under the umbrella of the

3  coercive suggested identifications with Ms. Lualemaga.

4        THE COURT:  But that wasn't specifically identified.

5  You're now specifically identifying it.

6        MS. HOFFMANN:  I believe it was specifically

7  identified in our summary judgment papers.  I don't know

8  that --

9        THE COURT:  There have been a lot of filings in this

10  case.

11        MS. HOFFMANN:  Yes.

12        THE COURT:  I'm talking about what you specifically

13  identified is your theory in your proffer of jury instructions

14  to me.

15      Are you adding something to the proffer?

16        MS. HOFFMANN:  Yes.

17        THE COURT:  Identify it.

18        MS. HOFFMANN:  The failure to disclose that

19  Ms. Lualemaga selected David Trulove from the wall of photos in

20  the early morning hours of July 24th.

21        THE COURT:  That she did not?

22        MS. HOFFMANN:  No.  That she did select David

23  Trulove.

24        THE COURT:  Oh, David.  I'm sorry.

25        MS. HOFFMANN:  And then for --

1        **MS. BAUMGARTNER:**  Can I address that particular
2   argument, Your Honor?

3        **THE COURT:**  I'm sorry.  What?

4        **MS. BAUMGARTNER:**  Can I address that particular
5   argument?

6        **THE COURT:**  Okay.

7        **MS. BAUMGARTNER:**  That is the only one where the --
8   of what they just said, that's the one the DA knew about;
9   right?  So the DA knew about what happened the night in terms
10  of selecting photos off the wall.  They had every opportunity
11  to speak to the eyewitness.  That is not something that
12  wouldn't necessarily have made the ID inadmissible, et cetera.

13      The other things -- again, you know, they're slightly
14  different because the -- it's undisputed that the DAs did not
15  know when they approved the arrest warrant about the Barcenas
16  allegation.  They did not know about the 2001 memo, and they
17  did not know that -- I believe the allegation, again -- I have
18  sometimes a hard time understanding this, but the allegation is
19  that somehow McMillan and Johnson showed Latisha photos before
20  she went on tape and then intentionally had her hide that fact
21  or something like that.  So, of course, the DA didn't know
22  about that because it didn't happen.

23      So this new allegation is different in that respect.

24      **THE COURT:**  Okay.  Let's move on.

25      You wanted to talk on your list about designations.

1        **MS. BAUMGARTNER:**  So this has been a very confusing

2   process because -- I had this different idea about how this was

3   going to happen.  I thought that both parties were simply going

4   to read -- that we were going to combine what was going to be

5   read and we were just going to read it.  But, apparently,

6   what's going to happen is that plaintiff wants to read

7   snippets, and then we're going to go back and read additional

8   parts.

9        **THE COURT:**  I thought that everything was getting

10  organized by subject matter.

11       **MS. HOFFMANN:**  Yes.

12       **THE COURT:**  And that it was getting read together.

13       **MS. HOFFMANN:**  So, yes, we're fine with that.  We put

14  together a -- what we wanted to do by subject matter in order.

15  We provided it to defendants what -- we told them we were happy

16  to do what we wanted to put in on a subject and then they could

17  immediately do what they wanted to put in on a subject or we

18  could read the entirety of what we wanted and then they could

19  read the entirety of what they wanted.  What we wanted to

20  preserve was make it clear what we're offering and what they're

21  offering.

22       So if we have --

23       **THE COURT:**  No.  That's confusing.  It's confusing.

24  No.  So now what?

25       **MS. BAUMGARTNER:**  So now we need to go back and make

a complete list in our agreed-to order.  That's what I was
assuming would happen.  It is not what has happened.  So now we
need to do that.  I don't think it should take --

**THE COURT:**  You want to sit -- you want to have a
witness up there and then say, "Oh, page 7.  Let's get a new
witness up on the stand so that you know it's the defense
that's putting it on"?

**MS. HOFFMANN:**  No.  What we were suggesting is that
we would agree on one person to sit in the box and that when it
was -- you know, to be the witness.  We were working out an
agreement for that.  And then when it was for the 50 pages or
so the plaintiffs want to read, someone from our team would
stand in the box, a plaintiff lawyer, and ask the questions and
for the pages that defendants wanted to read, we'd switch and
they'd ask the questions.  That was our proposal.

**MS. BAUMGARTNER:**  The problem is what they want are
snippets of the greater parts that we want.

**THE COURT:**  We're not going to do that.

So what do I need to do today?

**MS. BAUMGARTNER:**  I think now that that's clear, I'm
hopeful that we can agree on that part.  We do have a lot of
objections.

**MS. HOFFMANN:**  There's a couple other global issues.
There are a number of times in the deposition where we had the
witness read portions of her prior testimony to herself and

1    then ask her questions about it.

2        We would propose so that the jury can understand what's

3    happening, that at that point where the witness was reading it

4    to herself, we then read to the jury the portions -- the

5    portions that I believe both of us agree are admissible at

6    least for the limited purpose of what she testified to before

7    either the preliminary hearing or the first trial.  So we think

8    that that's clear for the jury for them to understand -- to

9    hear that during that pause in the testimony.  Defendants

10   object to that.

11       **THE COURT:**  I think it depends on whether or not

12   something makes sense in context.

13       **MS. BAUMGARTNER:**  I'm concerned about the hearsay

14   objections and because the -- what the --

15       **THE COURT:**  What hearsay objections?

16       **MS. BAUMGARTNER:**  That what she said at the trial is

17   hearsay, not admissible for any purpose.  So by reading it into

18   the deposition [sic], it becomes -- the jury is going to hear

19   it and it's going to be admitted essentially.  So that's the

20   problem with that procedure.

21       **THE COURT:**  Well, if I can't understand the question

22   and answer, then I don't know how it's -- interestingly enough,

23   you all should have thought about that when you asked the

24   question and answer because then if you had said it during the

25   deposition, you know, it would be on the record and we wouldn't

1    have this problem.

2        I guess for purposes of keeping it in or putting it in, I

3    have to assume that the witness actually read it.  Maybe that's

4    not a bad assumption to make.  But if the follow-on question

5    is, so do you agree, and the answer is yes, well, I don't know

6    what she's agreed to without the context.

7        **MS. HOFFMANN:**  And I would -- we can look at

8    particular examples maybe later after we've conferred about how

9    to combine the testimony, but I don't think it would be hearsay

10   because to the extent it's -- either she's testifying about it

11   and then adopting it or she's -- or she's -- if it's being used

12   to impeach her, then she is -- I don't have the rule number in

13   front of me, but it's her prior testimony that she's given an

14   opportunity to explain.  So I think it's admissible.  It's just

15   for clarity.

16       **THE COURT:**  As I said at the beginning, you have

17   to -- it can come in potentially under one of two rules.  So

18   801(d)(1) or 613.  And the basis for admission or the manner --

19   not necessarily the manner, but those are the two potential

20   rules for prior testimony and/or prior statements.  I still am

21   not exactly sure where we go from here.

22       **MS. BAUMGARTNER:**  We also have -- and I believe we

23   submitted it to the Court, part of the problem -- again, this

24   is our perspective.  There were many, many problematic

25   questions asked at the deposition.  So we're trying to figure

1    out what objections we want to continue to assert because of

2    the way that the questions were asked.

3         So we have a fairly long list of those objections to the

4    specific questions of the portions that plaintiff wants to

5    read.  And we have a number of times now actually submitted

6    those with page, line, and objection to the Court, and I don't

7    think we're going to agree, unfortunately, on those.

8         We, again, spoke to them last night saying we've removed

9    some of our objections based on various things, but we still

10   have very specific objections to very specific questions that

11   the Court is going to need to rule on and we've submitted those

12   in --

13        **THE COURT:**  Well, I thought I dealt with a

14   significant number of things last time we were here.

15        **MS. BAUMGARTNER:**  You dealt with the ones for David.

16   We did not go through the ones for Ms. Lualemaga, except for

17   one or two.

18        **MS. HOFFMANN:**  I think we should look at the

19   transcript.  My memory is you gave some representative rulings

20   about certain things, like misstating the testimony or

21   cumulative objections that you would not --

22        **THE COURT:**  Right.  And so to the extent that it --

23   and I said this before.  If the argument is that it misstates

24   the testimony or that it is cumulative, those objections are

25   overruled, because unless I know the whole amount of testimony,

1    it's hard for me to say whether something misstates it.

2        And so usually -- you know, usually we just say the jury

3    is going to decide.  So if you think it misstates the

4    testimony, then the jury will have both sets of testimony and

5    the jury will decide whether or not it actually misstated it or

6    not.

7        Second, on the issue of cumulative, again, I overruled

8    that objection because people are under strict -- they're under

9    strict hours deadlines, and my view was that by imposing those

10   restrictions, that would address any kind of cumulative issues.

11       **MS. BAUMGARTNER:**  So one of the things I believe we

12   did was try to provide context of the "misstates the testimony"

13   objections.  We also -- I know some of the cumulative

14   objections we'll make sure those are removed.  But we have

15   other objections as well.

16       **THE COURT:**  Well, it seems to me probably the easiest

17   thing to do is for -- I need the whole thing.  I need to know

18   what people are asking for.  And I need it, especially if

19   you've agreed that you're going to read it in a topic-based

20   way, then get me the whole thing by topic.  Just give it to me.

21       And then what I would say is, if I have the whole

22   transcript and there is one kind of objection that is

23   repeated -- let's say it's misstates the testimony or hearsay

24   or whatever -- highlight that portion of the transcript so that

25   I have it in context just like I was in trial and give me a

1    code that says, "Yellow means misstates the testimony."

2        And I want a proposed form of order that lists -- all I

3    want is a chart that has the designation, and then I will take

4    that chart and I will read the transcript from beginning to end

5    and I will say grant, denied, grant, denied, grant, denied.

6    But don't -- but I have to have it in a way that makes sense.

7    So I think that's probably the most efficient way to do it.

8        **MS. BAUMGARTNER:**  I agree, Your Honor.  We've been

9    trying to get there eventually, but it's been a process.

10       **THE COURT:**  And I will advise the jury that these

11   segments of the testimony are being proffered portions by each

12   side, and that I have ordered you and I hereby order you to

13   divide up the presentation of this evidence to affirm my

14   notation to the jury that this is coming from both of you.

15       So it doesn't have to be by one side or not.  You can even

16   switch it up by topic.  I don't care.

17       **MS. HOFFMANN:**  I just want to make sure I understand

18   exactly what you want us to submit.

19       **THE COURT:**  Good.

20       **MS. HOFFMANN:**  So I thought I heard you say maybe

21   submitted by topic area or submitted -- do you want the

22   entirety of the deposition --

23       **THE COURT:**  My understand -- I want to see it in the

24   manner in which it is going to be read to the jury.

25       **MS. HOFFMANN:**  Okay.

1          **MS. BAUMGARTNER:**  Yes.

2          **THE COURT:**  My understanding was that you were going

3    to divide it up by topic area.

4          **MS. HOFFMANN:**  Yes.

5          **THE COURT:**  So I want a binder.  I'm going to read it

6    and I'm going to rule on the objections.  And then when you

7    play it for the jury, I'm going to do something else because

8    I've already read it.  I want it precisely given to me in the

9    manner in which you want it read to the jury.  And don't give

10   me the little font.  My eyes are no longer that good.  So give

11   it to me in the regular font.

12         **MS. HOFFMANN:**  Okay.

13         **THE COURT:**  Figure out what the actions are and give

14   me a key and just highlight it so that I know as I'm reading

15   through it, what the objection is.

16         **MS. HOFFMANN:**  So the way that we -- again, I just

17   want to make sure we're doing this exactly the way the Court

18   wants.  The way we have done it so far to just indicate our

19   designations was to take the actual transcript pages and

20   highlight it so you knew which words we intended -- we

21   suggested be read and which words not.

22        So is it acceptable to continue doing that and then in

23   some other way indicate on the transcript what the objections

24   are or the key of objections?  Does that make sense?

25         **MS. BAUMGARTNER:**  Your Honor, that's not how I've

1  done it.  So what we have done is we actually pulled out the

2  page lines that we intend to read and put them in order.

3       So it may be it says 46/11 to 48/25 and 179/1 to 179/4,

4  but it is in the order that we think it should be read with the

5  page lines in it.  It doesn't include the stuff that we don't

6  want read.  It's only what we want read in the order we want

7  read.  That's what we have done.  Rather than providing the

8  entire transcript, we provided the portions that we think is

9  appropriate to read and the context for the objections.

10       **MS. HOFFMANN:**  Right.  That's -- I'm just looking

11  literally the form.

12       What we did -- so you can see that this is an accurate

13  representation of exactly what it is, we took the deposition

14  pages, highlighted the words we wanted read, and put them in

15  the order in which it would be read.

16       And when we've had this issue in the past, which we've had

17  in a pretrial trial, this was actually what we filed and what

18  we entered into the record so that there's no dispute that this

19  is coming directly from the actual deposition pages and also no

20  dispute as to what exactly was read into -- before the jury.

21  But I'm happy to do it however the Court prefers.  I'm just

22  trying to make sure --

23       **THE COURT:**  Let me see yours.

24       **MS. BAUMGARTNER:**  I would definitely put it in bigger

25  font, Your Honor, because I understand that.

1          But what it does is it has the page --

2              **THE COURT:**  Can you pass that up, because I can't see

3      it.

4              **MS. BAUMGARTNER:**  It's got some of my scribbles on

5      it.  But generally it's -- this is for David.  David will be

6      different because it's by video, but this is generally what

7      we've also done for Ms. Lualemaga.

8              **THE COURT:**  So as I understand it -- look, you've

9      just done it the opposite of each other.  That is, as I see

10     this, you want everything read that's not X'd out; right?

11             **MS. BAUMGARTNER:**  So I X'd out some stuff.  We have

12     an updated version.  We have one that's only the stuff to be

13     read; there's no Xs.  It's the complete thing that we want

14     read.  This was just yesterday's version, so I took out some

15     stuff to try and shorten.

16             **THE COURT:**  So you've deleted from the pages?

17             **MS. BAUMGARTNER:**  Of the stuff we want read.

18     Correct.

19             **THE COURT:**  Okay.

20             **MS. BAUMGARTNER:**  So this is not the complete

21     deposition.  This is only the portions of the deposition we

22     want read in the order that we want it read.

23             **THE COURT:**  Right.  But the document that you're

24     giving to them effectively deletes or does it just exit out?

25             **MS. BAUMGARTNER:**  Oh, no.  It deletes it.  What I

1    think I sent to them last night is the complete -- again, I'm

2    sorry that I handed you one that has Xs on it.  Those Xs you

3    should ignore.  That's not what the final one looks like.  The

4    final one does not have those Xs.  That testimony has been

5    removed because I no longer want it read.

6          THE COURT:  So you've given them a document that just

7    has the portions that you want read with the page number and

8    line number and what they've done -- I mean --

9          MS. BAUMGARTNER:  In the order I want it read.

10          THE COURT:  Right.

11       What I understand the plaintiffs have done is they've

12    taken --

13       You can give this back to her.

14          MS. BAUMGARTNER:  Thank you, Your Honor.

15          THE COURT:  -- they've taken the pages of the

16    deposition and highlighted what they wanted read, which is also

17    a way of doing things, but it needs to be sorted in a manner

18    that puts it in the sequence that it needs to be read.  And I

19    need to know -- I need to have that combined.  That is, I need

20    both of yours together.

21          MS. BAUMGARTNER:  So I will tell you this -- again, I

22    dealt mostly with David; Ms. Rosenblit dealt mostly with

23    Ms. Lualemaga.

24       For David, at least the additions that the plaintiff wants

25    read that are not included in mine are fairly minimal.  So

those can be easily added in if they tell me where they wanted

them added in.  That's mostly true with Ms. Lualemaga, but

there's -- there's more extensive portions.  And the reason for

that is, I also want read a lot of what it is they want read.

So there's not a lot of extra things if we're going to be

reading them together for David for sure.  And there's not

actually that much for Ms. Lualemaga either.

So I -- I'm hopeful that now that we have the direction

from the Court what we can do is we can create a document that

has all of the testimony that's going to be read in the order

that it's going to be read with the objections highlighted so

that the Court can rule on them.  And if the Court grants the

objection, we won't read that part.  If the Court overrules the

objection, we will read that part.

**THE COURT:**  That's what I'm asking for.

**MS. HOFFMANN:**  Right.  So I just want to know -- the

reason that we did it this way -- a couple reasons, is we have

them in the order that we want it read.  We just think it's

easier to judge the context of the quotes and also the --

nothing has been lost in all the copy and pasting, that this is

accurately representing.

The other thing I just want to raise -- we've had a lot of

things that we're trying to work together on and, as Your Honor

has noted, we obviously have very different perspectives.  The

difficulty in trying to agree together on one set of readings

```
1   is that we are trying to prove literally the opposite thing

2   with Ms. Lualemaga's testimony.  We are trying to prove that

3   she's lying; they are trying to prove that she's telling the

4   truth.

5        And so I'm totally happy to attempt to work together to

6   agree.  I just -- it's very hard for me to imagine how that's

7   going to happen because we want literally the opposite thing,

8   which is why we had suggested we put on the things that we want

9   and then they put on what they want, which is, again, trying to

10  prove the opposite point.

11       So I just -- I'm foreseeing that no matter how much we try

12  to work in good faith, it's going to be difficult to come to

13  any agreement, because, again, we're literally -- we have a

14  whole section about her admitting lies at the -- you know,

15  admitting lies she made at the pretrial conference and at the

16  trial.  We're trying to impeach her.  We're trying to show

17  she's a liar.  That's the opposite of what the defendants are

18  trying to prove, how we reach agreement about where that

19  goes --

20            THE COURT:  Well, look.  The other way to do it is

21  that it just gets read in the page order that it was provided.

22  If you can't agree, then -- and you can't get her here, then

23  you've lost control over the examination and I have a

24  deposition and start at page 1 and you end at page 572,

25  whichever portions come in, come in, and then you argue.
```

1    That's the other way to do it.  It's fair.  It's not ideal, but
2    it's fair.
3         MS. HOFFMANN:  Okay.  We will try our best.
4         MS. BAUMGARTNER:  And if we cannot come to an
5    agreement, we will present the Court with a chronological order
6    from page 1 through page 572 of all the portions that are going
7    to be read without subject matter order.  And that will include
8    what they want read and what we want read in chronological
9    order.
10        THE COURT:  I mean, I don't know how else to do it.
11        MS. BAUMGARTNER:  I understand.
12        THE COURT:  And, you know, the alternative is that
13   you say we have five topics and if the topic is -- well, I
14   don't know that you even have that many topics with Lualemaga.
15   Right?  I guess you could say the topic is the -- well, maybe
16   you could do it by day.  So the first day the deposition
17   transcript about her initial contact with the officers, and
18   then the next one would be the second day and all of the things
19   with -- I don't know, guys.
20        MS. HOFFMANN:  Okay.  We will try our best to reach
21   an agreement.
22        THE COURT:  If when I read it I can figure out how to
23   get -- how to do a trade off, it just seems to me very odd how
24   one -- how one does that.
25        MS. BAUMGARTNER:  I mean, we could have a third party

do it, for example.  I don't know if that would be useful to
have somebody comes in who's not particularly identified but
simply ask the questions.

     **THE COURT:**  So I don't understand -- it would be
different if there were two sets of attorneys asking the
questions in the deposition.

     **MS. BAUMGARTNER:**  So that actually just struck me.
Perhaps, Your Honor -- I don't know if this would make a
difference.  If we're going to read it in the order that it was
asked in the deposition, we could perhaps divide it up in the
way that it was asked in the deposition, what questions he
asked, what questions we asked.

     **MR. BRUSTIN:**  There were two lawyers asking
questions.  It was a joint deposition.

     **MS. BAUMGARTNER:**  Well, no.  There are two lawyers
asking questions.  I asked a whole bunch of questions, and then
Mr. Brustin ask asked a whole bunch of questions.

     **THE COURT:**  Well, I guess the other approach is you
both stand at the podium and you read your portions.

     **MR. BRUSTIN:**  That would be fine.  But -- well, some
of the things that we're -- I think for both sides, some of the
things we're introducing some things they asked; they're
introducing some things we asked.

     **MS. BAUMGARTNER:**  Well, but, again, it's not a
question of who's introducing it at this point.  It's the

1    question of who's asking the questions.

2        Again, it sounds to me that perhaps we can agree on that,

3    that in the deposition whoever asked the question is going to

4    be asking the question on the stand.  The question is the

5    order.  Right?

6        So the question is, are we going to keep switching back

7    and forth if we're on the same subject matter, or are we going

8    to do it through the course of the deposition because the

9    first, I don't know, 300 pages were my questions, the last 300

10   pages were his questions.  So it may be we do it in the order

11   they were asked in that deposition.  I don't think this is the

12   most useful for the jury.

13       But, nonetheless -- and then to the extent the plaintiff

14   wants parts -- the first section that I asked, I'll ask those

15   questions.  To the extent that we want part of the second

16   question where Mr. Brustin asked the questions, he'll ask those

17   questions, and they'll all be asked in the way they were asked

18   in the deposition.  It's going to be confusing for the jury.

19   But, again, that's why we have arguments.

20       **THE COURT:**  Well, again, I think the original idea of

21   doing it in a -- you know, in a way that was topic based as

22   opposed to proof based was helpful.

23       And it is fine with me, you know, that if you want to have

24   one witness and the two of you get up at the appropriate time

25   and you can stay at that mic and you can stay at that mic so

1    you can have all your stuff out.

2        But perhaps one of the ways to do it is by day because

3    certain things happened on certain days and that at least that

4    could be cabined for the jury.  And the way depositions work

5    one side goes first and the other side goes.  So you might have

6    Day 1 on page 1 through 50 and 300 to 350, but putting Day 1

7    together seems to make sense.  And it's somewhat objective as

8    opposed to then going back and saying, well, no, you know, you

9    said this identification, but then three weeks later, you

10   changed your mind, which is the way you might do it if someone

11   was here in the courtroom, but you've lost that opportunity.

12       MR. BRUSTIN:  Yeah.  The only thing I would add to

13   that, Your Honor -- that makes sense.  There are some discrete

14   activities each day.  So, for example, on the 24th we could

15   break it up by what happened on the precinct on the 24th and

16   what happened at her home on the 24th.  That would be a

17   reasonable way to --

18       THE COURT:  I don't disagree with that.  That is --

19   that seems to me to be a fair, objective way of doing it that

20   helps everybody.  But if you're trying to do this as counsel

21   suggested, that you're trying to create it in a way that's

22   proof based, that's going to make it more difficult and the

23   only other option I have for you is to say screw it.  You guys

24   do it from beginning to end.

25       So it seems -- I think that there is a middle ground that

1    may not be the best for each side but certainly is fair and

2    makes it more absorbable for the jury and it is fine with me if

3    you each want to stand up and ask the questions.

4         **MS. BAUMGARTNER:**  I'm happy to talk to opposing

5    counsel about it.  We've spent -- I've spent an inordinate

6    amount of time on this issue already trying to get the

7    transcripts ready and various things like that.  I'm hopeful

8    this will happen, but I think it would be good to know that we

9    have a default.  Right?  If we can't actually agree on this

10   that what is going to happen is it's going to be from page 1

11   through, you know, it's going to go through and go in order.

12        **THE COURT:**  Right.  I don't know that I can do it any

13   other way.

14        **MS. BAUMGARTNER:**  Yep.  I --

15        **THE COURT:**  And then each side would ask the

16   questions that they asked during the deposition.

17        **MS. BAUMGARTNER:**  Yes.  And that's not the preferred

18   way, but, again, I've spent a lot of time.  So I'm not -- we'll

19   try and work it out.

20        **THE COURT:**  The problem is that she's an important

21   witness, and I understand that.  But it is what it is.

22        **MS. HOFFMANN:**  Should we set a deadline for when we

23   submit this to the Court?

24        **THE COURT:**  I'm not going to look at it before jury

25   selection, so as long as I have it by Friday.

```
 1            MR. BRUSTIN:  We're not planning on reading it in the
 2    first couple of days.
 3            THE COURT:  I work the weekends.  I have 300 other
 4    cases.  You better get it to me by Friday if you want me to see
 5    it.  The first couple days are the following week.
 6            MS. HOFFMANN:  No, I'm just saying -- just trying to
 7    give you a timing when we're going to be using it.  I
 8    understand you have lots going on.
 9            MS. BAUMGARTNER:  One other issue is, Your Honor, is
10    this is not the only deposition.
11        So I understand the plaintiff has put in portions of the
12    trial testimony interspersed, I believe, within the
13    deposition --
14            THE COURT:  I don't think we can do that.  I think --
15    and, frankly, the jury needs to know that this is the testimony
16    that happened last year.  And this is the testimony that
17    happened at the first trial and this is what happened at the
18    second trial.  And then you're going to have to argue it.
19            MS. HOFFMANN:  Your Honor, I think a lot of that is
20    what we were discussing earlier where she reads a portion of
21    her testimony.  So maybe you can review it when we submit
22    because I think it is clearer for the jury to understand the
23    few snippets that she's reading at the same time.
24            MS. BAUMGARTNER:  The snippets that she's reading are
25    not the biggest issue.  The biggest issue is they submitted
```

wholesale things that she did not write at the time of the
deposition from the trial testimony.  So that's the problem.
That's hearsay, that is not admissible.

        **THE COURT:**  What's not admissible?

        **MS. BAUMGARTNER:**  Just the raw reading of her trial
testimony, which is included in these designations, is my
understanding.

        **THE COURT:**  Well, trial testimony is admissible.
Prior statements are admissible under oath.

        **MS. BAUMGARTNER:**  Only if they're -- not for a party
if they're not impeachment.  So the question -- and, again, I
think a lot of that is not impeachment.  So they --

        **THE COURT:**  So statement -- this is 801(d)(1).  A
statement that meets the following conditions is not hearsay.
Subsection 1:

        "The declarant testifies and is subject to
    cross-examination about a prior statement and the
    statement, A, is consistent with the declarant's
    testimony and was given under penalty of perjury at
    trial, hearing, or other proceeding or in a
    deposition."

        **MS. BAUMGARTNER:**  And there's the provision regarding
cross-examination, the ability to cross-exam, and we are not in
the same shoes as the prosecutor.  So that's the problem.  I
have four individual defendants who were not there to

cross-examine her at the trial, and, for that reason, her

testimony only comes in if it's inconsistent.

           **MS. HOFFMANN:**  I think there's two different --

           **MS. BAUMGARTNER:**  -- or consistent.

           **MS. HOFFMANN:**  If I'm remembering correctly there's

the provision the Court is reading, and I think there's also

804, which we had raised about prior testimony.  And that's the

one where the question is whether there was someone with a

predecessor in interest or an equal incentive to develop the

testimony.  I don't have the rule in front of me.

           **THE COURT:**  804.  Well --

           **MS. HOFFMANN:**  There's a separate question which I

think we both agreed on, which is that original testimony from

this witness goes to materiality from the first trial -- from

the preliminary hearing and the first trial -- particularly,

the first trial goes to materiality.

      And so if we're going to be reading all of the additional

testimony from this witness, I think it makes sense to start

with a brief snippet of what it is she actually said at the

first trial, which is, you know, the statement that, you know,

"I saw Jamal Trulove commit this crime and I'm sure it's him."

      There's about -- I think we have three pages of her

testimony from the first trial which we think is the key part

of the evidence that was used to convict Mr. Trulove and in

examining whether the withheld evidence, for example,

1  undermining the reliability of her identification would have

2  made a difference at that first trial.  This jury needs to know

3  what it is she said at the first trial, what the identification

4  was.  That goes directly to causation and materiality.  So

5  we --

6          THE COURT:  I would expect -- I would expect that

7  testimony from the first trial is being read.

8          MS. HOFFMANN:  Right.  That's what they're talking

9  about.

10         MS. BAUMGARTNER:  So either all of it comes in or

11 none of it comes in.  So that's the problem, is that if we want

12 to present to the jury what the first trial looked like,

13 everything comes in, not just snippets.

14         THE COURT:  I understand that's your perspective.

15 And that's not going to happen.

16    What's your fallback position?

17         MS. BAUMGARTNER:  We're talking about the depo

18 designations right now.  The depo designations are not just

19 depo designations; they're snippets of the trial testimony.

20         THE COURT:  So that's why I said her testimony -- I

21 assumed the testimony from the first trial was coming in.  Now,

22 maybe there isn't an evidentiary basis for it.  But I assumed

23 that it was coming in.  And I did not assume -- well, I don't

24 know how long she testified.  But if there's an independent

25 basis for that testimony to come in, then that testimony should

1  be read.

2      And if you -- and then you can read the deposition

3  testimony.  And then you can argue to the jury that she said

4  something here and then she said something there and that's

5  argument.

6          **MS. BAUMGARTNER:**  I have no objection if they say --

7  if they identify which portions of this trial testimony they

8  believe to be inconsistent and is therefore impeachment and

9  then we can address that particular issue.

10      My understanding is they've just put stuff in there for

11  the truth of the matter, keep in mind.  There's no indication

12  that this is just for the issue of materiality because it's in

13  part of the deposition.  But we need to know the basis of their

14  hearsay exception when they submit these portions in the

15  deposition and, again, if she's on the stand --

16          **THE COURT:**  Well, the deposition is -- the rules are

17  different for the deposition than they are for the prior trial

18  testimony.

19          **MS. BAUMGARTNER:**  It's my understanding what they're

20  trying to do is read the prior trial testimony as part of the

21  deposition.

22          **MS. HOFFMANN:**  No.  We organized things by topic.

23  We're now taking the Court's instruction.  We're going to do

24  everything in order.  So prior testimony, then Deposition

25  Day 1, then Deposition Day 2 or by --

1    **THE COURT:** You can't -- I mean, the problem is that
2    you're not going to agree, so it has to be done that way.
3    **MS. BAUMGARTNER:** Again, it's my understanding that
4    the trial testimony in this particular circumstance is not
5    being admitted for any purpose other than impeachment, and they
6    have not identified the impeachment value of this trial
7    testimony. So that's my concern. And I don't have any
8    indication -- I don't have anything to respond to.
9    **THE COURT:** All right. Then stop talking.
10    **MS. HOFFMANN:** The original trial testimony, the
11    three pages of Ms. Lualemaga's description of seeing the
12    shooting and identifying our client is certainly not being
13    admitted for the truth; we're arguing it's false. It's being
14    admitted for -- to know -- for materiality and causation to
15    know exactly what it is the original jury heard and I can
16    provide plenty of case cites that that is -- that's what you do
17    in a wrongful conviction case. I can also provide a case cite
18    that you do not need to include the entirety of the trial --
19    **THE COURT:** I can't -- I can't imagine in this case
20    not having her testimony from the first trial. That is --
21    that's in part why we're here. So -- and you -- it's certainly
22    not your position that it's not true because you believe she
23    testified truthfully.
24    And if it's three pages, why are we spending 50 pages on
25    it?

1      **MS. BAUMGARTNER:**  Because if they're going to be

2  submitting trial testimony, Your Honor, for some purpose other

3  than impeachment which is now what I'm understanding, we need

4  to include the entire trial testimony for both trials.

5      **THE COURT:**  I'm not sure that's true.  All right.  So

6  I need to know obviously what the testimony is because you're,

7  in part, arguing 403.  And if I've got three pages of testimony

8  being proffered and your argument is "I need to put in a week's

9  worth of testimony" -- first of all, you don't have that much

10 time, and I told you I'd give you guys 4 1/2 hours for

11 Lualemaga and that was it.  So you certainly can't do that.

12      **MS. BAUMGARTNER:**  I believe you do have the three

13 pages that are at issue in front of you in the trial readiness

14 binder.

15      **THE COURT:**  Okay.  Do you know how much I have in

16 front of me?  Do you want to tell me what page, what binder?

17      **MS. BAUMGARTNER:**  Ms. Rosenblit will.

18      **MS. ROSENBLIT:**  Renee Rosenblit, Your Honor.

19   We did provide to you this morning a courtesy copy in a

20 black binder which has both defendants proposed readings of

21 Ms. Lualemaga's deposition --

22      **THE COURT:**  I don't have a black binder that you've

23 given me.  I have two white binders.

24      **MS. ROSENBLIT:**  The one I handed Ms. Stone this

25 morning.  I'm sorry.  It's not labeled.  It was --

```
1              MR. BRUSTIN:  We have it, Your Honor.
2              MS. HOFFMANN:  It's in ours also.
3              MS. ROSENBLIT:  Your Honor, that binder includes the
4    updated list of deposition designations and objections and then
5    if you continue, there's defendant's proposed reading in
6    subject matter order of Ms. Lualemaga's testimony.  And then
7    there's also a submission by plaintiffs.  And submission -- I
8    should be clear.  Their submission to us.
9              THE COURT:  So I have a --
10             MS. ROSENBLIT:  And within plaintiff's submission, if
11   you flip through, you can see that there are deposition
12   excerpts and there are trial testimony excerpts.
13             THE COURT:  What is Tab 76?
14             MS. ROSENBLIT:  I'm sorry, Your Honor.  I had few
15   resources this morning.  I believe the order is our updated
16   index of all of the designations and objections.  And then in
17   subsequent tabs are both defendants' proposed readings and then
18   plaintiff's proposed readings.
19             THE COURT:  Sorry.  It's just not making sense.
20   All right.  So I have a document which is a chart that says
21   testimony designations for Priscilla Lualemaga by topic, and
22   then there's Deposition Volume 1.  There's no topic identified,
23   but ...
24             MS. ROSENBLIT:  Your Honor, yes.  I did include the
25   full deposition, both Volume 1 and Volume 2, for Ms. Lualemaga
```

1    as well.

2         THE COURT:  The first tab is not a full deposition.

3    The first tab -- the first page of the first tab does not

4    correspond to the first entry in the chart.  So I don't know

5    what it is.

6         MS. ROSENBLIT:  All right.  Well, I apologize.  I

7    thought maybe this would assist us but maybe not.

8         THE COURT:  Perhaps it could, but I don't know what

9    it is, and it's not identified.

10       I see.  There's the oath.  The counter-designation is the

11   oath.  And then the next designation is page 7 and the next

12   line on the attachment the page 8.

13       So given what Ms. Baumgartner told me, it looks like this

14   first group is defendants because it is not copies of pages,

15   but it is some kind of annotation or, that is, it's a series of

16   things that have been pulled out.  But, again, it doesn't

17   correspond to the defendants' designation.

18        MS. ROSENBLIT:  Your Honor, if I may.

19       Now that we are going to meet and confer and work to

20   organize this, we can get you -- or plaintiffs I suppose can

21   get you the trial testimony they're proposing to admit.  But I

22   was only working to direct your attention to that piece as an

23   example, but I'm failing to do so, so I'll stop.

24        THE COURT:  The second tab, again, looks different.

25   So the first tab looks like this.  The second tab looks like

 1   this.  What's the difference?

 2        MS. ROSENBLIT:  Your Honor, one is defendants'

 3   proposed readings, and the other is plaintiff's proposed

 4   readings.

 5        THE COURT:  And then the next tab is the entirety of

 6   the deposition.

 7        MS. ROSENBLIT:  And there are two tabs with both

 8   Volume 1 and Volume 2 of the entirety of deposition.

 9        THE COURT:  Well, don't give it to me again now that

10   I know that I have it.

11      So with respect to Lualemaga, we have two volumes of

12   deposition testimony, we have her testimony -- what are the

13   other sources of the information for her?

14        MS. HOFFMANN:  Testimony at the preliminary hearing,

15   testimony at the first trial, and testimony at the second

16   trial.  I believe that's everything.

17        THE COURT:  And that's it?

18        MR. BRUSTIN:  For testimony.

19        THE COURT:  Well, what else would you read?

20        MR. BRUSTIN:  There's two taped statements.

21        MS. HOFFMANN:  That wouldn't come in here, though.

22   That's not relevant for this.

23        MR. BRUSTIN:  Not here.

24        THE COURT:  All right.  Well, let me know what part

25   of the trial testimony you want.

1    And, Ms. Baumgartner, you don't have to give me the whole

2    thing.  Just say my cross-designation is the whole thing.  You

3    can say it.  I don't know how long that is.

4         **MS. BAUMGARTNER:**  I actually don't either,

5    Your Honor.  I don't think it's very long, but I'm going to

6    have to look at that and figure that out.  It was not my

7    understanding that we were -- again, my understanding is we

8    were going based on the deposition and any impeachment related

9    to the deposition.

10    Now that I understand that we're also going based on her

11    preliminary hearing and both trial testimony, I will look at

12    that testimony and make the designations.

13         **THE COURT:**  And my understanding is that the -- well,

14    you'll have to identify the basis for which it comes in.

15    Again, I assumed -- I actually assumed she'd be here.  I only

16    learned that she wouldn't be at the last pretrial conference.

17    So now that she's not going to be here, we have to figure out

18    how the evidence that you want -- or we don't have to figure

19    out.  You have to tell me how the evidence that you want to

20    come in comes in.

21         **MS. BAUMGARTNER:**  So, again, the way I've been

22    treating this is as though the deposition -- as if she were

23    sitting on the stand.

24         **THE COURT:**  I understand.  Depositions are different.

25    Right?  There are rules for how that comes in.

1    The question is, then, for the plaintiffs, if you want the

2    trial testimony and the testimony from the preliminary hearing,

3    what is it that you want, what's the evidentiary basis for it?

4         MR. BRUSTIN:  Understood.

5         THE COURT:  And then they'll let you know and then

6    we'll go from there.

7         MS. HOFFMANN:  Your Honor, if I may.  I just want to

8    flag an issue.  I don't believe that there will be much -- we

9    will have much difficulty reaching a resolution on the David

10   Trulove designations.  I think there's not that much difference

11   between what the two sides want to designate.

12       There's one issue I want to flag with you, we're working

13   together to reach an agreement on this.  But because it's a

14   videotape and he repeatedly refers to John Doe by name, we're

15   going to have to figure out a way to address that.  So we're

16   negotiating.  We're figuring that out.  We're in agreement that

17   we can do anything reasonable.  I just wanted to flag that for

18   Your Honor so it wasn't a surprise.

19        MS. BAUMGARTNER:  I've spoken to my vendor and I've

20   been told that it's fairly easy.  So we will change both the

21   transcript and the audio.

22        THE COURT:  Okay.  Plaintiffs filed -- or actually

23   you both filed this 413 and you used his name again.  The

24   documents you just filed last night used his name.  So I will

25   lock it, given that it is no longer -- given that I'm going to

1    get an updated one.

2        The courtroom deputy is ordered to lock 413, the exhibit

3    list or -- yeah, the exhibit list.  Okay.

4        **MS. BAUMGARTNER:**  Yeah.  Your Honor, right,

5    Your Honor.  I'm sorry.

6        **THE COURT:**  If I were you, someone should be in

7    charge of doing -- on each side, should be charge in doing a

8    search and replace before anything gets filed.  It's the

9    easiest way to figure it out.

10       **MS. HOFFMANN:**  One other small matter I want to put

11   on the record quickly.  It's another area where I think we've

12   reached agreement.  With respect to the original deposition

13   transcripts or certified and sealed description transcripts

14   we're submitting to the Court.

15       For three of the transcripts, we're having -- we're having

16   difficulty getting the certified sealed from the one reporter.

17   And so I think we have an agreement that the transcripts are

18   accurate, and we will submit stipulation that those three

19   transcripts are accurate.  And that's Barcenas, D'Amico, and --

20       **MS. BAUMGARTNER:**  Who else was the third, the earlier

21   deposed one?  It was D'Amico.  Anyway, there was three for the

22   plaintiff.  And we also are having difficulty getting a sealed

23   bound transcript for Mr. Trulove.  Basically, it's the first

24   four depositions that were taken in this case for some reason

25   we're having difficulty with.  So we've come to an agreement

1  that there's no need to present a sealed transcript for those.

2         THE COURT:  That's fine.  Just get it in writing and

3  file it.

4         MS. HOFFMANN:  Yes.

5         THE COURT:  Were there any concerns about the Court's

6  procedural stipulations that I sent to you?

7         MS. BAUMGARTNER:  No.  I looked at them, Your Honor.

8         THE COURT:  They're due to be filed, I think, today.

9         MS. HOFFMANN:  I thought we already submitted that.

10         MS. BAUMGARTNER:  No, no.  This was new ones.

11  Excuse me, Your Honor.  This was some the Court just filed

12  fairly recently.  I took --

13         THE COURT:  It was 2/26.  I'll go over these with

14  you.  I'll have the courtroom deputy just print a copy and

15  just -- so the first is that it be stipulated that each of the

16  jurors will be deemed present upon reconvening after each

17  adjournment or recess unless the contrary is noted for the

18  record.

19         MS. HOFFMANN:  I don't mean to interrupt.  We did

20  already file a stipulation for both sides --

21         MS. BAUMGARTNER:  This is a -- sorry.

22         MS. HOFFMANN:  -- about excusing the jury and all

23  those procedural stipulations.

24         THE COURT:  Okay.  Because I just don't -- I don't --

25         MS. HOFFMANN:  We certainly intended to file a

1  stipulation.  If we didn't, we can double-check, but we have

2  reached agreement.  No one has a dispute about that.

3          THE COURT:  I did not see them on the docket.

4          MS. HOFFMANN:  Okay.

5          THE COURT:  There was the -- oh, wait.  I found it.

6  Yes, it looks like you did.  That's great.  Thank you.

7      There were -- you indicated on the designations there were

8  potential issues with the husband.

9          MS. HOFFMANN:  Yes.

10          THE COURT:  All right.  Do we need to discuss that?

11          MS. BAUMGARTNER:  I don't think I was aware that

12  there were potential issues with the Lau.

13          MS. HOFFMANN:  We had listed objections.  We never

14  got to this before.  I think we can -- we could go over it now

15  or we could meet and confer and submit this.  I don't think

16  that this would -- this is not something that would come in

17  likely until defendant's case, so it's not something that's

18  particularly pressing.  It's also not very extensive.  There's

19  only a couple little designations, period, I think.

20          THE COURT:  All right.  So you don't want to deal

21  with that right now?  Or do you?

22          MS. BAUMGARTNER:  Well, I -- my understanding -- oh.

23  What I received from them was the portions they want to read

24  which I think are about six lines long -- no, okay, maybe 20

25  lines long.  But I don't know that I received written

1  objections to any of the portions that I submitted I wanted

2  read.

3          **MS. HOFFMANN:**  We did when we originally designated

4  them.  But I think it makes sense for us to meet and confer on

5  this when we're doing everything else.  And if we still have

6  any remaining --

7          **THE COURT:**  That's fine.

8          **MS. BAUMGARTNER:**  That's fine.

9          **MS. HOFFMANN:**  -- objections, we can raise them then.

10          **THE COURT:**  All right.  I had on my list that one was

11  going to get me a copy of the doctor --

12          **MS. BAUMGARTNER:**  We're withdrawing that.

13          **THE COURT:**  You're withdrawing?  Okay.

14      And then you filed the additional trial stipulations with

15  some reading of the explanation of the court of appeal, and

16  then you advised me of what your stipulations were on adverse

17  witnesses.

18      Anything to deal with on that document?

19          **MS. BAUMGARTNER:**  I don't think so, Your Honor.  I

20  think really the issue is going to be sort of what the attitude

21  of these witnesses are when they appear.

22          **THE COURT:**  Yeah, that's fine.

23          **MS. BAUMGARTNER:**  Assuming they do appear.

24          **THE COURT:**  We'll see what they say and if you need

25  to ask me to designate them as adverse, you just ask.  I mean,

1    that's the way it works.

2        **MS. BAUMGARTNER:**  Your Honor, can I -- this just,

3    again, popped into my head, another question about when it is

4    that we're going to make the determination that somebody is not

5    going to be appearing pursuant to a subpoena or otherwise

6    unservable.

7        For example, Ms. Meadows has been served by both sides

8    with trial subpoenas.  I don't know where she is.  And I don't

9    know if she's going to show up.  So we are going to have to

10   figure that out at some point about whether she's actually

11   going to show up and what that means in terms of how we're

12   going to proceed.

13       That may also be true, for example, with Mr. Grady.  It's

14   quite possible that even though he's been served with a

15   deposition -- you know, trial subpoena, he's not going to show

16   up.  And so we have to figure out sort of when in the context

17   of the trial we're going say, okay, now is the time to say he's

18   not going to show up or whatever it may be.

19       For example, I received no communication from Mr. Grady

20   since the time we served him with the trial subpoena, even

21   though we sent, of course, a standard standby letter.  So it

22   could -- technically he's supposed to be here Monday, the 12th,

23   at 8:00 a.m.

24       So I don't know quite how we're going to address that.  I

25   just wanted to raise it as an issue that's going to -- I have

1    no doubt is going to appear.

2         THE COURT:  Well, now is not the time.  So if you

3    told him he had to be here on Monday at 9:00 a.m. and he's not

4    here, then we'll address it Monday after he's failed to appear.

5         MS. BAUMGARTNER:  Okay.

6         THE COURT:  So I want to talk about March 16th, which

7    is a Friday.  I had originally said we'd be in session.  I had

8    forgotten that I agreed to judge a National Moot Court

9    Competition for the Hispanic National Bar Association.  I can

10   find a replacement for myself because I have to do it on

11   Saturday as well.  But would you rather have the Friday off?

12        MS. BAUMGARTNER:  Yes, Your Honor.

13        MR. BRUSTIN:  I think we can all agree that we're --

14        MS. BAUMGARTNER:  I actually -- yeah, one of my best

15   friends is getting married in Baltimore on the 17th and I said

16   I couldn't go because we were going to be in court on Friday.

17   I still might not be able to drag myself out of here, but it's

18   more likely if we're dark on that Friday that I can actually

19   go.  So I would be pleased.

20        THE COURT:  Any objection?

21        MR. BRUSTIN:  No, Your Honor.  We're fine with it.

22        THE COURT:  Okay.  You may have said something else,

23   but he's the lead.

24     Okay.  So we won't be in court then on the 16th.  I have

25   enough time on the schedule.  I've precleared this jury through

the 6th, which is plenty of time for deliberations.  And we'll
see what they do in terms of deliberations.  Some jurors like
to finish at 1:30, some jurors like to go all day, and I just
don't know what this group is going to do.  I let them know
always that once we get to closings and once we do
deliberations, they can be here all day if they want, but I do
let them decide.  And if they choose not to be here all day and
they go past, you know, where they were, then that's on them,
not on me.  So there's plenty of time in the schedule.

    Okay.  That's all I had.  Is there anything else you had?
If not, we'll go over the list of deliverables.

        **MR. BRUSTIN:**  I think that's all we have, Your Honor.
    Anything else you see?

        **MS. HOFFMANN:**  I don't think so.  I'm just
double-checking.

        **MS. BAUMGARTNER:**  That's everything on my list.

        **THE COURT:**  Okay.  So what I have is ...

                (Pause in the proceedings.)

        **THE COURT:**  Actually, I found something else.

    The audio transcripts I was supposed to have today.

        **MS. BAUMGARTNER:**  So we have not -- we've agreed in
concept on them is my understanding.  So we've gone over the
transcripts -- each of them -- made changes, and we've agreed
in concept that this will be the transcripts, except that we
haven't heard about the CADs, I don't think.

```
 1        But for the transcripts for all the statements that were
 2   made, the two Lualemaga statements, the Kuka statement, the '08
 3   Latisha Meadows statement, the David statement, and the Joshua
 4   Bradley statement.  I think those we're pretty much in
 5   agreement on.  There's a few word choices, but I'm sure we'll
 6   agree on them.
 7        And then we have the transcripts for all the CADs.  The
 8   CADs were objected to on the grounds of hearsay so --
 9             THE COURT:  Okay.  So I don't have to deal with
10   anything in terms of audio transcript?
11             MS. HOFFMANN:  No.
12             THE COURT:  All right.  So I have for -- I'm going to
13   receive the list of bad acts from the prosecutor.
14             MS. BAUMGARTNER:  Prosecutor?
15             THE COURT:  I'm sorry.
16             MS. BAUMGARTNER:  My role is very clear.
17                           (Laughter.)
18             THE COURT:  From the defense.
19             MS. BAUMGARTNER:  Again, we'll be as overinclusive as
20   we can be, Your Honor.  Sometimes it's -- they may have a
21   different opinion as to what are the quote, bad act, than we
22   do, but we'll certainly try and be overinclusive.
23        For example, I didn't consider the fact that his picture
24   was on a wall that said "up the hill" and was referred to as a
25   gang was a bad act that we were speaking of here, but it
```

1  appears from the redactions that that is their position, so we

2  will address that particular issue.

3          THE COURT:  All right.  So I have that due on the

4  6th.  Is that the one I said by noon?

5          MS. BAUMGARTNER:  That is the one you said by noon.

6  The Fifth Amendment one is not by noon.

7          THE COURT:  Okay.  And then the plaintiff's response

8  is due the following day on Wednesday, the 7th; right?

9          MS. HOFFMANN:  Yes, I think so.

10         THE COURT:  And then on Trainum, that's -- I have

11 your response on that.  So I need to do that.

12     Okay.  The exhibit list with everything comprehensive to

13 the Court.  You're getting that when?

14         MS. BAUMGARTNER:  I don't think we set a date for

15 that.  We -- it's available.  I mean, we can get that done on

16 Monday or if the Court doesn't need it on Monday, we can say

17 Wednesday just in case we have too many other things due on

18 Monday.  But that's simply a process of putting together two

19 documents and emailing it.

20         THE COURT:  All right.  So apparently what I said was

21 defendants will exchange or provide the plaintiffs with the

22 list by Monday, March 5th at noon.

23     By 9:00 a.m. Tuesday, March 6th, plaintiffs will advise

24 whether they maintain any objections to the exhibits.

25 Defendants will respond by the end of the day Tuesday --

 1          **MS. BAUMGARTNER:**  This is not the comprehensive -- I
 2    misunderstood the Court when she said comprehensive list.  I
 3    thought comprehensive list meant every single document being
 4    marked for identification.  Here, you're talking about the
 5    actual ones we want admitted.
 6          For example, to take out the search warrants because we're
 7    hopefully going to get that information based on testimony as
 8    opposed to documentation.  That's my understanding of what's
 9    due on --
10          **THE COURT:**  So -- okay.  So let's do it in two ways
11    so we're all clear.  That's why we go through this.
12          One major comprehensive list to the Court by Monday in an
13    editable version so that I have my own list to check and the
14    courtroom deputy, that way we can prep the list.
15          The other dates are relative to you all continuing your
16    meet and confer about what's still out there so that I can
17    figure out if there's anything in dispute that I need to rule
18    on.  With respect to that, Monday by noon.
19          9:00 a.m. Tuesday, plaintiffs will respond whether they're
20    maintaining any of their objections, given that you're going to
21    go back and look at the transcript.
22          And then I guess in this process of meeting and conferring
23    you're going to respond back to them by the end of the day
24    Tuesday and they'll respond back by the end of the day
25    Wednesday.  So we'll go back and forth twice while you're on

1  the plane so at least by the end of the day Wednesday we'll

2  have some clarity.

3      MS. HOFFMANN:  I think what we had said before was

4  they would file something by the end of the day Tuesday and

5  file something on Wednesday.  At least that's how I understood

6  it.  Is that what you --

7      THE COURT:  I don't think you need to -- I don't

8  think you have to file it if you're just exchanging it.

9      MS. BAUMGARTNER:  No.  At this point what -- excuse

10  me, Your Honor.  I understand at this point what we're doing is

11  I am explaining why it is that I think that the document is

12  admissible.  And plaintiff's counsel will be explaining why it

13  is not admissible.

14      THE COURT:  Okay.

15      MS. BAUMGARTNER:  So I think that that's what we're

16  going to do.  I think the question is do you want that as a

17  joint submission which means --

18      THE COURT:  No.  Don't do it joint.

19      MS. BAUMGARTNER:  Thank you.  So we'll submit ours --

20      THE COURT:  Let me go over that again.

21      MS. BAUMGARTNER:  Yeah.

22      THE COURT:  So defendants -- the first part of this

23  is not filed.

24      MS. BAUMGARTNER:  Right.

25      THE COURT:  So defendants will provide their list by

1    Monday, March 5th, at noon.

2              **MS. BAUMGARTNER:**  Correct.

3              **THE COURT:**  Then by the next morning, 9:00 a.m.

4    Pacific time, plaintiffs will advise whether they maintain any

5    objections to the exhibits on that list.

6         If they do, defendants will file a proffer with the

7    evidentiary basis for the exhibits by Tuesday and then

8    plaintiffs will respond by the end of the day Wednesday to that

9    filing with a filing.  Okay?

10             **MR. BRUSTIN:**  Yes.

11             **THE COURT:**  Then that way I have it in writing on

12   Thursday.

13             **MS. BAUMGARTNER:**  Got it.

14             **THE COURT:**  Okay.  In terms of exhibits, the parties

15   are going to -- plaintiff is going to produce one full

16   comprehensive set to the defendants by March 9th, and they'll

17   have one full comprehensive set for the witness.  Right?

18             **MR. BRUSTIN:**  Yes.

19             **THE COURT:**  So you can bring those to court on

20   March 9th.

21        For the Court, you're going to provide the courtroom

22   deputy with a set of the original anticipated exhibits, which

23   we think is about 60.  You're going to provide the Court with

24   binders, having those anticipated exhibits, which I expect to

25   be about 60.  Please do not give me anything thicker than that.

 1  In fact, I have lots of binders, if you don't want to bring

 2  binders, I've got them.  Make sure they're three-hole punched.

 3  These 5-inch binders are very difficult to manage up here.

 4      And then we will need a thumb drive with all of the

 5  exhibits electronically.  All of this by March 9th.

 6      The video of Meadows we'll expect to receive with a thumb

 7  drive by Monday.  You've indicated that you sent that.

 8  Defendants are going to send us their exhibits, you already

 9  have a copy so all 500 sometime next week, no later than the

10  9th.

11      What do you want the order to be with respect to witness

12  identification?  That is, because as I understand it, the City

13  has to file paperwork to make sure that they're here on time,

14  as I said, typically, that's not -- I don't have to worry about

15  that.  But in this case, it sounds like I do.  So do I need to

16  change my order of 24 hours to 48 hours so that they can make

17  sure to get them here?

18      **MS. HOFFMANN:**  We're fine either way.  I mean, I

19  think obviously the -- you know, there's some things outside

20  our control in how long witnesses take --

21      **THE COURT:**  I understand.

22      **MS. HOFFMANN:**  -- but I don't think we would have a

23  problem in general identifying the order that we intend to take

24  witnesses and then may or may not get to them on a particular

25  day.

1          MR. BRUSTIN:  And also may be forced to go out of

2    order if we're having trouble with people showing up.  We'll

3    give them the list of the day.

4          MS. BAUMGARTNER:  Certainly.  And, again, the way

5    that this usually works with me, Your Honor, because I do this

6    all the time because I have -- I'm producing police officer

7    witnesses all the time, which is, you know, we start narrowing.

8    Right?  We think we're going to call you the first week.  Okay.

9    What does that mean?  Okay.  We think we're going to call you

10   Monday or Tuesday.  All right.  We'll be prepared.  Then it

11   keeps narrowing so that we have the ability to move with what

12   actually happens during trial because I know that that's not

13   entirely predictable.

14        So, again, I believe I've provided completely unavailable

15   dates for certain witnesses, and I have their contact

16   information.  But, again, we need -- some of them need to

17   arrange with their bosses about being gone.

18        Again, so the longer I have, certainly the easier it is.

19   I will do whatever I can.  But, again, even if I get an

20   indication, for example, if we think it's going to be in first

21   week or the second week, that can be helpful.

22        MR. BRUSTIN:  The more I think about it, I think 48

23   hours is better for both sides and we'll make every effort to

24   keep with that, but we can certainly give you a preferred order

25   and make every effort to get them there in that order.

 1              MS. BAUMGARTNER:  Yeah.

 2              THE COURT:  All right.  So witnesses 48 hours.

 3       And then what I will do is remind me when we get to the

 4  end of the day on Thursday to see what -- to the extent that

 5  you know what's happening on Monday.  I mean, typically, I

 6  wouldn't -- I expect you're going to be working weekends.  So I

 7  wouldn't necessarily say that you have to do something on

 8  Thursday for Monday.  I understand what position you're in.

 9  But let's just talk on Thursdays what we expect for Monday.

10              MS. BAUMGARTNER:  That would be great, Your Honor.

11              MR. BRUSTIN:  Your Honor, do you expect to sit any

12  other Fridays during the month?

13              THE COURT:  So I know for sure and I've -- because

14  I'm out of town on both the 23rd and 30th.  So we will not be

15  in those days.  I would expect we'd be here the 6th, assuming

16  we're still around.  So ...

17              THE CLERK:  April 6th; right?

18              THE COURT:  April 6th, yeah.

19       And then, obviously, we're picking the jury on the 9th.

20  So we're here for the 9th.

21              MR. BRUSTIN:  Right.

22              THE COURT:  Frankly, not having it on Fridays helps

23  the jury so that they know I've got the Friday off.  And it

24  helps them with their workloads too.  So I don't mind doing it

25  that way.

1    Okay.  So the next notes I have -- I didn't give you a

2  date for designations, did I?

3          **MS. BAUMGARTNER:**  I don't believe so.

4          **THE COURT:**  So you know what I need.  Obviously,

5  until I rule, you're not reading anything.  I think, actually,

6  I said, no, by the 9th.

7          **MS. HOFFMANN:**  I think you said Friday, the 9th.

8          **THE COURT:**  So I can -- yeah.  So designations by

9  March 9th.  I'll get a glass of wine, get something that

10  doesn't make my blood pressure go up and say denied, grant,

11  denied, denied, grant, grant, grant, denied, whatever.

12    Okay.  You're going to meet and confer on the priors.

13  That's going to be -- that's part of this -- the bad acts

14  designation; right?

15          **MR. BRUSTIN:**  Yes.

16          **THE COURT:**  We were going to do something with the

17  homicide file.

18          **MS. BAUMGARTNER:**  As long as I have an agreement that

19  the Court can lock it up, I think I can convince the lieutenant

20  to bring in the original.  That's all.  That was my only

21  concern.

22          **THE COURT:**  Okay.  Is there anything else that you

23  all had?

24          **MS. BAUMGARTNER:**  I'm going to look to see whether we

25  can consider getting Benson here while he's still in custody.

1          THE COURT:  Right.

2          MS. BAUMGARTNER:  Let's see.  Oh, yes.  I have to

3   submit a brief by not noon on Tuesday regarding the inferences

4   of pleading the Fifth.

5          THE COURT:  Okay.  And that's by Tuesday?

6          MS. BAUMGARTNER:  Yes.  But those are the only other

7   things that I think I have.

8          THE COURT:  You had something.  There was another

9   side to that one.

10         MR. BRUSTIN:  Right.  Do we have a date -- do you

11   want us to -- are we responding?

12         MS. HOFFMANN:  I think she gave us a date.  I'm just

13   trying to find it in my notes.

14         MR. BRUSTIN:  Can we do it as a response, Your Honor?

15         THE COURT:  Yes.

16         MS. BAUMGARTNER:  Oh.  By the way, Your Honor, we've

17   agreed that Officer Androvich is not available.  He's extremely

18   ill and can't come in.  So we have some very, very minor

19   designations for Officer Androvich.  We haven't submitted them

20   yet.  I just wanted to let the Court know.

21         THE COURT:  Okay.

22         MR. BRUSTIN:  Your Honor, can we have till Thursday

23   on the Fifth Amendment issue to respond?

24         THE COURT:  Sure.

25      Okay.

```
1          MS. BAUMGARTNER:  I'm sorry.  The Court -- oh.  I
2   have to submit an order regarding getting the medical records
3   for Ms. Meadows.
4          THE COURT:  I mean, that's -- you know, just copy the
5   other side.  I don't --
6          MS. BAUMGARTNER:  Okay.
7          THE COURT:  You have permission to, and I'll --
8          MS. BAUMGARTNER:  Yeah, I just don't know how fast
9   they can get them.
10         MS. HOFFMANN:  And -- sorry.  And, obviously, you'll
11  provide us a copy of whatever it is you receive?
12         THE COURT:  Yes, she will.
13         MS. BAUMGARTNER:  Yes, of course.
14      And at this point, we don't need to notice the attorney
15  that was assigned to her?
16         MR. BRUSTIN:  We were told she's no longer assigned
17  to her.
18         MS. BAUMGARTNER:  Oh, okay.  Then --
19         MR. BRUSTIN:  In fact, we also learned that
20  Ms. Meadows was in -- she was in her -- she was in her program
21  for a couple weeks and now she's no longer there.  She left.
22  So we're going to continue to try to find her and track her.
23  We had been.
24         MS. BAUMGARTNER:  I was not ware of that, Your Honor.
25  Hm.
```

1          THE COURT:  Okay.

2          MS. BAUMGARTNER:  Well, I guess we'll address her

3   failure to appear on Monday, the 12th, as well.  If she doesn't

4   show up, we'll figure that out.

5          MR. BRUSTIN:  We're going to work very hard to find

6   her and bring her in.

7          THE COURT:  I'm sure you are.

8      Okay.  I don't see anything else in my notes.

9      At some point I will give you maybe by the end of next

10  week, give you a draft of what will begin to look like jury

11  instructions.  I suspect you're not going to have a lot of time

12  right now.  And you may not have much time on trial days, but I

13  do think, given some of the disagreements, that you understand

14  what my starting point is.  And -- so that we can move from

15  there.  I thought about doing it today, but given the moving

16  target on the malicious prosecution, I thought that it was not

17  quite -- you weren't quite ready to do that.

18      Here's the other one that -- and so what I'm working off

19  of are your most recent submissions.  Causation, I think, is --

20  may need more explanation than the instruction you've given me.

21  You will get back what you gave to me, which is the standard

22  causation instruction.  And there may be other instructions

23  that merit including coming out of the *Spencer v. Peters* case

24  so that the jury understands the framework for how they have to

25  make their decision.  That's certainly the case that I will go

1   to to try to figure out what this should look like.

2        So, anyway, just a heads-up that that will be the next

3   kind of big issue, and I won't really leave it until the last

4   minute.  We'll try to just work on these things over time.

5        Okay?

6             MR. BRUSTIN:  Your Honor, I'm sorry.  Can I raise one

7   other issue?

8             THE COURT:  It's not 2:00 o'clock yet.

9             MR. BRUSTIN:  And I do this in an abundance of

10  caution.  I want the Court to be aware and the defendants to be

11  aware that we're waiting -- we're waiting for the ruling on the

12  time limits.  One thing we are considering is dropping Evans as

13  a defendant.

14            THE COURT:  Is what?

15            MR. BRUSTIN:  Dropping Evans as a defendant.  We are

16  having a very difficult time -- we are having a very difficult

17  time with the amount of time.  We're having a difficult time

18  putting it together.  So that's one of the things we're

19  considering.  I wanted to raise it with Your Honor, so that

20  it's not a surprise if that does happen.

21            THE COURT:  Okay.

22            MS. BAUMGARTNER:  I'm certainly always happy to have

23  the dismissal of any defendant in any claim.  There's a lot of

24  evidence in this case regarding that particular claim.  And,

25  again, even if it happens at the end of trial, I'm pleased.

1   Yeah, I guess I just wait.  But, certainly, it would be more
2   efficient if we could have some resolution of that issue
3   earlier and it might be easier to set up the witnesses.  And I
4   know, for example, that all of my clients are retired.  He is
5   renting a hotel room for the month.

6       So, again, I appreciate the thought.  I will take it
7   whenever I can get it.  But obviously the earlier the better
8   for me.

9           MR. BRUSTIN:  And, in fact, one of the things we
10  would do is we might be approaching the defendants to talk
11  about whether we can agree on what evidence would still be
12  coming in and what wouldn't and -- as part of making that
13  decision so we can talk to him about that.  But it would
14  certainly narrow greatly the amount of evidence we had to put
15  in on that issue.  It's a complicated decision.  We'll make it
16  as quickly as we possibly can.  We understand how close we are
17  to trial.

18          THE COURT:  Well, it would probably be helpful for me
19  for you to send me another updated chart as to why you think I
20  haven't given you enough time.  I certainly think I have.  And,
21  like I said, I will talk to the judges in front of whom you
22  tried cases because, as I said, some lawyers think that they
23  are better than they actually are.  And if judges tell me, you
24  know, you're one of the more efficient litigators they know and
25  you use your time wisely and then that says something.  If they

1  say, yeah, they could have done it in half the time I gave

2  them, it says something else.  And I haven't made those phone

3  calls.

4      Part of your administrative motion indicated that, you

5  know, you were concerned that the defense was going to eat your

6  time.  I've addressed that issue.  So I don't think you should

7  assume that for purposes of your calculations.  I have time in

8  the calendar to make adjustments if I think it's appropriate.

9  But, you know, I am not the only federal judge who gets these

10  time -- these time estimates from lawyers that, you know, and

11  then we slash them by 50 percent because we don't think that

12  you're actually thinking about your case critically and we do

13  it all the time.  I mean, I'm not the only one.  And, like I

14  said, this is more time than I typically give.

15      So if you want me to think about it with more specifics --

16  again, the more I dig into this case, the more I know, the more

17  evidence I understand is there, et cetera.  And my view and

18  your view may be different.  Frankly, I think that not having a

19  malicious prosecution case in there is a good thing.  I think

20  it's very difficult to win those claims, given the defenses

21  that are available.  So that doesn't mean I could grant summary

22  judgment, but they're difficult claims.

23          MR. BRUSTIN:  We hear you.

24          THE COURT:  So, in any event, I am not trying to be

25  unfair.  I understand that I've got time.  So send it to me.

 1  Tell me what you're thinking again so that I can get you a

 2  decision.

 3          **MR. BRUSTIN:**  We will.

 4          **THE COURT:**  And I do think that -- you know, I wanted

 5  to hear your perspectives on the evidence that is still at play

 6  in light of the dismissal of that claim before really deciding

 7  some of these issues.  And I think once I can get my head

 8  around where the barriers are, that will also give you both

 9  information -- both sides information about what's -- you know,

10  what this case and trial is all about.

11          **MR. BRUSTIN:**  Sure.  And we'll try to lay out more

12  specifically.  I can tell you, Your Honor, you're having given

13  us the time limit was -- I think we've, as a result of that,

14  we've made our case narrower and I think better with having to

15  deal with it.  But we feel like we're at the point -- we could

16  be wrong, but we feel like we're at the point now where we're

17  going to be making cuts that will hurt our case.  Whereas, the

18  cuts we've made now as a result of your ruling I think have

19  helped our case.  We're having a tough time cutting evidence

20  now.

21          **THE COURT:**  All right.  Well, send me your -- I know

22  you're asking for another 15 hours.  But I have to see where

23  that is.

24      Okay.  Anything else?

25          **MS. BAUMGARTNER:**  No, Your Honor.

1          **THE COURT:**  Are you sure you don't want to keep

2    going?

3          **MR. BRUSTIN:**  I know you can.  We know that.

4          **THE COURT:**  All right.  Have a good weekend.

5          **MR. BRUSTIN:**  Thank you, Your Honor.

6          **MS. BAUMGARTNER:**  Thank you, Your Honor.

7          **THE COURT:**  I will see you Thursday morning 8:00 a.m.

8          **MS. BAUMGARTNER:**  Yes, Your Honor.

9          **MS. HOFFMANN:**  Yes.

10         **THE COURT:**  All right.  Thank you.

11         **MR. BRUSTIN:**  Thank you.

12              (Proceedings adjourned at 1:02 p.m.)

13                        ---o0o---

14

15

16

17   I certify that the foregoing is a correct transcript from the

18   record of proceedings in the above-entitled matter.

19

20   Dated:  March 16, 2018

21

22   _____

23      Sarah L. Goekler, CSR 13446, RMR, CRR, CCRR

24              U.S. Court Reporter

25